# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MUNICIPAL DERIVATIVES ANTITRUST LITIGATION | MDL No. 1950 |
| | Master Docket No. 08-02516 (VM) (JCF) |
| THIS DOCUMENT RELATES TO: | |

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO MOTIONS OF 1)  CITY OF OAKLAND, COUNTY OF ALAMEDA, CALIFORNIA FOR APPOINTMENT OF LIEFF CABRASER AS INTERIM LEAD OR CO LEAD COUNSEL AND 2)  HAYWOOD COUNTY, TENNESSEE FOR APPOINTMENT OF POMERANTZ HAUDEK AS <u>INTERIM LEAD COUNSEL</u>**

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*City of Detroit v. Grinnell Corp.*
495 F.2d 448 (2d Cir. 1974)..................................................................15

*Ferguson v. Lieff Cabraser Heimann & Bernstein*,
69 P.3d 965 (2003)..................................................................15

*In re Auction Houses Antitrust Litig.*,
197 F.R.D. 71, 75 (S.D.N.Y. 2000) ........................................19

*In re Cardinal Health, Inc. ERISA Litig,*.
225 F.R.D. 552, 555 (S.D. Ohio 2005) ..................................18

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
MDL No. 1361, 2001 WL 243494 (D. Me.March 12, 2001) .................13

*In re Corrugated Containter Litig.*,
MDL No. 310, 1981 WL 2093 (S.D. Tex. June 4, 1981) .....................16

*In re Electrical Carbon Products Antitrust Litig.*,
447 F.Supp.2d 389 (D.N.J. 2006) ..........................................5

*In re Flash Memory Antitrust Litig.*,
No. C-07-0086 SBA (N.D. Cal. Filed Jan. 1, 2005) ..................5

*In re Folding Carton Antitrust Litig.*,
557 F. Supp. 1091 (N.D. Ill. 1983) ........................................15

*In re Polyester Staple Antitrust Litig.*,
No. 03-1516, 2007 U.S. Dist. LEXIS 52525 (W.D.N.C. July 19, 2007)...................7

*In re Rail Freight Fuel Surcharge Antitrust Litig.*
MDL No. 1869, 2008 WL 1883447 (D.D.C. Apr. 28, 2008) ..................4

*Kalish v. Karp & Kalamotousakis, LLP*,
246 F.R.D. 461 (S.D.N.Y. 2007) ..........................................8

*Phemister v. Harcourt Brace Jovanovich, Inc*.,
1984 WL 21981 (N.D. Ill. Sept. 14, 1984) .............................14

*Schwab v. Philip Morris U.S.A.*,
449 F.Supp.2d 992 (E.D.N.Y.2006) ......................................8

**STATUTES**

Antitrust Criminal Penalty Enhancement and Reform Act of 2004 .................................10, 12, 14

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ................................................................................................ passim

http://www.haywoodcountybrownsville.com/HaywoodCounty/Statistics.aspx............................7

Herbert B. Newberg & Albert Conte,  *Newberg on Class Actions,* (4th ed. West 2008) .................3

*Manual for Complex Litig.,* (4th ed. 2004) ........................................................... passim

Moscone, Emblidge, & Quadra, www.meqlaw.com .......................................................8

Third Circuit *Task Force Report on Selection of Class Counsel* ......................................3

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................. 2

II.   LEGAL ARGUMENT ........................................................................................... 3

    A.    The Overwhelming Support, And Cooperation Among, The Plaintiffs And Firms Organized By The Proposed Lead Firms Justify Appointment As Interim Lead Counsel ................................................................................. 3

        1.    The Proposed Lead Firms Have Assembled A Group of Counsel Capable of Prosecuting This Action At The Highest Level ..................... 6

        2.    Twenty-One Firms Have Agreed To Cooperate And Use BoA's Cooperation For The Benefit Of The Putative Class ................................. 9

    B.    Neither LCHB Nor Pomerantz Has Performed Work That Materially Advanced Identification or Investigation of Plaintiffs' Claims .......................... 10

        1.    LCHB ................................................................................................ 11

        2.    Pomerantz ......................................................................................... 12

    C.    Pomerantz's And LCHB's Attacks On The Agreement With BoA Show A Fundamental Misunderstanding Of The Rights It Conveys ................................. 13

        1.    LCHB And Pomerantz Do Not Provide Any Plausible Factual, Legal Or Policy Justifications For Their Criticism Of The BoA Agreement ....................................................................................... 13

        2.    The Cooperation Provided By BoA Is Consistent With Its Statutory Obligations ...................................................................... 17

    D.    Entering The Proposed Order Will Best Represent The Interests Of The Proposed Class And Also Expedite The Litigation ............................................ 18

III.  CONCLUSION .................................................................................................... 20

Plaintiffs Fairfax County Virginia, the State of Mississippi, The Mayor and the City Council of Baltimore; the City of Chicago; the City of Fall River, Massachusetts; the Charleston County School District; Berkeley County, South Carolina; Central Bucks School District; and Hinds County, Mississippi[1] respectfully submit this consolidated opposition to the motions of: (1) the City of Oakland and the County of Alameda, California for the appointment of Lieff Cabraser Heimann and Bernstein LLP ("LCHB") as Interim Lead Counsel or Interim Co-Lead Counsel, and (2) of Haywood County, Tennessee in support of the appointment of Pomerantz Haudek Block Grossmann and Gross ("Pomerantz") as Interim Lead Counsel.

## I.    **<u>INTRODUCTION</u>**

Our opening brief (hereinafter "Opening Mem.") showed that Cohen Milstein Hausfeld and Toll, PLLC ("Cohen Milstein"), Boies Schiller and Flexner, LLP ("Boies Schiller") and Susman Godfrey, LLP ("Susman") (collectively, "the Proposed Lead Firms") are eminently qualified to be appointed Interim Lead Counsel under the criteria set forth in Fed. R. Civ. P. 23(g).[2] Consistent with the guidelines set forth in Fed. R. Civ. P. 23(g) as well as several recent consolidated antitrust cases, the Court should appoint the Proposed Lead Firms as Interim Lead Counsel based on: (1) the Proposed Lead Firms' proven ability to work together, and with other well-qualified plaintiffs' counsel, to lead similarly large and complex cases efficiently and effectively, (2) the fact that all plaintiffs and plaintiffs' firms other than LCHB and Pomerantz support our application, (3) the quality and depth of the Proposed Lead Firms' investigation into the "potential claims" in the action, *see* Fed. R. Civ. P. 23(g)(1)(A)(i)and (4) the depth, breadth

---

[1]/      Counsel for the recently filed *Washington County, Tenn. v. Bank of America, NA, et al,* No. 08-cv-6304 (S.D.N.Y. filed July 14, 2008) also supports the Proposed Lead Firms.

[2]/      *See* Opening Mem. at III.A.1 (establishing Fed. R. Civ. P. 23(g)(1)(A)(i)) and III.B. (establishing 23(g)(1)(A)(ii)-(iv)).

and deep bench of the Proposed Lead Firms.  It is on the basis of all these factors that we ask for appointment as Interim Lead Counsel.

This brief will not focus on reiterating our qualifications. It will, however, focus on three issues raised in LCHB's and Pomerantz's leadership motions that cannot go unaddressed.  *First*, the overwhelming support from, and cooperation between, other plaintiffs and law firms – consistent with the *Manual for Complex Litigation* (4th ed. 2004) ("*Manual*") and the holdings of several consolidated antitrust class action cases – establish the justifications for appointing the Proposed Lead Firms as Interim Lead Counsel.  *Second,* it appears that most of LCHB's affirmative acts -- highlighted as exemplifying independent, valuable efforts at uncovering the nature and extent of the conspiracy -- occurred after the filing of the Fairfax County Complaint.  *Third*, Pomerantz's and LCHB's criticisms about the agreement with the "Bank of America ("BoA"), as well as the mediation process overseen by Judge Weinstein, are wholly unsupported by evidence, law or policy justifications.   In short, the brief will show that appointing the Proposed Lead Firms as Interim Lead Counsel, with authority to appoint an Executive Committee, serves the best interest of the class.

## II.     LEGAL ARGUMENT

### A.     The Overwhelming Support, And Cooperation Among, The Plaintiffs And Firms Organized By The Proposed Lead Firms Justify Appointment As Interim Lead Counsel.

"By far, the most common method [of selecting among competing applicants] is the so-called private ordering approach." *Manual* § 21.272.  *Accord* Third Circuit *Task Force Report on Selection of Class Counsel*, 208 F.R.D. 340, 355 (2002) ("*Task Force Report*"); Herbert B. Newberg & Albert Conte, *3 Newberg on Class Actions,* § 9.35 (4th ed. West 2008) (a court should encourage the parties to agree on lead counsel and should impose its choice only in "extraordinary circumstances"); "Memorandum Order," *In re Intel Corp. Microprocessor*

*Antitrust Litig.*, MDL No. 1717, Slip Op. at 2 (D.Del. Apr. 18, 2006) ("*Intel*"), attached as

Exhibit A to the accompanying "Declaration of Megan E. Jones" ("Jones Declaration") ("[t]he

most common approach to the selection of class counsel is private ordering, in which plaintiffs'

counsel agree on which of them should serve as class counsel.") (citation omitted). Under the

private ordering approach, the attorneys agree upon who should be lead counsel, subject to

approval by the court after it determines that counsel is adequate.[3]  *See Manual*, § 21.272.

   Courts have repeatedly endorsed this approach in appointing lead counsel in recent

antitrust class actions.  Recently, for example, Judge Friedman of the U.S. District Court for the

District of Columbia, declined to add a dissenting firm to the consensus choice for lead counsel,

holding:

> The Court concludes that Cohen Milstein and Quinn Emanuel meet all of the
> criteria set forth in Rule 23(g)(1) of the Federal Rules of Civil Procedure. *They
> are the consensus choice of all other counsel in the case* except for Whatley
> Drake & Kallas, they will adequately represent those interests with respect to each
> of the criteria set forth in the Rule, and they are best able to represent the interests
> of the class. In view of these circumstances, the Court *sees no need to appoint a
> third firm as additional Interim Co-Lead Class Counsel* in order to accomplish the
> purposes of the Rule and concludes that a decision to add Whatley Drake might
> well disturb the equilibrium achieved by the virtual consensus reached among
> plaintiffs' counsel.

"Memorandum Op. and Order" in *In re Rail Freight Fuel Surcharge Antitrust Litig.*, MDL No.

1869 (D.D.C. March 11, 2008), attached as Exhibit B to the Jones Declaration (emphasis

added).[4]

---

[3]     Ironically, LCHB has also previously supported private ordering.  *See Intel* (attached as Exhibit N to the Jones Declaration);  *In re Chocolate Antitrust Litig.*, MDL No. 1935 (M.D. Pa. filed July 26, 2007) (attached as Exhibit O to the Jones Declaration).  They do not explain why they now abandon their previously preferred method of lead counsel selection.

[4]     Other dissenting firms later asked the court to add them to the Executive Committee, claiming that they were qualified to serve in that capacity. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, MDL No. 1869, 2008 WL 1883447 at *2 (D.D.C. Apr. 28, 2008).

When, as in this case, a majority of plaintiffs in *In re Electrical Carbon Products Antitrust Litig.*, MDL No. 1514 ("*ECP*") agreed on a four-member executive committee and co-liaison counsel structure, LCHB petitioned the court to be lead counsel on behalf of its client, the City and County of San Francisco.  As here, several qualified firms refrained from pursuing leadership roles in *ECP* "for the sake of a consensual approach" of an agreed upon structure.  *See* Hearing Tr. at 79:2, June 25, 2003 (Exhibit C to Jones Declaration).  The court held that it "appears to me that there's nothing unique about the San Francisco City and County that would cause me to consider either adding their attorney to the Executive Committee or scrapping the Executive Committee structure to permit Lieff Cabraser to be the lead firm." *Id.* at 80.  The court thus favored private ordering and appointed the consensus choices to serve as co-lead and co-liaison counsel over the objections of LCHB, which represented the City and County of San Francisco.[5]

And in the *Flash Memory Antitrust Litig.*, No. C-07-0086 SBA (N.D. Cal. filed Jan. 1, 2005) ("*Flash Memory*"), LCHB again sought interim lead counsel status even though (as here) it filed a complaint substantially after other complaints had been filed and even though (as here)

---

Judge Friedman held that, while these firms might well be qualified to serve on the Executive Committee, there was no evidence before the Court that they were *more* qualified than any of the agreed-upon firms, nor was there any evidence that the agreed-upon firms were not qualified to serve. *Id.*  In addition, the court was persuaded that the structure should be that which is agreed upon by the majority of clients and firms.  *Id.*  Judge Friedman noted that appointing the dissenting firms "is neither necessary, nor would it be beneficial." *Id.* at *3.

[5]     Another recent example of a court endorsing private ordering approach is *In re Foundry Resins Antitrust Litig.*, No. 2:04-md-1638 (S.D. Ohio filed Oct. 26, 2004), attached as Exhibit D to the Jones Declaration.  Plaintiffs in 16 of 18 consolidated cases supported a group of four co-leads, including Cohen Milstein.  Plaintiffs in the two remaining cases supported a different structure.  Rejecting their competing proposal, the court appointed the majority slate. *Id.*, slip op. at 2 ("[s]aid counsel, who have garnered the support of 88% of Plaintiffs, possess the apparent experience, qualifications, and ability to serve most effectively as interim lead co-counsel in these proceedings")

the vast majority plaintiffs and their counsel had coalesced to support other firms.  Calling

LCHB a "latecomer," the court rejected its leadership bid.  Hearing Tr. at 40-55, 75-78, October

30, 2007 (Exhibit E to the Jones Declaration).

The same conclusion is warranted here, where 21 of 24 firms (87%) support making

Cohen Milstein, Boies Schiller, and Susman interim class counsel with the authority to appoint

an Executive Committee.  *See e.g.,* Exhibit F at ¶ 5 (Heins Mills Decl.); Exhibit G  at ¶ 8 (Fine

Kaplan Decl.); Exhibit H at ¶ 3 (Barrack Rodos Decl.); Exhibit I at ¶ 5 (Levin Fishbein Decl.);

Exhibit J at ¶ 7 (Gold Bennett Decl.).  The collective judgment of these counsel, some of whom

stepped back from pursuing lead roles themselves, is entitled to serious consideration, and their

decision to support the Proposed Lead Firms is a reflection of their considered judgment that the

interests of the litigation and class would best be served by doing so.   This expression should

also provide this Court with comfort in the ability of the Proposed Lead Firms to "lead" the

prosecution of all claims within these actions.

      1.     <u>The Proposed Lead Firms Have Assembled A Group of Counsel Capable
of Prosecuting This Action At The Highest Level.</u>

Collectively, the Proposed Lead Firms alone have over 370 litigators.[6] *See* Opening

Mem. at 22.  In addition, the Proposed Lead Firms have assembled a group of co-counsel with a

tremendous amount of experience in complex class action litigation and comprise well over 50

more litigators.  Moreover, most of these firms[7] have served, and currently serve, as lead or co-

---

      [6]     Cohen Milstein has 71 attorneys in five domestic offices spread across the nation
and an office in London; Boies Schiller has 218 attorneys in a dozen offices across the country;
and Susman has 82 attorneys in five offices spread coast to coast.

     [7]     Many of these firms were themselves actively investigating potential bid-rigging
claims in the municipal derivatives market.  *See* Ex. F (Heins Mills Decl.) at ¶¶ 2, 3; Ex. G at ¶ 2
(Fine Kaplan Decl.); Ex. H at ¶ 4 (Barrack Rodos Decl.).  In contrast to LCHB and Pomerantz,
however, these firms acknowledge that these cases could not have been filed without the

lead counsel in MDL cases around the nation.[8]  Thus, the Proposed Lead Firms had the foresight,

given the magnitude of this case, to amass talented, qualified counsel sufficient to represent the

interests of the putative class against the vast resources at defendants' disposal.  *See* Fed. R. Civ.

P. 23(g)(1)(A)(ii) (weighing counsel's experience in handling class actions); 23(g)(1)(A)(iii)

(counsel's knowledge of the applicable law).

In contrast to this array of talent that can readily prosecute this national class action,

Pomerantz is a firm comprised of 21 attorneys, most of whom appear to practice in areas other

than antitrust.  Pomerantz's application is wholly unsupported by other clients or co-counsel,

which likely reflects both Pomerantz's scant resources and the fact that it has not shown any

substantial success in investigating or developing the proposed class's claims.  Instead, on behalf

of a single Tennessee county with a population of 22,500,[9] it copied almost verbatim the

---

information assembled by the Proposed Lead Firms, and, accordingly, they have committed
themselves to pursue this litigation under the leadership of the Proposed Lead Firms.

[8]    Most of the firms assembled have a proven and tested history of working together
successfully.  For example, Gold Bennett Cera and Sidener (*see* Ex. J), Heins, Mills and Olsen
(Ex. F)  and Cohen Milstein recently litigated *In re Polyester Staple Antitrust Litigation*, MDL
No. 1516 (W.D.N.C.), together as co-lead counsel.  There, Judge Voorhees stated that "the
competency of Plaintiffs' counsel, as well as counsel's ability to handle a complex class action, is
evident. Class Counsel, who have appeared before the Court on numerous occasions during the
course of the litigation, have been exceptionally well-prepared on each occasion and
demonstrated a mastery of both antitrust and class action jurisprudence. Plaintiffs' counsel have
vigorously prosecuted this action and will undoubtedly continue to do so upon certification."  *In
re Polyester Staple Antitrust Litig*., No. 03-1516, 2007 U.S. Dist. LEXIS 52525, at *44
(W.D.N.C. July 19, 2007).

[9]    *See* http://www.haywoodcountybrownsville.com/HaywoodCounty/Statistics.aspx
(last visited July 15, 2008).

complaints filed by the Proposed Lead Firms.[10] In short, appointing Pomerantz would not be in the best interests of the plaintiffs and the putative class.

LCHB likewise asks this Court to appoint it as sole interim lead counsel, or, in the alternative, to add it to some unspecified firm or firms as interim co-lead counsel. Similar to that of Pomerantz, LCHB's application is supported solely by its own clients, their in-house counsel, and one other private law firm.[11]  The appointment of LCHB as sole interim lead counsel would be contrary to the best interests of plaintiffs and the putative class. LCHB has only 53 attorneys (not all of whom do antitrust work), and while it has served as co-lead counsel in some major cases, it has not served, nor is it, in its present configuration, capable of serving, as sole lead counsel in a federal antitrust case of this size and complexity.[12]  LCHB's request that it be appointed sole[13] lead counsel is unreasonable, based on its size, and speculative (providing this Court with no identities of firms with which it intends to work).

---

[10]    One factor which a Court can use in evaluating a candidate for lead counsel is the quality of its submissions. *Kalish v. Karp & Kalamotousakis, LLP*, 246 F.R.D. 461 (S.D.N.Y. 2007); *Schwab v. Philip Morris U.S.A.,* 449 F.Supp.2d 992, 1106 (E.D.N.Y.2006) (Weinstein, J.). *See also* Fed. R. Civ. P. 23(g)(1)(A)(i) (the work counsel has done in identifying the potential claims in the action).  On this score, Pomerantz falls short. Based on its lead counsel submissions as well as its complaint, there is no indicia of a meaningful independent effort to investigate this matter.

[11]    Moscone, Emblidge & Quadra, LLP ("Moscone"), the other private firm on LCHB's complaint, has 9 attorneys.  *See* www.meqlaw.com (last visited July 17, 2008).

[12]    Close to a third of the antitrust cases listed in LCHB's firm resume, *see* Exhibit A to Declaration of E. Fastiff, are state court cases in California.  *See* nos. 2, 3, 15, 17, 18, 20, 23, 26, 29, 34, 35, and 37.  Many of the antitrust cases listed in LCHB's resume (*id.*), are also indirect cases.  *See* nos. 8, 15, 17, 20, 26, 29, 31, 34, 35, and 37.

[13]    *See* Tr. of March 28, 2008 Proceedings at 10-13 in *In re Transpacific Air Passenger Antitrust Litig.*, MDL No. 1913 (N.D. Cal. filed Nov. 6, 2007), attached as Exhibit K to the Jones Declaration (where the court, when presented with choosing between a "crew" (co-lead counsel) and a "single captain" (sole lead counsel) for the litigation, appointed co-lead counsel based on the magnitude of the case).

This Court should also reject LCHB's fallback position: that it should be appointed as a co-lead counsel in some unspecified structure with an unspecified firm or firms. There is no compelling reason to shoehorn LCHB into the Proposed Lead Firms' leadership structure, which is already supported by the overwhelming majority of capable plaintiffs and plaintiffs' counsel. As discussed in detail below, LCHB has done little to develop the claims in this litigation. Nor is it the only firm that independently investigated these claims. *See* Ex. F (Heins Mills Decl.) at ¶¶ 2, 3; Ex. G at ¶ 2 (Fine Kaplan Decl.); Ex. H at ¶ 4 (Barrack Rodos Decl.). Furthermore, adding LCHB to a structure including one or more of the Proposed Lead Firms would be unfair to the other well-qualified firms that, in the interests of the proposed class, chose to support the structure instead of throwing their hats into the lead counsel ring. *See* Ex. G at ¶ 8 (Fine Kaplan Decl.); Ex. I at ¶ 8 (Levin Fishbein Decl.); Ex. J at ¶ 8 (Gold Bennett Decl.).

2.    Twenty-One Firms Have Agreed To Cooperate And Use BoA's Cooperation For The Benefit Of The Putative Class

Of the 24 plaintiffs' firms in this action, only three firms chose to file a complaint without the benefit of access to BoA's cooperation: LCHB; its affiliated counsel, Moscone; and Pomerantz. The remaining 21 firms have agreed on the value of this cooperation from a member of the alleged cartel, and are prepared to maximize and use it to the benefit of the putative class.

Rather than waste resources by obtaining conspiracy information through formal discovery of a cooperating amnesty defendant, the Proposed Lead Firms and their supporting firms intend to use BoA's cooperation to litigate this case both economically and efficiently. As noted by Judge Edward Infante in the *Air Cargo Shipping Servs. Antitrust Litig.*, MDL No. 1775 (E.D.N.Y. filed June 27, 2006) ("*Air Cargo*"), early cooperation by a co-conspirator has several advantages for a class. *See* ¶26 of Exhibit 2 to the Hausfeld Declaration of Opening Mem. (listing benefits such as "receipt by the class of detailed information that explains and supports

plaintiffs' prosecution of the case" and information being provided "without the need for formal and sometimes limiting discovery procedures, and will be provided in a form most useful to the class") and ¶20 (another benefit includes a refined complaint based on cooperation). The nearly unanimous support of plaintiffs' counsel for harnessing BoA's cooperation to litigate this case efficiently on behalf of the class should not be frustrated by appointing either of the firms that have decided, for tactical reasons related to their lead counsel applications, to take issue with the Agreement that made such cooperation possible (while relying on the fruits of that cooperation in drafting of their substantially similar complaints). Surely, the best interests of the class will be served by the unified approach of Proposed Lead Firms (and its affiliated firms) to use BoA's cooperation to streamline the issues, shape discovery, and calculate damages in this case.

**B.     Neither LCHB Nor Pomerantz Has Performed Work That Materially Advanced Identification or Investigation of Plaintiffs' Claims**

Put simply, but for the lengthy investigation undertaken by Cohen Milstein, in conjunction with Boies Schiller and Susman, into the alleged illegal *conspiracy* (as opposed to just the overall "industry" or "market"), and the agreement with BoA that obtained the beneficial ACPERA cooperation[14] for all members of the class, the cases now consolidated before this Court as MDL No. 1950 could not have been filed. In light of this fact, it is notable that neither LCHB nor Pomerantz point to any facts that they alone were able to unearth that allowed them to plead the details of the conspiracy – as opposed to the facets of the industry or market -- alleged in their respective complaints or which identified any of the proper defendants in this case, beyond BoA.

---

[14]/     *See* ¶ 24 of Exhibit 2 to the Hausfeld Declaration of Opening Mem., where Ret. Judge Edward Infante praised CMHT's innovative use of ACPERA in *Air Cargo*, defining "the scope of the parties' cooperation obligations with a level of definition that is absent from the ACPERA statute itself" and creating "certainty for the class by defining the scope of cooperation."

1.    <u>LCHB</u>

LCHB attempts to detail those efforts that exemplify LCHB's leadership in the development of the claims at issue in this case.  A careful review of these items presents a different picture:

a.    LCHB emphasizes letters that it sent FOIA requests to the SEC and IRS. However, LCHB did so nearly two weeks *after* the Fairfax County complaint was filed.

b.    LCHB emphasizes that it sent out preservation letters to third parties.  However, it only did so during the first week of June of 2008, over two months *after* the Fairfax complaint was filed.  Moreover, the letters were sent to companies such as AOL and Google that offer email service (not specific to any defendant); there is no explanation for the value such letters provide the class.

c.    LCHB emphasizes that it declined an offer of cooperation from BoA.  However, the offer was extended to LCHB by BoA *after* LCHB filed the City of Oakland's complaint.  The Court should not be left with the impression that LCHB was capable of filing a complaint in this matter without the information available from BoA.  When such conspiracy information was made public in the Fairfax County complaint, LCHB filed six weeks later.

d.    LCHB emphasizes that it obtained public information on 450 GICs during the Class Period and developed its own database.  However, that figure represents a small fraction[15] of transactions that occurred annually during the 16-year Class Period.   LCHB also asserts that it

---

[15/]    LCHB claims that its clients, the City of Oakland and the County of Alameda, purchased municipal derivative products "worth over $1.3 billion" during the Class Period. While the City of Baltimore alone, for example, purchased a larger amount of municipal derivatives during the Class Period than these municipalities, these facts are not relevant to the determination this Court must make on leadership.  This is not a securities case subject to the Private Litigation Securities Reform Act ("PSLRA").  That model is not and should not be applied in deciding leadership in antitrust cases. *See* Third Circuit *Task Force Report on Selection of Class Counsel*, 208 F.R.D. 340, 415 (2002).  But if the Court wants this information, we would be happy to provide it.

has had an economic expert on retainer since December 2006. LCHB's own estimation of the reliability of this database, as well as any of its retained experts' opinions, is undermined by their notable absence from the City of Oakland and County of Alameda complaints. For example, even LCHB's most recently filed complaint (on behalf of the County of Alameda), which was filed on July 11, 2008, does not include the chart it submitted to this Court in its leadership papers (nor any other identifiable economic expert conclusions about the market).

Most of LCHB's "Substantial Work," independently developed or not, appears to have been developed after the Fairfax County complaint was filed. Moreover, LCHB's remaining claims about investigation into the "industry" are hardly the basis for an antitrust conspiracy claim. Indeed, despite over *a year* of such economic and industry investigation, LCHB was inexplicably unable to file its complaints until six weeks *after* the Fairfax County complaint. These facts certainly do not lend credibility to LCHB's claims that their "identification" or "investigation" of the potential claims qualifies them for interim lead counsel under Fed. R. Civ. P. 23(g)(1)(A)(i).[16]

2.     Pomerantz

As addressed in our opening papers (Opening Mem. at 10), Pomerantz has not shown any substantial contribution to developing the proposed class's claims. *See* Fed. R. Civ. P. 23(g)(1)(A)(i).[17]

---

[16]     Pomerantz claims in its response that the information in the Fairfax County complaint has long been publicly available and hence BoA's cooperation has been of little value. If so, one has to ask: why did Pomerantz wait until after Fairfax County's complaint was filed to file a complaint on behalf of Haywood County that largely copied Fairfax County's pleading?

[17]     In its recently filed Attachment B on July 18, 2008, Pomerantz still provides no public support for the inclusion of the selection of defendants as named in the Fairfax County complaint.

**C.**     **Pomerantz's And LCHB's Attacks On The Agreement With BoA Show A Fundamental Misunderstanding Of The Rights It Conveys.**

1.     LCHB And Pomerantz Do Not Provide Any Plausible Factual, Legal Or Policy Justifications For Their Criticism Of The BoA Agreement.

Pomerantz attempts to elevate itself into a leadership position by denigrating the mediation process supervised by Judge Daniel Weinstein of JAMS. Without a scintilla of evidence in its papers or its sworn affidavit, it calls the process in its opening brief a "troubling complication" and worthy of "justifiable suspicion." Pomerantz Mem. at 2, 3. LCHB, mimicking this approach, claims it cannot accept BoA's cooperation because "it is not prepared to give up the Class's rights against BoA." LCHB Mem. at 12.

In its response brief, Pomerantz goes even further by castigating Cohen Milstein for having an alleged *modus operandi* of engaging in "sweetheart settlements" that operate as "reverse auctions" both here and in *Air Cargo*.[18] It is wrong on all counts. The $85 million settlement with Lufthansa Airlines in *Air Cargo* was no sweetheart deal. It was approved by the other co-leads appointed by the Court in that case; reviewed and supported by retired Judge Infante; and preliminarily approved by Magistrate Judge Viktor Pohorelsky. By any objective measure, Cohen Milstein acted in the best interests of the class in that case.

The same is true here. ***There is no settlement agreement with BoA***. If one is agreed to, it will be reviewed and evaluated by Judge Weinstein, submitted to this Court for review and approval, subjected to Rule 23 notice procedures and receive final approval only after this Court has heard the views of objectors, if there are any. ***Thus, there is no risk of an unvetted or unexamined***

---

[18]     Pomerantz's inflammatory rhetoric against Cohen Milstein rings hollowly when one considers that Michael Buchman and J. Douglas Richards, its lead antitrust attorneys, hale from a firm (Milberg Weiss) that, unlike Cohen Milstein, was actually disqualified from serving in leadership of an antitrust class because of outright conflicts of interest. *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, MDL No. 1361, 2001 WL 243494 (D. Me. March 12, 2001).

***settlement agreement***.  The proposed class here is in no way disserved by this process. Indeed, the caselaw cited at page 11, note 11 of our opening brief emphasizes that early settlement efforts are encouraged. That should be especially true where such efforts yield information that allows a case to be filed promptly. Pomerantz simply has not supplied any justifiable suspicions for this Court to examine.[19]

These histrionic claims show only that LCHB and Pomerantz have not carefully examined the Cooperation Agreement itself (which was provided to both of them).  If they had, they would find that each of their purported concerns are specifically addressed therein:

- That plaintiffs' treble damages resulting from BoA are reserved against other defendants (Cooperation Agreement, ¶12:  "BoA's sales will remain in the case for purposes of calculating the potential liability of other defendants in this action; *all such rights for treble damages from other defendants are specifically reserved* by Plaintiffs' counsel on behalf of all of their clients") (emphasis added).

- That even if a settlement amount is not reached pursuant to this agreement, plaintiffs are still entitled to cooperation from BoA to use against other defendants (Cooperation Agreement, ¶12:  "Even if no settlement is reached during this process, BoA shall still be obligated to provide the cooperation set for the Section 213(b) of ACPERA to Plaintiffs' Counsel and their clients in preparation and pursuit *of any claim* regarding the municipal derivatives business.") (emphasis added)

- That Plaintiffs' Counsel are obligated to "coordinate, organize and manage any and all cooperation with any potential civil plaintiffs to be provided by BoA," which "applies to all aspects of any settlement negotiations regarding potential claims . . . including the conveyance of Settlement Materials." (Cooperation Agreement, ¶10)[20]

---

[19]/    Contrary to Pomerantz's vitriolic assertions, for example, Cohen Milstein had Fairfax County as a client when it entered into the Cooperation Agreement with BoA. Again, Pomerantz has completely misread the Cooperation Agreement.  Addendum B is clear on its face that it is an agreement that permits access to confidential information; it is not a retainer agreement.  Nor does it give any indicia of being an actual retainer agreement.

[20]/    This aspect of the agreement conserves resources on both sides of the aisle:  BoA is not forced to give duplicative and time-consuming proffers to every plaintiffs' counsel that requests cooperation, and later plaintiffs' counsel can receive the results of the proffers without

Under this agreement, plaintiffs lose nothing in exchange for valuable cooperation from a co-conspirator, even if no actual settlement is reached. *Plaintiffs' rights to treble damages are expressly reserved; they are not waived.* Indeed, plaintiffs are not even under pressure to agree to a settlement amount in order to receive the cooperation from BoA; there is no incentive to "race to the bottom" settlement number to get the agreed-upon cooperation

Neither Pomerantz nor LCHB submit a sound legal basis for challenging the agreement with BoA. LCHB attempts to make an argument that the treble damages remedy is the "key to vitality and effectiveness" of civil antitrust enforcement. LCHB Mem. 11 at n. 9. However, as noted above, treble damages resulting from BoA's conduct are not lost as a result of this agreement.[21]

---

expending resources to memorialize such proffers (but rather just receive the facts from them). (¶10: "to promote efficiency, economy and confidentiality of the Settlement Materials…"). *See* Fed. R. Civ. P. 23(g)(1)(B).

[21]    LCHB makes much of the importance of treble damages in refusing to work with BoA at this time. Of course, LCHB has, in settling other cases, agreed to dismiss punitive damage class claims with prejudice. *See Ferguson v. Lieff Cabraser Heimann & Bernstein*, 69 P.3d 965, 966 (Cal. 2003). In the antitrust context, settlement for treble damages is not always the norm. Many antitrust settlements that achieve substantially less than single damages for the class are considered fair and adequate settlements. In some of these cases, the class received less than ten percent of estimated damages. *See In re Folding Carton Antitrust Litigation*, 557 F. Supp. 1091, 1097 (N.D. Ill. 1983) (summarizing cases and percentages). "This result [settlement for single damages] is overwhelmingly preferable to continued litigation, particularly in light of the above-described factual and legal difficulties the plaintiffs would have faced in establishing their case." *Phemister v. Harcourt Brace Jovanovich, Inc.*, 1984 WL 21981 at *11 (N.D. Ill. Sept. 14, 1984). Moreover, as the Second Circuit has pointed out, "there are strong reasons why trebling is improper when computing a base recovery figure which will be used to measure the adequacy of a settlement offer," and "the vast majority of courts which have approved settlements in this type of case, even though they may not have explicitly addressed the issue, have given their approval to settlements which are traditionally based on an estimate of single damages only." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir.2000).

LCHB's and Pomerantz's next legal assertion -- that early cooperation from defendants is not valuable to antitrust plaintiffs -- is an unusual one to ask this Court to adopt. To the contrary, the value of the Proposed Lead Firms' cooperation agreement with BoA is reflected in the caselaw. For instance, in the classic *Corrugated Container Antitrust Litigation*, two defendants entered into early settlement deals that, while limiting the recovery from those defendants, were approved on the basis of (1) the value of the settling defendants' early cooperation, (2) the "ice breaker" effect on other defendants of their early deals, and (3) the fact that their settlements came before the issue of class certification was resolved. The court also noted that the ultimate damages recoverable by the class was not reduced by the settlements, due to the remaining defendants' joint and several liability.[22] *In re Corrugated Container Litig.*, MDL No. 310, 1981 WL 2093, at *18-*21 (S.D. Tex. June 4, 1981) ("This settlement was advantageous to the class. It did not detract from the class's chances of prevailing for the entire range of damages; in fact, through discovery benefits and the streamlining of the class case against defendants, it enhanced them. It was the first one negotiated and, in addition to the benefits already detailed, broke the ice and brought other defendants to the point of serious negotiations."), *aff'd* 659 F.2d 1322 (5th Cir. 1981). As in that case, the early cooperation secured from BoA, and the settlement opportunities it has occasioned, strongly support--contrary to Pomerantz and LCHB's contentions--the fairness of the current agreement and negotiations with BoA.

LCHB and Pomerantz also fail to provide policy justifications for eschewing BoA's cooperation. As we explained in our opening brief, early cooperation offers substantial benefits to civil plaintiffs. *See* Opening Mem. at 6-8. The Proposed Lead Firms here have negotiated for

---

[22] The same, of course, holds true in this case, with respect to any settlement deal struck with BoA. Treble damages are not "waived," "given up" or "surrendered" under the agreement; they are expressly preserved against other defendants.

such beneficial cooperation for the benefit of the entire class: for those class members affected by ACPERA[23] and those that are not, while preserving, as a practical matter, all rights to seek and collect treble damages from other defendants. There is no policy or legal justification for the position that treble damages caused by BoA are worth more to the class if paid by BoA itself rather than by other defendants. Not surprisingly, LCHB and Pomerantz provide no legal support for that prong of their argument. LCHB's and Pomerantz's arguments are purely tactical and should not be weighed by this Court. This agreement with BoA gets early cooperation for civil plaintiffs, that can be used early in the case against other defendants, while preserving treble damages, in an attempt to settle the claims of BoA expeditiously – the entire process of which is overseen by a qualified mediator. LCHB and Pomerantz obviously prefer tilting at such windmills rather than explaining the specific manner in which they contributed to the discovery, development and investigation of the conspiracy claims that the putative class alleges or are more qualified than the Proposed Lead Firms.

LCHB's and Pomerantz's purported concerns about the agreement are each addressed by the agreement itself. Further, they provide no sufficient legal challenges to the agreement with BoA or policy justifications that warrant heightened scrutiny. Their groundless objections should not be rewarded by appointing either of them as Interim Lead Counsel.

      2.    <u>The Cooperation Provided By BoA Is Consistent With Its Statutory Obligations</u>.

In its July 9, 2008, letter to this Court, BoA states that any assertion that the cooperation provided to civil plaintiffs to date is

somehow inappropriate or 'suspicious' runs directly contrary not only to the

---

[23]/    LCHB and Pomerantz are silent about the ramifications of refusing available ACPERA cooperation on behalf of those class members entitled to it.

> obligations required by the United States Department of Justice of conditional applicants under the Department's Corporate Leniency Policy (see http://usdoj.gov/atr/public/guidelines/0091.pdf) and the cooperation contemplated in Section 213(b) of the Antitrust Criminal Penalty Enhancement Act of 2004 ("ACPERA"), but also to Bank of America's approach to resolving this matter.

*See* Letter of K. Sullivan to Hon. J. Marrero, dated July 9, 2008 (attached as Exhibit L to Jones Declaration). It goes on to state that such an early attempt at resolution of complex litigation is "an appropriate and even desired effort to conserve judicial resources." *Id.*

This valuable cooperation was provided by BoA to each of the Proposed Lead Firms in advance of filing their complaints. Cohen Milstein and BoA signed the agreement in September of 2007. Boies Schiller has been involved with the mediation with BoA since as early as December 2007, which includes participating in expert meetings, substantive proffers, and participating in the development and drafting of the first complaint. As noted in fn. 2 of our motion, Susman was invited to participate by Cohen Milstein and Boies Schiller and has since been similarly involved.[24]

That LCHB's and Pomerantz's primary criticism of the Proposed Lead Firms is that we procured cooperation from an amnesty defendant that 1) is consistent with an amnesty defendant's statutory obligations, 2) conveys to the benefit all members of the putative class, and 3) enabled the first complaint to be filed, speaks volumes about the strength of their challenge to the Proposed Lead Firms as well as the agreement with BoA.

**D.    Entering The Proposed Order[25] Will Best Represent The Interests Of The Proposed Class And Also Expedite The Litigation.**

In appointing lead counsel, courts also consider whether the proposed lead counsel will "act fairly, efficiently, and economically in the interest of all parties and parties' counsel." *In re*

---

[24]    After orally agreeing to be bound by Attachment A in earlier proffer meetings with BoA, Susman formally memorialized its agreement with BoA on July 8, 2008.

[25]    Attached as Exhibit M to Jones Declaration.

*Cardinal Health, Inc*. ERISA Litig., 225 F.R.D. 552, 555 (S.D. Ohio 2005).  *See also In re Auction Houses Antitrust Litig.,* 197 F.R.D. 71, 75 (S.D.N.Y. 2000).  Here, the Proposed Lead Firms have a long, proven history of working together to prosecute antitrust actions in a fair, efficient, and successful manner.  They have also spent many hours learning about this industry -- and the conspiracy -- from one of the co-conspirators under the auspices of the nationally renowned mediator, Judge Weinstein.  This head start and proven track record will allow them to act both efficiently and economically on behalf of the class.  Accordingly, these attorneys and firms enjoy overwhelming support among plaintiffs and their counsel.   Because of this consensus, the proposed order should be entered.  Shoehorning another firm into the leadership would add nothing substantial and would be unfair to those firms that put the interests of the class above their own.

The Proposed Lead Firm structure is not only established and well organized (enough to bring the first action in this matter), it is also includes firms with offices that are geographically dispersed nationwide (*e.g*., Pennsylvania, Minnesota, California,[26] New York, Texas, Tennessee, Washington, Nevada). This network of firms will enhance the efficiency of the litigation and also conserve resources.  Moreover, as demonstrated through the attached affidavits, these attorneys have demonstrated their intention, ability and desire to be involved, and thereby advance the interests of all class members.  *See* Exhibits F to J to the Jones Declaration.

---

[26]    LCHB argues that since it is the only one of the competing firms representing California clients, it should be included as Interim Lead Counsel.  It does not show, however, in its papers or sworn affidavit, that the alleged conspiracy affected California entities any differently from how it affected other entities across the nation – indeed, on a motion for class certification, plaintiffs' counsel would need to show precisely the opposite.  The Proposed Lead Firms can ably represent putative class members in California.  Cohen Milstein has an office in San Francisco, Boies Schiller has one in Oakland, and Susman has one in Los Angeles.

### III.   <u>CONCLUSION</u>

For all of the foregoing reasons, the Proposed Lead Firms request that the Court enter the attached proposed order appointing Cohen Milstein, Boies Schiller, and Susman Interim Lead Counsel and authorizing them to appoint an Executive Committee to assist them.

Dated: July 18, 2008

By:  /s/ Robert G. Eisler

William A. Isaacson
Tanya Chutkan
Jonathan Shaw
Jack A. Simms (DC Bar No. 501921
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:  (202) 237-6131

Magda M. Jimenez
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Telephone: (212) 446-2300
Fax: (212) 446-2350

William Christopher Carmody
SUSMAN GODFREY L.L.P.
654 Madison Avenue, 5th Floor
New York, NY 10065-8440
Telephone: (212) 336-8330
Fax: (212) 336-8340

H. Lee Godfrey
SUSMAN GODFREY L.L.P.
Suite 5100
1000 Louisiana
Houston, TX 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666

Marc M. Seltzer
SUSMAN GODFREY L.L.P.
Suite 950
Avenue of the Stars
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Fax: (310) 789-3150

Jonathan W. Cuneo (DC Bar No. 939389)
Daniel M. Cohen (DC Bar No. 470056)
CUNEO GILBERT & LADUCA, LLP
507 C Street NE
Washington, D.C. 20002
Telephone:  (202) 789-3960
Facsimile:  (202) 789-1813

Robert G. Eisler
COHEN, MILSTEIN, HAUSFELD & TOLL
P.L.L.C.
150 East 52nd Street
Thirtieth Floor
New York, NY 10022
Telephone:  (212) 838-7797
Facsimile:  (212) 838-7745

Michael D. Hausfeld
Richard A. Koffman
Megan E. Jones
Christopher J. Cormier
COHEN, MILSTEIN, HAUSFELD & TOLL
P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Michael P. Lehmann
Christopher L. Lebsock
Jon T. King
COHEN, MILSTEIN, HAUSFELD & TOLL
P.L.L.C.
One Embarcadero Plaza
San Francisco, CA 94111
Telephone:  (415) 229-2080
Facsimile:  (415) 986-3643

Carol V. Gilden
COHEN, MILSTEIN, HAUSFELD & TOLL,
P.L.L.C.
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Telephone:  (312) 357-0370
Facsimile:  (312) 357-0369

Arthur N. Bailey
ARTHUR N. BAILEY & ASSOCIATES
111 West Second Street, Suite 4500
Jamestown, NY 14701
Telephone:  (716) 664-2967
Facsimile:  (716) 664-2983

Joel Davidow (DC Bar No. 50849)
Clifford K. Williams
KILE GOEKJIAN REED & McMANUS
PLLC
1200 New Hampshire Avenue, NW
Suite 570
Washington, DC 20036
Telephone:  (202) 659-8000
Facsimile:  (202) 659-8822

Allen Black
Roberta Liebenberg
Donald Perelman
FINE KAPLAN & BLACK, RPC
1835 Market Street
28th Floor
Philadelphia, PA 19103
Telephone:  (215) 567-6565
Facsimile:  (215) 568-5872

Samuel D. Heins
Vincent J. Esades
Dylan J. McFarland
HEINS MILLS & OLSON
310 Clifton Avenue
Minneapolis, MN 55403
Telephone:  (612) 338-4605
Facsimile:  (612) 338-4692

Allan Steyer
D. Scott Macrae
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
One California Street, Third Floor
San Francisco, CA 94111
Telephone:     (415) 421-3400
Facsimile:       (415) 421-2234

Steven Greenfogel
MEREDITH COHEN GREENFOGEL &
SKIRNICK, P.C.
1521 Locust St., 8th Floor
Philadelphia, PA 19102
Telephone:  (215) 564-5182
Facsimile:   (215)  569-0958

Arnold Levin
Laurence S. Berman
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia , Pennsylvania 19106-3697
Telephone:  (215) 592-1500
Facsimile:  (215) 592-4663

Armand Derfner
DERFNER ALTMAN & WILBORN
40 Calhoun Street, Suite 410
P.O. Box 600
Charleston, SC 29401
Telephone:  (843) 723-9804
Facsimile:   (843) 723-7446

Steven A. Kanner
FREED KANNER LONDON &
 MILLEN LLC
2201 Waukegan Rd.,
Suite 130
Bannockburn, IL 60015
Telephone:   (224) 224-632-4500
Facsimile:    (224)  632-4521

Brent Hazzard
HAZZARD LAW, LLC
6360 I 55 N
Suite 340
Jackson, MS  39211
Telephone:  (601) 977-5253
Facsimile:    (601)  977-5236

Gerald J. Rodos
Jeffrey B. Gittleman
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone:   (215) 963-0600
Facsimile:  (215) 963-0838

Paul F. Bennett
Steven O. Sidener
Solomon B. Cera
C. Andrew Dirksen
GOLD BENNETT CERA & SIDENER LLP
595 Market Street, Suite 2300
San Francisco, CA  94105
Telephone:  (415) 777-2230
Facsimile:  (415) 777-5189

Roland G. Riopelle
SERCARZ & RIOPELLE, LLP
152 W. 57th Street, Suite 24C
New York, NY 10019
Telephone: (212) 586-4900
Fax: (212) 586-1234

Brian K. Herrington
BRENT COON & ASSOCIATES
6360 I-55 North
Suite 340
Jackson, MS 39211
Telephone:  (601) 957-6177
Facsimile:  (601) 957-6507

Precious Martin, Sr.
PRECIOUS MARTIN, SR. &
ASSOCIATES
821 N. Congress Street
Jackson, MS 39201
Telephone: (601) 944-1447
Fax: (601) 944-1448


*Attorneys for One or More Individual Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

IN RE MUNICIPAL DERIVATIVES
ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO:

ALL ACTIONS

MDL No. 1950

Master Docket No. 08-02516 (VM) (JCF)

**DECLARATION OF MEGAN E. JONES
IN SUPPORT OF PLAINTIFFS'
CONSOLIDATED OPPOSITION TO
MOTIONS OF 1)  CITY OF OAKLAND,
COUNTY OF ALAMEDA, CALIFORNIA
FOR APPOINTMENT OF LIEFF
CABRASER AS INTERIM LEAD OR CO
LEAD COUNSEL AND 2)  HAYWOOD
COUNTY, TENNESSEE FOR
APPOINTMENT OF POMERANTZ
HAUDEK AS INTERIM LEAD COUNSEL**

1.  I am an attorney at the law firm of Cohen, Milstein, Hausfeld and Toll, PLLC in Washington, D.C.   I make this declaration based on my own personal knowledge. If called upon to testify, I could and would testify competently to the truth of the matters stated herein.

2.  Attached as Exhibit A is a true and correct copy of the Memorandum Order in  *In re Intel Corp. Microprocessor Antitrust Litig.*, MDL No. 05-1717, Slip. Op. (D.Del.) (Apr. 18, 2006).

3.  Attached as Exhibit B is a true and correct copy of the Memorandum and Order, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, MDL 1869, March 11, 2008.

4.  Attached as Exhibit C is a true and correct copy of the Order, *In re Electrical Carbon Products Antitrust Litig.*, MDL No. 1514 (D.N.J.), dated June 25, 2003.

5.  Attached as Exhibit D is a true and correct copy of Order,  *In re Foundry Resins Antitrust Litig.*, No. 2:04-md-1638 (S.D. Ohio).

6.  Attached as Exhibit E is a true and correct copy of the Hearing Transcript from *Flash Memory Antitrust Litig.*, No. C-07-0086 SBA (N.D. Cal.), dated October 30, 2007.

7.  Attached are true and correct copies of the following affidavits from counsel:

    a.  as Exhibit F, Declaration of Vincent J. Esades In Support of Plaintiffs' Motion for Appointment of Interim Leadership Structure;

    b.  as Exhibit G, Declaration of Roberta D. Liebenberg on behalf of Fine, Kaplan and Back, R.P.C.;

    c.  as Exhibit H, Affidavit of Gerald J. Rodos on behalf of Barrack, Rodos & Bacine;

    d.  as Exhibit I, Declaration of Laurence S. Berman on behalf of Levin, Fishbein, Sedran & Berman; and

    e.  as Exhibit J, Declaration of Solomon B. Cera on behalf of Gold Bennett Cera & Sidener, LLP.

8.  Attached as Exhibit K is a true and correct copy of the Hearing Transcript from *In Re Transpacific Passenger Air Transportation Antitrust Litig.*, MDL No. 1913, dated March 28, 2008.

9.  Attached as Exhibit L is a true and correct copy of the letter from K. Sullivan to Hon. Judge Marrero, dated July 9, 2008.

10. Attached as Exhibit M is a proposed Order Appointing Interim Leadership Structure.

11. Attached as Exhibit N is a true and correct copy of selected plaintiffs' "Memorandum of Law in Support of Majority Plaintiffs' Motion to Consolidate Actions and For Appointment of Interim Direct Purchaser Class Co-Lead and Liaison and Local Counsel" submitted in *In re Chocolate Confectionary Antitrust Litig.*, MDL 1958.

12. Attached as Exhibit O is a true and correct copy of selected plaintiffs' "Memorandum of Law in Support of Motion for Consolidation and for Appointment of Co-Lead Counsel and Liaison Counsel," submitted in *In re Intel Corp. Microprocessor Antitrust Litig.*, MDL No. 1717.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.  So executed on July 18, 2008 in Washington, DC.

_____
Megan E. Jones

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                          :
                                :
INTEL CORP. MICROPROCESSOR      : MDL Docket No. 05-1717-JJF
ANTITRUST LITIGATION            :

### MEMORANDUM ORDER

Pending before the Court are two competing Motions for appointment as interim class counsel and liaison counsel and for consolidation of the seventy-two pending purchaser antitrust cases against Intel Corporation ("Intel"). One group, calling itself the CFHS Firms, requests the Court to appoint four firms as co-interim class counsel: Cohen, Milstein, Hausfeld & Toll, P.L.L.C.; The Furth Firm LLP; Hagens Berman Sobol & Shapiro LLP; and Saveri & Saveri, Inc.. The CFHS Firms also request that the Court appoint Prickett, Jones & Elliott as interim liaison counsel. The other group, calling itself the National Plaintiffs Group, is comprised of the named plaintiffs in eight of the pending purchaser antitrust cases. The National Plaintiffs Group requests the Court to appoint Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein") as interim class counsel and Biggs and Battaglia as interim liaison counsel. For the reasons discussed, the Court will appoint the CFHS Firms as interim class counsel and Prickett, Jones & Elliott as interim liaison counsel.

Under Federal Rule of Civil Procedure 23, a court "may designate interim counsel to act on behalf of the putative class before determining whether to certify the action as a class

action." Fed. R. Civ. P. 23(g)(2)(A). "If more than one
adequate applicant seeks appointment as class counsel, the court
must appoint the applicant best able to represent the interests
of the class." Fed. R. Civ. P. 23(g)(2)(C). In deciding whom to
appoint as class counsel, the Court must consider: the work
counsel has done in identifying or investigating potential claims
in the action, counsel's experience in handling class actions,
other complex litigation, and claims of the type asserted in the
action, counsel's knowledge of the applicable law, and the
resources counsel will commit to representing the class. Fed. R.
Civ. P. 23(g)(1)(C)(i). In addition, the Court may consider "any
other matter pertinent to counsel's ability to fairly and
adequately represent the interests of the class." Fed. R. Civ.
P. 23(g)(1)(C)(ii). The most common approach to the selection of
class counsel is private ordering, in which plaintiffs' counsel
agree on which of them should serve as class counsel. Manual for
Complex Litigation (Fourth), § 21.272 (2004). This is also the
approach recommended by the Third Circuit Task Force on the
Selection of Class Counsel. See Final Report of the Third
Circuit Task Force on the Selection of Class Counsel, 18
(2002)(available at http://www.ca3.uscourt.gov/attorney_
information_and_forms.htm.) (hereinafter "Task Force Report").

After reviewing the submissions of the National Plaintiffs
Group and the CFHS Firms, the Court is satisfied that both

2

proposed interim class counsel have sufficient expertise and experience to effectively represent the interests of the putative class. The Court selects the CFHS Firms for two reasons. First, the CFHS Firms are closer to being the choice of the private ordering process favored by most courts and the Third Circuit Task Force. There are currently 72 purchaser antitrust cases against Intel pending before this Court, with 111 named Plaintiffs. The CFHS Firms has the support of 73 of those Plaintiffs in 59 cases, while the National Plaintiffs Group is comprised of 32 Plaintiffs in 8 cases. Second, the CFHS Firms appear to be capable of drawing upon a greater pool of resources than the National Plaintiffs Group. This could prove to be especially beneficial in a large and complex case such as this. See Task Force Report at 96 (noting that courts "should be cognizant of the possibility that the class could benefit from the combined resources and expertise of a number of counsel, especially in a complex case where the defendants are represented by a number of large and highly qualified law firms").

The choice of four firms as co-interim class counsel raises the danger that services will be duplicative and fees unnecessarily increased. To alleviate that danger, the Court notes that it will not approve any award of fees or expenses that reflects duplication, inefficiency, or the costs of coordinating the efforts of the firms involved in the representation.

Moreover, the Court reserves the right to alter the class counsel structure if it discovers substantial duplication of effort or finds that the litigation is being unduly delayed due to the presence of multiple counsel. With those warnings in mind, the Court concludes that the benefits of multiple class counsel in this case outweigh the dangers of inefficient representation and increased costs.

The Court's appointment of the CFHS Firms as interim class counsel does not indicate approval of the in camera fee proposal submitted by the CFHS Firms in response to the Court's Order dated January 10, 2006 (D.I. 18). In making its selection of interim class counsel, the Court gave minimal consideration to the fee proposals submitted by the National Plaintiffs Group and the CFHS Firms. The Court intends to award fees based on a percentage of any recovery to be determined at the close of the case. The Court will discuss the process for awarding fees in more detail at the initial conference in this matter.

NOW THEREFORE, IT IS HEREBY ORDERED that:

1. Pursuant to Federal Rule of Civil Procedure 42, and consistent with the November 8, 2005 Order of the Judicial Panel on Multidistrict Litigation (D.I. 1), all purchaser antitrust actions pending in this Court against Intel Corporation and all related actions later filed in or transferred to this Court are

4

consolidated for pretrial purposes. All such actions now pending in this Court are listed in Schedule A, attached hereto;

     2. Civil Action No. 05-485-JJF shall be the lead case. All documents filed in this consolidated action shall be placed in the file of Civil Action No. 05-485-JJF;

     3. The caption of the consolidated purchaser antitrust actions henceforth shall be:

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| INTEL CORP. MICROPROCESSOR | : | MDL Docket No. 05-1717-JJF |
| ANTITRUST LITIGATION | : | |
| | : | |
| PHIL PAUL, on behalf of himself | : | |
| and all others similarly | : | |
| situated, | : | |
| | : | |
|     Plaintiffs, | : | Civil Action No. 05-485-JJF |
| | : | |
|   v. | : | CONSOLIDATED ACTION |
| | : | |
| INTEL CORPORATION, | : | |
| | : | |
|     Defendant. | : | |

     4. The National Plaintiffs Group's Motion For Consolidation And Appointment Of Interim Class Counsel And Liaison Counsel (D.I. 23) is **DENIED**;

     5. The Motion By Cohen Milstein Hausfeld & Toll, The Furth Firm, Hagens Berman Sobol, and Saveri & Saveri For Appointment As Interim Class Counsel (D.I. 20) is **GRANTED**;

6. The firms of Cohen Milstein Hausfeld & Toll, The Furth Firm, Hagens Berman Sobol, and Saveri & Saveri are appointed Interim Class Counsel pursuant to Federal Rule of Civil Procedure 23(g)(2)(A);

7. Interim Class Counsel shall be generally responsible for coordinating the activities of Plaintiffs during pretrial proceedings and, on behalf of Plaintiffs and other members of the proposed class shall:

(a) determine and present to the Court and opposing parties the position of Plaintiffs on all matters arising during pretrial proceedings;

(b) direct and execute on behalf of Plaintiffs, all pleadings and other filings with the Court;

(c) direct the briefing and argument of all motions on behalf of Plaintiffs;

(d) coordinate discovery on behalf of Plaintiffs consistent with the requirements of Fed. R. Civ. P. 26;

(e) enter into stipulations with opposing counsel as necessary for the conduct of the litigation;

(f) accept, on behalf of all Plaintiffs, service of papers by Defendant, other than those filed through the ECF system, and distribute them to Plaintiffs' counsel as appropriate;

(g) conduct settlement negotiations on behalf of

Plaintiffs, but not enter binding agreements except to the extent expressly authorized;

(h) maintain adequate time and disbursement records covering services as interim class counsel;

(i) monitor the activities of co-counsel to ensure that schedules are met and unnecessary expenditures of time and funds are avoided; and

(j) perform such other duties as may be incidental to proper coordination of Plaintiffs' pretrial activities or authorized by further order of the Court;

7.   The firm of Prickett, Jones & Elliott is appointed interim Liaison Counsel;

8.   Interim liaison counsel shall be responsible for maintaining and distributing an up-to-date service list, distributing to all Plaintiffs' counsel Court Orders, pleadings, and other documents in the centralized actions, and performing assignments as requested by interim class counsel;

9.   Interim class counsel shall file a Consolidated Class Action Complaint no later than **Friday, April 28, 2006**;

10.   The Court will conduct an initial conference in this matter on **Thursday, May 4, 2006, at 3:00 p.m.** in Courtroom No. 4B on the 4th floor, Boggs Federal Building, Wilmington.

7

11.   The Court will issue an agenda for the initial conference.  The parties shall submit, by **Friday, April 28, 2006,** any suggestions for matters to be included on the agenda.


April 18, 2006
DATE

UNITED STATES DISTRICT JUDGE

8

SCHEDULE A

Cases Filed In The District Of Delaware

05-470-JJF,  Jim Kidwell, et al. v. Intel Corp.

05-473-JJF,  Robert J. Rainwater, et al. v. Intel Corp.

05-476-JJF,  Matthew Kravitz, et al. v. Intel Corp.

05-478-JJF,  Ruccolo v. Intel Corp.

05-485-JJF,  Paul v. Intel Corp.

05-488-JJF,  Volden et al. v. Intel Corp.

05-489-JJF,  Chacon et al. v. Intel Corp.

05-490-JJF,  Simon v. Intel Corp.

05-505-JJF,  Ambruoso v. Intel Corp.

05-508-JJF,  Baran v. Intel Corp.

05-509-JJF,  Czysz v. Intel Corp.

05-510-JJF,  Ludt v. Intel Corp.

05-515-JJF,  Ficor Acquisition Co. LLC et al. v. Intel Corp.

05-519-JJF,  Fairmont Orthopedics & Sports Medicine PA v. Intel Corp.

05-520-JJF,  Law Offices of Kwasi Asiedu v. Intel Corp.

05-521-JJF,  HP Consulting Services, Inc. v. Intel Corp.

05-522-JJF,  Cowan et al. v. Intel Corp.

05-526-JJF,  Manyin et al. v. Intel Corp.

05-531-JJF,  Cone v. Intel Corp.

05-532-JJF,  Feitelberg v. Intel Corp.

05-533-JJF,  Weeth v. Intel Corp.

1

05-537-JJF,  Harr v. Intel Corp.

05-539-JJF,  Cohn v. Intel Corp.

05-540-JJF,  Griffin v. Intel Corp.

05-541-JJF,  Kornegay v. Intel Corp.

05-544-JJF,  Ramos v. Intel Corp.

05-547-JJF,  Bergerson & Associates, Inc. v. Intel Corp.

05-554-JJF,  Arnold v. Intel Corp.

05-556-JJF,  Genese et al. v. Intel Corp.

05-557-JJF,  Boeding v. Intel Corp.

05-558-JJF,  Munson v. Intel Corp.

05-560-JJF,  Pines v. Intel Corp.

05-575-JJF,  Salpeter et al. v. Intel Corp.

05-616-JJF,  Herroeder-Perras v. Intel Corp.

05-617-JJF,  Roach v. Intel Corp.

05-627-JJF,  DiMarco v. Intel Corp.

05-672-JJF,  Richards et al. v. Intel Corp.

05-674-JJF,  Schupler v. Intel Corp.

05-686-JJF,  Marshall v. Intel Corp.

05-710-JJF,  Kurzman v. Intel Corp.

05-846-JJF,  Giacobbe-Fritz Fine Art LLC v. Intel Corp.

**Cases Transferred From the Northern District of California**

05-773-JJF,  Lipton et al. v. Intel Corp.

05-774-JJF,  Prohias v. Intel Corp.

05-775-JJF,  Konieczka v. Intel Corp.

05-776-JJF,  Niehaus v. Intel Corp.

05-777-JJF,  Hamilton v. Intel Corp.

05-778-JJF,  Brauch et al. v. Intel Corp.

05-779-JJF,  Baxley v. Intel Corp.

05-780-JJF,  Frazier et al. v. Intel Corp.

05-781-JJF,  Dickerson v. Intel Corp.

05-782-JJF,  The Harman Press v. Intel Corp.

05-894-JJF,  Shanghai 1930 Restaurant Partners L.P. v. Intel Corp.

05-895-JJF,  Major League Softball Inc. v. Intel Corp.

05-896-JJF,  Allanoff v. Intel Corp.

05-897-JJF,  Law Offices of Laurel Stanley et al. v. Intel Corp.

05-898-JJF,  Lazio Family Products v. Intel Corp.

05-899-JJF,  Walker v. Intel Corp.

05-900-JJF,  Stoltz v. Intel Corp.

05-901-JJF,  Naigow v. Intel Corp.

05-902-JJF,  Hewson v. Intel Corp.

05-903-JJF,  Lang v. Intel Corp.

05-904-JJF,  Trotter-Vogel Inc. v. Intel Corp.

05-905-JJF,  Juskiewicz v. Intel Corp.

05-906-JJF,  Uwakwe v. Intel Corp.

05-907-JJF,  Juan v. Intel Corp.

05-908-JJF,  Dressed to Kill Custom Draperies LLC v. Intel Corp.

05-909-JJF,  Kinder v. Intel Corp.

05-910-JJF,  Rush v. Intel Corp.

3

**Case Transferred From The Southern District Of California**

05-911-JJF,  <u>Suarez v. Intel Corp.</u>

**Case Transferred From The Southern District Of Florida**

05-912-JJF,  <u>Schwartz v. Intel Corp.</u>

**Case Transferred From The Eastern District Of Tennessee**

05-913-JJF,  <u>Armbrister et al. v. Intel Corp.</u>

**Case Transferred From The Western District Of Tennessee**

05-914-JJF,  <u>Wiles v. Intel Corp.</u>

4

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

)
In re RAIL FREIGHT FUEL SURCHARGE                    )
ANTITRUST LITIGATION                                 )
                                                     )          MDL Docket No. 1869
---                                                  )          Misc. No. 07-489 (PLF)
                                                     )
This document relates to:                            )
                                                     )
ALL CASES                                            )
                                                     )
---

MEMORANDUM OPINION AND ORDER

This matter came before the Court for an initial status conference on March 7,

2008 to discuss the parties' Joint Statement submitted pursuant to paragraph 17 of the Court's

Initial Practice and Procedure Order and to hear argument on various motions of the parties

concerning the appointment of Interim Co-Lead Class Counsel.

The Court has considered the unopposed motion for the appointment of Cohen

Milstein and Quinn Emanuel as Interim Co-Lead Class Counsel for the Direct Purchaser

Plaintiffs and the opposed joint motion for appointment of Whatley Drake & Kallas, LLC as

Interim Co-Lead Class Counsel and Roger M. Adelman as Liaison Class Counsel, the motions

papers, and the arguments of counsel in open court. The Court concludes that Cohen Milstein

and Quinn Emanuel meet all of the criteria set forth in Rule 23(g)(1) of the Federal Rules of Civil

Procedure. They are the consensus choice of all other counsel in the case except for Whatley

Drake & Kallas, they will adequately represent those interests with respect to each of the criteria

set forth in the Rule, and they are best able to represent the interests of the class. In view of these

circumstances, the Court sees no need to appoint a third firm as additional Interim Co-Lead Class

Counsel in order to accomplish the purposes of the Rule and concludes that a decision to add

Whatley Drake might well disturb the equilibrium achieved by the virtual consensus reached

among plaintiffs' counsel.

Accordingly, the Court will GRANT the motion of Cohen Milstein and Quinn

Emanuel to appoint those firms as Interim Co-Lead Class Counsel [49] and DENY the motion of

Whatley Drake & Kallas [41]. In view of the fact that Cohen Milstein has its primary offices in

the District of Columbia, there is no need for the appointment of anyone else to serve as Liaison

Class Counsel, and so the motion to appoint Roger M. Adelman as Liaison Class Counsel also is

DENIED.

The issue of which firms should serve on an Executive Committee of Counsel

under the direction of Interim Co-Lead Class Counsel and to assist Interim Co-Lead Class

Counsel in the fulfillment of their responsibilities is a different matter. Although the Cohen

Milstein and Quinn Emanuel motion suggests five firms other than his to serve in this capacity,

Mr. Whatley represented in open court that if his motion for the appointment of Whatley Drake

& Kallas as Interim Co-Lead Class Counsel were denied, Whatley Drake would be interested in

serving on the Executive Committee. Similarly, plaintiffs Complete Transportation Systems, Inc.

and its counsel, in a written submission and in open court, requested that William M. Audet of

Audet & Partners, LLP be appointed to the Executive Committee. Michael Hausfeld of Cohen

Milstein represented to the Court that he and Stephen Neuwirth of Quinn Emanuel would like the

opportunity to consider these requests, consult with others, and report their views to the Court

once the Court resolved the pending motions to appoint Interim Co-Lead Class Counsel.

Separate and apart from these matters, the Court has considered the motion of Lovell Stewart Halebian LLP, The Mason Law Firm, LLP, and Stamell & Schager, LLP that they be appointed as Interim Co-Lead Class Counsel for the Indirect Purchaser Plaintiffs. They argue that the Indirect Purchaser Plaintiffs should be separately represented in order to avoid potential conflicts of interest and to adequately protect the separate interests of the Indirect Purchaser Plaintiffs. Counsel for the Direct Purchaser Plaintiffs agree that the Indirect Purchaser Plaintiffs should be separately represented, and no one has objected to the appointment of these three firms as Interim Co-Lead Class Counsel for the Indirect Purchaser Plaintiffs. The Court has concluded that these firms meet the criteria of Rule 23(g)(1) of the Federal Rules of Civil Procedure. The Court therefore will GRANT the motion of Lovell Stewart Halebian LLP, The Mason Law Firm, LLP, and Stamell & Schager, LLP for appointment as Interim Co-Lead Class Counsel for the Indirect Purchaser Plaintiffs [44].

All of that having been said, the Court will sign the form of order submitted by Cohen Milstein and Quinn Emanuel appointing them as Interim Co-Lead Class Counsel for the Direct Purchasers after excising the portion of that order relating to the appointment of an Executive Committee, and it will also sign the order submitted by counsel for the Indirect Purchaser Plaintiffs to appoint them as Interim Co-Lead Class Counsel.

Finally, pursuant to the discussion at the status conference, Interim Co-Lead Class Counsel for the Direct Purchaser Plaintiffs shall advise the Court in writing on or before March 18, 2008 of their views as to which firms should serve on the Executive Committee and

provide a form of order to implement their proposal.  If anyone objects to the proposal submitted,

they must file a response on or before March 25, 2008.

SO ORDERED.


/s/_____
PAUL L. FRIEDMAN
United States District Judge


DATE:   March 11, 2008

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE FOUNDRY RESINS
ANTITRUST LITIGATION

Case No.          2:04-md-1638
Master Docket No.  2:04-cv-415

JUDGE GREGORY L. FROST
Magistrate Judge Mark R. Abel

This document relates to: <u>ALL CASES</u>.

## ORDER

On December 9, 2004, this Court held a first preliminary pretrial conference in the above captioned multidistrict litigation cases. Counsel for all parties appeared and, after preliminary on-the-record discussions, agreed that the Court and counsel could discuss the matters to be addressed informally and off the record. This Order both memorializes those discussions and disposes of several pending issues.

**Appointment of lead counsel.** The Court has been presented with two alternatives for the appointment of interim lead counsel. Although all Plaintiffs' counsel agreed to waive a formal evidentiary hearing and preferred to submit the issue of lead counsel to the Court on their briefs, the Court proceeded on December 9, 2004 to discuss informally with the parties each of the following factors as outlined in the *Manual for Complex Litigation* (4th ed. 2004):

- qualifications, functions, organization, and compensation of designated counsel;
- whether there has been full disclosure of all agreements and understandings among counsel;
- would-be designated attorneys' competence for assignments;
- whether there are clear and satisfactory guidelines for compensation and reimbursement, and whether the arrangements for coordination among

1

counsel are fair, reasonable, and efficient;

- whether designated counsel fairly represent the various interests in the litigation–where diverse interests exist among parties; the court may designate a committee of counsel representing different interests;
- the attorneys' resources, commitment, and qualifications to accomplish the assigned tasks; and
- the attorneys' ability to command the respect of their colleagues and work cooperatively with opposing counsel and the court–experience in similar roles in other litigation may be useful, but an attorney may have generated personal antagonisms during prior proceedings that will undermine his or her effectiveness in the present case.

*Id.* at 27. The Court also inquired into the issue of anticipated billing rates and was informed that there was no notable distinction between the competing factions for the interim lead counsel position(s).

In light of these factors, the discussions had with counsel, informal argument before the Court, and the parties' filings, the Court hereby designates the following firms to act as interim lead co-counsel in the class action cases: Choen, Milstein, Hausfeld & Toll, P.L.L.C.; Goodkind Labaton Rudoff & Sucharow LLP; Levin, Fishbein, Sedran & Berman; and Preti, Flaherty, Beliveau, Pachios & Haley, LLP. Said counsel, who have garnered the support of 88% of Plaintiffs, possess the apparent experience, qualifications, and ability to serve most effectively as interim lead co-counsel in these proceedings.

Having appointed interim co-lead counsel, the Court will not set forth at this time specific guidelines for how they should function in managing this litigation outside the presence of the Court. Until proven wrong, the Court trusts that given the experience and apparent professionalism of interim lead co-counsel, they will be able to understand their roles and function effectively, efficiently, and economically without micro-management by this Court.

2

The Court does note, however, that interim lead co-counsel shall act as spokesperson for Plaintiffs' counsel in matters of joint or common action before the Court. This does not limit the right of other counsel to be heard on matters not susceptible to joint or common action or when genuine and truly substantial divergence of opinion exists among counsel. The Court emphasizes that this latter statement does **not** mean that the Court will view favorably the presentation of cumulative views or views that differ only slightly from interim lead co-counsels' views.

This Order renders the motion for entry of a case mangement order (Doc. # 17 in 1:04-cv-434) and the cross-motion for a proposed pretrial order (Doc. # 13) **MOOT**.

**Appointment of liaison counsel.** Having considered the factors described in the foregoing section as they relate to the role of liaison counsel, the existing relationship of Hahn Loeser & Parks LLP to the appointed interim lead co-counsel, and the qualifications and ability of the Hahn Loeser counsel involved, the Court appoints Hahn Loeser as interim liaison counsel. Liaison counsel bears the responsibility, when necessary, for forwarding to Plaintiffs' counsel copies of all documents filed under seal, including this Court's Orders.

**Attorney fees.** All counsel for Plaintiffs in the class action cases shall forward a written account of their record of time and expenses to the interim lead co-counsel no less than every ninety days. Failure to provide such information as required may result in this Court's refusal to consider non-compliant counsel's application for fees and expenses should any class action plaintiff prevail.

**Motion to stay.** On November 24, 2004, Defendants filed a motion to stay discovery in

these proceedings pending completion of ongoing investigations before the Grand Jury. (Doc. # 10.) Plaintiffs have filed a memorandum in opposition. (Doc. # 17.) The parties have agreed with the Court's approval that, following the issuance of this Order, Defendants' counsel shall meet with Plaintiffs' interim co-lead counsel to discuss outstanding issues, including but not limited to possibility of a stay and any need for a protective order. Said discussions should occur as soon as possible and, **by January 3, 2005, the parties shall file a report with this Court detailing the results of those discussions.** The Court holds Defendants' pending motion for a stay in abeyance until after January 3, 2005.

**Consolidation of unconsolidated class action cases.** The case of *Caterpillar, Inc. v. Ashland, Inc.*, No. 1:04-1199 (C.D. Ill.), is a related individual action. For purposes of pretrial proceedings, this case is included with the consolidated class action cases; for ease of reference, these combined proceedings shall be referred to as the "coordinated action." Thus, the Court hereby consolidates the additional class action cases set forth in the Conditional Transfer Order (Doc. # 24) with the cases previously consolidated in this coordinated action. **The Court further directs counsel in case No. 2:04-cv-667 to file no later than December 17, 2004 the motion for consolidation discussed during the December 9, 2004 informal discussions.** The Court shall subsequently issue a notice that will indicate each consolidated case and its Southern District of Ohio case number.

**Case caption and case numbers.** The Court shall assign every case in this coordinated action that currently lacks a Southern District of Ohio case number such a number. The cases will collectively be referred to by 2:04-md-1638. Additionally, the Court will utilize the lowest case number, case No. 2:04-415, as the Master Docket Number.

4

Every filing in the coordinated action shall bear the following caption:

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **IN RE FOUNDRY RESINS** | **Case No.**        2:04-md-1638 |
| **ANTITRUST LITIGATION** | **Master Docket No.   2:04-cv-415** |

**JUDGE GREGORY L. FROST**
**Magistrate Judge Mark R. Abel**

**This document relates to:** _____

When a pleading or other court paper is intended to apply to all actions, the words "ALL ACTIONS" shall appear on the line next to the words "This document relates to" in the caption as set forth above. When a pleading or other court paper is intended to be applicable only to one, some, but not all, of the cases governed by this order, the party filing the pleading shall indicate the actions to which the pleading is intended to apply in the line next to the words "This document relates to."

**Amended consolidated complaint.** As discussed informally with the Court and in accordance with the parties' agreement, **the Class Action Plaintiffs shall filed an amended consolidated complaint by January 7, 2005.**

**Extension of time in which to file answers or otherwise respond to amended consolidated complaint.** This Court recognizes that Defendants have moved for an extension of time in two of the consolidated cases. (Doc. # 8.) This Order vacates all existing response deadlines, and Defendants need not respond at this time to any already filed complaint. As

5

discussed informally with the Court and in accordance with the parties' agreement, **Defendants shall respond to the amended consolidated complaint by February 7, 2005. Defendants shall also respond to the complaint in *Caterpillar* by that date.** Accordingly, Defendants' motion for an extension of time to answer, move, or otherwise plead is **MOOT.** (Doc. # 8.)

**Status conferences.** As discussed during the informal discussions, this Court shall set periodic status conferences. **The First Status Conference is set for Wednesday, January 26, 2005 at 1:30 p.m. in Courtroom Four.** The parties shall confer prior to the status conference and file with the Court, no later than two days prior to the conference, an agenda of issues to be addressed. Counsel should not regard this filing as an opportunity to present argument. Rather, the proposed agenda should simply set forth those issues the parties seek to discuss with the Court. If any matter on the agenda is not resolved during informal discussions held at the status conference, the Court will set the matter for a subsequent in-court hearing. Following each status conference, the Court will issue an order memorializing the issues addressed and resolutions reached therein.

**Applicable procedural rules.** Except as otherwise provided herein or by further order of this Court, the Federal Rules of Civil Procedure and Local Civil Rules of the United States District Court for the Southern District of Ohio shall govern all further proceedings herein.

***Pro hac vice* applications.** Each attorney who is not already a member of the bar of this Court but who seeks to act as counsel for any party in these proceedings must apply for admission *pro hac vice*. The Court will not waive the fee for *pro hac vice* admission. The Magistrate Judge shall address such motions.

6

**Electronic filing.** All counsel must register for electronic filing with the Court.

**Scheduling Order.** Following resolution of the motion for a stay and the January 26, 2005 status conference, this Court will issue a scheduling order as necessary.

**IT IS SO ORDERED.**

                                        /s/  Gregory L. Frost
                                        GREGORY L. FROST
                                        UNITED STATES DISTRICT JUDGE

# EXHIBIT E
# (1 OF 3)

10-30-07 hearing.txt

1

1              IN THE NORTHERN DISTRICT OF CALIFORNIA

2        OAKLAND, CALIFORNIA; DEPT 3; SAUNDRA ARMSTRONG, JUDGE

3    IN RE FLASH MEMORY LITIGATION ) C07-5073 SBA

     NGUYEN,                       ) C07-00086

4           PLAINTIFF,             ) TUESDAY 10/30/07

     V.                            ) UNITED STATES MOTION TO

5    SAMSUNG ELECTRONICS CO. LTD,  ) INTERVENE

            DEFENDANT.             ) PLAINTIFFS' MOTION TO

6    _____) APPOINT INTERIM CLASS

                                     COUNSEL FOR DIRECT/INDIRECT

7                                    PURCHASER CLASS, CASE

                                     MANAGEMENT CONFERENCE

8

9              REPORTER'S TRANSCRIPT OF PROCEEDINGS

10   APPEARANCES:

11   FOR THE PLAINTIFF:

12   CLASS PLAINTIFFS:

13   FOR A COMPUTER PLACE. INC. (INTERESTED PARTY)

     SAVERI & SAVERI, INC.

14   111 PINE STREET, SUITE 1700

                    10-30-07 hearing.txt
        SAN FRANCISCO, CALIFORNIA  94111
15      TEL (415) 217-6810 FAX (415) 217-6813
        GUIDO@SAVERI.COM
16      BY:  GUIDO SAVERI,
             R. ALEXANDER SAVERI, ATTORNEYS AT LAW
17

        FOR PLAINTIFF SANDRA GREEN:
18      JERRY K. CIMMET, ATTORNEY AT LAW
        177 BOVET ROAD, SUITE 600
19      SAN MATEO, CALIFORNIA  94402
        CIMMET@ATT.NET
20      TEL (650) 866-4700 FAX (650) 866-4770

21      LABATON SUCHAROW
        100 PARK AVENUE
22      NEW YORK, NEW YORK  10017
        TEL (212) 907-0700 FAX (212) 818-0477
23      JKERBER/2KABATON.COM
        BY:  KELLIE C. LERNER,
24           HOLLIE SALAMON, ATTORNEYS AT LAW

25      (MORE APPEARANCES ON NEXT PAGE)

                                                        2

        1    FOR PLAINTIFF KEVIN IRWIN'S COMPUTER AND PHOTO:

        2    BERMAN, DEVALERIO PEASE TABACCO BURT & PUCILLO
             425 CALIFORNIA STREET, TWENTY-FIRST FLOOR
                            Page 2

```
                        10-30-07 hearing.txt
3    SAN FRANCISCO, CALIFORNIA  94104

     (415) 433-3200

4    BY:  CHRISTOPHER HEFFELFINGER, ATTORNEY AT LAW


5    FOR PLAINTIFF TRAVIS WIEBE:

     BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER

6    2125 OAK GROVE ROAD, SUITE 120

     WALNUT CREEK, CALIFORNIA  94598

7    DBIRKHAEUSER&BRAMSONPLUTZIK.COM

     TEL (925) 945-0200 FAX (925) 945-8792

8    BY:  DANIEL E. BIRKHAEUSER, ATTORNEY AT LAW


9    FOR INDIRECT PLAINTIFF DAN HARRISON:


10   GIRARD GIBBS, LLP

     601 CALIFORNIA STREET, 14TH FLOOR

11   SAN FRANCISCO, CALIFORNIA  94108-2819

     TEL (415) 981-4800 FAX (415) 981-4846

12   DCG@GIRARDGIBBS.COM, ECP@GIRARDGIBBS.COM

     BY:  DANIEL C. GIRARD,

13       ELIZABETH C. PRITZKER, ATTORNEYS AT LAW


14   FOR INDIRECT PLAINTIFFS DEE CRAVENS, STUART GO, TRONG


15   NGUYEN:


16   STEYER LOWENTHAL BOODROOKAS, ALVAREZ & SMITH, LLP

     ONE CALIFORNIA STREET, THIRD FLOOR

17   SAN FRANCISCO, CALIFORNIA  94111

     TEL (415) 421-3400 FAX (415) 421-2234

18   ASTEYER@STEYERLAW.COM

     BY:  ALLAN STEYER, ATTORNEY AT LAW
                            Page 3
```

10-30-07 hearing.txt

19

20    FOR PLAINTIFF DEE CRAVENS:

21    MURRAY & HOWARD
      436 14TH STREET, SUITE 1413
22    OAKLAND, CALIFORNIA  94612
      TEL (510) 444-2660 FAX (510) 444-2522
23    GMURRAY@MURRAYHOWARDLAW.COM, WWW.MURRAYHOWARDLAW.COM
      DHOWARD@MURRAYHOWARDLAW.COM
24    BY:  GILMUR R. MURRAY, PARTNER
           DEREK G. HOWARD, PARTNER
25

      (MORE APPEARANCES ON THE NEXT PAGE)

                                                              3

1     FOR PLAINTIFF TRONG NGUYEN:
      LAW OFFICES OF COOPER & KIRKHAM, P.C.
2     655 MONTGOMERY STREET, SUITE 1700
      SAN FRANCISCO, CALIFORNIA  94111
3     TEL (415) 788-3030 FAX (415) 882-7040
      JDC@COOPKIRK@AOL.COM
4     BY:  JOSEF D. COOPER, ATTORNEY AT LAW

5     FOR DIRECT PLAINTIFF JEMS SOFTWARE, AND CONSULTING, INC:

6     WEXLER TORISEVA WALLACE
      1610 ARDEN WAY, SUITE 290

```
                        10-30-07 hearing.txt
 7    SACRAMENTO, CALIFORNIA  95815

      TEL (916) 568-1100 FAX (916) 568-7890

 8    MJT@WTWLAW.US, WWW.WTWLAW.US

      BY:  MARK J. TAMBLYN, ATTORNEY AT LAW

 9


10    FOR INDIRECT PURCHASER PLAINTIFFS: TRONG NGUYEN,


11    TECHTOYSFORLESS, ROXANNE MILLER:


12    THE FURTH FIRM, LLP

      225 BUSH STREET, 15TH FLOOR

13    SAN FRANCISCO, CALIFORNIA  94104

      TEL (415) 433-2070 FAX (415) 982-2076 HCIRILLO@FURTH.COM

14    BY:  HENRY A. CIRILLO, MANAGING PARTNER


15    FOR PLAINTIFF KAROL JUSKIEWICZ:


16    TRUMP ALIOTO TRUMP & PRESCOTT, LLP

      2280 UNION STREET

17    SAN FRANCISCO, CALIFORNIA  94123

      TEL (415) 447-1651 FAX (415) 346-0679

18    JPATANE@TATP.COM

      BY:  JOSEPH M. PATANE, ATTORNEY AT LAW

19

      TRUMP, ALIOTO & TRUMP

20    2280 UNION STREET

      SAN FRANCISCO, CALIFORNIA  94123

21    TEL (415) 563-7200 FAX (415) 346-0679 (415) 447-1650

      BY:  MARIO N. ALIOTO, ATTORNEY AT LAW

22
```

Page 5

10-30-07 hearing.txt

23    FOR PLAINTIFF BRIAN LEVY:


24    ABRAHAM, FRUCHTER & TWERSKY

       BY:  ARTHUR J. CHEN, ATTORNEY AT LAW

25    FIRM PHONE (212) 2379-5050 CELL (646) 785-6331

       ARTHCHEN@GMAIL.COM

⌷

                                                              4




1    (MORE APPEARANCES ON NEXT PAGE)


2    FOR PLAINTIFF CALIF-COAST INVESTIGATIVE SERVICES:


3    COTCHETT, PITRE & MCCARTHY

      SAN FRANCISCO AIRPORT OFFICE CENTER

4    840 MALCOLM ROAD, SUITE 200

      BURLINGAME, CALIFORNIA  94010

5    TEL (650) 697-6000 FAX (650) 697-0577

      JCOTCHETT@CPMLEGAL.COM

6    BY:  JOSEPH W. COTCHETT, ATTORNEY AT LAW


7    FOR PLAINTIFF WESTELL TECHNOLOGIES:


8    FREED KANNER LONDON & MILLEN, LLC

      2201 WAUKEGAN ROAD, SUITE 130

9    BANNOCKBURN, ILLINOIS  60015

      SKANNER@FKLMLAW.COM, WWW.FKLMLAW.COM

10   DIRECT (224) 632-4502 MAIN (224) 632-4500 FAX (224)

      632-4521

```
                        10-30-07 hearing.txt
11  BY:  STEVEN A. KANNER,

         MICHAEL FREED, ATTORNEYS AT LAW

12


13  FOR PLAINTIFF RICHARD THAL DIRECT PURCHASER:


14  MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C.

    22ND FLOOR ARCHITECTS BUILDING

15  117 S. 17TH STREET

    PHILADELPHIA, PA  19103

16  TEL (215) 564-5162 FAX (215) 569-0958

    BY:  STEVEN J. GREENFOGEL, ATTORNEY AT LAW

17

    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

18  EMBARCADERO CENTER WEST

    275 BATTERY STREET, 30TH FLOOR

19  SAN FRANCISCO, CALIFORNIA  94111-3339

    TEL (415) 956-1000 FAX (415) 956-1008

20  JSAVERI@LCHB.COM

    BY:  JOSEPH R. SAVERI,

21       ROBERT J. NELSON, ATTORNEYS AT LAW


22  ORRICK, HERRINGTON & SUTCLIFFE, LLP

    1000 MARSH ROAD

23  MENLO PARK, CALIFORNIA  94025-1021

    TEL (650) 614-7645 (HEAFEY (650) 614-7668 (O'ROURKE) FAX

24  (650) 614-7403

    MHEAFEY@ORRICK.COM, POROURKE@ORRICK.COM

25  BY:  MICHAEL F. HEAFEY,

         PETER O'ROURKE, ATTORNEYS AT LAW
```

                                                              5

                              Page 7

10-30-07 hearing.txt

```
 1    FOR PLAINTIFF TECHTOYSFORLESS:
      GUSTAFSON GLUEK, PLLC
 2    650 NORTHSTAR EAST
      608 SECOND AVENUE SOUTH
 3    MINNEAPOLIS, MN  55402
      TEL (612) 333-8844 FAX (612) 339-6622
 4    GUSTAFSONGLUEK.COM, RSTEINER@GUSTAFSONGLUEK.COM
      BY:  RENAE D. STEINER, ATTORNEY
 5

 6    FOR PLAINTIFF TRAVIS RICHARDSON:

 7    LAW OFFICE OF JOHN M. KELSON
      1999 HARRISON STREET, SUITE 700
 8    OAKLAND, CALIFORNIA  94612
      TEL (510) 465-1326 FAX (510) 465-0871
 9    BY: JOHN M. KELSON, ATTORNEY AT LAW

10    FOR DIRECT PLAINTIFFS A COMPUTER PLACE, FLASH MEMORY:

11    PEARSON SIMON SOTER WARSHAW PENNY, LLP
      15165 VENTURA BLVD., SUITE 400
12    SHERMAN OAKS, CALIFORNIA  91403
      TEL (818)788-8300 FAX (818) 788-8104 DIRECT (818) 205-2800
13    CELL (818) 489-6009 CPEARSON@PSSWPLAW.COM
      BY:  CLIFFORD H. PEARSON, ATTORNEY AT LAW
14
      PEARSON SIMON SOTER WARSHAW PENNY, LLP
```

Page 8

10-30-07 hearing.txt

15  44 MONTGOMERY STREET, SUITE 1200

    SAN FRANCISCO, CALIFORNIA  94104

16  TEL DIRECT (415) 433-9000, EXT 105 MAIN (415) 433-9000

    FAX (415) 433-9008

17  BSIMON@PSSWPLAW.COM

    BY:  BRUCE L. SIMON, ATTORNEY AT LAW

18

    COTCHETT, PITRE & MCCARTHY

19  840 MALCOLM ROAD

    BURLINGAME, CALIFORNIA  94010

20  TEL (650) 697-6000 FAX (650) 697-0577

    JCOTCHETT@CPMLEGAL.COM

21  BY:  JOSEPH W. COTCHETT, ATTORNEY AT LAW


22


23


24


25  (MORE APPEARANCES ON NEXT PAGE)



                                                              6



1  FOR CALIFORNIA COAST AND INDIRECT PLAINTIFFS:


2  COTCHETT, PITRE & MCCARTHY

   840 MALCOLM ROAD

3  BURLINGAME, CALIFORNIA  94010

   TEL (650) 697-6000 FAX (650) 697-0577

10-30-07 hearing.txt

4    SWILLIAMS@CPMLEGAL.COM

     BY:  STEVEN N. WILLIAMS, ATTORNEY AT LAW

5

6    FOR PLAINTIFF LAURA YOUNG:

7    REINHARDT WENDORF & BLANCHFIELD

     3-1250 FIRST NATIONAL BANK BUILDING

8    332 MINNESOTA STREET

     SAINT PAUL, MINNESOTA  55101

9    OFFICE TEL (651) 287-2100 FAX (651) 287-2103

     G.BLANCHFIELD@RWBLAWFIRM.COM

10   BY: GARRETT D. BLANCHFIELD, JR., ATTORNEY AT LAW

11   FOR PLAINTIFF WESTELL TECHNOLOGIES, INC.

12   THE MILLS LAW FIRM

     145 MARINA BOULEVARD

13   SAN RAFAEL, CALIFORNIA  94901

     TEL (415) 455-1326 FAX (415) 455-1327

14   BY:  ROBERT W. MILLS, ATTORNEY AT LAW

15   FOR PLAINTIFF NESTER TECH:

16   THE MILLS FIRM

     145 MARINA BOULEVARD

17   SAN RAFAEL, CALIFORNIA  94901

     TEL (415) 455-1326 FAX (415) 455-1327

18   BY:  HARRY SHULMAN, ATTORNEYS AT LAW

19   FOR INDIRECT PLAINTIFFS:

                          Page 10

10-30-07 hearing.txt

```
20   ZELLE HOFMANN VOELBEL MASON & GETTE
     A LIMITED LIABILITY PARTNERSHIP
21   44 MONTGOMERY STREET, SUITE 3400
     SAN FRANCISCO, CALIFORNIA  94104
22   TEL (415) 693-0700 FAX (415) 693-0770
     WWW.ZELLE.COM
23   BY:  FRANCIS SCARPULLA
            CHRISTOPHER T. MICHELETTI (PLAINTIFFS PERKINS)
24       CRAIG C. CORBITT
            QIANWEI FU, ATTORNEYS AT LAW
25   (MORE APPEARANCES ON NEXT PAGE)
```

7

```
1    FOR PLAINTIFF GEORGEJON, INC:


2    KAPLAN FOX & KILSHEIMER, LLP
     423 SUMAC ROAD
3    HIGHLAND PARK, ILLINOIS  60035
     TEL (847) 831-1585 FAX (847) 831-1580
4    GSPECK@KAPLANFOX.COM
     BY:  GARY L. SPECKS, OF COUNSEL
5


6    FOR DEFENDANTS:


7    FOR DEFENDANT WIENBORD:


8    FINNEGAN HENDERSON FARABOW GARRETT & DUNNER LLP
```

10-30-07 hearing.txt

STANFORD RESEARCH PARK

9   3300 HILLVIEW AVENUE

    PALO ALTO, CALIFORNIA  94304-1203

10  TEL (650) 849-6752 CELL (650) 862-3664 FAX (650) 849-6666

    WENDY.HERBY@FINNEGAN.COM

11  BY:  WENDY A. HERBY, ATTORNEY AT LAW

         STEVEN H. MORRISSETT, ATTORNEY AT LAW

12


13  KRIEG KELLER SLOAN REILLEY & ROMAN, LLP ATTORNEYS

    114 SANSOME STREET, 4TH FLOOR

14  SAN FRANCISCO, CALIFORNIA  94104-3898

    TEL (415) 249-8330 DIRECT (415) 318-3571 FAX (415) 249-8333

15  MLISI@KKSRR.COM

    BY:  MICHAEL D. LISI, ATTORNEY AT LAW

16

    GIBSON, DUNN & CRUTCHER, LLP

17  ONE MONTGOMERY STREET

    SAN FRANCISCO, CALIFORNIA  94104-4505

18  TEL (415) 393-8268 FAX (415) 374-8439

    JSANDERS@GIBSONDUNN.COM, WWW.GIBSONDUNN.COM

19  BY:  JOEL S. SANDERS, PARTNER


20  WILMER CUTLER PICKERING HALE AND DORR, LLP

    1117 CALIFORNIA AVENUE

21  PALO ALTO, CALIFORNIA  94304

    TEL (650) 858-6022 FAX (650) 858-6100

22  LEEOR.NETA@WILMERHALE.COM

    BY:  LEEOR NETA, ATTORNEY AT LAW

23

10-30-07 hearing.txt

24


25    (MORE APPEARANCES ON NEXT PAGE)



                                                                    8




1    HELLER EHRMAN WHITE & MCAULIFFE, LLP

     ATTORNEYS

2    333 BUSH STREET

     SAN FRANCISCO, CALIFORNIA  94104-2878

3    TEL (MAIN) (415) 772-6000 DIRECT (415) 772-6617

     FAX (415) 772-6268 SMORGAN@HEWM.COM

4    BY:  SCOTT E. MORGAN, ATTORNEY AT LAW


5    LATHAM & WATKINS

     505 MONTGOMERY STREET, SUITE 2000

6    SAN FRANCISCO, CALIFORNIA  94111-2562

     TEL (415) 391-0600 FAX (415) 395-8095 DIRECT (415) 395-8240

7    MOBILE (925) 997-2991 DAN.WALL@LW.COM

     BY:  DANIEL M. WALL, ATTORNEY AT LAW

8

     FOR HYNIX SEMICONDUCTOR AMERICA, INC:

9    O'MELVENY & MYERS, LLP

     EMBARCADERO CENTER WEST

10   275 BATTERY STREET

     SAN FRANCISCO, CALIFORNIA  94111-3305

11   TEL (415) 984-8700 DIRECT (415) 984-8876 FAX (415) 984-8701

     MTUBACH@OMM.COM

12   BY:  MICHAEL F. TUBACH,

           KATHERINE M. ROBISON, ATTORNEYS AT LAW

                        Page 13

10-30-07 hearing.txt

13

14

15

16

17

18

19

20

21

22

23

24

25   REPORTED BY:  STARR A. WILSON, CSR 2462

〇

9

1   OAKLAND, CALIFORNIA; TUESDAY, OCTOBER 30, 2007; 1:08 P.M.,

Page 14

10-30-07 hearing.txt

2  DEPARTMENT THREE; SAUNDRA BROWN ARMSTRONG, JUDGE

3                              -oOo-

4           THE CLERK:  ALL RISE.  THIS COURT IS NOW IN

5  SESSION.  THE HONORABLE SAUNDRA BROWN ARMSTRONG PRESIDING.

6           PLEASE BE SEATED.

7           CALLING CIVIL 0786, IN RE FLASH MEMORY.

8           WILL COUNSEL THAT HAVE FILED THE MOTIONS, PLEASE

9  STATE THEIR APPEARANCES FOR THE COURT?

10          MR. G. SAVERI:  GOOD AFTERNOON, YOUR HONOR.

11          THE COURT:  GOOD AFTERNOON.

12          MR. G. SAVARI:  MY NAME IS GUIDO SAVERI OF THE

13 FIRM SAVERI AND SAVERI.

14          THE COURT:  OKAY.

15          MR. G. SAVERI:  I REPRESENT TWO DIRECT PURCHASERS:

16 A COMPUTER PLACE AND GEORGE'S JON, INC.

17          THE COURT:  OKAY.
                     Page 15

10-30-07 hearing.txt

18          MR. G. SAVARI:  WE HAVE FILED A MOTION IN

19   CONNECTION WITH THE APPOINTMENT OF THE TERM COUNSEL.

20          THE COURT:  OKAY.  THANK YOU.

21          MR. G. SAVERI:  THANK YOU VERY MUCH.

22          MR. SIMON:  GOOD AFTERNOON, YOUR HONOR.  BRUCE

23   SIMON, PEARSON & SIMON, AND I'M OPPOSED COLEAD WITH

24   MR. SAVERI REPRESENTING COMPUTER PLACE.

25          THE COURT:  OKAY.  GOOD AFTERNOON.

                                                    10

1

2          MR. COTCHETT:  GOOD AFTERNOON, YOUR HONOR.  JOSEPH

3   COTCHETT AND FRANCIS SCARPULLA.

4          MR. SCARPULLA:  GOOD AFTERNOON, YOUR HONOR.

5          THE COURT:  GOOD AFTERNOON.

Page 16

10-30-07 hearing.txt

6          MR. COTCHETT:  WE FILED INDIVIDUAL CASES FOR THE

7    INDIRECT.  AND IF WE HAVEN'T BEEN ADVISED, WE'LL ADVISE YOU

8    THAT WE HAVE AGREED UPON A STRUCTURE THAT WE THINK WILL SAVE

9    THE COURT A LOT OF TIME.

10          THE COURT:  OKAY.  YOU'VE AGREED UPON A STRUCTURE.

11   AND YOU'VE AGREED -- ONE OF THE THINGS THAT -- AND I DON'T

12   KNOW IF THIS IS -- IF YOU RESOLVED IT -- IF YOU HAD, MAYBE

13   WE'LL GET TO YOURS SOONER THAN LATER -- BUT MY BIGGEST

14   CONCERN, ONE OF THE BIGGEST CONCERNS IS THAT I'M BEING ASKED

15   TO APPOINT FIVE LAW FIRMS IN A CASE THAT DOES NOT SEEM TO ME

16   TO WARRANT THAT MANY LAW FIRMS; TWO FOR DIRECT; TWO FOR

17   INDIRECT AND ONE LIAISON.

18          MR. COTCHETT:  THAT'S EXACTLY WHAT WE PUT TOGETHER

19   ON THE INDIRECT SIDE.

20          THE COURT:  WHAT?

21          MR. COTCHETT:  TWO LAW FIRMS ONLY ON THE INDIRECT

Page 17

10-30-07 hearing.txt

22    SIDE AS COLEAD COUNSEL AND THEN THE LIAISON.

23        THE COURT:  OKAY.  SO THE QUESTION I HAVE, I THINK

24    AS I HEAR EVERYBODY ELSE'S ANNOUNCEMENTS, IS WHETHER WE NEED

25    TO HAVE TWO LAW FIRMS ON -- ON EACH SIDE AS OPPOSED TO ONE

                                                                11

1    LAW FIRM.  AND THEN WHAT THE NEED FOR THE LIAISON IS, AND

2    WHAT THE LIAISON ACTIVITIES, WHATEVER THEY ARE, COULD BE

3    ASSUME THOSE RESPONSIBILITIES CAN BE RIGHTLY ASSUMED BY

4    WHOEVER THE LEAD COUNSEL ARE.  IT JUST SEEMS TO ME THAT FIVE

5    LAW FIRMS, UM, SEEMS TO BE A BIT MUCH.  SO THOSE -- THAT'S

6    KIND OF THE IDEAL WHY I BROUGHT YOU HERE SO WE CAN, AFTER

7    EVERYONE HAS ANNOUNCED THEIR --

8        MR. COTCHETT:  WE CAN SPEAK TO THAT, YOUR HONOR.

9        MR. SCARPULLA:  THANK YOU, YOUR HONOR.

10        MS. SALZMON:  HOLLIS SALZMON, LABATON SUCHAROW ON

10-30-07 hearing.txt

11   BEHALF OF THE JEMS PLAINTIFF.

12          THE COURT:  OKAY.  DID YOU FILE A MOTION?

13          MS. SALZMON:  YES, YOUR HONOR.  WE HAVE A -- A

14   CROSS MOTION FOR LEADERSHIP IN THE DIRECT CASES.

15          THE COURT:  FOR THE JAMES FIRM?

16          MS. SALZMON:  JEMS.  J-E-M-S.

17          THE COURT:  OKAY.  AND YOU WANT TO BE LEAD

18   PLAINTIFF?

19          MS. SALZMON:  YES, YOUR HONOR.

20          THE COURT:  OKAY.  THANK YOU.

21          MS. SALZMON:  THANK YOU.

22          THE COURT:  OKAY.

23          MR. J. SAVERI:  GOOD AFTERNOON, YOUR HONOR.

24   JOSEPH SAVERI FROM LIEFF, CABRASER, HEIMAN & BERNSTEIN ON

25   BEHALF OF PLAINTIFF RICHARD THAL.

10-30-07 hearing.txt

1           MY PARTNER, ROBERT NELSON.

2           THE COURT:  HI, MR. NELSON.

3           MR. NELSON:  HI, YOUR HONOR.

4           THE COURT:  GOOD SEEING YOU AGAIN.  I HAVEN'T SEEN

5  YOU IN YEARS.

6           MR. NELSON:  I WAS JUST THINKING THAT MYSELF.  WAY

7  TOO LONG.

8           MR. J. SAVERI:  AND WE ALSO SUBMITTED AN

9  APPLICATION TO BE APPOINTED LEAD COUNSEL FOR THE DIRECT

10  PLAINTIFFS.

11           THE COURT:  OKAY.  THANK YOU.

12           MR. J. SAVERI:  THANK YOU, YOUR HONOR.

13           MR. HOWARD:  GOOD AFTERNOON.  DEREK HOWARD WITH

14  MURRAY & HOWARD.  AND WE FILED A MOTION FOR LIAISON COUNSEL

10-30-07 hearing.txt

15    ON THE INDIRECT SIDE.

16             THE COURT:  RIGHT.  RIGHT.

17             MR. HOWARD:  THANK YOU.

18             THE COURT:  OKAY.  WE DON'T HAVE ANYONE FOR THE

19    DIRECT SIDE ACTING FOR THE LIAISON.  THERE IS A PARTY THAT

20    ARE HERE THAT HAVE SOMEBODY MORE ON THE -- THAT'S WHY YOU'RE

21    --

22             MR. HOWARD:  EXACTLY, YOUR HONOR.

23             THE COURT:  OKAY.  OKAY.

24             MR. FREED:  GOOD MORNING, YOUR HONOR.  MICHAEL

25    FREED AND STEPHEN KANNER REPRESENTING PLAINTIFF WESTELL

                                                    13

1    TECHNOLOGIES.

2             WE ARE SUPPORTING MR. SAVERI AND MR. SIMON FOR

3    LEAD COUNSEL IN THE DIRECT CASES.  BUT WE ALSO HAVE AN

10-30-07 hearing.txt

4    ALTERNATIVE MOTION, DEPENDING UPON WHETHER YOUR HONOR WANTS

5    TO CONSIDER OTHER LEAD COUNSEL.

6              THE COURT:  OKAY.  OKAY.  GO AHEAD.  THANK YOU.

7              GOOD AFTERNOON.

8              MR. GIRARD:  GOOD AFTERNOON, YOUR HONOR.  I'M DAN

9    GIRARD.  MY FIRM IS GIRARD GIBBS.  WE ARE MOVANTS FOR

10   INTERIM CLASS COUNSEL ON THE INDIRECT SIDE ON BEHALF OF THE

11   PLAINTIFF DAN HARRISON.

12             THE COURT:  OKAY.

13             MR. GIRARD:  AND I'M HERE WITH MY PARTNER

14   ELIZABETH PRITZKER ALSO.

15             THE COURT:  OKAY.  GREAT.  THANK YOU.

16             GOOD AFTERNOON.

17             MR. CIRILLO:  GOOD AFTERNOON, YOUR HONOR.  HENRY

18   CIRILLO FROM THE FURTH FIRM.  WE FILED A BRIEF IN SUPPORT OF

19   THE ZELLE HOFMANN FIRM AND THE GUSTAFSON FIRM FOR LEAD OF

10-30-07 hearing.txt

20   THE INDIRECT PURCHASER PLAINTIFFS.

21            THE COURT:  OKAY.  GREAT.  THANK YOU.

22            MS. KROOP:  GOOD AFTERNOON, YOUR HONOR.  LARA

23   KROOP ON BEHALF OF THE US DEPARTMENT OF JUSTICE AND I'M HERE

24   WITH NAT COUSINS.

25            MR. COUSINS:  GOOD AFTERNOON, YOUR HONOR.

                                                      14

1            THE COURT:  GOOD AFTERNOON.

2            MR. BLANCHFIELD:  GOOD AFTERNOON.  GOOD AFTERNOON,

3   YOUR HONOR.  GARRETT BLANCHFIELD HERE ON BEHALF OF PLAINTIFF

4   LAURA YOUNG.

5            LIKE MR. FREED EARLIER, WE SUBMITTED PAPERS IN

6   SUPPORT OF THE SIMON FIRM AND THE SAVERI FIRM AS LEAD

7   COUNSEL.  BUT IF THE COURT IS GOING TO CONSIDER EXPANDING

8   THE LEAD COUNSEL FOR THE DIRECT PURCHASER CASES, THEN WE HAD

10-30-07 hearing.txt

9    SUBMITTED AN APPLICATION TO BE CONSIDERED FOR THAT POSITION.

10         THE COURT:  OKAY.  THANK YOU.

11         GOOD AFTERNOON.

12         MR. R. SAVERI:  GOOD AFTERNOON, YOUR HONOR.

13         THE COURT:  GOOD AFTERNOON.

14         MR. R. SAVERI:  RICK SAVERI FROM SAVERI AND

15    SAVERI.  I'M HERE ALSO WITH GUIDO SAVERI AND WITH BRUCE

16    SIMON FOR THE LEAD COUNSEL POSITION.

17         THE COURT:  OKAY.  THANK YOU.

18         MR. R. SAVERI:  THANK YOU.

19         MR. BIRKHAEUSER:  AND, FINALLY, YOUR HONOR, DAN

20    BIRKHAEUSER.  WE REPRESENT TRAVIS WEIBE AND OTHERS.  THERE

21    IS AN ADMINISTRATIVE MOTION TO RELATE THE CASES THAT'S

22    PENDING.  WE'VE ALSO FILED A JOINDER IN SUPPORT OF THE

23    LEADERSHIP STRUCTURE ON THE INDIRECT SIDE.

10-30-07 hearing.txt

24          THE COURT:  OKAY.  THANK YOU.

25          MR. BIRKHAEUSER:  THANK YOU, YOUR HONOR.

☐
                                                        15

1               MR. HEFFELFINGER:  GOOD AFTERNOON, YOUR HONOR.

2    CHRIS HEFFELFINGER FROM BERMAN, DEVALERIO, PEASE, TABACCO,

3    BURT & PUCILLO ON BEHALF OF THE PLAINTIFF, KEVIN'S COMPUTER

4    PLACE.  AND WE'RE HERE SUPPORTING THE APPLICATION OF

5    MR. SAVERI AND MR. SIMON TODAY ON THE DIRECT SIDE.

6               THE COURT:  OKAY.  THANK YOU.

7               OKAY.  UM, AS I INDICATED RIGHT WHEN I HAVE BEFORE

8    ME, ON MOTIONS TO APPOINT INTERIM CLASS COUNSEL FOR DIRECT

9    PURCHASER PLAINTIFFS AS WELL AS FOR THE INDIRECT PURCHASER

10   PLAINTIFFS AND THE APPOINTMENT OF LIAISON COUNSEL.

11              UM, I ALSO HAVE THE REQUEST FOR LETTERS OF

12   ROGATORY BUT I THINK WE'RE GOING TO DELAY THAT UNTIL AFTER

10-30-07 hearing.txt

13    WE APPOINT COUNSEL AND HAVE THE CONSOLIDATED COMPLAINT

14    FILED.

15         UM, SO THE REASON THAT I, UM, I DECIDED TO KEEP

16    THIS ON CALENDAR WAS BECAUSE IN REVIEWING THIS I -- I HAD

17    SOME QUESTION IN TERMS OF THE NEED FOR FIVE LAW FIRMS AS

18    LEAD PLAINTIFF, AS LEAD COUNSEL IN THIS CASE.  AND, UM, AND

19    ALSO THE -- THE NEED FOR AN INTERIM LAW FIRM AS LIAISON.

20    AND WHAT THAT PERSON -- WHAT THAT FIRM IS GOING TO BE DOING.

21    AND I DON'T KNOW IF YOU ALL HAD MET AND CONFERRED OR

22    DISCUSSED ANY OF THIS.  I, FROM SPEAKING, FROM HEARING FROM

23    MR. COTCHETT, MAYBE WE SHOULD START WITH YOU.

24         MR. COTCHETT:  THANK YOU, YOUR HONOR.

25         THE COURT:  SINCE YOU ALL HAVE APPARENTLY

                                                      16

1    DISCUSSED IT.

10-30-07 hearing.txt

2           MR. COTCHETT:  YES.

3           THE COURT:  BECAUSE MY CONCERN IS, JUST BASED ON

4    THE TOP HEAVINESS OF THIS AND THE EXTENT TO WHICH THESE

5    RESPONSIBILITIES IN THIS -- BECAUSE THIS REALLY DOESN'T

6    APPEAR TO BE THAT LARGE OF A CASE THAT WOULD WARRANT IT, UM,

7    THAT NUMBER OF LAW FIRMS INVOLVED, BUT I CERTAINLY CAN SPEAK

8    BECAUSE, OTHERWISE, YOU ALL HAVE GIVEN IT SOME THOUGHT.  BUT

9    I'M CONCERNED ABOUT WHETHER OR NOT THE LEAD LAW FIRM SHOULD

10   BE ASSUMING THE RESPONSIBILITIES THAT THE INTERIM -- THAT

11   THIS LAW FIRM WANTS TO ASSUME.  AND IF NOT, WHY CAN'T THE

12   LAW FIRMS DO THAT?

13           AND, SECONDLY, AND MORE IMPORTANTLY, WHETHER --

14   WHETHER IT'S NECESSARY TO HAVE TWO LAW FIRMS AS LEAD COUNSEL

15   FOR INDIRECT AND THEN TWO OF THE ADDITIONAL FOR DIRECT.  OR

16   WHETHER IT CAN BE ASSUMED BY LAW ONE FIRM SUFFICIENTLY,

17   WITHOUT COMPROMISING THE QUALITY OF THE PREPARATION OF

10-30-07 hearing.txt

18    ACTIVITIES, AND ALSO WITHOUT DUPLICATING EXPENSE.  YOU KNOW,

19    WHETHER THERE IS GOING TO BE SOME SAVINGS TO THE CLASS

20    MEMBERS BY HAVING ONE LAW FIRM ASSUMING RESPONSIBILITIES OR

21    WHETHER THERE REALLY IS, UM, SEEMINGLY APPROPRIATE AND

22    NECESSARY TO HAVE FIVE OR TWO ON EACH SIDE AND A LIAISON.

23    SO THAT'S KIND OF MY --

24              MR. COTCHETT:  SURE.

25              THE COURT:  -- CONCERN.

                                                          17

1              MR. COTCHETT:  AS YOUR HONOR WILL RECALL FROM THE

2    PAPERWORK THAT WAS FILED, THERE WERE APPROXIMATELY FOUR

3    MOTIONS FOR LEAD COUNSEL IN THE INDIRECT.  I'M ONLY SPEAKING

4    INDIRECT NOW.

5              THE COURT:  OKAY.

10-30-07 hearing.txt

6           MR. COTCHETT:  A, LET ME SAY THAT THIS IS, WE

7    BELIEVE, A VERY VERY LARGE CASE.  I DON'T WANT TO GO THROUGH

8    THE BACKGROUND OF WHAT FLASH MEMORY IS BUT -- BECAUSE YOU'VE

9    READ ALL THE PAPERWORK, YOU KNOW THAT FLASH MEMORY

10   ENCOMPASSES EVERYTHING FROM THE LITTLE ITEM YOU PUT INTO

11   YOUR DIGITAL CAMERA ALL THE WAY UP TO YOUR HANDHELD DEVICES.

12   IT'S AN ENORMOUS CASE.

13           THE COURT:  LIKE 23 -- 23 PLAINTIFFS?

14           MR. COTCHETT:  RIGHT NOW ON THE INDIRECT SIDE,

15   THAT'S CORRECT.

16           THE COURT:  OKAY.

17           MR. COTCHETT:  IF NOT MORE THAT IS STILL BEING

18   FILED.

19           WE SAT DOWN AND WE LOOKED AT THIS CASE FROM A

20   LOGICAL POINT OF VIEW OF WHAT KIND OF DOCUMENTS WOULD BE

21   REQUIRED TO REVIEW THE, AT THE OUTSET, AND WE COMPARED IT

Page 29

10-30-07 hearing.txt

22    WITH THE D-RAM CASE, THE S-RAM CASE AND THE SIMILAR CASES.

23            IN LOOKING AT THOSE CASES, I CAN'T GIVE YOU THE

24    NUMBER OF THOUSANDS OF DOCUMENTS, BUT WE WERE TALKING ABOUT

25    THOUSANDS, LITERALLY, IF NOT THOUSANDS, HUNDREDS OF

                                                                18

1    THOUSANDS, TENS OF THOUSANDS OF DOCUMENTS, AND THE

2    DEPOSITIONS THAT GO ALONG WITH THAT, AND THE CERTIFICATION.

3    THIS IS CLEARLY AN EXAMPLE, IN MY 40 YEARS OF PRACTICE, I

4    THINK THIS HAPPENS TO BE ONE OF THE LARGEST OF THE

5    COLLATERAL CASES, D-RAM, S-RAM, AND THE COLLECTIVE

6    ELECTRONIC CASES.

7            WE THOUGHT, LOGICALLY SPEAKING, THERE IS SOME VERY

8    VERY FINE LAW FIRMS, ALL OF WHICH HAVE APPLIED FOR

9    LEADERSHIP.  I THINK THAT EACH ONE IS AS GOOD AS ANOTHER.

10            WE SAT DOWN AMONG OURSELVES AND --

10-30-07 hearing.txt

11          THE COURT:  THAT'S TRUE.  THAT'S EXACTLY WHY I HAD

12   YOU ALL COME IN BECAUSE THERE ARE GOOD LAW FIRMS, AND SOME

13   OF WHICH HAVE APPLIED TO RELIEVE COUNSEL INDIVIDUALLY.  AND

14   THEN, OF COURSE, WE HAVE LAW FIRMS THAT ARE ASKING TO -- TO

15   RELIEVE COUNSEL IN COMBINATION WITH ANOTHER LAW FIRM.

16          AND I'M THINKING THAT IF -- IF THE ONES THAT ARE

17   APPLYING INDIVIDUALLY ARE EXCELLENT LAW FIRMS.  AND I --

18   THAT'S -- THAT'S ONE OF THE REASONS WHY I'M HERE BECAUSE

19   I -- I AM, UM, NEEDING TO BE PERSUADED THAT IS NECESSARY TO

20   HAVE TWO ON EACH SIDE.

21          MR. COTCHETT:  AS YOU KNOW, WE APPLIED AS AN

22   INDIVIDUAL LAW FIRM.

23          THE COURT:  RIGHT.  I KNOW THAT.

24          MR. COTCHETT:  HOWEVER, WE WERE PERSUADED, AFTER

25   SITTING DOWN WITH OTHER COUNSEL, THAT THIS CASE IS SO LARGE

19

10-30-07 hearing.txt

1    THAT IT SHOULD HAVE TWO LAW FIRMS AT THE HEAD.

2          UM, TRADITIONALLY, WHEN WE LOOK AT THESE CASES

3    HAVE BEEN EITHER TWO, FOUR OR SOMETIMES EVEN SIX UP THERE.

4    AND I UNDERSTAND THE COURT'S CONCERN.  OBVIOUSLY, EFFICIENCY

5    IS WHAT IT'S ALL ABOUT.

6          THE COURT:  UH-HUH.

7          MR. COTCHETT:  BUT I TRULY BELIEVE, IN LOOKING AT

8    THIS CASE, THE SIZE OF IT, AND COMPARING IT ANALYTICALLY

9    WITH THE D-RAM, S-RAM, AS I SAID, FOR, AND OTHER CASES, THIS

10   CASE COULD CONSUME, I DON'T WANT TO USE THIS PHRASE LIGHTLY,

11   A HUNDRED LAW FIRMS.  AND I THINK THAT TWO AT THE HEAD --

12   COULD THERE BE ONE AT THE HEAD AND DIRECT OTHERS?

13   OBVIOUSLY, AS THE COURT KNOWS, WE'RE GOING TO HAVE TO HAVE

14   ASSISTANCE FROM MANY OF THESE LAW FIRMS.  IN TERMS OF TAKING

10-30-07 hearing.txt

15   DEPOSITIONS, THERE WILL BE DIFFERENT TRACKS GOING AT ALL

16   TIMES AND YOU WILL DEAL WITH THAT AT THE CONCLUSION OF THE

17   CASE WHEN YOU LOOK AT FEE APPLICATION IF THE CASE IS

18   SUCCESSFUL.

19           THE COURT:  NOW, YOU'RE ONLY SPEAKING WITH RESPECT

20   TO THE INDIRECT PERSONS?

21           MR. COTCHETT:  I'M ONLY SPEAKING IN REGARD TO THE

22   INDIRECT.  THAT IS A TOTAL SEPARATE CASE, IF YOU WILL, FROM

23   THE DIRECT.  TOTALLY SEPARATE.

24           A LOT MORE COMPLICATED, I MIGHT ADD, BECAUSE

25   ALTHOUGH WE MAKE AN ARGUMENT THAT MANY OF THESE PRODUCTS ARE

                                                          20

1    STAND ALONE ITEMS --

2            THE COURT:  UH-HUH.

3            MR. COTCHETT:  LET ME GIVE YOU AN EXAMPLE, AGAIN

                           Page 33

10-30-07 hearing.txt

4    USING THE CAMERA, THE LITTLE FLASH CARD THAT YOU PUT, THAT

5    IS A STAND ALONE ITEM.  THAT IS NOT BUILT INTO A COMPUTER,

6    FOR EXAMPLE.

7          WE BELIEVE THE INDIRECT SIDE IS A LOT MORE

8    COMPLICATED, IF YOU WILL, AND IS DESERVING OF TWO LAW FIRMS.

9          COULD ONE LAW FIRM BE THE TITULAR HEAD AND RUN A

10   STEERING COMMITTEE?  THE ANSWER'S YES.  I HAPPEN TO BELIEVE

11   PERSONALLY WE HAVE SOME EXCELLENT FIRMS HERE.  I KNOW

12   MR. SCARPULLA.  WE WORKED TOGETHER.  AND IT WAS OUR

13   THINKING, AFTER SITTING DOWN WITH A NUMBER OF PEOPLE, THAT'S

14   A ZELLE HOFMANN FIRM, AFTER SITTING DOWN WITH THEM WE

15   THOUGHT THAT TWO LAW FIRMS COULD HEAD THIS UP.

16          THE COURT:  NOW, YOU SAID, MY COURTROOM DEPUTY

17   CAME IN AND TOLD ME THAT SOMEONE HAD TOLD ME THAT YOU ALL

18   HAD COME TO AN AGREEMENT.  WHEN YOU SAY YOU HAD COME TO AN

19   AGREEMENT WHO --

10-30-07 hearing.txt

20          MR. COTCHETT:  THE COTCHETT FIRM HAS COME TO AN

21    AGREEMENT THE ZELLE HOFMANN FIRM TO BE COLEAD COUNSEL FOR

22    THE INDIRECTS.

23          THE COURT:  SO WHAT HAPPENED TO GUSTAFSON --

24    GUSTAFSON & GLUEK?

25          MR. COTCHETT:  THEY ARE WILLING TO STEP BACK AND

21

1    TAKE A -- ANOTHER ROLE IN THE CASE.

2          THE COURT:  AND SO BOTH OF YOU ACTUALLY HAVE FOUR

3    PLAINTIFF; GUSTAFSON HAS FOUR AND YOU ALSO HAVE FOUR?

4          MR. COTCHETT:  YES.

5          THE COURT:  SO THAT'S KIND OF THE EVEN --

6          MR. COTCHETT:  WELL, IT'S NOT SO --

7          THE COURT:  WHAT ABOUT THE PLAINTIFFS BECAUSE MY

8    UNDERSTANDING WAS THE PLAINTIFFS FROM GUSTAFSON HAD PLACED

Page 35

10-30-07 hearing.txt

9    THEIR SUPPORT BEHIND ZELLE AND GUSTAFSON?

10           MR. COTCHETT:  CORRECT.

11           THE COURT:  SO -- SO, UM -- AND I'M ASSUMING YOUR

12    PLAINTIFFS ARE PLACING YOUR --

13           MR. COTCHETT:  YES.

14           THE COURT:  -- THEIR SUPPORT BEHIND YOU.

15           MR. COTCHETT:  YES.

16           THE COURT:  WHAT ABOUT -- WHAT ABOUT THEIR

17    POSITION, THESE PLAINTIFFS THAT ARE -- THAT HAVE PREVIOUSLY

18    BEEN SUPPORTING GUSTAFSON?  ARE THEY SUPPORTIVE OF THE

19    SUBSTITUTION?

20           MR. COTCHETT:  THE ANSWER IS I WILL LET

21    MR. SCARPULLA SPEAK TO THAT DIRECTLY.  JUST AS THE

22    PLAINTIFFS THAT WERE SUPPORTING US HAVE AGREED LIKEWISE,

23    THAT MR. SCARPULLA'S FIRM, ZELLE HOFMANN, COULD BE COLEAD.

```
                              10-30-07 hearing.txt
     24   WE COME TO WHAT, I THINK, IS A VERY VERY WORKABLE AND

     25   EFFICIENT WAY TO RUN THE CASE.
```

                                                                    22


```
      1           THE COURT:  OKAY.  THANK YOU.  MR. COTCHETT.

      2           MR. SCARPULLA:  THANK YOU, YOUR HONOR.  FRANCIS

      3   SCARPULLA, YOUR HONOR.  MAY IT PLEASE THE COURT.

      4           YES, WE HAVE AN AGREEMENT WITH MR. GUSTAFSON'S

      5   FIRM THAT THEY WOULD SUPPORT THIS STRUCTURE.

      6           BUT NOT ONLY THAT, YOUR HONOR, IN, AS MR. COTCHETT

      7   POINTED OUT, IN THE INDIRECT PURCHASER'S SIDE OF THE CASE,

      8   THERE ARE, AS YOUR HONOR KNOWS, A NUMBER OF REPEALER STATES.

      9   AND EACH STATE HAS ITS OWN LAW.

     10           WE HAVE SUED, NOT ONLY FOR A FIFTY-STATE CLASS,

     11   BUT ALSO FOR SEPARATE STATE CLASSES UNDER EACH STATE'S

     12   APPROPRIATE CONSUMER PROTECTION OR ANTITRUST LAW.  THAT IS
```

10-30-07 hearing.txt

13    GOING TO TAKE A LOT OF WORK AND A LOT MORE INVOLVEMENT OF

14    LAWYERS AND STRUCTURE THAN ON THE DIRECT SIDE.

15            SO THAT'S WHY MR. COTCHETT AND I AGREED THAT WHAT

16    WE SHOULD DO IS HAVE TWO PEOPLE -- TWO FIRMS THAT WOULD BE

17    ABLE TO EFFICIENTLY RUN THAT SIDE OF THE CASE.

18            IT IS SIGNIFICANTLY DIFFERENT.  WE HAVE TO PROVE

19    NOT ONLY LIABILITY AND DAMAGE, BUT THAT EACH -- THAT THE

20    OVERCHARGES WERE PASSED ON TO US DOWN THROUGH THE CHAIN.

21            AND IN THE EVENT THAT THERE ARE CLAIMS MADE BY

22    DIFFERENT LEVELS ON THAT CHAIN OF DISTRIBUTION, YOU REALLY

23    DO NEED SEPARATE COUNSEL FOR THEM.  AND THAT WAS ANOTHER

24    REASON --

25            THE COURT:  RIGHT.

23

1            MR. SCARPULLA:  -- THAT WE DISCUSSED HAVING AT

10-30-07 hearing.txt

2    LEAST TWO PEOPLE.

3         SO IF RESELLERS MAKE CLAIMS AND CONSUMERS MAKE

4    CLAIMS --

5         THE COURT:  UH-HUH.

6         MR. SCARPULLA:  -- THAT WE WOULD MAINTAIN THAT

7    SEPARATION.

8         THE COURT:  OKAY.  SO THAT'S --

9         MR. SCARPULLA:  SO, THEREFORE, I MEAN THERE'S A

10   REASON FOR WHAT WE HAVE DONE, YOUR HONOR.

11        THE COURT:  OKAY.  SO RIGHT NOW THE QUESTION

12   THOUGH IS -- IS THE SUBSTITUTION OF COTCHETT FOR GUSTAFSON.

13        THE QUESTION I HAVE WHICH BROUGHT YOU HERE, I

14   THOUGHT, OR AT LEAST BROUGHT YOU TO THE PODIUM, I THOUGHT,

15   WAS WHETHER OR NOT THE PLAINTIFFS THAT HAD BEEN SUPPORTING

16   THE ZELLE GUSTAFSON COMBINATION ARE ALSO SUPPORTING THE

17   ZELLE COTCHETT.

10-30-07 hearing.txt

18          MR. SCARPULLA:  THAT IS WHAT MR. GUSTAFSON TOLD ME

19   HE WAS DOING.

20          THE COURT:  OKAY.  SOMEONE IS COMING FORWARD.

21          MS. STEINER:  YOUR HONOR, MAY IT PLEASE THE COURT,

22   RENAE STEINER FROM GUSTAFSON GLUEK.  DAN GIRARD IS STANDING

23   HERE AS WELL.

24          ALL FOUR OF OUR FIRMS MOVE TO BE LEAD COUNSEL IN

25   THIS CASE.

                                                        24

1          THE COURT:  RIGHT.

2          MS. STEINER:  IN TALKING TOGETHER, WE ALL FOUR

3   AGREE THAT MR. COTCHETT'S FIRM AND MR. SCARPULLA'S FIRM WE

4   WOULD SUPPORT HERE TODAY AS THE TWO LEAD COUNSEL.

5          THE COURT:  OKAY.

10-30-07 hearing.txt
6            MS. STEINER:  WE THINK THAT'S A GOOD STRUCTURE FOR

7    ALL THE REASONS THEY TALKED ABOUT.

8            WE ALSO WANT TO POINT OUT, I THINK --

9            THE COURT:  SO YOU'RE WITHDRAWING YOUR REQUEST?

10           MS. STEINER:  THAT IS CORRECT.  IN SUPPORT OF THE

11   STRUCTURE THEY HAVE JUST EXPLAINED.

12           THE COURT:  OKAY.

13           MS. STEINER:  UM, YOUR HONOR, THERE'S NOT JUST 23

14   PLAINTIFFS, OF COURSE, IN OUR PROPOSED CLASS.  THERE'S

15   MILLIONS AND MILLIONS OF CONSUMERS.  AND MR. COTCHETT TALKED

16   ABOUT THIS CASE.

17           THE COURT:  I'M TALKING ABOUT THE NAMES OF

18   PLAINTIFFS THAT HAVE BEEN NAMED THUS FAR IN THIS HEARING.

19           MS. STEINER:  THAT'S CORRECT, YOUR HONOR.

20   MR. COTCHETT TALKED ABOUT THE SIZE OF THIS CASE.  THERE ARE

21   BILLIONS OF DOLLARS IN COMMERCE IN THE UNITED STATES OVER

10-30-07 hearing.txt

22   THE PROPOSED CLASS PERIOD.

23         FOR EXAMPLE, IN D-RAM, WHICH I WORKED ON QUITE A

24   BIT, WE REVIEWED FOUR MILLION PAGES OF DOCUMENTS, TOOK OVER

25   A HUNDRED DEPOSITIONS, AND, UNLIKE THE DIRECT CASE, HAD TO

                                                              25

1   DO DOWNSTREAM DISCOVERY TO SHOW THE PASS THROUGH.  AND IN --

2   ALSO DID 29 THIRD PARTY 30(B(60)S AND DISCOVERY ON THOSE

3   PEOPLE SO IT IS A TREMENDOUS AMOUNT OF WORK.

4         THE COURT:  OKAY.

5         MS. STEINER:  AND WE THINK COLLECTIVELY WE CAN

6   HARNESS EVERYBODY TO GO FORWARD.

7         THE COURT:  I DIDN'T MEAN TO SLIGHT YOU.  I KNEW

8   YOU WERE STANDING HERE.

9         MR. GIRARD:  NOT AT ALL, YOUR HONOR.

10         I'M DAN GIRARD.  AND SO MY FIRM IS THE OTHER

Page 42

10-30-07 hearing.txt

11    APPLICANT FOR INTERIM COUNSEL ON THE INDIRECT SIDE.  UM,

12    WE'RE PREPARED TO SUPPORT, MR. SCARPULLA AND MR. COTCHETT AS

13    COLEAD.

14              THE COURT:  THAT IS GIRARD GIBBS?

15              MR. GIRARD:  THAT IS GIRARD GIBBS.  EXACTLY.

16    WE'RE HERE IN SAN FRANCISCO.

17              THE COURT:  SO YOU'RE WITHDRAWING YOUR MOTION AS

18    WELL?

19              MR. GIRARD:  WE WILL SUPPORT THE PROPOSAL.

20              THE COURT:  OKAY.

21              MR. GIRARD:  UM, I DID WANT TO SPEAK TO THE TWO

22    VERSES, THE ONE POINT THE COURT IS CONSIDERING.

23              THE COURT:  YOU ALL HAVE PRETTY MUCH PERSUADED ME.

24    YOU CAN SPEAK IF YOU LIKE.

25              MR. GIRARD:  I'LL LEAVE IT AT THAT IF THAT IS

26

10-30-07 hearing.txt

1    ACCEPTABLE.

2              THE COURT:  YEAH.  I AM PERSUADED.

3              SO GIVEN THE WITHDRAWAL OF THE OTHER APPLICANTS

4    AND GIVEN THE -- IT SEEMS TO ME -- THE UNANIMITY WITH

5    RESPECT TO THE CHOICE OF CELL AND COTCHETT, THEN ZELLE AND

6    COTCHETT WILL BE APPOINTED LEAD --

7              MR. SCARPULLA:  THANK YOU.

8              THE COURT:  -- COUNSEL FOR THE INDIRECT

9    PLAINTIFFS.

10             MR. SCARPULLA:  THANK YOU.  WE'LL GET AN ORDER TO

11   YOU.

12             THE COURT:  AND ALSO I NEED YOU TO SPEAK TO

13   MR. MURRAY, THE LIAISON.

14             MR. HOWARD:  YES.  DEREK --

Page 44

10-30-07 hearing.txt

15          THE COURT:  BECAUSE THE LIAISON FOR THE INDIRECT

16   BECAUSE THIS IS FOR THE INDIRECT SIDE.  MY QUESTION IS

17   WHETHER THERE IS A NEED FOR IT.  AND THE LIAISON ON THE

18   INDIRECT SIDE OR WHETHER THIS IS SOMETHING THAT CAN --

19   CAN -- CAN BE.

20          FIRST OF ALL, LET ME ASK YOU, TELL ME THE

21   RESPONSIBILITIES THAT LIAISON WILL BE ASSUMING?  WHAT IS IT

22   THAT YOU --

23          MR. HOWARD:  WELL, YOUR HONOR, TO SPEAK TO THAT

24   POINT DIRECTLY, TWO THINGS:  FIRST OFF, ALL OF THESE

25   APPLICANTS SUPPORTED OUR -- OUR POSITION IN APPLYING FOR

27

1   LIAISON COUNSEL.  AND THE LAWYERS THAT WISHED TO LEAD THIS

2   CASE SEE THIS AS A NECESSARY ROLE AND AN IMPORTANT ROLE FOR

3   THEM.

Page 45

10-30-07 hearing.txt

4          THE COURT:  TO DO WHAT?

5          MR. HOWARD:  IN DISCHARGING THEIR LEAD COUNSEL

6   DUTIES.

7          THE COURT:  SO WHAT IS THE RULE?

8          MR. HOWARD:  THE DUTIES ARE TRADITIONALLY

9   CONSIDERED TO BE MORE ADMINISTRATIVE THAN SUBSTANTIVE.  WE

10  ACT AS A COORDINATOR AND A FACILITATOR AMONG THE PLAINTIFFS'

11  COUNSELS THEMSELVES, WHICH TAKES QUITE A BIT OF WORK.

12          IT INCREASES THE EFFICIENCY IN THE MANNER IN WHICH

13  THE ASSIGNMENTS ARE GIVEN OUT AND TO MAKE SURE THAT

14  EVERYBODY IS WORKING THE CASE IN AN EFFICIENT MANNER.  IT

15  TAKES THE BURDEN OFF OF LEAD COUNSEL SO THEY CAN DEVOTE

16  THEIR --

17          THE COURT:  BUT WHAT IS IT?  WHAT IS IT

18  SPECIFICALLY THAT IT WILL BE DOING THAT A PARALEGAL COUNSEL

19  COULDN'T DO?

Page 46

10-30-07 hearing.txt

20          MR. HOWARD:  I WOULD -- I WOULD -- WELL,

21    TRADITIONALLY, THAT POSITION IS GIVEN TO A FIRM BUT I CAN

22    LIST THEM FOR YOU SPECIFICALLY.  NUMBER ONE, COMMUNICATING

23    WITH THE COURT.  MAKING SURE THAT FILINGS ARE DONE,

24    ELECTRONIC FILINGS AND ANY OTHER FILINGS THAT NEED TO BE

25    MADE ARE DONE EFFICIENTLY.  AND --

                                                            28

1          THE COURT:  WHY WOULDN'T LEAD COUNSEL DO THAT?

2          MR. HOWARD:  WELL, BECAUSE WHEN WE ARE WORKING

3    WITH A BUNCH OF LAW FIRMS WE HAVE TO HAVE SOMEONE THAT IS

4    ACTING AS A POINT PERSON TO MAKE SURE THAT EVERYBODY GETS

5    FILED AND THAT DRAFTS ARE EXCHANGED AND WHATNOT.

6          THE COURT:  AND LEAD COUNSEL WOULDN'T DO THAT?

7    THAT IS NOT THEIR RESPONSIBILITY?

8          MR. HOWARD:  WELL, YOUR HONOR, TRADITIONALLY AND
                              Page 47

10-30-07 hearing.txt

9    PARTICULARLY IN THESE LARGER ANTITRUST CASES, THERE HAS

10   BEEN, FOR EXAMPLE, AN LCD MATTER PENDING BEFORE JUDGE

11   ILLSTON.  THERE HAS BEEN -- I'VE BEEN WORKING ACTIVELY ON

12   THAT CASE.  THE LIAISON COUNSEL HAS BEEN TAKING AN IMPORTANT

13   ROLE IN COORDINATING THE ACTIVITIES OF THE PLAINTIFFS'

14   COUNSEL IN THE FILINGS WITH THE COURT IN ORDER TO DEAL WITH

15   ADMINISTRATIVE ISSUES FROM EVERYTHING TO FILINGS TO

16   COLLECTION, TO TIMELY COLLECTION OF TIME AND EXPENSES.  UM,

17   TO EXCHANGES OF COMMUNICATION, TO ORGANIZING SMALL WORKING

18   GROUPS.  THE CASE WOULD BE DIVIDED UP INTO SMALL WORKING

19   GROUPS ON VARIOUS DISCOVERY MATTERS.

20           WE TAKE ON THAT ROLE SPECIFICALLY FOR THE REASON

21   THAT THE LEADS CAN DEVOTE THEIR ENERGIES TO DIFFERENT

22   ACTIVITIES.

23           AND AS I MENTIONED BEFORE, THE LEAD COUNSEL COULD

10-30-07 hearing.txt

24    HAVE COME IN HERE AND SAID WE DON'T NEED IT, BUT THE LEAD

25    COUNSEL DO SEE A NEED FOR THIS.  THEY DO THINK THAT IT IS AN

                                                            29

1    IMPORTANT SUPPORT MECHANISM FOR THE PLAINTIFFS' SIDE.

2    PARTICULARLY WE HAVE DOZENS OF LAW FIRMS WORKING.  AND OF

3    WHAT I THINK WILL HAPPEN IS THAT WE'LL INCREASE THE

4    EFFICIENCY AND LOWER THE EXPENSES FOR THE CLASS RATHER THAN

5    VICE VERSA.

6            THE COURT:  OKAY.  I'M INTERESTED IN HEARING FROM

7    LEAD COUNSEL THAT I HAVE JUST INDICATED AN INCLINATION TO

8    APPOINT AS TO WHY YOU ALL, GIVEN THE FACT THAT YOU HAVE TWO

9    LAW FIRMS, WOULD NOT BE ABLE TO ASSUME RESPONSIBILITIES THAT

10    HE HAS JUST INDICATED AND WHAT YOUR VIEW IS IN TERMS OF WHAT

11    IT IS REALLY ESSENTIAL TO HAVE A LIAISON IN ADDITION TO THE

12    TWO -- THE TWO FIRMS.

Page 49

10-30-07 hearing.txt

13          MR. COTCHETT:  TRADITIONALLY, IT'S DONE BOTH WAYS.

14    I SAY TRADITIONALLY, HISTORICALLY IS WHAT I MEAN TO SAY IS

15    WE HAVE USED A LIAISON FOR TASKS THAT INVOLVE THE ENTIRE

16    GROUP.

17          NOW, WHAT YOU HAVE HERE IS YOU HAVE A PERSON THAT

18    APPLIED -- A FIRM THAT APPLIED FOR A LIAISON, JUST FOR THE

19    INDIRECTS.  IF WE ARE GOING TO HAVE A LIAISON, IT WOULD

20    APPEAR TO ME THE SMART THING TO DO FOR THE EFFICIENCY OF THE

21    COURT IS TO HAVE A LEAD LIAISON FOR BOTH THE DIRECT AND THE

22    INDIRECT.  PULL IT IN THAT WAY.

23          NOW, TO EXPOUND UPON WHAT DUTIES THEY SERVE --

24          THE COURT:  IS THAT GOING TO BE MORE CON -- YOU

25    ALL SEEM TO BE MAKING A BIG DISTINCTION BETWEEN --

                                                        30

1          MR. COTCHETT:  AS TO THE SUBSTANTIVE LAW?

10-30-07 hearing.txt

2          THE COURT:  YEAH.  SO I MEAN IN TERMS OF HAVING

3     A -- ONE FIRM AS A LIAISON FOR BOTH, IS GOING TO -- IS THAT

4     GOING TO MAKE IT MORE CONFUSING ACTUALLY FOR THE LIAISON AND

5     MORE --

6          MR. COTCHETT:  I DON'T THINK SO.  GIVEN THE TASKS

7     THAT THE LIAISON IS GOING TO DO.  AND IT'S SET FORTH IN THE

8     MANUAL ON COMPLEX LITIGATION.  IT IS WHOLE SERIES OF TASKS

9     WHICH THE LIAISON CAN DO APPROPRIATELY THAT WILL NOT

10     INTERFERE WITH THE WORK OF THE LEAD COUNSEL.

11          BUT I'VE SEEN COURTS WHO HAVE SAID NO, THE LEAD

12     COUNSEL ARE GOING TO DO THOSE DUTIES SO IT GOES EITHER WAY.

13     I BELIEVE THIS CASE IS SO BIG, AS I SAID BEFORE, THAT IT

14     COULD USE A LIAISON FOR BOTH THE INDIRECT AND THE DIRECT.

15          THE COURT:  OKAY.  THANK YOU.

16          MR. SCARPULLA:  YES, YOUR HONOR.  FRANCIS

17     SCARPULLA, MAY IT PLEASE THE COURT.

10-30-07 hearing.txt

18          AGAIN, HISTORICALLY, THE FUNCTION OF LIAISON

19   COUNSEL HAS BEEN TO INTERACT BETWEEN THE COURT AND

20   PLAINTIFFS' COUNSEL.  SO IF THE COURT HAS ISSUES THAT THE

21   COURT WISHES TO COMMUNICATE TO PLAINTIFFS' COUNSEL OR, FOR

22   THAT MATTER, FOR DEFENSE COUNSEL, THEN THE COURT HAS ONE

23   PERSON OR ONE FIRM THAT THE COURT CONTACTS.

24          THE COURT:  WHAT IS WRONG WITH CONTACTING YOU

25   DIRECTLY?

                                                        31

1          MR. SCARPULLA:  THAT'S FINE.  I MEAN, YES,

2   EXACTLY.  THAT -- THE COURTS HAVE DONE IT BOTH WAYS.

3   HISTORICALLY, BEFORE THERE WAS THE ELECTRONIC FILING ON A

4   LOT OF ELECTRONIC COMMUNICATIONS --

5          THE COURT:  UH-HUH.

                        Page 52

10-30-07 hearing.txt

6        MR. SCARPULLA:  -- IT WAS EASIER FOR THE COURT TO

7    HAVE ONE FIRM WITH WHOM THE COURT HAD ALL OF THOSE TYPES OF

8    COMMUNICATIONS.  AND THAT FIRM WAS CHARGED WITH THE

9    RESPONSIBILITY OF SETTING UP THE MEETINGS, MAKING SURE THAT

10   ALL OF THE PLAINTIFFS' COUNSEL KNEW WHAT TIME THE HEARINGS

11   WERE, WHAT THE COURT WANTED, THOSE KINDS OF THINGS.  AND AS

12   MR. COTCHETT POINTS OUT AND I SUBSCRIBE --

13        THE COURT:  AND I ISSUE ORDERS AND PEOPLE READ

14   THEM AND SO EVERYONE KNOWS WHAT TIME --

15        MR. SCARPULLA:  YES, YOUR HONOR.

16        BUT THAT WAS THE HISTORIC FUNCTION OF LIAISON

17   COUNSEL.

18        THE COURT:  AND I'M TRYING TO GET A FEEL FOR IF

19   THIS IS REALLY NECESSARY.  AND I'M NOT GETTING THE FEELING.

20   I DON'T -- THERE'S NOTHING REALLY OF SUBSTANCE THAT I --

21   THAT I CAN SEE THAT I WOULD NEED TO HAVE ANOTHER LAYER

Page 53

10-30-07 hearing.txt

22   THERE.  AND I, JUST IN LISTENING TO YOU, I UNDERSTAND WHAT

23   YOU'RE SAYING BUT NONE OF WHICH YOU'VE SAID SO FAR, IT SEEMS

24   TO ME, JUSTIFY HAVING ANOTHER LAW FIRM IN THE MIDDLE.

25           NOW, MAYBE THERE'S SOMETHING ELSE THAT I'M -- I'M

                                                          32

1    MISSING, AND THAT'S A GOOD POSSIBILITY.  BUT I, BUT IN TERMS

2    OF CONTACTING -- LETTING YOU ALL KNOW WHEN YOU'RE GOING TO

3    BE, WHEN WE'RE GOING TO HAVE HEARINGS, I ISSUE ORDERS AND

4    THAT'S CLEAR.  I EXPECT PEOPLE TO READ THEM.

5           IF I NEED TO GET IN CONTACT WITH LAWYERS, AT MOST,

6    IT IS GOING TO BE FOUR LAW FIRMS.

7           MR. SCARPULLA:  RIGHT.

8           THE COURT:  THAT'S NOT ENOUGH FOR ME TO JUSTIFY

9    HIRING ANOTHER LAW FIRM JUST TO GET IN CONTACT WITH THREE

10   EXTRA LAWYERS.  UM, AND THE REST, I DON'T -- I DIDN'T HEAR

10-30-07 hearing.txt

11    ANYTHING ELSE REALLY THAT WOULD --

12          MR. HOWARD:  YOUR HONOR, MAY I TAKE ONE MORE CRACK

13    AT IT JUST TO TRY --

14          THE COURT REPORTER:  MAY I HAVE YOUR NAME AGAIN,

15    PLEASE?

16          MR. HOWARD:  -- I'M SORRY.  DEREK HOWARD.

17          THE COURT:  BUT DO YOU -- I GUESS WHAT I'M TRYING

18    TO UNDERSTAND IS, DO YOU REALLY BELIEVE THAT THERE'S -- THAT

19    THERE'S A NEED TO HAVE A LIAISON?  OR DO -- OR IS IT JUST

20    EITHER WAY?

21          MR. SCARPULLA:  IT CAN GO EITHER WAY, YOUR HONOR.

22    I MEAN OBVIOUSLY, IT'S YOUR HONOR'S CHOICE HERE.  IF YOUR

23    HONOR PREFERS TO DEAL WITH -- WITH THE FOUR COLEADS, THAT'S

24    FINE.  IF YOUR HONOR CHOOSES, RATHER THAN TO HAVE ONE

25    PERSON, ONE FIRM WITH WHOM YOUR HONOR CAN DEAL, THAT'S FINE,

33

10-30-07 hearing.txt

1   TOO.

2           THE COURT:  OKAY.  SO THAT'S BASICALLY WHAT IT

3   BOILS DOWN TO FROM YOUR PERSPECTIVE IN TERMS OF THE VALUE OF

4   A LIAISON?

5           MR. SCARPULLA:  YES, YOUR HONOR.  THAT'S YOUR

6   CHOICE.

7           THE COURT:  I DON'T NEED ANYONE TO DEAL WITH YOU.

8   I CAN DEAL WITH YOU ALL DIRECTLY ON THAT.

9           DID YOU WANT TO SAY SOMETHING?

10          MR. HOWARD:  WELL, YES, YOUR HONOR.  I -- AS

11  MR. SCARPULLA INDICATED, IT IS THE COURT'S DISCRETION.  AND

12  THE ONLY THING THAT I WOULD POINT OUT IS THAT THE ACTIVITIES

13  THAT THE LIAISON COUNSEL CONDUCTS ARE SET OUT IN THE MANUAL

14  FOR COMPLEX LITIGATION.

10-30-07 hearing.txt
15              AND IT WAS OUR CONSENSUS AMONG THE PEOPLE THAT

16      APPLIED FOR THE LEADERSHIP THAT THIS WOULD BE SOMETHING THAT

17      WOULD BE OF VALUE TO THE GROUP AS A WHOLE, NOT JUST BECAUSE

18      THE COMMUNICATIONS WITH THE COURT, BUT BECAUSE OF THE

19      INTERNAL ACTIVITIES OF THE PLAINTIFFS' COUNSEL AND THE

20      PROSECUTION PROSECUTING THE CASE.  AND THAT HAVING AN

21      ADDITIONAL ROLE WOULD TAKE, AN ADDITIONAL FIRM TAKING ON

22      THESE ADMINISTRATIVE FUNCTIONS WOULD BE HELPFUL TO OUR

23      GROUP.

24              UM --

25              THE COURT:  ADMINISTRATIVE FUNCTIONS SUCH AS WHAT?

                                                            34

1       SUCH AS FILING DOCUMENTS THAT THE --

2               MR. HOWARD:  YOUR HONOR, THAT'S JUST -- THAT IS

3       JUST ONE OF THEM.  THEY ARE -- WE ACT AS A FACILITATOR FOR

10-30-07 hearing.txt

4    MEETINGS AND ARRANGING --

5            THE COURT:  WHY WOULD YOU NEED TO ACT AS A

6    FACILITATOR?  WHEN DO YOU SAY --

7            MR. HOWARD:  WELL, YOUR HONOR, I CAN ASSURE YOU

8    WHEN WE GET INTO THESE WORKING GROUPS WITH DEFENDANTS GOING

9    BACK AND FORTH WITH DEFENDANTS, WE HAVE TO SET UP MEETINGS

10   WITH MULTIPLE FIRMS.  SOMETIMES WE'RE TRYING TO COORDINATE

11   ACTIVITIES OF TEN TO TWELVE FIRMS ON ONE SINGLE ISSUE.  THAT

12   IS JUST ONE EXAMPLE.

13           THE COURT:  THE LEAD PLAINTIFFS WOULDN'T DO THAT?

14   THE LEAD COUNSEL ON BOTH SIDES WOULDN'T DO THAT?

15           MR. HOWARD:  YOUR HONOR, THERE IS NO QUESTION THAT

16   THE RULE 23(G) AND THE INTER-COMPLEX LITIGATION ANTICIPATES

17   THAT, AS MR. SCARPULLA SAID, LEAD COUNSEL CAN DO THESE

18   ACTIVITIES JUST -- JUST AS WELL AS ADDITIONAL LEADS ON

19   COUNSEL FIRM CAN DO THESE ACTIVITIES.

Page 58

10-30-07 hearing.txt

20          BUT -- BUT WE MADE AN ASSESSMENT WITHIN OUR GROUP,

21    CONSIDERING THE SIZE OF THE CASE, THE ISSUES THAT ARE GOING

22    TO BE PRESENT, AND THE NUMBER OF PEOPLE THAT NEED TO BE

23    COORDINATED, THAT HAVING SOMEONE TAKE ON THIS BURDEN, IF WE

24    CAN CALL IT THAT, THIS ADMINISTRATIVE ROLE, THAT THAT WOULD

25    BE SOMETHING THAT WOULD BE HELPFUL TO OUR GROUP.

                                                        35

1          NOW, THERE ARE NOT AS MANY FIRMS ON THE DIRECT

2    SIDE.

3          THE COURT:  SO WHAT DO YOU THINK OF THE SUGGESTION

4    THAT IF YOU'RE GOING TO HAVE A LIAISON THAT IT SHOULD BE,

5    YOU NEED A LIAISON FOR BOTH THE DIRECT AND INDIRECT?

6          MR. HOWARD:  I HAVE  SEEN THAT HAPPEN.  AND I

7    THINK IT WOULD BE HELPFUL FOR THE COURT.  WHILE THERE ARE

8    SOME ISSUES THAT DIRECT AND INDIRECT MAY NOT AGREE ON, THERE

10-30-07 hearing.txt

9    ARE MANY ISSUES THAT THEY DO AGREE ON.  HAVING A SINGLE

10   LIAISON COUNSEL IS VERY HELPFUL TO THE PARTIES AND TO THE

11   COURT.

12            AND I THINK THAT THE REASON WHY WE CAME FORWARD

13   WITH THIS, AND HAVING DISCUSSIONS AFTER A MOTION WAS FILED,

14   THAT WE ALL ON THIS SIDE OF THE AISLE, THOUGHT THIS WAS

15   SOMETHING TO BE CONSTRUCTIVE AND WOULD ALSO REDUCE EXPENSES

16   FOR THE CLASS AND ALSO INCREASE EFFICIENCY.  BUT, AGAIN, IT

17   IS THE COURT'S CHOICE.

18            THE COURT:  SO YOU -- SO YOU THINK THIS WOULD

19   REDUCE COSTS AND INCREASE EFFICIENCY?

20            MR. HOWARD:  YES, I DO.

21            THE COURT:  DO YOU ALL -- DO THE TWO COUNSEL THAT

22   I HAVE INDICATED AN INCLINATION TO APPOINT AS LEAD COUNSEL

23   AGREE THAT HAVING A LIAISON WOULD DECREASE COSTS AND

10-30-07 hearing.txt

24    INCREASE EFFICIENCY?

25          MR. COTCHETT:  I BELIEVE IT WOULD, YOUR HONOR.

                                                            36

1          MR. SCARPULLA:  YES, YOUR HONOR.

2          THE COURT:  OKAY.  OKAY.  THANK YOU.

3          AND YOU WOULD BE, AND IF I APPOINTED YOU, IF YOU

4    WERE APPOINTED, I'M NOT SAYING --

5          MR. HOWARD:  YES.

6          THE COURT:  -- THAT I'VE DECIDED ONE WAY OR THE

7    OTHER.  IF YOU WERE APPOINTED, YOU WOULD BE WILLING TO ACT

8    AS LIAISON FOR BOTH THE DIRECT AND THE INDIRECT?

9          MR. HOWARD:  YES, WE WOULD, YOUR HONOR.

10         THE COURT:  OKAY.  AND THAT'S WHEN YOU -- WHEN I

11   ASKED YOU THE INITIAL QUESTION YOU MENTIONED THERE MAY BE

12   SOME DIFFERENCES.  I DON'T NECESSARILY MEAN TRYING TO

10-30-07 hearing.txt

13    RECONCILE THE DIFFERENCES BETWEEN THE DIRECT AND INDIRECT AS

14    OPPOSED TO EXERCISING THE SAME ADMINISTRATIVE FUNCTIONS FOR

15    THIS GROUP AS YOU WOULD EXERCISE FOR THIS GROUP.

16         MR. HOWARD:  TO THE EXTENT THAT WE CAN, YOUR

17    HONOR.  FOR EXAMPLE, THERE MAY BE SOME ISSUES THAT THEY

18    WOULD NOT, THAT INTERNALLY THEY WANT TO DECIDE AMONG

19    THEMSELVES, THERE MAY BE A DISCRETE ISSUE, THERE MAY BE SOME

20    HOUSEKEEPING THING THAT THEY'RE DEALING WITHIN INTERNALLY ON

21    THEIR SIDE.  BUT THERE ARE COMMON ISSUES FOR THE PLAINTIFFS

22    WHERE THE LIAISON COUNSEL CAN TAKE A ROLE IN ACTING AS A

23    CONTACT AND INCREASING EFFICIENCY AND REDUCING COSTS.

24         THE COURT:  I DON'T UNDERSTAND THE DISTINCTION

25    YOU'RE MAKING.  THERE MAY BE ISSUES THAT THEY WOULD, ON THIS

37

1    SIDE, THEY WOULD WANT TO HANDLE WITHIN THEMSELVES, TOO.

10-30-07 hearing.txt

2          MR. HOWARD:  I'M SURE I MAY HAVE MISUNDERSTOOD.

3          THE COURT:  FROM LISTENING TO YOU, YOU'RE SAYING

4    YOU VIEW FROM THE LIAISON FUNCTION AS BEING NECESSARY FOR

5    THE PURPOSE OF FACILITATING SOME OF THE ADMINISTRATIVE

6    BURDENS THAT WOULD OTHERWISE HAVE TO BE ASSUMED BY THE --

7          MR. HOWARD:  LEADS.

8          THE COURT:  -- COUNSEL.  SO I'M ASKING, AND WHEN I

9    MENTIONED THE, WHEN I ASKED YOU TO COMMENT ON THE SUGGESTION

10   THAT IF YOU'RE GOING TO BE LIAISON, IF I'M GOING TO PUT A

11   LIAISON ISSUE, IT SHOULD BE FOR BOTH, YOU SAID SOMETHING

12   ABOUT THERE MAY BE DIFFERENCES, AND I WANTED TO MAKE IT

13   CLEAR THAT IF I WERE TO APPOINT A LIAISON THAT WOULD ACT AS

14   A LIAISON FOR BOTH, IT WOULDN'T NECESSARILY BE JUST TO TRY

15   TO RECONCILE THE DIFFERENCES BETWEEN THESE TWO AS OPPOSED TO

16   WHAT, EXERCISING WHATEVER ADMINISTRATIVE FUNCTION THAT YOU

17   EXERCISE FOR THIS GROUP BEING AVAILABLE TO EXERCISE THAT

10-30-07 hearing.txt

18    SAME ADMINISTRATIVE FUNCTION FOR THIS GROUP.

19           MR. HOWARD:  I MISUNDERSTOOD.  I'M AGREEING WITH

20    YOUR HONOR.  I THINK I, MY ONLY POINT WAS JUST A SMALL ONE,

21    JUST THERE MAY BE SOMETHING OUT THERE THAT I DON'T KNOW

22    ABOUT THAT THE DIRECTS MAY WANT TO WORK AMONG THEMSELVES ON.

23    I DON'T EVEN KNOW WHAT --

24           THE COURT:  SO YOU FEEL MORE ALIGNED WITH THE

25    INDIRECT.  I'M GETTING THE IMPRESSION THAT YOU ARE MORE ON

                                                         38

1    THIS SIDE AND NOT REALLY WITH THE DIRECT.  IS THAT --

2           MR. HOWARD:  UM, I DON'T THINK TO THE EXTENT THAT

3    IT WOULD INTERFERE WITH ME ACTING AS A LIAISON FOR BOTH

4    DIRECTS AND INDIRECTS.  THAT IS -- THAT IS A TRADITIONAL

5    POSITION THAT IS APPOINTED.  WE WOULD HAVE NO PROBLEM

10-30-07 hearing.txt

6    FULFILLING THAT ROLE AS A LIAISON FOR ALL THE PLAINTIFFS.

7    IT'S DONE ALL THE TIME, YOUR HONOR.

8              THE COURT:  RIGHT.  RIGHT.

9              MR. HOWARD:  IT'S DONE ALL THE TIME.  I'M NOT

10   SUGGESTING THERE IS ANY KIND OF CONFLICT.  I THINK I'M JUST

11   MAKING A SMALL POINT THAT IS REALLY NOT RELEVANT TO YOUR

12   QUESTION.  I DON'T THINK THAT IS RELEVANT TO THIS.  I'M WAS

13   JUST SAYING THERE MAY BE SOME ISSUE OUT THERE ON THE DIRECT

14   SIDE THAT THEY WANT TO DISCUSS AMONG THEMSELVES.  THAT'S ALL

15   I WAS TRYING TO SAY.

16             THE COURT:  SO WHAT IS THE DIFFERENCE?  OKAY.  SO

17   WHY WOULD YOU SAY THAT WITH RESPECT TO THE DIRECT AND NOT

18   SAY IT WITH RESPECT TO INDIRECT.  YOU SAID YOU'RE MORE

19   ALIGNED WITH THE INDIRECT; IS THAT IT?

20             MR. HOWARD:  WE REPRESENT THE INDIRECT PURCHASER

21   CLASS.  AND ULTIMATELY THERE WILL BE TWO MOTIONS FOR CLASS

                         Page 65

10-30-07 hearing.txt

22    CERTIFICATION FILED FOR DIRECT CLASS AND INDIRECT CLASS.

23            THE COURT:  OKAY.  OKAY.

24            MR. HOWARD:  OKAY.

25            THE COURT:  THANK YOU.

                                                    39

1            MR. HOWARD:  THANK YOU.

2            THE COURT:  YES.

3            MR. G. SAVERI:  GUIDO SAVERI FOR THE DIRECT

4    PURCHASING CLASS.

5            THE COURT:  OKAY.

6            MR. G. SAVERI:  WE HAVE RECOMMENDED, IN ANSWER TO

7    YOUR QUESTION, WE HAVE RECOMMENDED TWO INTERIM LEAD COUNSEL.

8            THE COURT:  ALL RIGHT.

9            MR. G. SAVERI:  YOU TALKED ABOUT THE SIZE OF THIS

10   CASE, YOUR HONOR.

# EXHIBIT E
# (2 OF 3)

10-30-07 hearing.txt

11          THE COURT:  SAVERI AND PIERCE.

12          MR. G. SAVERI:  YOU PROBABLY READ A LOT OF THE

13   PAPERS AND RELAYED TO THE D-RAM CASE SO THIS IS SORT OF AN

14   OFFSHOOT OF THE D-RAM CASE.

15          THE COURT:  YOUR VOICE IS VERY SOFT.

16          MR. G. SAVERI:  I WAS LEAD COUNSEL IN A D-RAM

17   CASE.

18          THE COURT:  SPEAK INTO THE MICROPHONE BECAUSE YOUR

19   VOICE IS VERY SOFT.

20          MR. G. SAVERI:  IS THIS BETTER, YOUR HONOR?

21          THE COURT:  YES.

22          MR. G. SAVERI:  I WAS LEAD COUNSEL IN A D-RAM CASE

23   IN FRONT OF JUDGE HAMILTON, WHICH WAS SETTLED RECENTLY AND

24   PUT TO BED FOR $325 MILLION.

25          THE D-RAM CASE WAS A VERY LARGE CASE AND REQUIRED

40

10-30-07 hearing.txt

1    A LOT OF WORK BY A LOT OF FIRMS.  FOR EXAMPLE, WE ANALYZED

2    FOUR MILLION DOCUMENTS THAT WERE PRODUCED BY THE DEPARTMENT

3    OF JUSTICE.  WE TOOK 110 DEPOSITIONS IN THAT CASE.  MOST OF

4    THEM WERE TAKEN BY THE DIRECT PLAINTIFFS.  WE HAD THE

5    INDIRECT CLASS, OF INDIRECT ATTORNEYS WORKING WITH US.  BUT

6    I THINK THE SIZE OF THIS CASE IS EVEN LARGER THAN D-RAM WAS.

7    SO THIS IS A LARGER CASE THAN D-RAM AND HAS MORE PARTIES IN

8    IT.

9              THE COURT:  OF DIRECT PLAINTIFFS?

10             MR. G. SAVERI:  YES, RIGHT.  BECAUSE THE

11   PLAINTIFFS --

12             THE COURT:  NINE NAMED -- IS IT NINE?

13             MR. G. SAVERI:  I'M TALKING ABOUT THE DEFENDANTS.

14   THERE ARE MORE DEFENDANTS.

10-30-07 hearing.txt
15          THE COURT:  OH.

16          MR. G. SAVERI:  THERE ARE MORE DEFENDANTS IN THIS

17  CASE IN FLASH THAN THERE WERE IN D-RAM.

18          THE COURT:  OKAY.

19          MR. G. SAVERI:  AND CONSEQUENTLY, I THINK THE

20  DOCUMENTS ARE GOING TO BE MUCH MUCH LARGER THAN WERE

21  PRODUCED IN D-RAM.  AND PROBABLY THE DEPOSITIONS WOULD BE

22  MORE BECAUSE YOU'RE DEALING WITH ABOUT 12 TO 13 TO 14

23  DEFENDANTS, WHEREAS IN D-RAM WE HAD ABOUT SIX OR SEVEN.  SO

24  THE QUESTION OF HAVING TWO LEAD COUNSEL ON A DIRECT SIDE TO

25  HANDLE THIS CASE IS -- THEY'RE NOT A LOT OF LEAD COUNSELS.

                                                    41

1  AND THE FACT OF HAVING TWO LEAD COUNSEL FOR THE INDIRECTS IS

2  A GOOD SIZE.  IF YOU WILL RECALL THAT IN A D-RAM CASE, JUDGE

3  HAMILTON APPOINTED --

Page 69

10-30-07 hearing.txt

4        THE COURT:  A GOOD CASE.

5        MR. G. SAVERI:  JUDGE HAMILTON APPOINTED THREE

6   LEAD COUNSEL.  AND HERE WE'RE JUST PROPOSING THAT ON THE

7   DIRECT SIDE WE HAVE TWO LEAD COUNSEL.  THAT'S ALL.

8        AND IN THE DIRECT CASE WE HAVE ONLY NINE CASES

9   HERE COMPARED TO 41 CASES, I THINK, THAT WERE FILED IN THE

10  INDIRECT CASE.

11       NOW, WHEN YOU STOP TALKING ABOUT A LIAISON

12  COUNSEL, THERE ARE DIFFERENT ISSUES THAT ARISE BETWEEN A

13  DIRECT CASE AND THE INDIRECT CASES.

14       THE COURT:  UH-HUH.

15       MR. G. SAVERI:  NUMBER ONE, IN A DIRECT CASE, WE

16  DON'T HAVE ANY PASS-ON PROBLEMS WITH THINGS LIKE THAT.  WE

17  JUST HAVE TO PROVE THE OVERCHARGE THAT WAS ASSESSED TO THE

18  DIRECT BUYERS AND THAT'S OUR CASE.

19       THE INDIRECT PEOPLE HAVE TO GO ON ONE STEP FURTHER

10-30-07 hearing.txt

20    AND SAY NOT ONLY DID THE -- NOT ONLY WAS THE OVERCHARGE

21    PASSED ON TO THE DIRECT BUYERS, BUT THEN A DIRECT BUYERS

22    PASS IT ON AT A DIFFERENT LEVELS ALL THE WAY DOWN IN LINE TO

23    THE CONSUMER.

24          NOW, THOSE ARE PROBLEMS THAT THE INDIRECT PEOPLE

25    HAVE AND WE DON'T HAVE.  MOREOVER, IN OUR CASE, WE HAVE NINE

                                                                42

1    CASES THAT AREN'T FILED AND THEY HAVE 41 CASES.  SO YOU CAN

2    SEE THERE'S EVEN A -- A METHOD OF CONTROLLING 41 CASES

3    COMPARED TO ONLY NINE IS DIFFERENT.

4          NOW, WITH REFERENCE TO A --

5          THE COURT:  SO YOU'RE SAYING THAT YOU DON'T REALLY

6    NEED A LIAISON?

7          MR. G. SAVERI:  WHAT I'M JUST GETTING AT, IN OTHER

8    WORDS, WE CAN DO THE LIAISON WORK.  THEY HAVE DIFFERENT
                              Page 71

10-30-07 hearing.txt

9    PROBLEMS AND I RECOGNIZE WHAT THEY'RE DOING.  BUT THEY HAVE

10   ONE LIAISON COUNSEL FOR BOTH CASES IS JUST CREATES ALL KINDS

11   OF PROBLEMS.

12          THE COURT:  DOES IT?

13          MR. G. SAVERI:  THE DIRECT PEOPLE DO NOT NEED A

14   LIAISON COUNSEL.  AND, FOR INSTANCE, IN THE D-RAM CASE, I

15   WAS LEAD COUNSEL.  MY OFFICE IS IN SAN FRANCISCO.  NOW WITH

16   ELECTRIC FILINGS AND EVERYTHING ELSE, YOU KNOW, JUST CAME

17   OUT OF OUR OFFICE, ALTHOUGH THERE WAS A LIAISON COUNSEL

18   APPOINTED IN OUR CASE BUT THE WORK THAT ACTUALLY WAS DONE

19   WAS VERY LITTLE.  SO I WOULD SUGGEST IN THE DIRECT CASE, WE

20   REQUEST THAT THERE BE TWO LEAD COUNSEL APPOINTED AND, NO, WE

21   DON'T NEED A LIAISON COUNSEL.  WE WILL DO THAT WORK

22   OURSELVES.

23          BUT I'M NOT DENIGRATING THE FACT THAT THE INDIRECT

10-30-07 hearing.txt

24    PEOPLE MAY REQUIRE A LIAISON COUNSEL FOR THEMSELVES BECAUSE

25    THEY'RE GOING TO BE DEALING WITH 41 DIFFERENT FIRMS, 41

0

43

1    DIFFERENT PLAINTIFFS, AND SO FORTH.  AND WE DON'T HAVE THAT

2    PROBLEM.

3            AND I THINK THAT IF YOU HAD A LIAISON COUNSEL FOR

4    BOTH -- FOR BOTH THE INDIRECTS AND THE DIRECT, I THINK

5    THAT'S ONLY GOING TO LEAD TO PROBLEMS AND INEFFICIENCY.  I

6    DON'T THINK IT'S NECESSARY.  AND THEY CAN HAVE THEIR

7    LIAISON.  I DON'T WANT TO DENIGRATE IT AT ALL.

8            BUT AS FAR AS THE DIRECT CLASS, YOUR HONOR, WE

9    REQUEST THAT THERE BE TWO LEAD COUNSEL AND NO LIAISON

10   COUNSEL.

11           THE COURT:  ON THE OTHER, THE COUNSEL FOR THE

12   OTHER FIRM THAT YOU ALL ARE PROPOSING, PEARSON, IS THAT WHAT

10-30-07 hearing.txt

13    YOU ALSO AGREE THAT THERE IS NO --

14          MR. COTCHETT:  WELL, I'M PROPOSING MR --

15          MR. SIMON:  YES, YOUR HONOR.  BRUCE SIMON ON

16    BEHALF OF PEARSON SIMON.  AND I'M PROPOSED COLEAD WITH

17    MR. SAVERI.

18          YES, WE DO NOT NEED LIAISON IN OUR VIEW.  I AM ONE

19    OF THE COLEADS IN THE LCD CASE THAT IS IN FRONT OF JUDGE

20    ILLSTON.  AND WE'RE IN THE PROCESS OF DOING A LOT OF THINGS

21    IN THAT CASE RIGHT NOW, WHICH WILL HAPPEN IN THIS CASE.  AND

22    ALTHOUGH THE LIAISON COUNSEL WAS APPOINTED IN THAT CASE, WE

23    FEEL WE CAN DO IT IN THIS CASE.

24          CLEARLY, LIAISON COUNSEL FOR ONE SIDE CAN'T BE

25    LIAISON COUNSEL FOR THE OTHER.  WE WILL BE FILING SEPARATE

44

1    COMPLAINTS, SEPARATE MOTIONS FOR THE CLASS.

10-30-07 hearing.txt

2          THE COURT:  YOU SAY CLEARLY THEY CAN'T.  WHY CAN'T

3    THEY?

4          MR. SIMON:  WELL, BECAUSE THERE IS A DISTINCT

5    DIFFERENCE --

6          THE COURT:  RIGHT.

7          MR. SIMON:  -- BETWEEN THE --

8          THE COURT:  THEY'RE LAWYERS.  LAWYERS CAN MAKE

9    DISTINCT DIFFERENCES.

10         MR. SIMON:  BUT, UNFORTUNATELY, ON THE INDIRECT

11   SIDE, SINCE THEY REPRESENT AN INDIRECT PURCHASER, THEIR

12   INTEREST MIGHT BE AT ODDS WITH PURCHASERS ON THE DIRECT

13   SIDE.

14         THE COURT:  OH, YOU MEAN CONFLICTS.  THERE WILL BE

15   CONFLICTS?

16         MR. SIMON:  POTENTIALLY.  AND EVEN THOUGH I HAVE

17   THE HIGHEST RESPECT FOR MR. HOWARD AND FOR THE COUNSEL

Page 75

10-30-07 hearing.txt

18    YOU'RE LEANING TOWARDS APPOINTING, IT JUST WOULD PRESENT A

19    CONFLICT POTENTIAL ISSUE.

20         THE COURT:  WELL, I MEAN THE CONFLICT DEFINITELY

21    IS A PROBLEM.  I DIDN'T --

22         MR. SIMON:  FOR EXAMPLE, IF WHEN WE DO THE

23    CONSOLIDATED AMENDED COMPLAINT, YOU KNOW, WE WOULD WORK ON

24    OURS.  WE WOULD HAVE CERTAIN ALLEGATIONS.  THEY WOULD HAVE

25    DIFFERENT ALLEGATIONS.  AND REALLY A LIAISON ROLE IN TRYING

                                                         45

1    TO WORK OUT DIFFERENCES DOESN'T WORK BECAUSE THOSE

2    DIFFERENCES SIMPLY HAVE TO GO ALONG ON PARALLEL TRACKS FOR

3    YOUR HONOR TO CONSIDER IN THE DIRECT CASE AND IN THE

4    INDIRECT CASE.  WHEN YOU MOOSH THEM TOGETHER OR MERGE THEM

5    TOGETHER, TO USE A MORE TECHNICAL WORD, THEN YOU CAN CREATE

10-30-07 hearing.txt

6    THAT CONFLICT PROBLEM.  SO WE WOULD ASK THE COURT JUST TO

7    AVOID THAT FOR THAT REASON.  NOT, YOU KNOW, ANYTHING HAVING

8    TO DO WITH THEIR STRUCTURE.

9              THE COURT:  RIGHT.

10             MR. SIMON:  I POINT OUT ONE, A COUPLE OF THINGS,

11   YOUR HONOR, JUST A FEW POINTS I'M SURE YOU CONSIDERED.

12   THERE ARE NINE DIRECT CASES.

13             THE COURT:  RIGHT.

14             MR. SIMON:  AND SEVEN OF THE NINE CASES SUPPORT

15   MR. SAVERI AND MYSELF.  UM, BEFORE SEPTEMBER, AFTER THE DOJ

16   ANNOUNCED THEIR INVESTIGATION --

17             THE COURT:  NO.  LIEFF CABRASER WAS ONE OF THE

18   ONES THAT WERE WILLING TO DO IT INDIVIDUALLY.

19             MR. SIMON:  INDIVIDUALLY.  BUT MY POINT THAT I WAS

20   GOING TO MAKE IS THAT THEY FILED THEIR CASE AFTER --

21             THE COURT:  RIGHT.

Page 77

10-30-07 hearing.txt

22          MR. SIMON:  -- THE DEPARTMENT OF JUSTICE ANNOUNCED

23   THEIR INVESTIGATION.  WE FILED BACK IN FEBRUARY.

24          THE COURT:  SO A EIGHT-MONTH DIFFERENCE.

25          MR. SIMON:  RIGHT.  BUT AT THE POINT BEFORE THE

                                                              46

1    DEPARTMENT OF JUSTICE ANNOUNCED THEIR INVESTIGATION, AND

2    WHEN WE ORIGINALLY FILED OUR PAPERS, WE HAD SUPPORT OF ALL

3    THE CASES.  SO WE SPENT MANY MONTHS COORDINATING THOSE

4    CASES, PUTTING THEM TOGETHER.  YOU KNOW, TRYING TO WORK OUT

5    CASE MANAGEMENT STATEMENTS FOR YOUR HONOR.  WE FILED RELATED

6    CASE MOTIONS.

7          THE COURT:  I MEAN ALL THOSE IS COMPELLING TO ME.

8    I MEAN BUT I -- YOU KNOW, I GUESS THE REASON I DECIDED TO

9    HAVE THIS ON, I MEAN, FOR EXAMPLE, THE COTCHETT FIRM AND

10   LIEFF CABRASER, THESE WERE FIRMS THAT WERE COMING

                         Page 78

10-30-07 hearing.txt

11    INDIVIDUALLY.  AND THEN YOU ALL WERE COMING TOGETHER.  AND I

12    HAVE GREAT RESPECT FOR THE ONES INDIVIDUALLY.  AND I'M

13    THINKING, WELL, IF WE CAN FIRMS OF THIS STATUTE THAT ARE

14    WILLING TO DO IT INDIVIDUALLY, AND THEY CAN DO IT

15    INDIVIDUALLY, THEN WE MAY HAVE A SAVINGS FOR THE CLASS,

16    WHICH IS WHY I DECIDED TO HAVE YOU ALL COME IN.

17          MR. SIMON:  AND I APPRECIATE IT.  ONE THING I

18    WOULD SAY, YOUR HONOR, IS THAT, AND I HAVE THE HIGHEST

19    RESPECT FOR ALL THE FIRMS THAT ARE APPLYING, BUT IF THEY

20    APPLIED INDIVIDUALLY AND HAD FILED EARLY IN THE CASE RATHER

21    THAN FILING AFTER WE'D GONE TO ALL OF THIS WORK JOINTLY

22    TOGETHER, IT MIGHT BE A DIFFERENT SCENARIO.  AND WHAT THAT

23    MIGHT ENCOURAGE, YOU KNOW, IS PEOPLE THAT COME IN AT THE

24    LAST MINUTE AND SAY I'LL DO IT INDIVIDUALLY WHEN WE WORKED

25    TOGETHER SO EFFICIENTLY FOR EIGHT MONTHS TO TRY TO PUT THE

47

10-30-07 hearing.txt

1    CASE TOGETHER, WENT TO THE MDL, GOT IT SENT TO YOUR HONOR

2    AND ALL THOSE THINGS.

3          THE COURT:  THANK YOU FOR THAT.

4          I WON'T FORGET THE GIFT.

5          MR. SIMON:  YEAH, I WILL TAKE CREDIT FOR IT BUT WE

6    ARE HERE NOW.

7          UM, AND, YOU KNOW, SO IT'S ONE THING WHEN YOU HAVE

8    ALL THE CASES KIND OF PUT TOGETHER AND GOING ALONG FOR EIGHT

9    MONTHS AND ALL THE WORK BEING DONE THAT'S BEEN DONE.  AND

10   IT'S BEEN CONSIDERABLE WORK, OUR OWN INVESTIGATION AND

11   EVERYTHING ELSE.

12         AND THEN WE HAVE OTHER LAW FIRMS, ALL OF WHOM IN

13   THEIR OWN RIGHT WOULD APPLY INDIVIDUALLY FOR LEAD COUNSEL,

14   WHO CHOOSE TO SUPPORT US.  EITHER ONE OF US COULD APPLY TO

10-30-07 hearing.txt

15  YOU INDIVIDUALLY.  BUT WE CHOOSE TO BRING THE GROUP TOGETHER

16  AND HAVE A PRIVATE ORDERING AS THE COMPLEX MANUAL CALLS IT.

17  AND REALLY WHAT IS HAPPENING, WITH NO DISRESPECT TO THE

18  FIRMS THAT ARE APPLYING INDIVIDUALLY, IS THAT THEY'RE COMING

19  IN AND TRYING TO UPSET --

20          THE COURT:  YOU PERSUADED ME.

21          MR. SIMON:  ALL RIGHT.  THANK YOU, YOUR HONOR?

22          THE COURT:  I'M PERSUADED THAT YOU ALL SHOULD.

23          ARE YOU STANDING FOR A REASON, SIR?

24          MR. J. SAVERI:  I AM JOSEPH SAVERI OF LIEFF

25  CABRASER AND I'D LIKE TO BE HEARD ON THE ISSUE, IF I MIGHT.

                                                          48

1          THE COURT:  YOU MAY.  YOU MAY.

2          I AM PERSUADED THAT THERE IS A REASON FOR TWO

3  FIRMS AS WELL BUT YOU CERTAINLY CAN BE HEARD.

10-30-07 hearing.txt

4          MR. J. SAVERI:  AND, YOUR HONOR, LET ME JUST TRY

5   TO MAKE A FEW POINTS, WHICH I THINK ARE IMPORTANT.  AND THE

6   FIRST, IS THAT WE LOOKED LONG AND HARD AT THIS CASE BEFORE

7   WE FILED IT.  AND WE CONSIDERED THE POTENTIAL EFFICIENCIES

8   AND POTENTIAL STRUCTURES.  AND GIVEN WHAT WE KNOW ABOUT THE

9   CASE, WE DO AGREE THAT THIS CASE IS, THE DIRECT CASE IS NOT

10  AS COMPLEX AS THE INCORRECT CASE.  THERE ARE LESS PLAINTIFFS

11  HERE.

12          THE COURT:  NOW, YOU HAVE TWO, YOU REPRESENT TWO

13  OF THE GROUP PLAINTIFFS?

14          MR. J. SAVERI:  NO, WE REPRESENT ONE.  MR. THAL.

15          THE COURT:  MR. THAL.

16          MR. J. SAVERI:  OKAY.  THE -- AND BASED ON OUR --

17  OUR ANALYSIS AND OUR EXPERIENCE, FRANKLY, IN THE LCD CASE,

18  WHICH IS A MUCH LARGER CASE, WE THINK THAT THE -- THE CLASS

19  IS BENEFITED THE MOST BY A PROPOSAL THAT'S EFFICIENT, THAT

10-30-07 hearing.txt

20    REDUCES COSTS, AND THAT IS AN APPLICATION BY A SINGLE FIRM.

21        A SINGLE FIRM, I THINK, ALL THE ANTITRUST LAWYERS

22    IN THE ROOM WOULD AGREE, IS MORE EFFICIENT THAN MULTIPLE

23    FIRMS.  THERE IS GOING TO BE LESS DUPLICATION OF EFFORT.  SO

24    THERE IS GOING TO BE A REDUCTION OF COSTS.  AND THE -- AND

25    BASED ON THAT, WE BELIEVE THAT THE MOST EFFICIENT WAY TO

49

1     ORGANIZE THIS CASE IS TO HAVE A SINGLE FIRM RUN THE CASE AND

2     --

3         THE COURT:  YOU ALL -- YOU FILED ON BEHALF OF MR.

4     THAL.  HOW -- RELATIVELY RECENTLY; RIGHT?  WHEN DID YOU FILE

5     THE COMPLAINT?

6         MR. J. SAVERI:  IT WAS -- I DON'T HAVE THE EXACT

7     DATE.  BUT IT WAS DURING THE SUMMER.  AND CERTAINLY THE --

8         THE COURT:  AROUND AUGUST OR SOMETHING?

10-30-07 hearing.txt

9          MR. J. SAVERI:  YES.  AND CERTAINLY THE, UM, THERE

10  ARE OTHER CASES ON FILE BEFORE US.  BUT I GUESS WHAT I WOULD

11  SAY WITH RESPECT TO THAT POINT, YOUR HONOR, IS THIS IS THE

12  FIRST HEARING IN THIS CASE.  REALLY NOTHING HAS HAPPENED

13  EXCEPT CASES HAVE BEEN FILED AND WE'VE BEEN AWAITING A

14  CONSOLIDATION OF THE CASES FOR ANYTHING TO GET GOING.  SO

15  REALLY THE IDEA THAT THIS CASE IS SUBSTANTIALLY ADVANCED

16  REALLY ISN'T -- ISN'T TRUE.  THIS IS -- WE'RE AT THE VERY

17  BEGINNING OF THE CASE.  AND WE'RE HERE TODAY TAKING AN

18  INITIAL STEP IN THAT -- IN THE CASE WHICH IS THE APPOINTMENT

19  OF INTERIM LEAD COUNSEL.  AND WHEN THE COURT CONSIDERS THAT

20  UNDER RULE 23(G), THE COURT SHOULD CONSIDER WHAT'S IN THE

21  BEST INTEREST OF THE CLASS.

22          AND BASED ON OUR ANALYSIS AND EXPERIENCE, WE THINK

23  THE BEST INTEREST OF THE CLASS ARE SERVED BY THE APPOINTMENT

10-30-07 hearing.txt

24    OF A SINGLE FIRM WITH THE RESOURCES, THE TRACK RECORD, AND

25    THE SKILL TO HANDLE THIS CASE BY ITSELF.

50

1                CERTAINLY, WE WORKED WITH SOME OF THE OTHER FIRMS.

2    AND WE LOOK FORWARD TO DOING THAT.

3                THE COURT:  SEPTEMBER 17 WAS WHEN YOU FILED YOUR

4    COMPLAINT.  OKAY.  SO WE'LL LOOK AT THE SUMMARY.

5                MR. J. SAVERI:  WELL, I'M NOT GOING QUIBBLE ABOUT

6    WHEN THE SUMMER ENDS, YOUR HONOR, BUT I THINK BY THE, AS TO

7    THE ASTRONOMY OF COUNSEL WAS A LONG TIME AGO.  BUT CERTAINLY

8    WE DIDN'T FILE AT THE VERY BEGINNING OF THE CASE BUT MY

9    POINT --

10                THE COURT:  HAVE YOU BEEN INVOLVED IN THE

11    INVESTIGATION OF ANY OF THESE DIRECT PURCHASER CLAIMS

12    BESIDES MR. THAL'S CASE THAT WAS FILED?

Page 85

10-30-07 hearing.txt

13          MR. J. SAVERI:  WE REPRESENTED THIS INDUSTRY AND

14   THIS MARKET ON BEHALF OF OUR CLIENTS.  WE, AND WE HAVE BEEN

15   DOING THAT FOR A NUMBER OF MONTHS.  CLEARLY, WE DID THAT IN

16   ADVANCE.

17          THE COURT:  SO YOU HAVE PROSECUTED LITIGATION

18   CONCERNING DIRECT PURCHASERS BESIDES MR. THAL THAT WAS JUST

19   FILED?

20          MR. J. SAVERI:  WELL, I'M NOT SURE EXACTLY WHAT

21   YOUR QUESTION IS, YOUR HONOR.  WE HAVE REPRESENTED DIRECT

22   PURCHASERS IN OTHER LITIGATION INVOLVING SIMILAR PRODUCTS

23   INCLUDING THE LCD CASE WHERE JUDGE ILLSTON APPOINTED US.

24          IF YOU'RE TALKING ABOUT THE PARTICULAR PRODUCTS

25   THAT, UM, ARE AT ISSUE IN THIS CASE, WHICH IS FLASH MEMORY,

⬚

51

1   WE DID INITIALLY FILE, UM, THE ALDERMAN CASE.  BUT IN TERMS

Page 86

10-30-07 hearing.txt

2    OF INVESTIGATION, OUR FIRM HAS BEEN DOING INVESTIGATION

3    INVOLVING THIS INDUSTRY, INVOLVING THE DEFENDANTS, THE

4    PRICING, FOR A NUMBER OF MONTHS.  I MEAN THAT -- THAT WHOLE

5    PROCESS LEADS UP TO THE SEPTEMBER FILINGS.

6          SEPTEMBER ISN'T WHEN WE STARTED THIS.  THAT'S JUST

7    THE POINT WHERE WE FILED THE COMPLAINT ON BEHALF OF MR.

8    THAL.

9          SO, I DON'T THINK THERE SHOULD BE ANY ARGUMENT

10   THAT, UM, WE HAVE COME, JUMPED ON A TRAIN THAT WAS ALL --

11   THAT WAS SUBSTANTIALLY FAR DOWN THE TRACKS.  WE'RE HERE AT

12   THE VERY BEGINNING OF THE CASE.

13         THE COURT:  WELL, WASN'T IT?  I MEAN THEY, THEIR

14   COMPLAINT WAS FILED NEARLY EIGHT MONTHS AGO.

15         LISA, DO WE HAVE THE DATES FOR THE SAVERI AND

16   PEARSON FILING?

17         MR. SIMON:  YES, YOUR HONOR.  WE FILED OUR
                      Page 87

10-30-07 hearing.txt

18    COMPLAINT ON FEBRUARY 20, 2007.  AND THE THAL COMPLAINT WAS

19    FILED ON SEPTEMBER 17, 2007, ROUGHLY A FEW DAYS AFTER THE

20    ANNOUNCEMENT CAME THAT THE DOJ OPENED THEIR INVESTIGATION.

21            THE COURT:  OKAY.  THANK YOU.

22            MR. G. SAVERI:  AND I THINK IT WAS FILED JUST

23    ABOUT THE TIME THAT WE FILED OUR MOTION TO BE REPORTED LEAD

24    COUNSEL BECAUSE AT THAT TIME THEY WEREN'T EVEN IN THE CASE.

25            THE COURT:  OKAY.  JUST A SECOND.  SHE'S HAVING

                                                            52

1    SOME DIFFICULTIES HERE.

2            THE COURT REPORTER:  THANK YOU.

3            THE COURT:  ARE YOU READY?

4            MR. G. SAVERI:  I THINK THEY FILED THEIR COMPLAINT

5    ON OR ABOUT EITHER THE SAME DAY THAT WE FILED A MOTION TO BE

                        Page 88

10-30-07 hearing.txt

6    APPOINTED INTERIM LEAD COUNSEL BECAUSE WE HAD WORKED ON THIS

7    CASE FOR SEVEN OR EIGHT MONTHS.  AND WE OUTLINED IN OUR

8    PAPERS WHAT WE HAD DONE.

9            THE COURT:  YEAH.

10           MR. G. SAVERI:  I MEAN, YOU KNOW, WHETHER YOU

11   SAID, WHETHER YOU LIKE IT OR NOT, AND, WELL, MAYBE WE SHOULD

12   APOLOGIZE, BUT BECAUSE YOU HAD THIS CASE BECAUSE OF THE WORK

13   THAT I DID AND MR. SIMON DID IN GOING BEFORE THE MDL

14   ORGANIZING ALL THE CASES ALL OVER THE COUNTRY.  THERE WAS A

15   CASE IN NEW YORK --

16           THE COURT:  OKAY.  SO THANK YOU.  SO THE POINT IS

17   THAT THEIR INVESTIGATION HAD TO PROCEED THEIR FILINGS, TOO.

18   SO YOURS PRECEDED THE SEPTEMBER FILING BY A COUPLE OF

19   MONTHS.  THEN THEIR FILINGS HAS BEEN, THEY FILED THE

20   COMPLAINT IN FEBRUARY SO YOU WOULD LOGICALLY ASSUME THAT

21   THEIR INVESTIGATION ALSO PROCEEDED THE FILING OF THE

Page 89

10-30-07 hearing.txt

22    COMPLAINT BY A FEW MONTHS.

23            MR. J. SAVERI:  YEAH.  ABSOLUTELY.  YOUR HONOR.

24    AND I DON'T -- I DON'T HAVE ANY PARTICULAR KNOWLEDGE ABOUT

25    WHEN THEY STARTED THEIR INVESTIGATION AS OPPOSED TO WHEN WE

                                                                53

1    STARTED OUR INVESTIGATION.  ABSOLUTELY, I WOULD AGREE.  AND

2    I WOULD HOPE THAT, UM, THEIR INVESTIGATION PRECEDED THEIR

3    FILING OF THE COMPLAINT.

4            BUT, AGAIN, YOUR HONOR, MY POINT IS, FIRST OF ALL,

5    WITH RESPECT TO THAT ISSUE, THAT NOTHING HAS REALLY HAPPENED

6    IN THIS CASE.  THEIR, UM, THEIR COMPLAINTS HAVE BEEN FILED.

7    THEIR INITIAL ORDERS REGARDING PRESERVATION, DOCUMENTS

8    HAVEN'T BEEN ENTERED.  AND, UM, AGAIN, IT, WHAT WE'RE HERE

9    ON TODAY IS 23(G).  AND A CHOICE OF WHAT COUNSEL BEST

10    REPRESENTS THE CLASS.

10-30-07 hearing.txt

11          AND BASED ON THOSE CRITERIA, WE THINK THAT

12    INCLUDING A FIRM THAT CAN HANDLE THIS CASE INDIVIDUALLY, OR

13    WITH OTHER COUNSEL, THAT HAS THE RESOURCES, THE TRACK

14    RECORD, AND THE SKILL TO BE ABLE TO HANDLE THIS CASE FROM

15    INVESTIGATION.  AND IT'S NOT JUST THE INVESTIGATION THAT'S

16    IMPORTANT, BUT THROUGH PRETRIAL PROCEEDINGS, THROUGH SUMMARY

17    JUDGMENT, TO BE ABLE TO TRY THE CASE AND HANDLE IT ON

18    APPEAL, AS A SINGLE EFFICIENT FIRM, ARE -- ARE THE KINDS OF

19    QUALITIES THAT THE -- THAT THE RULE ASKS THE COURT TO

20    CONSIDER WHEN IDENTIFYING AND CHOOSING LEAD COUNSEL.

21          THE COURT:  NOW, YOU CAN RAISE, THIS CERTAINLY HAS

22    LESS SUPPORT FROM AMONG THE DIRECT PURCHASERS THAN ANY OF

23    THE FIRMS DO.  UM, AND IT DOES APPEAR THAT -- LET ME ASK YOU

24    JUST BASED ON THAT -- I MEAN, UM, IS THERE ANYTHING ABOUT

25    THAT THAT YOU THINK I SHOULD CONSIDER IN TERMS OF ASSUMING

                                                              54

10-30-07 hearing.txt

1    THAT PERHAPS SINCE YOU HAVE LESS -- WELL, THEY HAVE MORE

2    SUPPORT FROM THE DIRECT PURCHASER.  BUT THEY WILL BE

3    NECESSARILY MORE, UM, EFFECTIVE THAN LIEFF CABRASER WHO, THE

4    ONLY SUPPORT YOU APPARENTLY HAVE IS YOUR CLIENT.

5            MR. J. SAVERI:  YOUR HONOR, I THINK THAT, FIRST OF

6    ALL, UM, IN TERMS OF EFFICIENCY OR IF YOU WANT TO CALL IT

7    EFFECTIVENESS, CLEARLY, WE HAVE RUN BY OURSELVES, AS THE

8    SOLE LEAD COUNSEL, CASES OF THIS MAGNITUDE MARSHALING THE

9    RESOURCES OF THE OTHER FIRMS, UM, MANY OF WHOM ARE -- WE'VE

10   WORKED WITH, FOR EXAMPLE, CURRENTLY IN THE LCD CASE.

11            AND SO WE'VE WORKED -- AND WE HAVE A HISTORY,

12   BASED ON OUR EXPERIENCE IN THIS AREA, WITH A NUMBER OF THESE

13   FIRMS.  I DON'T SEE ANY REASON WHY, UM, BECAUSE WE BELIEVE

14   THAT OUR FIRM IS UNIQUELY SUITED TO BE LEAD COUNSEL THAT WE

10-30-07 hearing.txt

15    WON'T, ONCE WE'RE APPOINTED, TO BE ABLE TO WORK EFFECTIVELY

16    WITH THE OTHER COUNSEL IN THE CASE.  CLEARLY, SOMETHING WE

17    DO AS LEAD COUNSEL IN EVERY CASE THAT WE'VE BEEN APPOINTED.

18    AND WE'RE ROUTINELY APPOINTED BY COURTS IN THIS JURISDICTION

19    AND THROUGHOUT THE COUNTRY.

20           SO REGARDLESS OF THE POLITICAL AGREEMENTS THAT

21    GAVE RISE TO A MULTIPLE FIRM APPLICATION, I THINK THAT OUR

22    FIRM, BASED ON ITS TRACK RECORD, EXPERIENCE, AND RESOURCES,

23    IS GOING TO BE ABLE TO DO THE JOB EFFECTIVELY.  SO I DON'T

24    THINK THE COURT WITH -- I DON'T THINK THE COURT SHOULD HAVE

25    ANY CONCERN THAT THE FACT THAT WE APPLIED BY OURSELVES HAS

                                                              55

1    ANY NEGATIVE, UM, IMPLICATION WITH RESPECT TO OUR ABILITY TO

2    WORK COOPERATIVELY WITH THE -- WITH THE PLAINTIFFS OR WITH

3    THE DEFENDANTS IN THIS LITIGATION.

                        Page 93

10-30-07 hearing.txt

4          THE COURT:  OKAY.  THANK YOU.

5          DID YOU WANT TO --

6          MS. SALZMON:  YES.

7          THE COURT:  JUST ONE SECOND, PLEASE.

8          MS. SALZMON:  HOLLIS SALZMON, LABATON SUCHAROW.

9          THE COURT:  GOOD AFTERNOON.

10         MS. SALZMON:  GOOD AFTERNOON, YOUR HONOR.  WE ALSO

11    FILED AT THE END OF SEPTEMBER OUR CASE.  AND THE REASON THAT

12    WE FILED FOR LEADERSHIP IN THIS CASE.  AND CERTAINLY WE ARE

13    PREPARED.  WE HAVE A -- A VERY SOLID FIRM OF OVER 60

14    ATTORNEYS, 17 OF WHICH ARE IN AN ANTITRUST PRACTICE GROUP.

15    WE ARE ABLE TO HANDLE THIS CASE AS LEAD COUNSEL ON OUR OWN.

16            THE REASON THAT WE FILED FOR LEADERSHIP IN THIS

17    CASE IS BECAUSE OF OUR CONCERN OF A POTENTIAL APPEARANCE OF

18    A CONFLICT.  THE OTHER FIRMS THAT ARE MOVING FOR LEADERSHIP

19    ARE ALSO LEAD COUNSEL IN THE LCD S-RAM AND D-RAM CASES.  AND

**Page 94**

10-30-07 hearing.txt

20    IN THOSE CASES THERE ARE THE SAME CAUSES OF ACTION

21    REPRESENTING OVERLAPPING CLASSES AGAINST VIRTUALLY IDENTICAL

22    DEFENDANTS.

23              AND OUR CONCERN IS THAT PROTECTION SHALL BE PUT IN

24    PLACE NOW IN ORDER TO, UM, PROCEDURALLY SAFEGUARD THE CLASS

25    GOING FORWARD.  FOR EXAMPLE, A CLASS CERTIFICATION STAGE ON

56

1    ADEQUACY OF COUNSEL.  OR IF THERE ARE SETTLEMENTS IN THIS

2    CASE, THAT THERE'S NOT ONE CASE OR ONE CLASS BEING FAVORED

3    OVER THE OTHER.  AND WE THINK IT'S VERY IMPORTANT AT THIS

4    STAGE OF THE GAME AT THE BEGINNING BEFORE ANYTHING HAPPENS

5    IN THE CASE TO MAKE SURE THAT THAT SAFEGUARD IS IN PLACE.

6              THE COURT:  SO YOU'RE SAYING THAT I SHOULD

7    CONSIDER THE CLASS CERTIFICATION ISSUES PRIOR TO, UM,

8    ANNOUNCING AN INCLINATION WITH RESPECT TO THE APPOINTMENT OF

10-30-07 hearing.txt

9    LEAD COUNSEL?

10            MS. SALZMON:  WELL, YOUR HONOR, THERE ARE SEVERAL

11   FACTORS, AS YOU'RE AWARE, THAT YOU NEED TO CONSIDER AS PART

12   OF THE APPOINTMENT OF LEAD COUNSEL.

13            THE COURT:  RIGHT.

14            MR. G. SAVERI:  QUALIFICATIONS, RESOURCES,

15   COOPERATION, THE ABILITY TO COOPERATE, AND, CERTAINLY, OUR

16   FIRM HAS A TRACK RECORD.

17            THE COURT:  SO BASICALLY, THE WORK THAT COUNSEL

18   HAS DONE IDENTIFYING OR INVESTIGATING POTENTIAL CLAIMS THAT

19   COUNSEL EXPERIENCE IN HANDLING THESE KIND OF CLASS ACTIONS

20   AND OTHER COMPLEX LITIGATION IN CLAIMS OF THE TYPE ASSERTED

21   IN THIS ACTION, COUNSEL'S KNOWLEDGE OF THE LAW, AND THE

22   RESOURCES COUNSEL WILL COMMIT TO REPRESENTING THE CLASS.

23   THAT'S KIND OF A -- WHAT I'M CONSIDERING.

Page 96

10-30-07 hearing.txt

24          NOW, YOU'RE -- YOU RAISED AN ISSUE THAT I, I

25    GUESS, WE SHOULD EXPLORE IF THAT'S SOMETHING THAT YOU'RE

⬚

57

1    SUGGESTING THAT THE COURT SHOULD CONSIDER THAT.  NOW,

2    OBVIOUSLY, WHEN YOU'RE TALKING ABOUT CERTIFYING CLASS, YOU

3    DO CONSIDER THE ISSUES THAT YOU JUST MENTIONED.  SO ARE YOU

4    SUGGESTING THAT AT THIS POINT GIVEN -- THERE IS SOMETHING

5    THAT YOU'RE AWARE OF THAT PERHAPS THE COURT SHOULD TAKE INTO

6    ACCOUNT IN DETERMINING WHETHER OR NOT, UM, COUNSEL WILL BE

7    ADEQUATE UNDER THOSE STANDARDS TO BE CONSIDERED NOW?

8            MS. SALZMON:  WELL, UNDER 23(G), THE END GOAL IS

9    TO APPOINT THE FIRM OR FIRMS THAT WILL PROVIDE THE BEST

10    REPRESENTATION TO THE CLASS, RIGHT.  THE CLASS HAS NOT YET

11    BEEN CERTIFIED BUT THERE ARE ABSENT CLASS MEMBERS THAT NEED

12    TO BE PROTECTED.  AND THAT IF -- IF NEUTRAL COUNSEL IS

Page 97

10-30-07 hearing.txt

13    APPOINTED AT THERE STAGE OF THE LITIGATION, RATHER THAN AT A

14    LATER TIME WHEN PERHAPS NEGOTIATIONS HAVE TAKEN PLACE OR,

15    UM, THERE'S CERTAIN INFORMATION THAT SHARED ONE CLASS

16    FAVORING THE OTHER, THAT THAT CAN BE -- THAT CAN BE AND

17    SHOULD BE FIXED NOW.

18            THE COURT:  SO YOU'RE SAYING THAT THE COUNSEL --

19    THAT THE COUNSEL THAT THE COURT IS CONSIDERING, AT LEAST THE

20    THREE, OF THE THREE THAT HAVE PRECEDED YOU, THAT THEY'RE NOT

21    NEUTRAL BECAUSE THERE, YOU THINK THERE IS A CONFLICT?

22            MS. SALZMON:  WELL I DON'T THINK THAT THERE'S -- I

23    DON'T THINK THAT THERE'S NECESSARILY A CONFLICT.  BUT

24    THERE'S A POTENTIAL FOR THE APPEARANCE OF CONFLICT.  SO THAT

25    --

                                                          58

1            THE COURT:  A POTENTIAL FOR THE APPEARANCE.
                          Page 98

10-30-07 hearing.txt

2          MS. SALZMON:  EXACTLY.  AND THE COURTS ARE SPLIT

3   ON THIS.  AND WHETHER A POTENTIAL FOR CONFLICT OF INTEREST

4   IS SUFFICIENT TO --

5          THE COURT:  THE POTENTIAL FOR A CONFLICT IS

6   DIFFERENT THAN THE POTENTIAL FOR AN APPEARANCE OF A

7   CONFLICT.  SO --

8          MS. SALZMON:  I AM MIXING THOSE.  IT'S A

9   POTENTIAL, THE POTENTIAL FOR A CONFLICT, WHICH GIVES THE

10  APPEARANCE OF A CONFLICT.  I THINK THAT'S BETTER SAID.  UM,

11  AND THAT I THINK THAT --

12          THE COURT:  WHAT DO YOU THINK -- WHAT DO YOU THINK

13  IS GENERATING -- IS TRIGGERING THAT?  AND WITH RESPECT TO

14  WHICH FIRM?

15          MS. SALZMON:  THE THREE OTHER FIRMS THAT ARE

16  MOVING FOR LEADERSHIP IN THIS CASE, THE SAVERI FIRM, THE

17  PEARSON FIRM AND THE LEAD FIRM.  I'M NOT SAYING IT

Page 99

10-30-07 hearing.txt

18    DISQUALIFIES THEM AS LEAD -- AS MOVING FOR LEAD COUNSEL IN

19    THIS CASE.  BUT I THINK THE BETTER COURSE IS TO HAVE A

20    NEUTRAL COUNSEL EITHER REPRESENTING THE CLASS IN -- SOLELY

21    OR IN CONJUNCTION WITH ONE OF THE OTHER FIRMS.  THE OTHER --

22            THE COURT:  YOU SAID IF IT DOESN'T DISQUALIFY THEM

23    THEN WHY WOULD I -- WHY WOULDN'T THEY AVAILABLE THEN?  I'M

24    TRYING TO UNDERSTAND --

25            MS. SALZMON:  YES.

                                                        59

1            THE COURT:  -- SPECIFICALLY WHAT IT IS YOU'RE

2    SAYING THAT YOU THINK I SHOULD TAKE INTO ACCOUNT IN

3    DETERMINING WHETHER OR NOT THEY ARE NEUTRAL OR WHETHER OR

4    NOT THERE IS PRESENTLY AN APPEARANCE OF CONFLICT OR A

5    CONFLICT.

                        Page 100

10-30-07 hearing.txt

6        BECAUSE IF THERE IS, I'M INTERESTED IN

7    UNDERSTANDING WHAT YOU'RE SAYING SO I CAN TAKE THAT INTO

8    ACCOUNT AND/BUT IF IT'S -- IF WHATEVER YOU'RE SAYING FROM

9    YOUR PERSPECTIVE IS SOMETHING THAT DOES NOT DISQUALIFY THEM,

10    THEN THAT WILL LEAD ME TO CONCLUDE THAT -- THAT IT IS NOT A

11    CONCLUSION, IT IS OUT OF THE APPEARANCE OF A CONFLICT AND SO

12    IN WHICH CASE I -- THERE IS NO NEED TO NECESSARILY

13    DISQUALIFY CONSIDERATION -- THEIR CONSIDERATION.

14            MS. SALZMON:  WELL, IT COULD RESULT IN A POTENTIAL

15    CONFLICT -- CONFLICT DOWN THE ROAD.  AND I THINK THAT ALL --

16            THE COURT:  WHAT IS IT?  IT COULD --

17            MS. SALZMON:  THE FACT THAT THEY REPRESENT

18    OVERLAPPING CLASSES IN RELATED LITIGATION INVOLVING THE

19    IDENTICAL OR VIRTUALLY IDENTICAL DEFENDANTS, THE SAME CLAIMS

20    AND THE SAME OVERLAPPING CLASSES THAT EITHER THERE WOULD BE

21    A GLOBAL SETTLEMENT AND THERE NEEDS TO BE A BALANCE.

Page 101

10-30-07 hearing.txt

22          THE COURT:  YOU SAY THEY REPRESENT THE DEFENDANTS

23    ON THE OTHER SIDE ON THE SAME CLAIMS?

24          MS. SALZMON:  NO.  THEY REPRESENT THE DIRECT

25    PLAINTIFFS -- I APOLOGIZE IF I MISSPOKE.  THEY REPRESENT THE

☐

60

1    DIRECT PLAINTIFFS AGAINST VIRTUALLY THE SAME DEFENDANTS IN

2    THE S-RAM CASE.

3          THE COURT:  SO HOW IS THAT A CONFLICT?  THEY

4    REPRESENT THE SAME --

5          MS. SALZMON:  IT IS NOT.  THEY REPRESENT THE SAME

6    PLAINTIFFS.  BUT IF YOU HAVE A GLOBAL SETTLEMENT WHERE

7    THERE'S ONE GROUP OF PLAINTIFFS THAT ARE BEING, UM, FAVORED

8    OVER ANOTHER BECAUSE THEY HAVE INTERESTS IN BOTH CASES, THEN

9    THERE IS A POTENTIAL DOWN THE ROAD FOR THERE TO BE AN ISSUE.

10          AND I THINK THAT THERE HAS BEEN, UM, A MIX OF

Page 102

10-30-07 hearing.txt

11    COURTS ON THE ISSUE IN MAKING SURE THAT THE ADEQUACY OF

12    COUNSEL IS -- IS PUT IN PLACE AT THE START OF THE CASE

13    RATHER THAN AT THE END WHERE THERE'S A POTENTIAL, THERE'S

14    SETTLEMENT FOR OBJECTORS TO COME IN OR CLASS CERTIFICATION

15    TO GIVE THE DEFENDANTS GROUNDS TO CHALLENGE CLASS

16    CERTIFICATION ON THE ADEQUACY OF COUNSEL.  AND I THINK THAT

17    --

18            THE COURT:  SO YOU'RE SAYING THAT THE COURTS HAVE

19    DEALT WITH IT EARLY ON.  THE COURTS THAT YOU'RE -- YOU'RE

20    THINKING OF -- I WILL ASSUME, THESE ARE COURTS THAT ARE

21    DEALING WITH IT AT THE CERTIFICATION STAGE OR ARE YOU SAYING

22    EARLIER THAN THE CERTIFICATION STAGE?

23            MS. SALZMON:  AT THE CERTIFICATION STAGE.  BUT

24    THERE HAVE ALSO BEEN THIS ISSUE HAS BEEN RAISED IN -- IN

25    CLASS ACTIONS AT THE 23(G) STAGE.  AND THERE HAVE BEEN

61

Page 103

10-30-07 hearing.txt

1    COURTS THAT ALLOWED COUNSEL WHO HAVE REPRESENTED SORT OF AN

2    OVERLAPPING SITUATION THAT I'M DESCRIBING HERE BE APPOINTED

3    LEAD COUNSEL.  BUT THOSE APPOINTMENTS HAVE BEEN A

4    CONJUNCTION WITH ANOTHER FIRM THAT IS NEUTRAL AND IS NOT

5    INVOLVED IN THE OVERLAPPING CASES.

6            THE COURT:  BUT YOU'RE SAYING THAT THE ONES THAT

7    ARE COUPLED HERE, WE HAVE ONE RECOMMENDATION THAT WE HAVE

8    TWO FIRMS THAT HAVE COUPLED TOGETHER, BUT YOU'RE SAYING BOTH

9    OF THEM HAVE THE SAME PROBLEMS.  SO NEITHER OF THEM WOULD BE

10   --

11            MS. SALZMON:  WELL, IT COULD BE --

12            THE COURT:  -- NEUTRAL.

13            MS. SALZMON:  -- ONE OF THEM AND OUR FIRM AS THE

14   NEUTRAL FIRM.  I THINK HAVING THE NEUTRAL FIRM THERE MAKES

Page 104

10-30-07 hearing.txt

15    SURE THAT THERE IS A BALANCE.   AND THAT THE CLASSES BEING

16    ADEQUATELY PROTECTED EVEN AT THE BEGINNING STAGE OF THE

17    CASE.

18              THE COURT:  YEAH.  LET'S SEE.

19              MS. SALZMON:  AND, CERTAINLY, YOUR HONOR --

20              THE COURT:  NOW, WHICH FIRM ARE YOU?

21              MS. SALZMON:  LABATON SUCHAROW.   THE JEMS

22    CONSULTING.

23              THE COURT:  AND SO YOU HAVE JUST THAT ONE CLIENT?

24              MS. SALZMON:  THAT'S RIGHT, YOUR HONOR.  BUT,

25    AGAIN --

                                             62

1              THE COURT:  AND WHEN DID YOU -- WHEN DO YOU FILE

2    YOUR --

3              MS. SALZMON:  WE FILED AT IF THE END OF SEPTEMBER.

Page 105

10-30-07 hearing.txt

4     BUT AS WE SET FORTH IN OUR PAPERS, WE'VE BEEN INVESTIGATING

5     THIS CASE SINCE MARCH.

6             THE COURT:  SO AT THE END OF SEPTEMBER SO JUST

7     ABOUT A MONTH AGO?

8             MS. SALZMON:  CORRECT.

9             THE COURT:  SO YOU JUST, YOU REALLY JUST CAME INTO

10    THE LAWSUIT?

11            MS. SALZMON:  CORRECT.  BUT I AGREE WITH THE

12    SENTIMENT OF MR. JOE SAVERI IN THAT THE CASE HAS REALLY JUST

13    BEGUN.  AND THAT THERE'S -- WHILE THERE'S -- THERE'S -- THIS

14    IS A -- THE BEGINNING STAGES OF THE CASE.  THE AMENDED

15    COMPLAINT HAS NOT EVEN BEEN FILED YET.  AND IT'S EARLY

16    ENOUGH IN THE PROCEEDINGS THAT THERE SHOULD BE AN ISSUE.  IN

17    FACT, I BELIEVE THE MAJORITY OF CASES WERE FILED IN

18    SEPTEMBER.  BUT WE HAVE BEEN ACTIVELY INVESTIGATING THIS

19    CASE SINCE MARCH.

Page 106

10-30-07 hearing.txt

20          THE COURT:  WELL, I DON'T KNOW THAT.  I JUST KNOW

21  THAT YOU JUST CAME INTO THE LAW FIRM -- I MEAN THE LAWSUIT A

22  MONTH AGO.

23          MS. SALZMON:  THAT'S CORRECT, YOUR HONOR.

24          THE COURT:  I ALWAYS ASSUME THAT BEFORE LAWYERS

25  FILE COMPLAINTS THEY HAVE BEEN ACTIVELY INVESTIGATING IT FOR

                                                        63

1   QUITE SOME TIME WHICH WOULD -- WHICH WOULD MEAN THAT THE

2   COMPLAINTS THAT WERE FILED OVER EIGHT MONTHS AGO WERE

3   PRECEDED BY A LENGTHY INVESTIGATION AS WELL.

4           MS. SALZMON:  THAT'S RIGHT.  BUT -- BUT THAT'S

5   JUST ONE FACT MORE TO CONSIDER.  A RACE TO THE COURTHOUSE

6   SHOULD NOT GIVE -- SHOULD NOT BE THE SOLE FACTOR IN

7   DETERMINING WHO'S APPOINTED LEAD COUNSEL IN A CASE.

8           THE COURT:  RIGHT.
                    Page 107

10-30-07 hearing.txt

9            MS. SALZMON:  THERE IS A GROUP OF FACTORS TO BE

10    LOOKED AT.  AND I THINK THAT THE -- THE PRIVATE ORDERING AS

11    WELL IS NOT THE SOLE FACTOR.  THE LEAD COUNSEL APPOINTMENT

12    SHOULD NOT BE A POPULARITY CONTEST OR A HEAD COUNT.

13            THE COURT:  ALL RIGHT.  BUT IT IS PARTLY, AND AN

14    EVALUATION OF THE EXPERIENCE AND THE -- THE INVESTIGATION --

15            MS. SALZMON:  IT IS A --

16            THE COURT:  -- THAT PROCEEDED.  SO WHAT IS YOUR

17    EXPERIENCE IN HANDLING AND INVESTIGATING AND HANDLING THESE

18    KIND OF CLAIMS?

19            MS. SALZMON:  WELL, OUR FIRM HAS BEEN IN PRACTICE

20    FOR 45 YEARS.  I'VE BEEN PRACTICING FOR 15 YEARS.  IF WE ARE

21    APPOINTED LEAD COUNSEL IN THIS CASE --

22            THE COURT:  NOT NATIONALLY HOW MANY YEARS YOU'VE

23    BEEN IN PRACTICE.  I'M ASKING A SPECIFIC QUESTION.  IN TERMS

Page 108

10-30-07 hearing.txt
24    OF THE NATURE OF THE CLAIMS THAT WE HAVE HERE AND YOUR

25    EXPERIENCE IN INVESTIGATING AND PROSECUTING THESE KINDS OF

64

1    CLAIMS.

2            MS. SALZMON:  WELL, WE ARE LEAD COUNSEL IN A

3    NUMBER OF DIRECT PURCHASER CASES UNDER THE SHERMAN ACT.  AND

4    WE HAVE CONSIDERABLE EXPERIENCE, BOTH AS LEAD COUNSEL AND IN

5    OTHER LEADERSHIP POSITIONS OVER THE YEARS, WITH SUBSTANTIAL

6    RECOVERIES FOR CLASS MEMBERS.

7            WE HAVE HAD A LONG STANDING PRACTICE IN THE

8    ANTITRUST ARENA.  AND THIS IS -- WE HAVE -- WE DO NOT HAVE

9    SPECIFIC EXPERIENCE.  WE ARE NOT IN A LEADERSHIP ROLE IN THE

10   S-RAM OR THE LCD CASE.  BUT WE HAVE A LOT OF CASES,

11   ANTITRUST CASES, IN WHICH WE ARE ABLE TO GET UP QUICKLY ON

12   THE LEARNING CURVE IN ANY INDUSTRY.  AND I DON'T SEE THAT

Page 109

10-30-07 hearing.txt

13    BEING A PARTICULAR PROBLEM FACTUALLY ON THIS INDUSTRY WHEN

14    WE HAVE THE CONCRETE BASIS OF LAW.  CERTAINLY, OUR ANTITRUST

15    PRACTICE GROUP IS A RECOGNIZED PRACTICE GROUP.

16            THE COURT:  YOU SAY YOU HAVE 17 LAWYERS?

17            MS. SALZMON:  WE HAVE 17 LAWYERS IN OUR ANTIRUST

18    PRACTICE GROUP.  IF APPOINTED LEAD COUNSEL, WE INTEND TO

19    STAFF THIS CASE PRIMARILY WITH THE SENIOR PARTNER, BERNIE

20    PERSKY, WHO IS THE HEAD OF THE ANTITRUST PRACTICE GROUP.  HE

21    HAS OVER 38 YEARS EXPERIENCE LITIGATING ANTITRUST CLASS

22    ACTIONS.

23            AS I SAID, I HAVE -- WOULD ALSO BE ON THE CASE AND

24    I HAVE OVER 15 YEARS LITIGATING.  UM, THE -- WE WERE JUST --

25            THE COURT:  LITIGATING WHAT?  CLASS ACTIONS?

65

1            MS. SALZMON:  CLASS ACTIONS, YES.  BUT PRIMARILY
              Page 110

10-30-07 hearing.txt

2    ANTITRUST CLASS ACTIONS.

3              THE COURT:  OKAY.

4              MS. SALZMON:  OKAY.

5              THE COURT:  THANK YOU.

6              MS. SALZMON:  THANK YOU.

7              THE COURT:  UH-HUH.

8              MR. G. SAVERI:  YOUR HONOR, I'D LIKE TO ADDRESS

9    JUST A COUPLE OF ISSUES.  UNDER RULE 23(G)(1)(C)(1) --

10             THE COURT:  RIGHT.

11             MR. G. SAVERI:  -- IT SAYS THAT THE COURT HAS TO

12   LOOK AT FOUR ELEMENTS IN DETERMINING WHO SHOULD BE LEAD

13   COUNSEL.

14             THE COURT:  WHICH ARE THE FOUR THAT I MENTIONED

15   EARLIER.

16             MR. G. SAVERI:  THE FIRST ONE IS THE WORK COUNSEL

17   HAS DONE IN IDENTIFYING OR INVESTIGATING THE POTENTIAL

10-30-07 hearing.txt

18    CLAIMS.

19          NOW, LET'S STAY WITH THAT ALONE.  I AND MR. SIMON

20    STARTED THIS CASE BACK IN -- FILED THE FIRST ONE IN FEBRUARY

21    OF 1907.

22          WE STARTED THE WORK ON THIS CASE IN 2007.  WE

23    INVESTIGATED THE CASE.  WE MARSHALED ALL THE PERSONS WHO HAD

24    FILED THE CASES.  WE COORDINATED THE CASES.  WE LOOKED INTO

25    THE CASE.  WE FILED THE MOTION BEFORE THE MDL TO GET THE

                                                          66

1    CASE HERE.  WE WORKED WITH THE DEFENDANTS AND TRIED TO PUT

2    TOGETHER A CASE MANAGEMENT SCHEDULE RIGHT OFF THE BAT.

3    THERE WAS A LOT OF WORK THAT WAS DONE IN CONNECTION WITH

4    THE -- INVESTIGATING THE CASE.

5          SEVEN AND EIGHT MONTHS LATER, YOU HAVE BOTH THE

10-30-07 hearing.txt

6    CABRASER OFFICE FILE A CASE AND ALSO THE LABATON OFFICE FILE

7    A CASE.

8            NOW, ONE OF THE ELEMENTS TO BECOME LEAD COUNSEL,

9    YOU HAVE TO SHOW THAT YOU INVESTIGATED THE CASE.

10           NOW, EIGHT MONTHS LATER, THEY HAD TO DO SOMETHING

11   EIGHT MONTHS LATER SO THAT THEY CAN COME TO YOU AND SAY THAT

12   WE MET ONE OF THE ELEMENTS REQUIRED TO APPOINT LEAD COUNSEL.

13   YOU GOT TO INVESTIGATE THE CASE.  ALL THEY HAD TO DO, IF

14   THEY WANTED TO GET INTO THE CASE, IS CALL ME OR MR. SIMON

15   AND ASK US WHAT'S THE CASE ALL ABOUT.  WHAT WORK HAVE YOU

16   DONE?  WOULD YOU SHARE THE INVESTIGATION WITH US?

17           HOWEVER, IF THEY DID THAT, THEY COULD NOT NOW COME

18   IN AND ASK TO BE APPOINTED LEAD COUNSEL BECAUSE THEY DIDN'T

19   DO ANY INVESTIGATION.

20           SO THE FIRST ELEMENT IS MISSING RIGHT OFF THE BAT.

21   IN OTHER WORDS, THE TWO JOHNNY-COME LATELYS JUST SO THAT

Page 113

10-30-07 hearing.txt

22   THEY CAN COME IN AND FILE A MOTION TO UPSET WHAT EVERYONE

23   ELSE IN THE CASE FIGURES IS A GOOD ORGANIZATIONAL STRUCTURE

24   TO MOVE THE CASE ALONG.

25          SO AS FAR AS WORK DONE IN INVESTIGATION AND

                                                              67

1    POTENTIAL CLAIMS, NO ONE -- NO ONE HAS DONE THE WORK THAT MY

2    OFFICE AND MR. SIMON'S OFFICE HAS DONE.

3          THE SECOND ONE IS THE COUNSELS' EXPERIENCE IN

4    HANDLING CLASS ACTIONS AND OTHER COMPLEX LITIGATION OF THE

5    TYPE ASSERTED IN THIS ACTION.  THAT'S THE SECOND ELEMENT

6    THAT ONE HAS TO LOOK AT.

7          ALSO, I SHOULD BACKTRACK ON WHAT WORK THAT WE HAVE

8    DONE IN BRINGING THIS CASE TO THE POINT THAT WE HAVE.

9          WE HAVE SERVED ALL THE DOMESTIC DEFENDANTS IN THIS

10   CASE, ALL THE DOMESTIC DEFENDANTS CASES HAVE BEEN SERVED.

Page 114

10-30-07 hearing.txt

11   WE DID IT RIGHT OFF THE BAT.

12         WE ALSO SERVED -- ALSO HAD THE PROCESS OUT TO

13   SERVE ALL THE FOREIGN COMPANIES.  IT'S ALL OUT THERE TO BE

14   INSERTED UNDER THE HAGUE CONFERENCE.  WE HAVE ONE FOREIGN

15   DEFENDANT WHO IS STIPULATED THAT THEY WOULD APPEAR IN THE

16   CASE.

17         WE HAVE -- WE'VE BEEN MOVING THIS CASE ALL ALONG.

18   NO OTHER DEFENDANT, NO OTHER OFFICE WHO'S REQUESTING THAT

19   THEY BE APPOINTED LEAD COUNSEL HAS DONE ANYTHING IN SERVING

20   PEOPLE ABROAD, HAS DONE ANYTHING WITH REFERENCE TO THE

21   DOMESTIC PEOPLE OR ANYTHING LIKE THAT.

22         IN FACT, THE CABRASER OFFICE, JUST TO GET A FOOT

23   UP, ASKED THIS COURT TO ISSUE LETTERS ROGATORY JUST A COUPLE

24   WEEKS AGO.  THERE WAS NO NEED TO DO THAT.  THERE WAS NO NEED

25   TO DO THAT.  WE SERVED ALL THE DOMESTIC PEOPLE.

68

10-30-07 hearing.txt

1          AND WITH REFERENCE TO THE FOREIGN PEOPLE, THAT

2     WORK HAS ALREADY BEEN OUT THERE THAT MR. SIMON AND I DID.

3     IN FACT, THEY ALSO ASKED YOU TO ISSUE LETTERS ROGATORY FOR

4     ONE OF THE FOREIGN DEFENDANTS, MOZELL.  WELL, THEY DON'T

5     REALIZE THAT MOZELL STIPULATED WITH ME AND MR. SIMON TO

6     APPEAR IN THIS CASE.  SO THERE WAS NO NEED TO DO THAT.

7          SO WHAT I'M TRYING TO SAY, YOU FILE A CASE SEVEN

8     OR EIGHT MONTHS LATER JUST TO COME IN AND TRY TO GET A LEG

9     UP ON WHAT EVERYBODY ELSE IN THE CASE FEELS THE STRUCTURE

10    SHOULD BE.

11         NOW, THE THIRD ELEMENT, COUNSEL'S KNOWLEDGE OF THE

12    APPLICABLE LAW.  WELL, WITH REFERENCE TO COUNSEL'S KNOWLEDGE

13    OF THE APPLICABLE LAW, I DON'T THINK THERE'S ANYONE IN THIS

14    OFFICE THAT HAS BEEN EXPOSED TO ANTITRUST CLASS ACTIONS MORE

10-30-07 hearing.txt

15    THAN I HAVE.  I'VE BEEN DOING IT FOR 45 YEARS AND MR. SIMON

16    HAS BEEN DOING IT FOR MANY YEARS.

17           SO AS FAR AS THE KNOWLEDGE OF APPLICABLE LAW, I

18    DON'T THINK PEOPLE COME CLOSE TO US.

19           WITH REFERENCE TO THE EXPERIENCE, WELL, LET'S TALK

20    ABOUT COUNSEL'S EXPERIENCE IN HANDLING CLASS ACTIONS AND THE

21    CLAIMS OF THE TYPE ASSERTED IN THIS ACTION.  MY OFFICE HAS

22    BEEN PRACTICING FOR 45 YEARS.

23           THE COURT:  I ACTUALLY READ YOUR PAPERS.

24           MR. G. SAVERI:  I MEAN IF YOU'RE GOING TO TALK

25    ABOUT WHO KNOWS ANYTHING ABOUT ANTITRUST LAWS, AND I SAY

                                                              69

1    THIS VERY RESPECTIVELY, THEY'RE ALL GREAT LAWYERS IN HERE

2    BUT MY OFFICE HAS HAD MORE EXPERIENCE IN THESE CASES AND HAS

3    APPEARED IN MORE SUBSTANTIAL CASES THAN ALL OF THEM.

                          Page 117

10-30-07 hearing.txt

4          JUST IN THE S-RAM, IN THE D-RAM CASE IF YOU WANT

5    TO TALK ABOUT IT, WE SETTLED THAT CASE WITH $725 MILLION FOR

6    15 PERCENT OF THE ACTION.  FIFTEEN PERCENT OF THE ACTION.

7    EIGHTY-FIVE PERCENT OPTED OUT.  AND IF ANYBODY ELSE HAD

8    SETTLED OUT LIKE WE DID, OUR SETTLEMENT WOULD HAVE BEEN $2.4

9    BILLION.

10          NOW, THAT'S WHAT WE DID FOR JUDGE HAMILTON.  AND

11    WHAT WE DID AS FAR AS PRACTICING AND MOVING THESE CASES

12    ALONG, THE EXPERTISE THAT WE HAVE, I THINK, NO ONE CAN MATCH

13    US.

14          WHAT WE DID FOR JUDGE HAMILTON, THERE WAS A STAY

15    BECAUSE OF THE DOJ.  THEY STAYED THE PRODUCTION OF

16    DOCUMENTS.  THEY STAYED FULL DISCOVERY FOR ABOUT -- ABOUT A

17    YEAR -- A YEAR AND A HALF.  ALL THEY DID WAS PERMIT,

18    REQUIRED THE DEFENDANTS TO TURN OVER THE DOCUMENTS THAT WERE

19    TURNED OVER BY THE DOJ.

Page 118

10-30-07 hearing.txt

20          THE STAY FOR FULL DISCOVERY WAS LIFTED ON

21    APRIL 14, 2006.  WITHIN ONE YEAR WE WERE READY TO GO TO

22    TRIAL ON APRIL 14, 2007.  AND WITHIN THAT PERIOD OF 12 OR 13

23    MONTHS I, AS LEAD COUNSEL, AND D-RAM, AND MR. SIMON, AS A

24    HEAD OF THE DISCOVERY COMMITTEE, WE MOVED THAT CASE ALONG

25    WITH THE GREATEST DISPATCH OF ANY CASE THAT I'VE SEEN.  NO

0

70

1    CASE TO MY KNOWLEDGE OF THIS COMPLEXITY WAS MOVED FROM THE

2    DAY THAT THEY LIFTED FULL DISCOVERY TO THE TIME THAT IT WENT

3    TO TRIAL IN A SHORTER PERIOD OF TIME BECAUSE SHE KEPT ON US

4    AS WE MOVED IT ALONG.  WE TOOK 110 DEPOSITIONS.  WE FILED

5    CLASS ACTIONS.  WE FILED DAMAGE STUDIES AND THE WHOLE BALL

6    OF WAX.  AND WE WERE READY TO GO TO TRIAL A WEEK BEFORE THE

7    CASE SETTLED.

8          NOW, AS FAR AS THE EXPERIENCE, OUR EXPERIENCE,
Page 119

10-30-07 hearing.txt

9    COMPARED TO THE LIEFF OFFICE, THE LIEFF OFFICE IS A GOOD

10   OFFICE.  I DON'T DENIGRATE THE OFFICE.  BUT WHEN YOU COMPARE

11   OUR OFFICE WITH ANTITRUST EXPERIENCE, IT JUST DOESN'T

12   COMPARE.  THEIR EXPERIENCE IS INSUBSTANTIAL.

13          AND IT IS THE SAME THING FOR THE LABATON OFFICE.

14   I'VE BEEN IN THE CASES WITH THE LABATON OFFICE.  THEY DON'T

15   COME NEAR THE EXPERIENCE THAT MY OFFICE HAS AND MR. SIMON'S

16   OFFICE HAS.

17          AND AS I SAID, THE ONLY REASON THEY CAME IN AT THE

18   END BECAUSE THEY WANTED TO GET INTO THE ACTION.  AND SO THEY

19   FILED A MOTION TO -- TO SAY I WANT TO BE COLEAD COUNSEL.

20          NOW, LET ME TALK ABOUT THE CONFLICT.  LET ME TALK

21   ABOUT THE CONFLICT.  IN THE FIRST PLACE, THE D-RAM CASE IS

22   OVER.  AS THEY SAY IN ITALIAN, FINITO.  IT'S ALL OVER.

23   D-RAM, I'M NOT IN THE D-RAM CASE ANY MORE.  IT'S ALL OVER.

Page 120

10-30-07 hearing.txt

24     THE DISMISSALS HAVE BEEN FILED.  SO I HAVE NO CONFLICT IN

25     APPEARING IN THE D-RAM CASE AT ALL.

☐

                                                                    71

1               NOW, AS FAR AS THE LCD CASE, MR. SIMON'S IN IT BUT

2     HE'S NOT IN THE S-RAM CASE OR ANYTHING LIKE THAT.  I HAVE NO

3     AUTHORITY IN ANY ONE OF THOSE CASES TO SETTLE THE CASE OR DO

4     ANYTHING ELSE LIKE THAT.  SO THERE IS --

5               THE COURT:  SO ARE YOU GOING TO SPEAK TO HER --

6     HER SUGGESTION THAT THERE MAY BE AN APPEARANCE OF CONFLICT

7     BASED UPON THE RECITATION ACTIVITIES.

8               MR. SIMON:  YOUR HONOR, CAN I ADDRESS THAT FOR A

9     SECOND?

10              MR. G. SAVERI:  JUST A SECOND.  JUST A SECOND,

11     PLEASE.  THERE IS NO ACTUAL CONFLICT HERE.  WHAT THEY'RE

12     TALKING ABOUT IS THE POSSIBILITY --

10-30-07 hearing.txt

13          THE COURT:  RIGHT.

14          MR. G. SAVERI:  -- AND THE EXPECTATION AND THE

15  SPECULATION THAT SOMETHING MIGHT ARISE BECAUSE THERE MAY BE

16  SOME COMPANY THAT IS NOT GOING TO HAVE SUFFICIENT ASSETS TO

17  PAY OFF A JUDGMENT.

18          IN THE FIRST PLACE, THERE'S BEEN NO SHOWING MADE

19  WHATSOEVER THAT ANY ONE OF THESE COMPANIES DOES NOT HAVE

20  SUFFICIENT ASSETS.  AND WHEN YOU'RE TALKING ABOUT THESE

21  COMPANIES --

22          THE COURT:  WELL, I DON'T KNOW IF THAT'S WHAT HER

23  CONCERN WAS.  HER CONCERN WAS, SEEMED TO BE, THAT THE

24  REPRESENTATIONAL ACTIVITIES THAT YOU'RE CURRENTLY ENGAGING

25  IN OR HAVE ENGAGED IN, IN THOSE OTHER ACTIONS MAY CREATE THE

                                                        72

1   APPEARANCE OF A CONFLICT WITH RESPECT TO YOUR BEING LEAD

# EXHIBIT E
# (3 OF 3)

10-30-07 hearing.txt

2    COUNSEL HERE.  AND THE QUESTION IS WHETHER OR NOT THE COURT

3    CAN TAKE THAT INTO ACCOUNT IN, UNDER THE 23(G)(1)(C) FACTORS

4    OF WHETHER I SHOULD WAIT UNTIL I, UM, HAVE A CLASS

5    CERTIFICATION MOTION AND TAKE IT INTO ACCOUNT UNDER THE

6    ADEQUACY OF COUNSEL THE FACTOR THAT I'LL BE EVALUATING IN

7    THAT ARENA.

8         MR. G. SAVERI:  IF THERE IS ANY PROBLEM THAT IS

9    THE TIME TO RAISE IT.  IF THERE IS ANY PROBLEM ABOUT THE

10   ADEQUACIES OF REPRESENTATION, MR. LABATON AND HIS CLIENT CAN

11   COME IN AT THAT TIME AND QUESTION THE APPOINTMENT OF WHO

12   SHOULD BE LEAD COUNSEL AT THAT TIME.

13        THE COURT:  WELL, I APPRECIATE YOUR COMMENTS.  I

14   MEAN OBVIOUSLY, AND I WOULD LIKE TO HEAR WHAT YOU'RE SAYING,

15   TOO, WITH RESPECT TO THE CON -- BECAUSE OBVIOUSLY TO THE

16   EXTENT THAT A CONFLICT IS APPARENT TO ME NOW THAT I

17   CERTAINLY WOULD BE INCLINED TO TAKE THAT INTO ACCOUNT.  BUT

10-30-07 hearing.txt

18    TO THE EXTENT THAT IT IS NOT APPARENT TO ME, AND IT'S

19    SOMETHING THAT POTENTIALLY COULD ARISE SOMETIME IN THE

20    FUTURE, THEN IT WOULD SEEM TO ME THAT IT WOULD BE MORE, MAKE

21    MORE SENSE FOR ME TO DELAY MY CONSIDERATION OF THAT TO THE

22    TIME THAT WE'RE GOING TO BE ASSESSING THAT.  AND THAT WILL

23    BE DURING THE COURSE OF THE CERTIFICATION.

24            MR. SIMON:  AND THOSE WERE THE TWO POINTS I WAS

25    GOING TO MAKE, YOUR HONOR.

                                                        73

1             FIRST OF ALL, THERE'S BEEN NO ASSERTION OF AN

2    ACTUAL CONFLICT, EVEN OF A POTENTIAL CONFLICT.  IT MAY BE

3    SOMETHING MIGHT HAPPEN DOWN THE LINE THAT YOU CAN TAKE INTO

4    CONSIDERATION.  AND THE REASON YOU APPOINT INTERIM COUNSEL

5    BECAUSE IT IS UP TO THE POINT OF CLASS CERTIFICATION WHERE

10-30-07 hearing.txt

6   ALL THOSE ISSUES ARE AIRED.

7         LET ME JUST TALK ABOUT LSC.  MR. SAVERI JUST STOOD

8   UP.  HE IS MY COLEAD COUNSEL IN THAT CASE.  UM, THE FACT OF

9   THE MATTER THERE IS ARE ONLY TWO CROSSOVER DEFENDANTS.

10  TOSHIBA AND SAMSUNG, BOTH OF WHICH ARE MULTIBILLION DOLLAR

11  COMPANIES, NEITHER OF WHICH WILL HAVE ANY PROBLEM RESPONDING

12  TO A JUDGMENT IN THE LCD CASE AND IN THIS CASE AND IN ALL

13  THE CASES THAT WERE CITED TO YOU AND I WON'T GO INTO THE

14  PAPERS --

15        THE COURT:  RIGHT.

16        MR. SIMON:  -- ALL TALK ABOUT A LIMITED FUND

17  SITUATION.  THAT IS NOT THE CASE HERE.

18        EVER SINCE THE BEGINNING OF THESE CASES OUT OF THE

19  DOJ, THE NORTHERN DISTRICT OF CALIFORNIA, GOING BACK TO

20  CITRIC ACID IN FRONT OF JUDGE SMITH THAT I WAS INVOLVED IN,

21  THAT, MY OWN FIRM, MR. COTCHETT'S FIRM, FINDING, MY OLD

Page 125

10-30-07 hearing.txt

22    FIRM, MR. COTCHETT'S FIRM.  THESE CASES SPAWN ADDITIONAL

23    CASES.  YOU WOULD BASICALLY BE TAKING AWAY FROM THE CASE THE

24    BEST QUALIFIED ATTORNEYS IF YOU BOUGHT THE LABATON ARGUMENT.

25    AND THEY'RE COMING IN FROM NEW YORK AND TRYING TO CONVINCE

74

1    YOU AT THIS LATE STAGE THAT THERE IS AN ARGUMENT WHERE THERE

2    IS NONE AND ON THAT I'LL LEAVE IT ON THAT ISSUE.

3           THE COURT:  OKAY.  THANK YOU.

4           MR. J. SAVERI:  YOUR HONOR, AND I WOULD JUST LIKE

5    TO ADDRESS THE CONFLICT POINT.  MR. SIMON IS MY COLEAD

6    COUNSEL IN THAT CASE.  WE'VE BEEN APPOINTED BY JUDGE ILLSTON

7    IN THAT CASE.  HE'S EXACTLY RIGHT THAT THERE'S VERY LITTLE

8    OVERLAP BETWEEN THE DEFENDANTS, BETWEEN THE TWO CASES.

9    THERE'S NO EVIDENCE IN THE RECORD THAT THERE'S ANYTHING LIKE

10   A LIMITED FOR SOMETHING THAT WOULD CREATE EVEN A WHIFF OF A

10-30-07 hearing.txt

11    POTENTIAL CONFLICT.  AND, IN FACT, I WOULD -- I WOULD ECHO

12    MR. SIMON'S COMMENTS THAT THE FACT THAT WE ARE IN THOSE --

13    IN THESE OTHER CASES.  WE HAVE EXPERIENCE IN THIS INDUSTRY.

14    WE'RE DOWN TO THE BENEFIT OF THE CLASS.  AND ACTUALLY I

15    THINK THAT'S A STRONG POSITIVE --

16             THE COURT:  OKAY.

17             MR. J. SAVERI:  -- IN FAVOR.  AND THE ONLY OTHER

18    POINT I DON'T THINK ITS MAKES SENSE TO, UM, TALK ABOUT OR GO

19    BACK THROUGH THE -- THE POINTS THAT WERE MADE EARLIER ABOUT

20    THE INVESTIGATION OR EXPERIENCE.

21             THE COURT:  RIGHT.

22             MR. J. SAVERI:  THE PAPERS ABSOLUTELY SPEAK FOR

23    THEMSELVES.

24             THE COURT:  THEY DO.

25             MR. J. SAVERI:  JUDGE ILLSTON WAS CONFRONTED WITH

⬚

10-30-07 hearing.txt

1    EXACTLY THE SAME ARGUMENTS IN LCD.  AND WITH ALL DUE

2    RESPECT, WE WERE CHOSEN AS LEAD COUNSEL.  SO I THINK THE

3    IDEA THAT, UM, WE ARE, COMING SECOND IN ANY OF THOSE

4    CATEGORIES IS JUST DEMONSTRABLY UNTRUE.

5            BUT IMPORTANTLY, YOUR HONOR --

6            THE COURT:  NOT DEMONSTRATIVELY TRUE.  I MEAN YOU

7    HAVE BEEN A PRETTY LATECOMER WITH RESPECT TO FILING THE

8    COMPLAINT HERE SO THAT'S -- THAT'S FAIRLY CLEAR.

9            MR. J. SAVERI:  BUT -- BUT, AGAIN, YOUR HONOR, THE

10   POINT IS IT SHOULDN'T BE A RACE TO THE COURTHOUSE.  IT

11   SHOULD HAVE SOMETHING TO DO WITH THE INVESTIGATION.

12           THE COURT:  RIGHT.

13           MR. J. SAVERI:  NO.  AND THE --

14           THE COURT:  AND I HAVE NO -- NO REASON TO BELIEVE

Page 128

10-30-07 hearing.txt

15    THAT ANY OF YOU HAVE FILED COMPLAINTS THAT WEREN'T DIRECTLY

16    ATTRIBUTABLE TO THE INVESTIGATION AND PROCEEDED THE

17    COMPLAINTS.

18           MR. J. SAVERI:  AND WE'RE UNDER NO OBLIGATION TO

19    TALK TO THE FIRST ONE WHO FILED TO OBTAIN THE FEW --

20           THE COURT:  YOU DON'T NEED TO RESPOND TO ALL THAT.

21           MR. J. SAVERI:  SO, FINALLY, YOUR HONOR, AGAIN, I

22    THINK THE REAL POINT THAT WASN'T ADDRESSED IN THIS LAST

23    ROUND IS THE EFFICIENCY.  AND I THINK THAT THE STARK ISSUE

24    THAT THIS MAY COME DOWN TO IS WHICH FIRM THE COURT BELIEVES

25    CAN HANDLE THIS CASE MOST EFFICIENTLY AND DEVOTE THE

                                                              76

1    APPROPRIATE LEVEL OF SKILL AND RESOURCES WITH THE

2    DEMONSTRABLE TRACK RECORD IN THIS FIELD TO HANDLE THIS CASE

3    ON BEHALF OF THE CLASS IN THE MOST COST EFFECTIVE AND

                          Page 129

10-30-07 hearing.txt

4    EFFICIENT MANNER.  AND HAVING A SINGLE FIRM, I THINK, DOES,

5    UM, BEST SUIT THAT CRITERIA.  AND THAT'S IMPORTANT UNDER

6    RULE 23(G).

7            THE COURT:  THANK YOU.

8            MR. J. SAVERI:  YOU'RE WELCOME.

9            MR. FREED:  YOUR HONOR, MAY I BE HEARD?

10           THE COURT:  YOU MAY.

11           MR. FREED:  THANK YOU, YOUR HONOR.  MICHAEL FREED.

12   I'M THE ONLY PLAINTIFF'S LAWYER HERE WHO ISN'T ASKING TO BE

13   SOLE LEAD COUNSEL FOR ONE OF THE TWO COLEAD COUNSEL.

14           OUR POSITION IS ONLY IF YOUR HONOR GOES TO AN

15   ISSUE OF ANYONE OTHER THAN MR. SAVERI AND MR. SIMON, THEN WE

16   WOULD ASK TO BE HEARD BUT --

17           THE COURT:  OKAY.  THEN I'LL LEAD YOU BE HEARD BY

18   THIS AFTERNOON.

19           MR. FREED:  SO LET ME SAY WHY I BELIEVE THERE

Page 130

10-30-07 hearing.txt

20    SHOULD BE TWO COLEAD AND IT SHOULD BE MR. SIMON AND

21    MR. SAVERI.

22            THE COURT:  OKAY.

23            MR. FREED:  UM, FIRST OF ALL, WE HAVE A CLIENT,

24    WESTELL TECHNOLOGIES, INC, WHICH IS A LISTED CORPORATION,

25    PROBABLY THE LARGER PURCHASER OF THE PRODUCT IN THIS CASE.

                                                        77

1    WE HAVE REPRESENTED THEM IN OTHER CASES.  THEY HAD A VERY

2    STRONG INTEREST IN WHAT TRANSPIRES HERE.

3            THE PRIVATE ORDERING OF THIS CASE, WHICH WAS

4    COMPLETED BEFORE THE LAST TWO FILED APPLICATIONS, WERE

5    BELIEVED BY US, ON BEHALF OF OUR CLIENT, TO BE THE MOST

6    EFFECTIVE AND EFFICIENT WAY TO HANDLE THIS CASE.

7            THE NOTION THAT ONE LAW FIRM IS BETTER THAN TWO, I

8    THINK, IS DISPROVED IN FACT.  I'VE BEEN LEAD COUNSEL IN MANY
                        Page 131

10-30-07 hearing.txt

9      CASES FOR 35, 40 YEARS.  I'VE HAD -- BEEN INVOLVED IN SOME

10     OF THE BIGGEST SETTLEMENTS AND GONE TO TRIAL IN CLASS ACTION

11     CASES.  ALMOST INVARIABLY THERE ARE TWO, THREE AND FOUR

12     COLEAD COUNSEL.  I'M NOT PROPOSING YOU EXPAND BEYOND TWO.

13     YOU MADE YOURSELF CLEAR.  BUT THERE IS A REASON FOR THAT.

14     THESE ARE LAWYERS WHO ARE INVOLVED IN OTHER CASES.  THEY ARE

15     BUSY LAWYERS.  THEY ARE NOT ALWAYS AVAILABLE AT THE SAME

16     TIME.  THERE ARE MANY MANY DIFFERENT ISSUES WHICH ARISE AND

17     HAVE TO BE REVIEWED AND SUPERVISED.  AND THAT ACTUALLY, I

18     THINK, UNDERMINES THE BENEFIT TO THE CLASS OF HAVING ONE

19     COLEAD COUNSEL BECOME A BOTTLENECK WHEN THERE ARE TWO

20     LAWYERS WHO CAN BACK EACH OTHER UP AND OVERSEE DIFFERENT

21     PARTS OF THE CASE.  SO I THINK THE TWO IS VERY VERY

22     IMPORTANT HERE.

23              I'M AWARE THERE ARE SOME CASES WITH ONE -- I'LL

Page 132

10-30-07 hearing.txt

24  SUBMIT TO YOUR HONOR, OVERWHELMINGLY THERE'S TWO, THREE AND

25  FOUR.  THAT'S ALWAYS BEEN MY EXPERIENCE.

                                                              78

1            THE COURT:  AND I THINK I MENTIONED QUITE A WHILE

2  AGO THAT I'M PERSUADED THAT THERE SHOULD BE TWO.

3            MR. FREED:  THANK YOU, YOUR HONOR.  AS FOR THE

4  LAWYERS, SAVERI AND SIMON, THEY HAVE BEEN SELECTED FOR

5  PRIORITY HERE BECAUSE OF THEIR KNOWLEDGE OF THE CASE, THEIR

6  EXPERIENCE AND BACKGROUND.  THERE IS NO REASON TO TURN

7  BEYOND WHAT IS THE PREFERENCE IS OF SEVEN OF THE NINE CASES,

8  INCLUDING THE VERY LARGEST PURCHASER THAT'S PUT HIMSELF

9  FORWARD.

10           THE COURT:  THANK YOU.

11           MR. FREED:  THANK YOU, YOUR HONOR.

12           THE COURT:  OKAY.  I REALLY APPRECIATE YOUR -- ALL

10-30-07 hearing.txt

13   OF YOUR COMMENTS.  THIS HAS BEEN HELPFUL.  AND AFTER

14   CAREFULLY CONSIDERING THE ARGUMENTS THAT YOU ALL HAVE MADE

15   AND THE PAPERS THAT YOU SUBMITTED IN GIVEN THE FACT THAT THE

16   COURT HAS CONSIDERED, I AM GOING TO APPOINT AS INTERIM

17   COUNSEL THE LAW FIRMS OF SAVERI AND SAVERI, INC., AND

18   PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP, AS INTERIM

19   COLEAD COUNSEL FOR THE DIRECT PURCHASER PLAINTIFFS.

20             AND AS I INDICATED EARLIER, UM, I AM APPOINTING

21   THE LAW FIRMS OF COTCHETT, PITRE & MCCARTHY AND ZELLE,

22   HOFMANN, VOELBEL, MASON & GETTE AS INTERIM COLEAD COUNSEL

23   FOR THE INDIRECT PURCHASERS.

24             UM, AND I DON'T KNOW ABOUT THE CONFLICT ISSUES.

25   BUT IF -- IF -- IF THE APPEARANCE MATERIALIZES AT SOME POINT

79

1   IN THE FUTURE, THEN CERTAINLY THAT WILL BE TAKEN INTO

Page 134

10-30-07 hearing.txt

2    ACCOUNT AT THE APPROPRIATE TIME, EITHER THE CLASS

3    CERTIFICATION OR EVEN LATER IF IT BECOMES A PROBLEM OR IT

4    THEN BECOMES A CONFLICT, THERE IS ALWAYS A HOPE FOR THE

5    COURT TO TAKE INTO ACCOUNT.

6            BUT AT THIS POINT, JUST BASED ON WHAT HAS BEEN

7    SAID, I AM NOT IN A POSITION TO REALLY ASSESS WHETHER THAT'S

8    A -- A REAL ISSUE OR NOT.  AND SO AT THIS POINT, BASED UPON

9    WHAT YOU ALL HAVE SAID TO ME AND WHAT YOU SUBMITTED IN YOUR

10   PAPERS, I AM APPOINTING THOSE LAW FIRMS AS THE INTERIM

11   COLEAD COUNSELS FOR THE INDIRECT AND DIRECT PLAINTIFFS.

12           WITH RESPECT TO THE LIAISON, UM, YOU KNOW, I

13   FRANKLY DON'T HAVE A, UM, REAL FEEL FOR WHETHER YOU ALL

14   THINK IT'S GOING TO BE REALLY EFFICIENT.  BUT GIVEN JUST THE

15   MAGNITUDE OF WHAT YOU'VE DESCRIBED IN TERMS OF YOUR

16   EXPERIENCE, I THINK, UM, I WILL APPOINT COUNSEL AS LIAISON

17   FOR THE INDIRECT ONLY.  AND I'M PERSUADED THAT IT WOULD NOT
                          Page 135

10-30-07 hearing.txt

18    BE A SAVINGS, AND IT MAY EVEN CREATE ADDITIONAL ISSUES BY

19    HAVING COUNSEL TRY TO, UM, SERVE IN A LIAISON CAPACITY FOR

20    BOTH.  AND SO -- AND THEN THE DIRECT LEAD COUNSEL IS NOT

21    INTERESTED IN HAVING THE LIAISON.  BUT SINCE THE INDIRECT,

22    THE COLEAD COUNSEL FOR THE INDIRECT SEEM TO BELIEVE THAT IT

23    WOULD BE BENEFICIAL FOR THEM, AND GIVEN THE MAGNITUDE AND

24    THE SHEER VOLUME OF THE INDIRECT VERSUS THE DIRECT, I'M

25    GOING TO DEFER TO THEIR EXPERIENCE AND APPOINT YOU AS

                                                          80

1    COUNSEL AS THE LIAISON.

2            UM, AND SO NOW WE ALSO HAVE TO HAVE THE, UM, IF

3    ONE OF YOU WILL TAKE RESPONSIBILITY FOR SUBMITTING A

4    PROPOSED ORDER CONSISTENT WITH THE COURT'S --

5            MR. SIMON:  WE'LL BE HAPPY TO, YOUR HONOR.

Page 136

10-30-07 hearing.txt

6        THE COURT:  OKAY.  AND THEN, UM, LISA.

7        THE CLERK:  YEAH.

8        THE COURT:  -- THE, UM, CONSOLIDATED -- THE

9  CONSOLIDATED AMENDED COMPLAINT.  HOW, UM, BOTH THE DIRECT

10  PURCHASER CASES AND THE SEPARATE CONSOLIDATED AMENDED

11  COMPLAINT AND THE INDIRECT PURCHASE, HOW LONG DO YOU ALL

12  NEED TO -- TO --

13        MR. SIMON:  YOUR HONOR, WE SUBMITTED A JOINT CASE

14  MANAGEMENT ORDER.  AND WE -- IT TIES INTO THE ISSUE OF

15  WHETHER OR NOT DOCUMENTS WILL BE PRODUCED IN THE INTERIM.

16  THE DEPARTMENT OF JUST --

17        THE COURT:  YOU FILED A CONSOLIDATED AMENDED

18  COMPLAINT?

19        MR. G. SAVERI:  YES, YOUR HONOR.

20        MR. SIMON:  YES, YOUR HONOR.  THE DEPARTMENT OF

21  JUSTICE WHICH IS NOW, IN FACT, THAT JUST HAPPENED HAS STATED

Page 137

10-30-07 hearing.txt

22   THEIR POSITION WITH RESPECT TO DISCOVERY THAT WOULD PRECEDE

23   THE FILING OF THE CONSOLIDATED AMENDED COMPLAINT AND

24   CERTAINLY MOTIONS TO DISMISS.  THEY SAY THEY ARE IN

25   AGREEMENT THAT DOCUMENTS THAT WERE PRODUCED BY DEFENDANTS TO

81

1   THE GRAND JURY COULD BE PRODUCED IN THE INTERIM PERIOD.  AND

2   IT'S OUR PROPOSAL JOINTLY THAT WE TIE THE FILING OF THAT

3   COMPLAINT TO THE PRODUCTION OF THOSE DOCUMENTS.

4           I'M SURE DEFENDANTS HAVE SOMETHING TO SAY ABOUT

5   THAT.  MR. COTCHETT.

6           MR. COTCHETT:  YES, I WOULD ADD TO THAT.  I THINK

7   WE SHOULD MAKE IT EITHER 60 OR 90 DAYS AFTER THEY PRODUCE

8   THE DOCUMENTS, WHICH ALLOWS US TIME.  AND IT'S -- COUNSEL

9   JUST POINTED OUT, I DON'T THINK THE DEPARTMENT OF JUSTICE

10  HAS ANY PROBLEM WITH THAT.  FOR YOUR HONOR'S UNDERSTANDING

10-30-07 hearing.txt

11   OF THE VOLUME, THESE ARE ALL PRODUCED AT THE DOJ ON DISCS.

12   SO IT'S NOT LIKE PRODUCING THOUSANDS OF BOXES.

13          THE COURT:  OKAY.

14          MR. COTCHETT:  IT'S ELECTRONICALLY PRODUCED.  IT'S

15   BEEN DONE.  JUDGE WILKEN JUST ORDERED IT AT THE S-RAM CASE.

16   JUDGE HAMILTON ORDERED IT AND IT'S BEEN DONE.  ESPECIALLY IN

17   LIME OF TWOOMBLEY.

18          THE COURT:  SO WHEN ARE THEY, YOU SAID 60 OR 90

19   DAYS AFTER THE PRODUCTION.  SO WHEN, IS THERE SOMEONE FROM

20   DOJ HERE?

21          MR. G. SAVERI:  SOMEONE IS HERE FROM THE

22   DEPARTMENT OF JUSTICE.  MR. COUSINS.

23          MR. SIMON:  YEAH. MR. COUSINS IS HERE.

24          THE COURT:  WHO CAN SPEAK, I SHOULD SAY WHO CAN

25   SPEAK TO PRODUCTION WHAT IS GOING TO TAKE PLACE SO WE CAN

                                                        82
                        Page 139

10-30-07 hearing.txt

1    HAVE AN IDEA.

2            MR. G. SAVERI:  THE EXPERIENCE THAT WE HAD IN

3    D-RAM.

4            THE COURT:  GOOD AFTERNOON.

5            MS. KROOP:  GOOD AFTERNOON, YOUR HONOR, LAURI

6    KROOP ON BEHALF OF THE UNITED STATES DEPARTMENT OF JUSTICE.

7            WHERE WE ARE RIGHT NOW IS REALLY WE'D LIKE TO COME

8    TO AGREEMENT AMONG ALL THE PARTIES AS PER OUR LIMIT ON

9    DISCOVERY.

10            THE COURT:  COME TO AN AGREEMENT ABOUT WHAT?

11            MS. KROOP:  WELL, WE, CURRENTLY WE CIRCULATED A

12    PROPOSED STIPULATED PROTECTIVE ORDER AND ALL THE PARTIES NOW

13    IN NOW IN DISCUSSION AMONGST THEMSELVES AND WITH US TO COME

14    TO AN AGREEMENT FILED WITH THE COURT OF STIPULATION.  WE

Page 140

10-30-07 hearing.txt

15   WOULD LIKE TO --

16          THE COURT:  A PROTECTIVE ORDER FOR THE GRAND JURY

17   DISCLOSURE?

18          MS. KROOP:  WHAT WE WOULD LIKE TO DO IS WE WOULD

19   LIKE TO LIMIT DISCOVERY IN THE FOLLOWING WAY:  DOCUMENT

20   DISCOVERY WE WOULD -- WE HAVE NO PROBLEM WITH.  WE WOULD

21   LIKE TO PREVENT ANY DEPOSITIONS OR INTERROGATORIES.  AND

22   THAT'S WHAT WE PROPOSE.  WE'RE DISCUSSING THAT WITH THE

23   PARTIES RIGHT NOW.  WE HAVEN'T YET COME TO AN AGREEMENT AND

24   WOULD LIKE MORE TIME.

25          THE COURT:  LET ME -- AGREEMENT.  OKAY.  A COUPLE

83

1    OF THINGS.  FIRST, YOU KNOW WHAT, THE FIRST THING I WANTED

2    TO DISCUSS WAS TRYING TO GET AN IDEA IN TERMS OF WHAT I CAN

3    EXPECT THESE CONSOLIDATED AND AMENDED COMPLAINTS TO BE

Page 141

10-30-07 hearing.txt

4    FILED.

5         NOW, ONE SUGGESTION HAS BEEN 60 DAYS AFTER THE

6    DEPARTMENT OF JUSTICE HAS PROVIDED DISCLOSURE OF THE GRAND

7    JURY MATERIALS WHICH, APPARENTLY, THE DEPARTMENT OF JUSTICE

8    HAS AGREED TO PROVIDE.  AND SO MY QUESTION IS, FIRST OF ALL,

9    IS THAT TRUE?  AND, SECONDLY, IF IT IS TRUE, WHEN DO YOU

10   PLAN TO PROVIDE THE GRAND JURY DISCLOSURE?  AND THAT'S GOING

11   TO TRIGGER THE DATE FOR THE AMENDED COMPLAINTS AND WE'LL

12   DISCUSS THE OTHER ISSUES.

13        MR. COTCHETT:  LET ME JUST CORRECT THAT, YOUR

14   HONOR.  IT'S NOT THAT THE DEPARTMENT OF JUSTICE WILL PROVIDE

15   IT TO US.  IT'S THAT THE DEFENDANTS WHO WILL SPEAK TO THIS

16   HAVE PROVIDED TO THE DEPARTMENT OF JUSTICE.  SO IT'S ALL IN

17   ONE FORMAT.  THEY WILL NOT PROVIDE IT.  WE'RE ASKING THE

18   DEFENDANTS TO SIMPLY GIVE US WHAT THEY GAVE THE DEPARTMENT

19   OF JUSTICE.

Page 142

10-30-07 hearing.txt

20          AND AS I UNDERSTAND IT, JUST LISTENING TO THEM,

21    THEY HAVE, THE DEPARTMENT OF JUSTICE HAS NO PROBLEM WITH

22    THAT.

23          SHE MENTIONED INTERROGATORIES AND EVERYTHING

24    ELSE -- EXCUSE ME -- DEPOSITIONS.  WE'LL GET TO THAT

25    DOWNSTREAM.  NOBODY WANTS TO --

84

1          MR. SIMON:  YOUR HONOR, IF --

2          MR. COTCHETT:  EXCUSE ME, COUNSEL.  NOBODY WANTS

3    TO TAKE DEPOSITIONS NOW.  WE ARE ONLY TALKING ABOUT WHEN DO

4    WE FILE THE AMENDED COMPLAINT.  AND OUR SUGGESTION IS 60

5    DAYS AFTER THEY GIVE US WHAT THEY'VE GIVEN ALREADY TO THE

6    DEPARTMENT OF JUSTICE.

7          THE COURT:  OKAY.  SO THE ASSUMPTION IS THAT THEY

8    INTEND TO GIVE YOU WHAT THEY'VE GIVEN TO THE DEPARTMENT OF
Page 143

10-30-07 hearing.txt

9      JUSTICE.  I GUESS I MISUNDERSTOOD YOU.

10          MR. COTCHETT:  RIGHT.

11          THE COURT:  SO I GUESS I NEED TO UNDERSTAND WHAT

12     ASSUMPTION IS CORRECT.

13          SIR, WOULD IDENTIFY YOURSELF FOR THE RECORD,

14     PLEASE.

15          MR. WALL:  YES, YOUR HONOR.  I'M DAN WALL FROM

16     LATHAM & WATKINS.  I REPRESENT TOSHIBA AMERICA ELECTRONICS,

17     CORP, AND TOSHIBA AMERICA, INC.

18          THE COURT:  OKAY.

19          MR. WALL:  UM, WE HAVEN'T BEEN HEARD FROM ON THIS

20     ISSUE.  IT IS ACTUALLY NEWS TO US JUST NOW.  THAT, UM, THE

21     DEPARTMENT OF JUSTICE IS -- IS TAKING THE POSITION THAT WE

22     SHOULD BE TURNING OVER, OR THAT WE CAN TURN OVER, THE GRAND

23     JURY PRODUCTIONS TO THE PLAINTIFFS.

Page 144

10-30-07 hearing.txt

24          AS WE HAVE INDICATED, UM, IN OUR PAPERS, UM,

25      THERE, WE ACTUALLY SORT OF STOPPED FOR A MOMENT AND LOOKED

                                                              85

1      AT WHAT'S ACTUALLY GOING ON WITH RESPECT TO THE GRAND JURY

2      PROCEEDING.  A COMMENT WAS MADE EARLIER IN THIS HEARING

3      ABOUT HOW MANY DEFENDANTS THERE WERE WITH RESPECT -- WITH

4      RESPECT TO THESE CASES.

5              THE COURT:  OKAY.  LET'S NOT GET OFF TRACK.  I

6      JUST HAVE -- THE FIRST QUESTION I'M TRYING TO RESOLVE RIGHT

7      NOW IS WHEN TO ORDER THE CONSOLIDATED AMENDED COMPLAINT THAT

8      YOU FILED.

9              MR. WALL:  LET ME --

10             THE COURT:  AND IN RESPONSE TO THAT, IT WAS

11     SUGGESTED THAT THE COURT ALLOW THE FILING OF THE COMPLAINT

12     60 DAYS AFTER THE PRODUCTION OF GRAND JURY DOCUMENTS THAT

                            Page 145

10-30-07 hearing.txt

13    HAVE BEEN TURNED OVER TO THE -- TO THE, UM, DEPARTMENT OF

14    JUSTICE.  AND THE DEPARTMENT OF JUSTICE PROBABLY HAS NO

15    OBJECTION OR HAS STATED THEY HAVE NO OBJECTION TO THE

16    DEFENDANTS TURNING OVER THE SAME DOCUMENTS THAT IT TURNED

17    OVER TO THEM, TO THE PLAINTIFF.  AND SO, BUT THAT -- THAT

18    SUGGESTION IS PREMISED UPON THE ASSUMPTION THAT THE

19    DEFENDANTS ARE AGREEABLE TO TURN THE DOCUMENTS OVER.

20         MR. WALL:  WHICH WE ARE NOT.

21         THE COURT:  AND IF YOU ARE NOT, SO WE NEED TO SET

22    ANOTHER DATE FOR THE FILING OF THE AMENDED CONSOLIDATED.

23         MR. SCARPULLA:  IF IT PLEASE THE COURT, FRANCIS IS

24    SCARPULLA, YOUR HONOR.

25         THE COURT:  YES.

                                                          86

1         MR. SCARPULLA:  IN A NUMBER OF CASES, WHAT WE HAVE

Page 146

10-30-07 hearing.txt

2    YOUR DONE, WITH YOUR HONOR'S PERMISSION, IS TO HAVE A MEET

3    AND CONFER, WHICH INCLUDES THE DEPARTMENT OF JUSTICE, THE

4    DIRECT PURCHASERS, THE DEFENDANTS WHO WISH TO BE PRESENT, OR

5    IF THEY HAVE A GROUP THAT THEY CAN GIVE AUTHORITY TO, AND

6    THE INDIRECT PURCHASERS.  WE'VE ATTEMPT TO COME UP WITH SOME

7    PLAN FOR YOUR HONOR.  WE DO THAT IN VERY SHORT ORDER.

8              SO IF THERE IS AN ISSUE THAT CAN BE NARROWED AND

9    YOUR HONOR CAN HAVE, BECAUSE YOUR HONOR, IF YOUR HONOR

10   WISHES TO APPOINT A SPECIAL MASTER OR HAVE A MAGISTRATE MAKE

11   A REPORT, YOUR HONOR CAN DO IT.  AND IN THIS, IT SOUNDS TO

12   ME LIKE SINCE THE DEFENDANTS HAVE, THIS IS THE FIRST TIME

13   THEY'VE HEARD ABOUT THIS, THAT PERHAPS IF YOUR HONOR GAVE US

14   A WEEK OR TWO TO SIT DOWN WITH THEM AND TO COME UP WITH, IF

15   WE CAN, A PROPOSED PLAN FOR YOUR HONOR TO REVIEW AND TO

16   APPROVE, IT MAY BE THAT WE CAN DO THIS IN SHORT ORDER, AND

17   IT WILL AVOID ALL OF THESE PROBLEMS THAT WE ARE GOING TO

Page 147

10-30-07 hearing.txt

18    HAVE HERE IN FRONT OF YOUR HONOR NOW TODAY.

19          MR. COTCHETT:  AND IT'S ACTUALLY WHAT RULE 26

20    PROVIDES FOR, A RULE 26 CONFERENCE ON WHAT WILL BE TURNED

21    OVER.

22          MR. WALL:  AND IF MY MAY, YOUR HONOR.  AGAIN, DAN

23    WALL FOR TOSHIBA.  TO TRY TO BE THE, SORT OF THE HONEST

24    BROKER ABOUT THIS, WE ALL KNOW IN THIS ROOM THAT THERE IS A

25    HUGE ISSUE, NOT JUST IN THIS ANTITRUST CASE, BUT IN ALL

                                                        87

1    ANTITRUST CASES OF THIS TYPE RIGHT NOW, AS TO WHETHER IN

2    LIGHT OF THE SUPREME COURT'S RECENT DECISION IN TWOMBLY, IT

3    IS -- IT IS APPROPRIATE FOR DISCOVERY TO GO FORWARD BEFORE

4    THERE IS -- THERE IS A WELL-PLEADED COMPLAINT THAT MEETS THE

5    MORE RIGOROUS PLEADING STANDARDS OF THAT CASE.

                        Page 148

10-30-07 hearing.txt

6          THIS ISSUE ABOUT WHETHER GRAND JURY PRODUCTIONS

7    WHICH, BY THE WAY, WILL HAVE ONLY BEEN MADE WHEN THEY'RE

8    MADE BY A -- A SMALL MINORITY OF THE DEFENDANTS IN THIS

9    CASE, BECAUSE ONLY A FEW RECEIVED GRAND JURY SUBPOENAS.

10   THEY SUED A LOT BUT ONLY A FEW RECEIVED THEM.

11          THERE -- THIS IS AN ISSUE THAT IS, UM, IS

12   COMMANDING A LOT OF ATTENTION RIGHT NOW FROM DISTRICT COURT

13   JUDGES LIKE YOURSELF WHO HAVE THESE CASES.  THERE WAS A VERY

14   RECENT IMPORTANT DECISION IN THIS DISTRICT FROM JUDGE ALSUP

15   ON THIS IN WHICH HE CAME DOWN VERY CLEARLY SAYING THAT THE

16   MERE PRESENCE OF A GRAND JURY INVESTIGATION IS NOT A

17   SUBSTITUTE OR BEING ABLE TO PLEAD THE KIND OF FACTS THAT

18   TWOMBLY REQUIRES.  AND THE FACT OF A GRAND JURY PRODUCTION

19   DOESN'T MEAN THE PRIVATE PLAINTIFFS ARE ENTITLED TO RUMMAGE

20   THROUGH THE SAME DOCUMENTS.

21          SO TO BE FAIR ABOUT IT, WE ARE GOING TO HAVE A

Page 149

10-30-07 hearing.txt

22    MAJOR DISAGREEMENT ABOUT THIS, THAT YOUR HONOR IS GOING TO

23    NEED TO RESOLVE.  AND WHAT WE SHOULD BE TALKING ABOUT IS HOW

24    WE'RE GOING TO HAVE THAT.  SO I CAN AGREE WITH WHAT COUNSEL

25    ARE SAYING.  LET US -- LET US, YOU KNOW, MEET IN THE NEXT

☐

                                                              88

1    TEN DAYS OR SO, COME UP WITH THE GROUND RULES ABOUT HOW

2    WE'RE GOING TO RESOLVE THAT, AND THEN WE'LL TENDER IT TO

3    YOUR HONOR AND THEN WE'LL ARGUE OUR POSITION.

4            MR. SIMON:  YOUR HONOR, MAY I POINT OUT SOMETHING

5    AND MAYBE MR. WALL MISSPOKE, BUT I'M HOLDING AN E-MAIL OF

6    OCTOBER 19, 2007, WHICH WAS SENT TO MR. WALL AS WELL AS ALL

7    DEFENDANTS AND ALL PLAINTIFFS FROM THE DEPARTMENT OF JUSTICE

8    FORWARDING THEIR PROPOSAL.  SO IT'S NOT JUST TODAY THAT

9    EVERYBODY FOUND OUT ABOUT IT.

10            I WAS RESPONSIBLE FOR TRYING TO PUT THE JOINT

                         Page 150

10-30-07 hearing.txt

11    CASE MANAGEMENT STATEMENT TOGETHER, WHICH YOU KNOW WAS A

12    FAIRLY LENGTHY DOCUMENTS.  WE HAD MEETS AND CONFERS WITH THE

13    DEFENDANTS TO GET THE GRAND JURY DOCUMENTS PRODUCED TO US SO

14    WE COULD COME TO YOU TODAY WITH AN AGREEMENT.

15            THE COURT:  WHAT IS THE PROPOSAL?

16            MR. SIMON:  THE PROPOSAL IS WITHIN 90 DAYS OF THE

17    DATE OF ENTRY OF A PROTECTED ORDER, ANY DEFENDANT THAT HAS

18    BEEN SERVED WITH A GRAND JURY SUBPOENA IN THE DOJ'S FLASH

19    MEMORY INVESTIGATION WILL PRODUCE TO THE OTHER PARTIES FOR

20    INSPECTION AND COPYING ALL DOCUMENTS THAT HAS PRODUCED TO

21    THE FLASH MEMORY GRAND JURY IN RESPONSE TO A SUBPOENA.

22    EVERY 90 DAYS THEREAFTER ON A ROLLING BASIS, IF THEY PRODUCE

23    MORE DOCUMENTS, THEY'LL PRODUCE THEM AGAIN.

24            WITH RESPECT TO THE GROUP OF PEOPLE THAT DIDN'T

25    GET A SUBPOENA THAT MR. WALL REFERS TO, THOSE DEFENDANTS,

89

Page 151

10-30-07 hearing.txt

1    THE DOJ HAS NO OBJECTION TO FULL-FLEDGED DOCUMENT DISCOVERY

2    GOING FORWARD.  IT SAYS RIGHT IN THEIR PROPOSAL.  THIS HAS

3    BEEN ON THE TABLE SINCE OCTOBER 19.  IT'S BEEN THE SUBJECT

4    OF MEET AND CONFER DISCUSSIONS.

5              THE COURT:  WHOSE PROPOSAL IS THAT?

6              MR. SIMON:  DOJ.  TO ALL OF US COLLECTIVELY.

7              THE COURT:  SO COUNSEL IS NOT -- IS NOT PRIVY TO

8    WHAT YOU'RE SAYING?

9              MR. WALL:  NO, I AM PRIVY TO IT.  BUT, YOUR HONOR,

10   THERE WERE SUBSEQUENT CONVERSATIONS BETWEEN OUR OFFICE AND

11   THE DEPARTMENT OF JUSTICE THAT -- THAT HAD, I DON'T WANT TO

12   JUST SIT HERE AND TALK --

13             THE COURT:  I THINK YOU'RE RIGHT.  AS FAR AS FOR

14   ME, JUST IN TERMS OF TIME HERE, TO GIVE YOU ALL SOME TIME TO

10-30-07 hearing.txt

15    SIT DOWN AND SEE IF YOU CAN UPDATE YOURSELVES ON WHERE YOU

16    ARE, AND SEE IF YOU CAN THEN, UM, COME UP WITH A PLAN THAT

17    PROPOSAL THAT IS GOING TO WORK.

18          MR. G. SAVERI:  AND, YOUR HONOR, IN CONNECTION

19    WITH THAT, WHAT MR. SIMON JUST READ IS PRACTICALLY A

20    DUPLICATE OF THE ORDER THAT JUDGE HAMILTON ENTERED IN D-RAM.

21          THE COURT:  BUT COUNSEL SAID THEY HAVE HAD UPDATED

22    DISCUSSIONS SINCE --

23          MR. G. SAVERI:  RIGHT.  ALL WE'RE ASKING IS TO SIT

24    DOWN WITH THEM TO SEE WHAT PROBLEMS THERE ARE AND WITHIN A

25    WEEK OR TEN DAYS SO THAT WE CAN COME BACK.  THAT'S ALL WE'RE

                                                    90

1    ASKING.

2          MR. COTCHETT:  AND WE'LL SUBMIT TO YOU IN TEN DAYS

3    WHAT THE PARTIES' POSITIONS.

                    Page 153

10-30-07 hearing.txt

4          THE COURT:  YES.

5          MR. G. SAVERI:  THAT'S ALL WE'RE ASKING.

6          THE COURT:  WHAT I DON'T NECESSARILY WANT -- I

7   DON'T WANT SIX DIFFERENT POSITIONS.

8          MR. SCARPULLA:  NO.  NO.  NO.  NO.

9          MR. G. SAVERI:  ONE POSITION FROM THE PLAINTIFFS;

10  ONE FROM THE DEFENDANTS.

11         MR. WALL:  YOU MIGHT ACTUALLY -- THERE'S --

12  THEY -- I DON'T KNOW WHAT THEIR SELECTION CRITERIA IS FOR

13  WHOM THEY SUED.  BECAUSE THEY HAVE LOTS OF DIFFERENT D-RAM

14  MANUFACTURERS, INCLUDING ONES THAT WE DON'T COMPETE WITH AND

15  THEY MAKE DIFFERENT KINDS OF THINGS.  BUT IT SHOULD NOT BE

16  ASSUMED IN THIS CASE THAT THE -- ALL OF THE DEFENDANTS ARE

17  GOING TO HAVE THE SAME POSITION ON SOME OF THESE ISSUES.

18  BECAUSE THE MOST OBVIOUS DISTINCTION IS SOME PEOPLE RECEIVED

19  GRAND JURY SUBPOENAS; SOME PEOPLE DIDN'T.  IN THE S-RAM CASE

Page 154

10-30-07 hearing.txt

20   THAT THEY LIKE TO USE AS AN EXAMPLE, ALL THE PEOPLE WHO

21   DIDN'T RECEIVE A GRAND JURY SUBPOENA WERE DROPPED FROM THE

22   CASE.  SO, YOU KNOW, PERHAPS THAT WILL HAPPEN.  BUT WE

23   SHOULD HAVE A PROCESS.

24           ALL I'M SAYING, MY ONLY POINT HERE IS WE SHOULDN'T

25   BE BULL RUSHING THIS ISSUE TO TRY TO GET IT RESOLVED NOW

                                                        91

1   WHEN WE ALL KNOW IT IS A HUGE PRELIMINARY ISSUE IN THIS IS.

2           MR. G. SAVERI:  WE'RE IN AGREEMENT WITH WHAT HE

3   SAYS.  BUT IF SOMEONE'S HASN'T TURNED OVER THE DOCUMENTS TO

4   THE GRAND JURY, WE'RE NOT ASKING FOR THOSE.  WE'RE ONLY

5   ASKING FOR DOCUMENTS THAT THE DEFENDANTS TURNED OVER TO THE

6   GRAND JURY.  SO IF THERE ARE NINE TO TEN DEFENDANTS --

7           THE COURT:  YOU MEAN TURNED FROM THE GRAND JURY TO

8   THE DEPARTMENT OF JUSTICE?
                    Page 155

10-30-07 hearing.txt

9          MR. G. SAVERI:  RIGHT.  SO, IN OTHER WORDS, IF

10    THERE IS A DEFENDANT WHO DIDN'T TURN ANY DOCUMENTS OVER TO

11    THE GRAND JURY, WE'RE NOT ASKING THEM FOR ANYTHING.  AND SO

12    WHAT MR. WALL SAYS, IF HIS -- IF HIS CLIENT DID TURN

13    DOCUMENTS OVER TO THE GRAND JURY, WE'D LIKE TO SEE THOSE.

14    IF MR. TUBACH, WHO REPRESENTS HYNIX TURNED DOCUMENTS OVER TO

15    THE GRAND JURY, WE'D LIKE TO SEE THOSE.  IF SOME

16    REPRESENTATIVE OF, SAY, HITACHI NEVER GOT A SUBPOENA AND

17    DIDN'T TURN ANYTHING OVER TO THE GRAND JURY, WE'RE NOT

18    ASKING FOR THOSE.

19          MR. TUBACH:  MICHAEL TUBACH.  I REPRESENT HYNIX

20    SEMICONDUCTOR OF AMERICA, INC., YOUR HONOR, NOT TO BE ADDED

21    TO THE NUMBER OF PEOPLE UP HERE.

22          HYNIX DID NOT RECEIVE A GRAND JURY SUBPOENA.  AND

23    WE JUST WANT TO MAKE CLEAR THAT WE ARE GOING TO BE OBJECTING

Page 156

10-30-07 hearing.txt

24   TO ANY SORT OF DISCOVERY.  IT DOESN'T LOOK LIKE THERE WILL

25   BE A DISPUTE.  IT LOOKS LIKE THE PLAINTIFFS --

                                                                    92

1            THE COURT:  IT SOUNDS LIKE THOUGH, AND I'M NOT

2    CONSTRUING ANY BROADLY THAT I INTERPRETED AT LEAST THE

3    REPRESENTATIONS THAT HAVE BEEN MADE.  THE ONLY -- THE ONLY

4    DISCOVERY THAT IT SEEMS THAT HAS BEEN CLEARLY REQUESTED

5    PRIOR TO THE FILING OF THE, UM, AMENDED CONSOLIDATED

6    COMPLAINT IS THE GRAND JURY DISCLOSURES THAT WERE PROVIDED

7    TO THE DEPARTMENT OF JUSTICE, PERIOD.

8            MR. G. SAVERI:  RIGHT.

9            MR. SCARPULLA:  THAT'S CORRECT, YOUR HONOR.

10           MR. G. SAVERI:  THAT'S RIGHT.

11           MR. TUBACH:  JUST I WANTED TO MAKE SURE THAT

12   SOMEONE WAS SPEAKING FOR THE SILENT MAJORITY OF THE

10-30-07 hearing.txt

13  DEFENDANTS THAT DIDN'T --

14          THE COURT:  SO IF YOU HAVE NO GRAND JURY DOCUMENTS

15  THAT HAVE BEEN TURNED OVER TO THE DEPARTMENT OF JUSTICE,

16  THEN THE -- THEN THERE'S NO -- THIS IS NOT ABOUT YOU.

17          MR. TUBACH:  THANK YOU.

18          THE COURT:  -- AT THIS POINT.

19          MR. WALL:  I REALLY WISH I COULD SIT DOWN, TOO.

20  BUT --

21          MR. SIMON:  YOUR HONOR --

22          THE COURT:  YES.

23          MR. SIMON:  -- POINT OUT ONE THING IN THE DOJ'S

24  PROPOSAL TO US CONSISTENT WITH D-RAM THIS IS JUST OUT OF THE

25  D-RAM CASE.  THERE WOULD ALSO BE SOME SALES INFORMATION ON

0

93

1  THEIR SALES THAT WOULD BE TURNED OVER AS A PART OF THE

10-30-07 hearing.txt

2    PRODUCTION BEFORE THE DATES OF THE CONSOLIDATED AMENDED

3    COMPLAINT.

4              THE COURT:  WAIT.  WAIT.  WAIT.  NOW, WE'RE

5    GETTING INTO THE ISSUE THAT WE'RE TALKING ABOUT.

6              MR. SIMON:  WE'RE TALKING ABOUT --

7              MR. G. SAVERI:  I CAN TALK ABOUT THOSE, YOUR

8    HONOR.

9              THE COURT:  THE PROPOSAL THAT WAS MADE IS THAT

10   THEY, THE PLAINTIFFS FILED A COMPLAINT, A AMENDED

11   CONSOLIDATED COMPLAINT, SIXTY DAYS AFTER THE PRODUCTION OF

12   THE GRAND JURY DOCUMENTS THAT WERE TURNED OVER FROM THE

13   DEFENDANTS TO THE -- TO THE GOVERNMENT.

14             MR. G. SAVERI:  RIGHT.  THAT'S CORRECT.

15             THE COURT:  PERIOD.

16             MR. WALL:  AND TO BE CLEAR ON THAT, OUR POSITION

17   IS THAT PLAINTIFFS, CIVIL PLAINTIFFS HAVE NO RIGHT TO TAKE

10-30-07 hearing.txt

18    DISCOVERY BEFORE THEY HAVE A COMPLAINT ON FILE THAT -- THAT

19    MEETS THE STANDARDS OF TWOMBLY.  THAT IS WHAT TWOMBLY SAYS.

20    THAT'S WHAT JUDGE ALSUP SAID.  AND THEY NEED TO PUT THAT ON

21    FIRST.  SO THIS -- THESE ISSUES SHOULD BE DISCONNECTED.

22              THE COURT:  PUT THAT ON FIRST.

23              MR. WALL:  PUT THAT COMPLAINT ON FILE FIRST.  SO

24    THESE ISSUES SHOULD BE DISCONTINUED.  THEY SHOULD -- THEY

25    SHOULD BE GIVEN SIXTY DAYS OR WHATEVER PERIOD THEY WANT TO

                                                            94

1    FILE A COMPLAINT.  THIS IS JUST WHAT WAS DONE IN THE

2    GRAPHICS PROCESSING CASE.

3              THE COURT:  SO YOU'RE BASICALLY SAYING THE MEET

4    AND CONFER IS NOT GOING TO REALLY SERVE ANY PURPOSE.

5              MR. WALL:  I THINK WHAT, THE MEET AND CONFER AS

10-30-07 hearing.txt

6    FAR AS I'M CONCERNED, IS GOING TO LEAD IS A BRIEFING

7    SCHEDULE ON THIS BECAUSE --

8              THE COURT:  LET'S SET A BRIEFING SCHEDULE NOW.

9              MR. WALL:  THAT IS FINE WITH ME.

10             MR. COTCHETT:  LET ME, IF IT PLEASE THE COURT, I

11   WANT TO SAY ONE THING ABOUT TWOMBLY.

12             THE COURT:  I ACTUALLY AM THINKING -- OH --

13             MR. COTCHETT:  I DON'T WANT MY SILENCE TO APPEAR

14   AS THOUGH I AGREE ABOUT WHAT TWOMBLY HOLDS.

15             THE COURT:  OKAY.  I ASSUME THAT YOU WON'T BE

16   SILENT WHEN WE SCHEDULE THIS SET FOR A BRIEFING SCHEDULE.

17             MR. COTCHETT:  EXACTLY.  BECAUSE I DON'T THINK

18   THAT TWOMBLY HOLDS WHAT COUNSEL THINKS IT HOLDS.

19             MR. G. SAVERI:  AND THE OTHER THING --

20             MR. COTCHETT:  NOR DID JUDGE WILKEN DOWNSTAIRS.

21             THE COURT:  OKAY.  LET'S SET A BRIEFING SCHEDULE.

Page 161

10-30-07 hearing.txt

22          EXCUSE ME.  TO MAKE THE RECORD CLEAR OF WHAT MR.

23   WALL SAID --

24          THE COURT:  THE RECORD WILL BE VERY CLEAR, I'M

25   SURE, WHEN THE BRIEFING IS OVER.

95

1          MR. G. SAVERI:  HE'S TALKING ABOUT THE -- THE

2   OPINION OR ORDER THAT CAME OUT OF JUDGE ALSUP'S IN GRAPHICS.

3   IT'S NOT FINISHED YET BUT ON THE CONTRARY --

4          THE COURT:  THE CASE NOT FINISHED OR HIS ORDER'S

5   NOT FINISHED?

6          MR. G. SAVERI:  THE PROCESS IS GOING ON.  BUT --

7   BUT JUDGE WILKEN AND ALSO JUDGE ILLSTON DID ORDER THE

8   DEFENDANTS TO PRODUCE THE GRAND JURY DOCUMENTS BEFORE --

9          MR. WALL:  WHY DON'T WE JUST SET A BRIEFING

10   SCHEDULE, YOUR HONOR, AND WE CAN SAVE A LOT OF TIME.  THIS

Page 162

10-30-07 hearing.txt

11   IS WHY WE HAVE BRIEFING SCHEDULES.

12          THE COURT:  YES, MR. COTCHETT.

13          MR. COTCHETT:  HOW ABOUT IF WE FILE A -- ACTUALLY

14   THIS -- WE COULD HAVE SIMULTANEOUS BRIEFS HERE ON THE

15   ISSUES.

16          THE COURT:  OPENING.

17          MR. COTCHETT:  OPENING AND SAVE A LOT OF TIME.

18          MR. G. SAVERI:  YEAH.

19          THE COURT:  DO YOU ALL WANT TO DO SIMULTANEOUS?

20          MR. SIMON:  SURE.  THAT'S FINE, YOUR HONOR.  AND I

21   THINK WE COULD ALSO --

22          MR. COTCHETT:  WE KNOW WHAT A DEPOSITION IS.  WE

23   KNOW WHAT OUR OPPOSITION IS.

24          MR. WALL:  THAT'S FINE.

25          THE COURT:  OKAY.  SO FILING AND --

96

Page 163

10-30-07 hearing.txt

1            MR. COTCHETT:  HOW ABOUT BY NOVEMBER 15, YOUR

2    HONOR?

3            THE COURT:  IT WORKS.  WHAT DAY OF THE WEEK IS

4    THAT?

5            MR. G. SAVERI:  THAT IS ON A THURSDAY, YOUR HONOR.

6            MR. COTCHETT:  WE'LL GET IT IN TO YOU.

7            THE CLERK:  THE THIRTEEN OR THE TWENTIETH?

8            MR. WALL:  I'M GETTING A CHORUS OF OPPOSITION FROM

9    MY COMRADES IN THE BACK.

10           THE COURT:  FOR SIMULTANEOUS?

11           MR. WALL:  NO, FOR THE NOVEMBER 15.  WE CAN DO

12    SIMULTANEOUS IF IT'S ALL RIGHT.

13           MR. G. SAVERI:  HOW ABOUT THE TWENTIETH, YOUR

14    HONOR?

10-30-07 hearing.txt

15          THE COURT:  TWENTIETH?

16              MR. COTCHETT:  AND THEN HOW ABOUT A SHORT REPLY TO

17  EACH ONE SIMULTANEOUS?

18              MR. WALL:  MAY I HAVE JUST ONE MOMENT, YOUR HONOR?

19              MR. COTCHETT:  WE WOULD SUGGEST THE TWENTIETH TO

20  GIVE THEM TIME.

21              THE COURT:  FOR THE OPENING.  AND THEN WHAT IS THE

22  REPLY?

23              MR. COTCHETT:  AND A TEN-DAY REPLY.  WE WOULD GET

24  IT IN -- HOW ABOUT A WEEK LATER, THE TWENTY-SEVENTH OR

25  TWENTY-EIGHTH?  AND YOUR HONOR CAN EITHER HOLD A HEARING OR

                                                                97

1   NOT.  PERSONALLY, I THINK IT WILL BE ALL BE DONE ON THE

2   BRIEFS.

3               MR. WALL:  MAY I GLANCE AT THE CALENDER?

Page 165

10-30-07 hearing.txt

4            THE CLERK:  ALL BE HEARD ON THE TWENTY-SEVENTH.

5            MR. WALL:  SO WE DON'T HAVE TO FILE THIS RIGHT

6    DURING THANKSGIVING WEEK AND WE CAN PUSH IT FINAL ANY TIME

7    THE WEEK OF THE TWENTY-SIXTH.  ANY TIME OF THE WEEK OF THE

8    TWENTY SIXTH.

9            THE CLERK:  THE TWENTY-SEVENTH.

10           THE COURT:  THE TWENTY-SEVENTH IS TUESDAY.  OKAY,

11   THE TWENTY-SEVENTH.

12           MR. WALL:  THE TWENTY-SEVENTH.

13           THE COURT:  THE TWENTY-SEVENTH IS TUESDAY.

14           MR. WALL:  THAT'S FINE.

15           MR. COTCHETT:  UH-HUH.

16           THE COURT:  SIMULTANEOUS RULINGS, RIGHT?

17           MR. COTCHETT:  SIMULTANEOUS.

18           MR. WALL:  ON THE QUESTION OF WHETHER THIS

19   DISCOVERY SHOULD PROCEED.

10-30-07 hearing.txt

20          MR. COTCHETT:  YES.

21          MR. WALL:  YES.

22          MR. COTCHETT:  HOW ABOUT A REPLY ON THE --

23          THE COURT:  AND, YOU KNOW, THIS REPLY AND THEN YOU

24   SAY THIS DISCOVERY, I'M LOOKING HERE THAT WE'RE STILL ON THE

25   SAME PLANE.  THAT MEANS JUST THE GRAND JURY.

                                                        98

1          MR. COTCHETT:  JUST THE GRAND JURY PRODUCTION.

2          THE COURT:  SO DON'T SAY JUST DISCOVERY.  WE'RE

3   TALKING ABOUT -- JUST SPECIFIC --

4          MR. SCARPULLA:  THAT'S ALL WE'RE TALKING ABOUT.

5          MR. COTCHETT:  AND THEN A BRIEF REPLY ON

6   DECEMBER 7, YOUR HONOR, TO EACH OTHER'S BRIEF?

7          MR. WALL:  THAT'S FINE.

8          THE COURT:  DOES THAT WORK?  DECEMBER 7.
                    Page 167

10-30-07 hearing.txt

9           MR. SIMON:  THAT'S FINE, YOUR HONOR.

10          THE COURT:  AND THEN I'LL --

11          MR. COTCHETT:  AND THEN YOU'LL ISSUE AN ORDER ONE

12   WAY OR THE OTHER.

13          THE COURT:  YEAH.  AND THEN YOU ALL SHOULD, WHEN

14   YOU SUBMIT YOUR PAPERS, YOU SHOULD SUBMIT A PROPOSED ORDER

15   CONSISTENT WITH THE RELIEF THAT YOU'RE ASKING THE COURT TO

16   ASSUME WITH THE AUTHORITY FOR IT JUST IN CASE I DECIDE TO

17   USE ONE OF YOUR PROPOSED ORDERS.

18          MR. COTCHETT:  EXCELLENT, YOUR HONOR.

19          MR. WALL:  WELL DO, YOUR HONOR.

20          THE COURT:  OH, YEAH.  SO THERE'S GOING TO BE ONE

21   BRIEF FROM --

22          MR. G. SAVERI:  ONE BRIEF FROM THE PLAINTIFFS.

23          THE COURT:  OKAY.

Page 168

10-30-07 hearing.txt
24          MR. G. SAVERI:  ONE BRIEF FROM THE DEFENDANTS.


25          THE COURT:  SO THERE WILL BE A JOINT BRIEF FROM

                                                                99




1   THE PLAINTIFFS?


2          MR. G. SAVERI:  ONE JOINT BRIEF FOR THE

3   PLAINTIFFS.


4          THE COURT:  JOINT BRIEF FROM THE DEFENDANTS.


5          MR. COTCHETT:  CORRECT.


6          THE COURT:  OKAY.  GOOD.  YEAH.


7          MR. SIMON:  ON THIS ISSUE WE ARE FULLY IN ACCORD.


8          MR. COTCHETT:  THERE IS ONE OTHER MATTER THAT I

9   THINK IS BEFORE US THIS MORNING AND I JUST ASKED MR. WALL

10   ABOUT IT AGAIN.  THE EVIDENCE PRESERVATION ORDER.


11          THE COURT:  ARE WE GOING TO -- (JUDGE TALKING TO

12   LAW CLERK.)

                        Page 169

10-30-07 hearing.txt

13          MR. COTCHETT:  WE'RE FINE WITH THAT LANGUAGE.

14          MR. G. SAVERI:  ARE YOU OKAY?

15          MR. COTCHETT:  YEAH.

16          MR. SIMON:  THE ONE WE HAVE IN THE PROPOSED

17   PRETRIAL ORDER.  THAT'S FINE.

18          MR. COTCHETT:  YEAH.

19          THE CLERK:  WHEN IT WAS FILED.

20          MR. COTCHETT:  THE FILE WOULD BE CMC STATEMENT

21   204.  DOCUMENT 204.

22   (OFF-THE-RECORD DISCUSSION BETWEEN THE CLERK AND COUNSEL.

23    JUDGE TALKING TO LAW CLERK.  COUNSEL SPEAKING TO COUNSEL.)

24          THE COURT:  YES.

25          MR. WALL:  WITH RESPECT TO THE PRESERVATION ORDER

                                                          100

1   THERE'S MUCH IN THEIR PROPOSED PRETRIAL ORDER THAT WE DO

10-30-07 hearing.txt

2    HAVE AN ISSUE WITH, BUT THE PARAGRAPH ON PRESERVATION IS

3    FINE.  THERE IS NO DISPUTE ABOUT THAT.

4         THE COURT:  OH.

5         MR. WALL:  AND I GAVE THAT TO YOUR CLERK THE

6    DOCKET NUMBER, DOCUMENT NUMBER --

7         THE COURT:  OKAY.

8         MR. WALL:  SO THERE IS NO ISSUE AS TO SIGNING

9    THAT.  THAT IS SIMPLY TO PRESERVE ALL EVIDENCE.

10         THE COURT:  OKAY.

11         MR. WALL:  -- PRIOR TO --

12         THE COURT:  THERE IS NO OBJECTION.

13         MR. SIMON:  NO OBJECTION, YOUR HONOR.

14         MR. G. SAVERI:  204.

15         MR. COTCHETT:  205.

16         MR. G. SAVERI:  205 OF THIS PARAGRAPH EIGHT ON

17    PAGE THREE.

10-30-07 hearing.txt

18          MR. COTCHETT:  DOCUMENT 205, CORRECT.  STAY WITH

19   THAT.

20          THE COURT:  YOU ALL HAVE INCORPORATED IN THE

21   PRETRIAL PREPARATION ORDER, IS IT A FREESTANDING ORDER?

22          MR. COTCHETT:  THERE IS A SEPARATE ORDER.  IT IS A

23   FREESTANDING DOCUMENT, YOUR HONOR.

24          THE COURT:  IT IS FREESTANDING.

25          MR. COTCHETT:  YES IT IS.

                                                101

1           THE COURT:  DO YOU HAVE A FREESTANDING DOCUMENT?

2    APPARENTLY IT IS NOW FREESTANDING.

3           MR. WALL:  IT IS NOT FREESTANDING.  IT IS

4    PARAGRAPH A OF A LONGER MORE CONTROVERSIAL OR --

5           MR. COTCHETT:  NO.  OKAY.  WE'LL GET YOU A

10-30-07 hearing.txt
6   FREESTANDING TO SAVE TIME.

7           THE COURT:  REMIND ME THAT IT IS UNOPPOSED AND

8   THAT WAY THERE WON'T BE ANY DELAY.

9           MR. COTCHETT:  BOTH SIDES WILL SIGN OFF ON THAT.

10          THE COURT:  OKAY.

11          MR. COTCHETT:  AND NOW WE NEED A NEW CASE

12  MANAGEMENT, A NEW DATE FOR A NEXT CMC.

13          THE COURT:  OKAY.  UM, THE BRIEFING WILL, UM --

14          MR. COTCHETT:  WILL BE DONE BY THE SEVENTH.

15          THE COURT:  YOU KNOW WHAT, NO, I'M NOT GOING TO DO

16  IT ANOTHER CMC NOW.  WHAT I'LL DO IS AFTER I HAVE, AFTER

17  I'VE GOTTEN -- THE FINAL BRIEFING IS FOR DECEMBER 7.

18          MR. COTCHETT:  YES.

19          THE COURT:  I'LL TRY TO RULE ON THAT SOONER THAN

20  LATER.  AND THEN ON THE ORDER THAT I ISSUE --

21          MR. COTCHETT:  THANK YOU.

10-30-07 hearing.txt

22          THE COURT:  -- TELLING YOU WHEN TO FILE THE

23    AMENDED COMPLAINT, I'LL ALLOW A CERTAIN AMOUNT OF TIME AFTER

24    THAT SO THAT WE CAN THEN, UM, HAVE A CMC.  AND I'LL

25    INCORPORATE THAT INTO THE --

                                                              102

1           MR. COTCHETT:  EXCELLENT.

2           THE COURT:  -- INTO THE ORDER.  BECAUSE I THINK WE

3    NEED TO RESOLVE THIS FIRST.

4           MR. COTCHETT:  RIGHT.

5           MR. WALL:  CORRECT.

6           MR. COTCHETT:  AND I THINK THAT'S ALL WE HAVE

7    BEFORE US.

8           MR. SIMON:  THANK YOU.

9           MR. G. SAVERI:  THANK YOU, YOUR HONOR.  THANK YOU.

10          MR. COTCHETT:  YOUR HONOR, THANK YOU VERY MUCH.

                        Page 174

10-30-07 hearing.txt

11          THE COURT:  GENTLEMEN AND LADIES, IT'S BEEN VERY

12     HELPFUL.  THANK YOU.

13          THANK YOU.  HAVE A GOOD EVENING.

14     (WHEREUPON, AT 2:52 P.M. THE PROCEEDINGS CONCLUDED.)

15              COURT REPORTER'S CERTIFICATE

16          I, STARR A. WILSON, CSR NO. 2462, UNITED STATES

17     DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, DO HEREBY

18     CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

19     RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

20          I CERTIFY THAT THE TRANSCRIPT FEES AND FORMAT

21     COMPLY WITH THOSE PRESCRIBED BY THE COURT AND JUDICIAL

22     CONFERENCE OF THE UNITED STATES.

23

24              _____

25              STARR A. WILSON, CSR NO. 2462

Page 175

# EXHIBIT F

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MUNICIPAL DERIVATIVES ANTITRUST LITIGATION | ) ) ) ) ) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) ) ) ) ) ) |

MDL No. 1950

Master Docket No. 08 Civ. 2516 (VM)(JCF)

## DECLARATION OF VINCENT J. ESADES IN SUPPORT OF PLAINTIFFS' MOTION FOR APPOINTMENT OF INTERIM LEADERSHIP STRUCTURE

I, Vincent J. Esades, declare as follows:

1.      I am an equity member of Heins Mills & Olson, P.L.C. ("Heins Mills") and make this declaration in support of Plaintiffs' motion for appointment of interim leadership structure in this multidistrict litigation.

2.      Along with other attorneys at Heins Mills, I have had significant involvement in this litigation for more than a year.  Our firm first became aware in February 2007 of investigations by the Department of Justice and the Internal Revenue Service into allegations of pervasive bid-rigging and other anti-competitive practices in the municipal derivatives industry.  At that time we independently undertook an extensive legal and factual investigation of the alleged collusive practices, including analysis of publicly available information and consultation with experts knowledgeable about the municipal finance industry generally and about investments in municipal derivatives specifically.  We also met with and consulted municipalities regarding the derivatives industry and issues concerning the alleged conspiracy.

66734.1

3.     My firm also conferred with Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("CMHT") and Boies, Schiller & Flexner LLP ("BSF") concerning the factual background of this litigation. As a result our discussions, we concluded that CMHT, BSF and Susman Godfrey ("SG") were more able than my firm to develop and plead claims against the defendants in this litigation.

4.     Heins Mills has substantial experience litigating antitrust class actions with CMHT, BSF and SG. We have associated with CMHT in the prosecution of, among other cases, *In re Vitamins Antitrust Litigation, In re Polyester Staple Antitrust Litigation, In re Publication Paper Antitrust Litigation, In re Hydrogen Peroxide Antitrust Litigation, In re Intel Corp. Microprocessor Antitrust Litigation, In re Rail Freight Fuel Surcharge Antitrust Litigation,* and several related class actions against *Comcast Corp.*; we have associated with BSF to prosecute *In re Vitamins Antitrust Litigation* and *In re High-Pressure Laminates Antitrust Litigation*; and we have associated with SG to prosecute *In re Universal Service Fund Telephone Billing Practices Litigation, In re: Ready-Mixed Concrete Antitrust Litigation,* and several antitrust actions against *Comcast Corp.*

5.     In recognition of the extensive work performed by CMHT, BSF and SG in this matter and our litigation experience with these firms, we believe that they are exceptionally qualified to serve as lead counsel in this litigation. For this reason, although Heins Mills has extensive experience and expertise in antitrust class litigation and would be eminently qualified to serve in a leadership role, we have decided not to seek a role as lead counsel in this litigation and to support instead the appointment of CMHT, BSF and SG to interim leadership positions.

6.    Heins Mills also supports authorization of an interim Executive Committee to assist the three proposed lead firms, and is fully prepared to serve on assignments they choose to delegate to our firm.

7.    Attached hereto as Exhibit 1 is a true and correct copy of Heins Mills' firm resume, which contains individual biographies of the firm's lawyers and summarizes the firm's experience in major antitrust class litigation.

8.    Our firm's senior partner, Samuel D. Heins, has practiced in the area of antitrust and other complex civil litigation for more than 30 years and I have practiced in the area for 14 years.  As described in more detailed in the attached resume, Heins Mills has served as lead or co-lead counsel in numerous antitrust class actions throughout the country involving price-fixing, vertical trade restraints, and monopolization.  Cases in which we were lead or co-lead counsel include *In re Polyester Staple Antitrust Litigation, In re Universal Service Fund Telephone Billing Practices Litigation, In re High Pressure Laminates Antitrust Litigation, Behrend v. Comcast Corp., Kristian v. Comcast Corp., Rogers v. Comcast Corp., In Re Bulk Graphite Antitrust Litigation, In re Publication Paper Antitrust Litigation, Howe v. Microsoft, In re Monosodium Glutamate Antitrust Litigation,* and *In re Travel Agency Commission Antitrust Litigation.*

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed this *16th* day of July, 2008 at Minneapolis, Minnesota.

Vincent J. Esades

3

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MUNICIPAL DERIVATIVES ANTITRUST LITIGATION | : : : |
| | MDL No. 1950 |
| THIS DOCUMENT RELATES TO | : |
| | Master Docket |
| ALL ACTIONS | : |
| | No. 08 Civ. 2516 (VM)(JCF) |

DECLARATION OF ROBERTA D. LIEBENBERG
ON BEHALF OF FINE, KAPLAN AND BLACK, R.P.C.

I, Roberta D. Liebenberg, declare as follows:

1.    I am a member of the law firm of Fine, Kaplan and Black, R.P.C., co-counsel for Plaintiffs Fairfax County, Virginia; State of Mississippi; City of Chicago, Illinois; City of Fall River, Massachusetts; Charleston County School District; and Berkeley County, South Carolina.

2.    Fine, Kaplan and Black ("FKB") began investigating anticompetitive conduct in the municipal derivatives market more than a year ago, subsequent to learning of investigations by the Department of Justice and the Internal Revenue Service. At that time, we retained and met with an expert who was extremely knowledgeable about the municipal finance industry and had particular expertise in the area of municipal derivatives. We also met with a number of municipalities in order to gain a better understanding of the facts and issues involved in the alleged conspiracy.

3.      FKB also conferred with Cohen Milstein Hausfeld & Toll, PLLC ("Cohen Milstein"), Boies, Schiller & Flexner LLP ("Boies Schiller) and Susman Godfrey LLP ("Susman Godfrey") concerning the on-going investigation and factual development of these class actions. It was readily apparent in these discussions that Cohen Milstein, Boies Schiller and Susman Godfrey had obtained factual information and cooperation from Bank of America that allowed them to plead the allegations in the initial Complaint in this multi-district litigation.

4.      FKB is a nationally recognized firm located in Philadelphia, Pennsylvania, that concentrates its practice entirely on complex litigation, with particular emphasis on antitrust class actions. The 2006 and 2007 Chambers USA Client Guides rank FKB as one of the premier antitrust practices in Pennsylvania. In 2008, I was named as one of the Top Ten Attorneys in Pennsylvania by *Philadelphia Magazine*. Attached hereto is a copy of FKB's firm resume, which includes the individual biographies of the firm's lawyers.

5.      My firm was selected to be co-counsel on behalf of the named Plaintiffs because of our extensive experience in litigating complex cases through trial. Currently, we are co-lead counsel in In re Urethane [Polyether Polyols] Antitrust Litig., MDL No. 1616 (D. Kan). We have served as co-lead counsel in In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465 (S.D.N.Y) ($1.027 billion settlement); In re Lorazepam and Clorazepate Antitrust Litig., 2003 WL 2203774 (D.D.C.) ($35 million settlement); and In re Providian Financial Corp. Credit Card Terms Litigation, MDL No. 1301 (E.D. Pa.) ($105 million settlement). We have also served on the Executive Committee or Experts Committee of numerous significant antitrust actions, including, but not limited to: In re Linerboard Antitrust Litig., MDL No. 1261 (E.D. Pa.)

($202.5 million settlement) and <u>In re Vitamins Antitrust Litig.</u>, MDL No. 1285 (D.D.C.) ($325 million settlement).

      6.    Accordingly, my firm is eminently qualified to be an interim lead counsel. However, given the extensive work performed by Cohen Milstein, Boies Schiller and Susman Godfrey in developing and filing this class action, and the extensive experience and resources possessed by those firms, FKB concluded that it would not seek to be a lead counsel in this case. We believe that the best interests of the class would be served if the Court were to appoint the law firms of Cohen Milstein, Boies Schiller and Susman Godfrey as Interim Lead Counsel. We therefore support the Motion for Appointment of Interim Leadership Structure filed jointly by those three law firms.

      7.    My firm also supports the request that upon the appointment of Cohen Milstein, Boies Schiller and Susman Godfrey as Interim Co-Lead Counsel, those law firms be empowered to appoint an Interim Executive Committee to assist them.

      8.    While FKB does not seek appointment as one of the Co-Lead Counsel in this case, we nevertheless wish to have a significant role in the litigation and to bring to it our vast experience in complex litigation matters. The proposed law firms that we support to be appointed as Interim Co-Lead Counsel have welcomed the participation of our firm and the other law firms that represent putative class members in the case to perform meaningful work in this case.

      9.    FKB respectfully believes that the Court should appoint the leadership structure of Cohen Milstein, Boies Schiller and Susman Godfrey. Those firms are supported by the vast majority of the plaintiffs and their counsel in this litigation. If this leadership structure

were bypassed in favor of appointing firms who have little support from other plaintiffs' counsel, it would be extremely unfair to FKB and the other well-qualified firms who have abided by the private ordering in this litigation.

Accordingly, FKB supports the Motion filed by Cohen Milstein, Boies Schiller and Susman Godfrey.

Executed this ___17th___ day of July, 2008.

By:_____
Roberta D. Liebenberg

- 4 -

### *ABOUT THE FIRM*

FINE, KAPLAN AND BLACK, RPC
1835 MARKET STREET, 28th FLOOR
PHILADELPHIA, PENNSYLVANIA 19103
(215) 567-6565

Fine, Kaplan and Black is a nationally recognized firm located in Philadelphia, Pennsylvania, which devotes its practice entirely to litigation, with particular emphasis on antitrust, securities, RICO, consumer protection and complex commercial litigation.

Fine, Kaplan and Black, R.P.C. is consistently highly ranked in Pennsylvania in the antitrust practice area by the Chambers USA Guide. The 2007 Guide states that:

> Clients endorsed this lean, ten-lawyer practice as *"incredibly intelligent and a real pleasure to work with - in a crisis situation the lawyers are always available to jump right in and solve a difficult problem ."* Others enthused: *"We entrust our most sensitive matters to this extremely ethical firm as the attorneys really listen to our concerns ."* The litigation boutique advises both plaintiffs and defendants in high-profile antitrust litigation.

According to the Guide in 2006, Fine Kaplan has in recent years forged "an interesting and enviable niche practice" that combines both plaintiff and defendant representation. In 2005, peers "described the boutique as being heavy with 'intellectually gifted lawyers' who have extensive trial experience in civil and criminal antitrust cases."

In addition Fine, Kaplan and Black's litigation partners – Allen Black, Roberta Liebenberg, Donald Perelman and Jeffrey Istvan – have been named as 2007 Pennsylvania Super Lawyers in a recent survey by Philadelphia Magazine. Ms. Liebenberg and Mr. Black were named among the top 100 lawyers in Pennsylvania; and Ms. Liebenberg was named among the top 50 women lawyers in the State. Gerard Dever, Fine Kaplan's newest partner, has been named 2007 Rising Star in the same Philadelphia Magazine survey.

Over the years since its formation in 1975, the firm has had leading roles in numerous important complex actions, including class actions, in federal and state courts. A few examples of these cases include:

United States v. Stolt-Nielsen, et al., 2007 WL 4225668 (E.D. Pa. Nov. 29, 2007), a criminal prosecution brought after the Antitrust Division rescinded an Amnesty Agreement that promised immunity from prosecution to the Company and its executives. This represents the first case in which the Government had rescinded an Amnesty Agreement and attempted to maintain a criminal prosecution against the parties to such an Agreement. After a three-week trial on a Motion to Dismiss the Indictment and extensive briefing by the parties, the Court found that the Government had "no reasonable basis" for revoking the Amnesty Agreement.

In re Urethane [Polyether Polyols] Antitrust Litig., M.D.L No. 1616 (D. Kan.), a pending multidistrict price-fixing action in which the firm serves as co-lead counsel for a putative class of direct purchasers. An initial settlement of $55 million has been reached with one defendant. The court has approved the settlement and certified a settlement class. The firm continues litigation against the remaining four defendants.

In re Nasdaq Market-Makers Antitrust Litigation, 187 F.R.D. 465 (S.D.N.Y. 1998), was a large, complex multidistrict price-fixing class action in which a member of the firm was Plaintiffs' Co-Lead Counsel, a class of more than a million class members was certified by the Court, and which ultimately was settled for a recovery of more than one billion dollars for the benefit of the class.

Love Terminal Partners v. City of Dallas, No. 06-1279, 2007 WL 3196307 (N.D. Tex. Oct. 31, 2007), a complex antitrust litigation growing out of the Wright Amendment Reform Act of 2006 in which the firm successfully represented Southwest Airlines and the Court granted a motion to dismiss the complaint.

In re Terrapin Express, Inc. v. Airborne Express, Inc., No. 11-199-01536-05 (AAA 2007), a class-wide arbitration in which the firm represents a class of independent contractors alleging systematic underpayment and breach of contract. In June 2008, a panel of arbitrators approved a $24.75 million settlement.

In re Copper Antitrust Litigation, M.D.L. No. 1303, 2007 WL 3355368 (W.D. Wisc. Apr. 24, 2007), an antitrust case in which the firm represented a group of large purchasers of copper in litigation alleging price manipulation in the copper market which settled favorably in 2007.

In re Remeron End-Payor Antitrust Litigation, 2005-2 (CCH) Trade Cas. ¶ 74,966, No. 02-cv-2007 (D.N.J. Sept. 13, 2005), an antitrust class action in which the firm was Co-Lead counsel, and achieved a settlement of $36 million for the class of end users of a prescription drug.

- 2 -

In re Linerboard Antitrust Litigation, 321 F. Supp. 2d 619 (E.D. Pa. 2004), and 2004 WL 1221350, at *6 (E.D. Pa. June 2, 2004), was a horizontal price-fixing class action against the major manufacturers of corrugated containers, in which the firm was a member of Plaintiffs' Executive Committee. Settlements in the fall of 2003 resulted in a recovery in excess of $202.5 million for the benefit of the class.

Harleysville Mutual Ins. Co. v. GE Reinsurance Corp., 2002 WL 922148 (E.D. Pa. May 6, 2002), was a complex litigation in which the firm won summary judgment for its plaintiff client less than six months after the action was filed.

In re Lorazepam and Clorazepate Antitrust Litigation, 2003 WL 22037741, *3 (D.D.C. 2003), was an antitrust class action in which the firm was Co-Counsel for the class of direct purchasers. The Court, in approving a $35,000,000 settlement for the class, characterized counsel "among the best and most experienced antitrust litigators in the country."

In re Microcrystalline Cellulose Antitrust Litigation, M.D.L. No. 1402 (E.D. Pa.), is a pending price-fixing class action involving the sale of microcrystalline cellulose (MCC), in which the firm is one of the Discovery Co-Chairs.

In re Vitamins Antitrust Litigation, M.D.L. No. 1285 (D.D.C.), is a massive international price-fixing class action, in which the firm is a member of Plaintiffs' Executive Committee. Settlements have been reached resulting in a recovery for the class in excess of $325 million.

Parsky v. First Union Corp., 51 Pa. D &C 4th 468, 2001 WL 535786 (Phila. Com. Pl. 2001), was a class action alleging breach of contract and breach of fiduciary duty against First Union Corp., arising out of First Union's conversion of its common trust funds to shares of its in-house mutual funds. In the fall of 2003 the firm achieved a settlement in excess of $23 million for the benefit of the class.

In re Providian Financial Corp. Credit Card Terms Litigation (E.D. Pa. 1999), a large, consumer fraud class action in which a member of the firm was Plaintiffs' Co-Lead Counsel, ultimately was settled for $105 million dollars for the benefit of the class.

In re Allegheny Health, Education & Research Foundation. The firm represented a former executive of the Allegheny Health System as a defendant in a variety of civil proceedings in federal and state trial courts, and in a federal bankruptcy court. The firm also represented the client in connection with a variety of government investigations concerning the financial collapse of the Allegheny system. See Browne v. Abdelhak, 2000 WL 1201889 (E.D. Pa. 2000)

In re Polypropylene Carpet Antitrust Litigation, 93 F. Supp. 2d 1348 (N.D. Ga. 2000), a horizontal price-fixing class action involving the carpet industry, in which the firm was Co-Counsel for the class, resulting in a recovery of nearly $50 million.

In re Commercial Explosives Antitrust Litigation, MDL 1093 (D. Utah), a large, complex multidistrict price-fixing class action in which a member of the firm was Discovery Co-Chair. The case was settled for a recovery of more than $ 77 million dollars for the benefit of the class.

In re Drill Bits Antitrust Litigation (C.A. No. H-91-627) (S.D. Tex.), a complex price-fixing class action in which a partner of the firm was on the Plaintiffs' Trial Team. The case ultimately was settled for a recovery of $ 53.4 million dollars for the benefit of the class.

In re Corrugated Container Antitrust Litigation, 1983-2 CCH Trade Cases ¶ 65,628 (S.D. Tex. 1983), a seminal price-fixing class action case in which a firm partner was one of six trial counsel for the plaintiff class and obtained $500 million in settlements, including a four month jury trial that resulted in a verdict for the class.

Mead Data Central v. West Publishing Co. (S.D. Ohio 1987); and West Publishing Co. v. Mead Corporation, (D. Minn. 1988). The firm, with co-counsel, represented West Publishing Company in two courts as both counterclaim defendant and plaintiff in a massive antitrust battle with Lexis, and ultimately achieved a very favorable settlement for West.

Northeast Jet Co. v. Lehigh-Northampton Airport Authority, et al., 767 F. Supp. 672 (E.D. Pa. 1991). A firm partner represented Defendants in RICO, antitrust, § 1983, and other claims against an airport authority, the chairman of its board, and the airport's executive director. All claims were dismissed on summary judgment before trial.

Swarthmore Radiation Oncology, Inc. v. Melvyn J. Lapes, M.D., et al., 1993-2 CCH Trade Cases ¶ 70,443 (E.D. Pa. 1992), a group boycott case in which the firm represented the Plaintiff and achieved an exceptionally satisfactory settlement, the amount of which is subject to a confidentiality agreement.

In re Domestic Air Transportation Antitrust Litigation, 137 F.R.D. 677 (N.D. Ga. 1991), a large complex antitrust price-fixing class action, in which the Court appointed one of the firm's partners as Plaintiffs' Co-Lead Counsel and in which a settlement valued by the Court at $ 458 million was obtained.

Hoefer & Arnett, Inc. v. The Lehigh Press, Inc., 695 F. Supp. 832 (E.D. Pa. 1988), a securities class action that was settled for $4 million after trial had begun, in which the firm was lead counsel for the plaintiff class. The Court found that "[t]he result is excellent in relation to the contingencies and risks of this lawsuit." Id. at 835.

Stainton v. Tarantino, 637 F. Supp. 1051 (E.D. Pa. 1986). The firm represented a partner of a prominent Philadelphia law firm in RICO litigation, and obtained a defense verdict after a month-long jury trial.

Virginia Soft Drinks Antitrust Litigation (E.D. Va. 1990), was a price-fixing action in which the firm, as one of the principal counsel, obtained class

certification and a settlement for 100% of damages after prior similar actions (brought by others) had failed.

Sutton v. Independence Medical Service Association of Pennsylvania, et al., (E.D. Pa. 1992) ("Blue Cross/Blue Shield") was an ERISA and fraud class action in which the firm as Plaintiffs' Lead Counsel obtained a class action settlement including full damages and equitable relief greatly improving the extent to which Blue Cross/Blue Shield pay major medical benefits.

Transamerican Refining Corporation v. Dravo Corporation, et al., 130 F.R.D. 70 (S.D. Tex. 1990) (Specialty Steel Piping Antitrust Litigation), was an antitrust action in which the firm and its co-counsel obtained a $50 million settlement for the plaintiff class.

In Re Tricor Indirect Purchaser Antitrust Litigaton, C.A. No. 05-360 (D. Del.) is an antitrust action in which the firm is co-lead counsel for the class of indirect purchasers of a prescription drug.

Various courts have commented favorably on the quality of our firm's work in antitrust and other class actions.  For example, in In re Linerboard Antitrust Litigation, 321 F. Supp. 2d 619 (E.D. Pa. 2004), and 2004 WL 1221350, at *6 (E.D. Pa. June 2, 2004), in which Donald Perelman and Roberta Liebenberg were members of Plaintiffs' Executive Committee, the Court approved a settlement of $202.5 million for the benefit of the class, and stated, "[T]he lawyering in the case at every stage was superb...."  In In re Lorazepam and Clorazepate Antitrust Litigation, 2003 WL 22037741, *6, M.D.L. No. 1290 (D.D.C. 2003), in which our firm was co-counsel for the class of direct purchasers, the Court in approving settlement characterized counsel "among the best and most experienced antitrust litigators in the country."  In the In re Nasdaq Market-Makers Antitrust Litigation, 1998 WL 782020, at *5 (S.D.N.Y. 1998), in which a member of our firm was Plaintiffs' Co-Lead Counsel, the Court in approving settlement stated that, "It is difficult to conceive of better representation than the parties to this action achieved...."

Allen D. Black, a member, is a graduate of Princeton University and the University of Pennsylvania Law School, magna cum laude, where he was Comment Editor of the Law Review and a member of the Order of the Coif. Thereafter, he served as law clerk to the Honorable John Minor Wisdom of the United States Court of Appeals for the Fifth Circuit, as a trial attorney in

- 5 -

the Civil Rights Division of the United States Department of Justice, and in the Judge Advocate General's Corps of the United States Navy.

Mr. Black was selected by his peers as one of the top 100 "Super-lawyers" in Pennsylvania in 2006. He is highly rated in both general commercial litigation and antitrust law by the 2006 Chambers Guide, which said: Allen Black is "a superb litigator with the rare ability to take on both the plaintiff and defendant side." Professor Stephen Burbank of the University of Pennsylvania Law School recently stated: "Allen Black is quite simply one of the best and most thoughtful lawyers in the country, a highly successful litigator and important contributor to numerous law reform efforts." Burbank, <u>Litigation in a Free Society: The Roles of Litigation</u>, 80 Wash. U.L.Q., 705, 719 (2002).

Mr. Black has been an elected member of The American Law Institute for 30 years, has served as a member of its council for 13 years, and was recently elected as the second vice president of the Institute. He is a Fellow of the American College of Trial Lawyers. Mr. Black has taught at the law schools of the University of North Dakota, Rutgers University, Temple University, and the University of Pennsylvania.

Donald L. Perelman, a member, is a graduate of the University of Michigan Law School (J.D., <u>magna cum laude</u>, 1980), and has had extensive experience since then in the conduct of antitrust, class action and other complex litigation. He served as a member of the Plaintiffs' Executive Committee in the <u>In re Linerboard Antitrust Litigation</u>, 321 F. Supp. 2d 619 (E.D. Pa. 2004), and 2004 WL 1221350, at *6 (E.D. Pa. June 2, 2004), which was settled in late 2003 resulting in a recovery for the class in excess of $202 million. He served as Co-Discovery Chair in the <u>Commercial Explosives Antitrust Litigation</u>, MDL 1093 (D. Utah), and he was principally responsible for the management of the discovery programs in <u>Lawrence v. Phillip Morris</u>, Civ. 94-1494 (E.D.N.Y.) and <u>Transamerican v. Dravo</u>, Civ. H-88-789 (S.D.N.Y.).

- 6 -

Roberta D. Liebenberg, a member, is a 1970 graduate of the University of Michigan and a 1975 graduate of the Catholic University Columbus School of Law, magna cum laude, where she was the Notes Editor of the Law Review. Thereafter, she served as a law clerk for the United States Court of Appeals for the Fourth Circuit. She is an elected member of the American Law Institute and has written and lectured extensively on a wide range of subjects including, antitrust, RICO, consumer financial services litigation and discovery issues. She has served as the Chair of the American Bar Association's Standing Committee on the Federal Judiciary. Prior to that appointment, she served as the Third Circuit representative on the Standing Committee from 2005-2006. She currently is a member of the American Bar Association's Standing Committee on Judicial Independence. She served as Chair of the Class Action and Derivative Suits Committee of the Section of Litigation of the American Bar Association and also co-chairs the Philadelphia Bar Association's Antitrust Committee. She served on the Board of Governors of the American Bar Association and is the former Vice Chair of the American Bar Association's Commission on Women in the Profession. She also serves as Co-Chair of the Philadelphia Bar Association's Antitrust Committee.

In 2008, Ms. Liebenberg was named as one of the Top Ten Attorneys in Pennsylvania by *Philadelphia Magazine*. In May, 2007, she was named as one of the National Law Journal's "50 Most Influential Women Lawyers in America." In October, 2006, Ms. Liebenberg was named by Pennsylvania Governor Ed Rendell as a Distinguished Daughter of Pennsylvania. In April, 2003, she was named as a first recipient of the Lynette Norton Award by the Pennsylvania Bar Association's Commission on Women in the Profession. That award was given to her in recognition of her outstanding litigation skills and mentoring of women attorneys. In December, 2003, she was named as one of the "Women of Distinction" by the Philadelphia Business Journal and the National Association of Women Business Owners, based on her commitment to professional excellence and community involvement. Every year since 2004, she has been

recognized by Philadelphia Magazine as one of the "Top 50 Female Super Lawyers in Pennsylvania" and one of the "Top 100 Super Lawyers in Pennsylvania." Ms. Liebenberg was named one of the "Women Leaders in the Profession" by The Legal Intelligencer. She was recognized as a leader in the field of "Class Actions."

Ms. Liebenberg successfully defended an executive of a chemical parcel tanker company in a criminal prosecution that was brought after the Antitrust Division rescinded an Amnesty Agreement that promised immunity from prosecution to the Company and its executives. This represents the first case in which the Government had rescinded an Amnesty Agreement and attempted to maintain a criminal prosecution against the parties to such an Agreement. After a three-week trial on a Motion to Dismiss the Indictment and extensive briefing by the parties, the Court found that the Government had "no reasonable basis" for revoking the Amnesty Agreement. United States v. Stolt-Nielsen, S.A., et al., 2007 WL 4225668 (E.D. Pa. Nov. 29, 2007).

Ms. Liebenberg also represented Southwest Airlines Co. in its successful defense of an antitrust lawsuit in which the plaintiffs had challenged a contract entered into by the Cities of Dallas and Fort Worth, the Dallas Fort Worth International Airport Board, Southwest and American Airlines regarding Dallas' Love Field. The court granted the Defendants' motion to dismiss in a 44 page opinion. 2007 WL 3196307 (S.D. Tex. Oct. 31, 2007). In addition, Ms. Liebenberg assisted Southwest in its successful efforts to secure Congressional approval of the Wright Amendment Reform Act, which resolved more than three decades of contentious legislation, legal and political battles regarding airline passenger service at Dallas' Love Field.

She has also served in leadership roles in the litigation of a number of plaintiffs' antitrust and consumer class actions, including: In re Urethane Antitrust Litigation - Polyether Polyols, M.D.L. No. 1616 (D. Kan.); In re Providian Financial Corp. Credit Card Terms Litigation

- 8 -

(M.D.L. 1301 E.D. Pa.) (Co-Lead Counsel) ($105 million settlement); In re Commercial Explosives Antitrust Litigation, MDL No. 1093 (D.Utah) (Co-chair of Discovery) ($71 million settlement); In re Travel Agency Commission Antitrust Litigation, MDL No. 1058 (D. Minn.) (Discovery chair for major corporate defendant) ($82 million settlement); and In re Polypropylene Carpet Antitrust Litigation, Case No. 1075 (N.D. Ga.)(Co-Chair, Expert Committee).

Michael D. Basch, a member, is a graduate of Duke University, summa cum laude, and Yale Law School. He clerked for Hon. U.W. Clemon, United States District Judge for the Northern District of Alabama, and was an associate at Dechert, Price & Rhoads, Philadelphia, before joining the firm in 1989.

Jeffrey S. Istvan, a member, received his law degree from the University of Virginia School of Law in 1992, where he was a Hardy Cross Dillard Scholar. He received his undergraduate education at the University of Rochester, from which he graduated summa cum laude and was elected to Phi Beta Kappa. He clerked for The Honorable Robert S. Gawthrop, III, United States District Court for the Eastern District of Pennsylvania (1992-93), before joining Fine, Kaplan and Black, R.P.C. in October, 1993.

Mr. Istvan has had wide-ranging experience in many complex cases, including antitrust, securities fraud, RICO, legal malpractice, corporate mismanagement, consumer protection and civil rights cases. He has earned a reputation as an outstanding writer, and he has been the primary drafter and editor of many complex briefs in important cases. Mr. Istvan recently was named a Pennsylvania Super Lawyer by Philadelphia Magazine.

Mr. Istvan was Lead Counsel in Parsky v. First Union Corp., No. 771, Feb. Term 2001 (C.C.P. Phila. Cty.), which in the fall of 2003 resulted in a recovery of more than $23 million for a class of trust customers of the bank. He was Co-Lead counsel in In re Remeron Antitrust

- 9 -

Litgation, No. 02-cv-2007 (D.N.J.), in which a $36 million dollar settlement for end users of a prescription drug was approved the court in the fall of 2005. Mr. Istvan presently is one of the principal counsel to a group of large purchasers of copper in In re Copper Antitrust Litigation, 436 F.3d 782 (7th Cir. Feb. 6, 2006), in which the Seventh Circuit recently reversed the district court's entry of summary judgment, and he is Co-Lead Counsel in In re Metoprolol Succinate End-Payor Antitrust Litigation, No. 06-71 (D. Del.).

Gerard A. Dever, a member, received his law degree from Temple University School of Law in 2000, where he graduated magna cum laude. He received his undergraduate education at American University from which he graduated cum laude. Prior to attending law school, he served as a legislative assistant to Philadelphia City Councilman Daniel P. McElhatton. Prior to joining Fine, Kaplan and Black, R.P.C., in January 2002, he was an associate at Pepper Hamilton LLP. Mr. Dever successfully defended the United States v. Stolt-Nielsen, S.A., et al. case with partner Roberta Liebenberg.

Mary L. Russell, an associate, received her law degree cum laude from Georgetown University Law Center, where she was an editor of the American Criminal Law Review. She received her undergraduate education at Kalamazoo College, where she was a Stone Honor Scholarship recipient. She was previously associated with Winthrop, Stimson, Putman & Roberts in New York City and Ballard, Spahr, Andrews & Ingersoll in Philadelphia, and was Of Counsel at Liebenberg & White.

Paul Costa, an associate, received his undergraduate degree from the University of Pennsylvania, where he graduated cum laude. He received his law degree from Georgetown University Law Center, where he graduated magna cum laude and was elected to the Order of the Coif. Following law school, he worked as an associate in the Washington, D.C. offices of Akin, Gump, Strauss, Hauer & Feld, L.L.P. Prior to joining Fine, Kaplan and Black, R.P.C. in October

2004, he served as a law clerk to the Honorable Cynthia M. Rufe of the United States District Court for the Eastern District of Pennsylvania.

Matthew H. Duncan, an associate, received his law degree from the University of Pennsylvania Law School in 2003, where he graduated cum laude, and won the Dolores Sloviter Award for best paper in the field of judicial administration. He received his undergraduate degree from Bucknell University in 1996 with a degree in Civil Engineering. He worked for four years in New York City as a construction project superintendent for Moretrench American Corp. Prior to joining Fine, Kaplan and Black, R.P.C., Matt served as a law clerk to the Honorable Anthony J. Scirica, Chief Judge of the United States Court of Appeals for the Third Circuit.

Ria C. Momblanco, an associate, received her law degree from the University of Pennsylvania Law School in 2002, where she was a senior editor and the technology editor for the Law Review. She received her undergraduate degree in chemical engineering from the University of California, Los Angeles. She is admitted to practice before the U.S. Patent and Trademark Office as well as in Pennsylvania and California. Prior to joining Fine, Kaplan and Black in 2006, Ms. Momblanco was an associate at Jones Day in Orange County, California where she practiced complex commercial litigation in the fields of health care and consumer credit reporting.

Adam J. Pessin, an associate, received his law degree from the University of Pennsylvania Law School magna cum laude in 2003, where he was research assistant for Professor Stephen Burbank, teaching assistant for Judge Alison Whitmer Tumas, and an editor of the Law Review. He received an undergraduate degree in English from Yale with distinction in 1996, and a diploma in Hebrew and Jewish studies from Oxford University in 1997. Prior to joining Fine, Kaplan and Black in 2007, Adam clerked for The Honorable Maryanne Trump

Barry of the United States Court of Appeals for the Third Circuit and was an associate at Patterson, Belknap, Webb and Tyler in New York City.

# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE MUNICIPAL DERIVATIVES ANTITRUST LITIGATION | : : : : | MDL No. 1950 Master Docket No. 08 Civ. 2516 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | : : : | |

## AFFIDAVIT OF GERALD J. RODOS
## ON BEHALF OF BARRACK, RODOS & BACINE

COMMONWEALTH OF PENNSYLVANIA      :
                                  :      ss.
COUNTY OF PHILADELPHIA            :

I, Gerald J. Rodos, Esquire, being duly sworn according to law, hereby depose and say:

1.      I am a partner in the law firm of Barrack, Rodos & Bacine, one of the counsel for plaintiffs in the actions captioned *Fairfax County, Virginia, et al., v. Packerkiss Securities, Inc., et al.*, Case No. 08-cv-0542-VM and *Fairfax County, Virginia, et al., v. Bank of America*, Case No. 08-cv-05493-VM.

2.      Barrack, Rodos & Bacine has more than thirty years of experience and success in litigating complex class actions, participating in hundreds of such cases and recovering billions of dollars for class members. My firm has concentrated its complex class action practice in antitrust and securities class actions. Barrack Rodos & Bacine has had significant leadership positions in these litigations, having been appointed by courts as lead counsel in numerous class actions throughout the United States. Among the antitrust class actions where the firm has been

appointed lead counsel or to the Executive Committee of all plaintiffs' counsel, are the

following:

> *In re Automotive Paint Refinishing Antitrust Litigation*, MDL No. 1426, the
Honorable R. Barclay Surrick in the Eastern District of Pennsylvania;

> *Brookshire Brothers, Ltd., et al. v. Chiquita Brands International, Inc., et al.*,
Lead Case No. 05-21962-Cooke/Brown, the Honorable Marcia G. Cooke in the Southern District
of Florida, Miami Division;

> *In re Publication Paper Antitrust Litigation*, Docket No. 3:04 MD 1631 (SRU),
the Honorable Stefan R. Underhill in the District of Connecticut;

> *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives and Composites, Inc.,
et al.*, No. CV-99-07796-GHK(Ctx), the Honorable Florence Marie Cooper in the Central
District of California, Western Division;

> *In re Graphite Electrodes Antitrust Litigation*, Master File No. 97-CV-
4182(CRW), the Honorable Charles R. Weiner in the Eastern District of Pennsylvania;

> *In re Flat Glass Antitrust Litigation*, Master Docket Misc. No. 970550, MDL No.
1200, the Honorable Donald E. Ziegler in the Western District of Pennsylvania;

> *In re Sorbates Antitrust Litigation*, Master File No. C 98-4886 MCC, the
Honorable William H. Orrick, Jr. in the Northern District of California;

> *In re Sodium Gluconate Antitrust Litigation*, No. C-97-4142CW, the Honorable
Claudia Wilken in the Northern District of California; and

> *In re Carpet Antitrust Litigation*, MDL No. 1075, the Honorable Harold L.
Murphy in the Northern District of Georgia, Rome Division; and

> *In re Citric Acid Antitrust Litigation*, Master File No. 95-2963, the Honorable
Charles A. Legge in the Northern District of California.

> A copy of my firm's resume is attached as Exhibit A.

3.     My firm supports the motion of Cohen, Milstein, Hausfeld & Toll, P.L.L.C.

("Cohen Milstein"), Boies, Schiller & Flexner LLP and Susman Godfrey L.L.P. to be appointed

interim co-lead counsel in this litigation. These firms are extremely experienced in the field of

complex antitrust class action litigation. My firm has litigated antitrust class actions with each of

the proposed co-lead counsel. For example, Barrack Rodos & Bacine was a member of the

Executive Committee in the *Vitamins Antitrust Litigation*, where Cohen, Milstein, Hausfeld &

Toll, P.L.L.C. ("Cohen Milstein"), Boies, Schiller & Flexner LLP and Susman Godfrey L.L.P.

served as co-lead counsel. In addition, my firm has prosecuted numerous antitrust class actions

as co-counsel with Cohen Milstein, including serving as co-lead counsel with that firm in the

*Flat Glass Antitrust Litigation* in the Western District of Pennsylvania. Currently, my firm is

serving alongside Cohen Milstein as members of the Executive Committee in the *Publication*

*Paper Antitrust Litigation* in the District of Connecticut.

4.      My firm became aware of the government investigation into alleged

anticompetitive conduct in the municipal derivatives market more than one year ago. Following

the public announcement of the investigation, attorneys at my firm conducted their own

investigation into alleged bid-rigging and price fixing in the market, speaking with industry

experts and potential victims of the conspiracy. Despite the information uncovered during the

course of this investigation, we were unable to gain a complete understanding of the conspiracy.

Indeed, to my knowledge, it was only after our co-counsel had evaluated information that Bank

of America provided pursuant to its cooperation agreement, that they were able to file the initial

complaints in this multi-district litigation.

Gerald J. Rodos

Sworn to and Subscribed

Before Me this 16th day

of July, 2008.

Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Patricia A. Hamer, Notary Public
City of Philadelphia, Philadelphia County
My Commission Expires April 6, 2012
Member, Pennsylvania Association of Notaries

## BIOGRAPHY OF BARRACK, RODOS & BACINE

*Barrack, Rodos & Bacine* has been extensively involved for more than thirty years in complex class action litigation, participating in hundreds of such cases and recovering billions of dollars for class members, including recovering more than $6.1 billion as co-lead counsel in class action litigation involving WorldCom, Inc. The Firm has concentrated its complex class action practice in antitrust and securities class actions. The Firm has had significant leadership positions in these litigations, having been appointed by courts as lead counsel in numerous class actions throughout the United States. Among the antitrust class actions where the Firm has been appointed lead counsel or to the Executive Committee of all plaintiffs' counsel, are the following:

*In re Automotive Paint Refinishing Antitrust Litigation*, MDL No. 1426, the Honorable R. Barclay Surrick in the Eastern District of Pennsylvania;

*Brookshire Brothers, Ltd., et al. v. Chiquita Brands International, Inc., et al.*, Lead Case No. 05-21962-Cooke/Brown, the Honorable Marcia G. Cooke in the Southern District of Florida, Miami Division;

*In re Publication Paper Antitrust Litigation*, Docket No. 3:04 MD 1631 (SRU), the Honorable Stefan R. Underhill in the District of Connecticut;

*In re Bath and Kitchen Fixtures Antitrust Litigation*, Docket No. 05-cv-00510-MAM, the Honorable Mary A. McLaughlin in the Eastern District of Pennsylvania;

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives and Composites, Inc., et al.*, No. CV-99-07796-GHK(Ctx), the Honorable Florence Marie Cooper in the Central District of California, Western Division;

*In re Graphite Electrodes Antitrust Litigation*, Master File No. 97-CV-4182(CRW), the Honorable Charles R. Weiner in the Eastern District of Pennsylvania;

*In re Flat Glass Antitrust Litigation*, Master Docket Misc. No. 970550, MDL No. 1200, the Honorable Donald E. Ziegler in the Western District of Pennsylvania;

*In re Sorbates Antitrust Litigation*, Master File No. C 98-4886 MCC, the Honorable William H. Orrick, Jr. in the Northern District of California;

*In re Sodium Gluconate Antitrust Litigation*, No. C-97-4142CW, the Honorable Claudia Wilken in the Northern District of California; and

*In re: Metal Building Insulation Antitrust Litigation*, Master File No. H-96-3490, the Honorable Nancy F. Atlas in the Southern District of Texas.

*In re Carpet Antitrust Litigation*, MDL No. 1075, the Honorable Harold L. Murphy in the Northern District of Georgia, Rome Division; and

*In re Citric Acid Antitrust Litigation*, Master File No. 95-2963, the Honorable Charles A. Legge in the Northern District of California.

Among the securities class actions where the Firm has been appointed as lead counsel in recent years are:

*In re WorldCom, Inc. Securities Litigation*, Master File No. 02-Civ-3288(DLC), the Honorable Denise L. Cote in the Southern District of New York;

*In re Cendant Corporation Litigation*, Master File No. 98-1664(WHW), the Honorable William H. Walls in the District of New Jersey;

*In re McKesson HBOC, Inc. Securities Litigation*, No. C-99-20743-RMW, the Honorable Ronald M. Whyte in the Northern District of California;

*In re R & G Financial Corp. Securities Litigation*, No. 05 cv 4186, the Honorable John E. Sprizzo in the Southern District of New York

*In re Schering-Plough Securities Litigation*, Master File No. 01-CV-0829 (KSH/RJH), the Honorable Katherine Hayden in the District of New Jersey; and

*In re Apollo Group, Inc. Securities Litigation*, Master File No. CV 04-2147-PHX-JAT, the Honorable James A. Teilborg Honorable James A. Teilborg in the District of Arizona.

The Firm has extensive experience in trying to a jury nationwide class actions: *Uniondale Beer Co., Inc. v. Anheuser-Busch, Inc., et al.*, Civil Action No. CV 86-2400(TCP) (Eastern District of New York) (antitrust class action trial); *In re WorldCom, Inc. Securities Litigation*, Master File No. 02-Civ-3288(DLC) (Southern District of New York) (2005 securities class action jury trial against accounting firm); *In re Apollo Group,*

*Inc. Securities Litigation*, Master File No. CV-04-2147-PHX-JAT (District of Arizona) (jury verdict for the full amount per share requested, which in the aggregate could exceed $200 million); *Gutierrez v. Charles J. Givens Organization, et al.*, Case No. 667169 (Superior Court of California, County of San Diego) (jury verdict in excess of $14 million for plaintiff consumer class); *In re Control Data Corporation Securities Litigation*, 933 F.2d 616 (8th Cir. 1991); *Gould v. Marlon*, CV-86-968-LDG (D. Nev.) (jury verdict for plaintiff class); *Herskowitz v. Nutri/System, et al.*, 857 F.2d 179 (3rd Cir. 1988); and *Betanzos v. Huntsinger*, CV-82-5383 RMT (C.D. Cal.) (jury verdict for plaintiff class).

Among the attorneys of the Firm with extensive experience in litigating antitrust class actions are the following:

*Leonard Barrack*, senior partner in Barrack, Rodos & Bacine, is a graduate of Temple University Law School (J.D. 1968) where he was Editor in Chief of the Temple Law Reporter.  Mr. Barrack has been practicing in the area of antitrust and securities class actions, and corporate litigation generally, for more than 35 years.  He was admitted to the bar of the Supreme Court of Pennsylvania in 1969, and is also a member of the bars of the U.S. Supreme Court, the U.S. Court of Appeals for the Third Circuit, the U.S. District Court for the Eastern District of Pennsylvania, and other federal circuit courts.

Mr. Barrack was co-lead counsel in, *inter alia, In re Carbon Fiber Antitrust Litigation, In re Graphite Electrodes Antitrust Litigation*, and *In re Flat Glass Antitrust Litigation*, referred to above.

Mr. Barrack has had extensive trial and deposition experience in complex actions including the successful trial of lawsuits under Section 14(a) of the Securities Exchange Act of 1934; *Gladwin v. Medfield*, CCH Fed. Sec. L. Rep. ¶95,012 (M.D. Fla. 1975), *aff'd*, 540 F.2d 1266 (5th Cir. 1976); *Rafal v. Geneen*, CCH Fed. Sec. L. Rep. ¶93,505 (E.D. Pa. 1972).  In addition, Mr. Barrack has lectured on class actions to sections of the American and Pennsylvania Bar Associations.

*Gerald J. Rodos*, partner in Barrack, Rodos & Bacine, is a graduate of Boston University (B.A. 1967) and an honor graduate of the University of Michigan Law School (J.D. Cum Laude 1970). Mr. Rodos has been practicing in the area of antitrust class actions, for more than 35 years. He was admitted to the bar of the Supreme Court of Pennsylvania in 1971, and is also a member of the bars of the Supreme Court of the United States, the U.S. Court of Appeals for the Third Circuit, the U.S. District Court for the Eastern District of Pennsylvania, and other federal circuit courts.

Mr. Rodos has been lead counsel or Executive Committee member prosecuting, *inter alia*, *In re Automotive Refinishing Paint Antitrust Litigation*, *Brookshire Brothers v. Chiquita Brands, et al.*, *In re Publication Paper Antitrust Litigation*, and *In re Bath and Kitchen Fixtures Antitrust Litigation*, referred to above.

Mr. Rodos is the co-author of <u>Standing To Sue Of Subsequent Purchasers For Antitrust Violations -- The Pass-On Issue Re-Evaluated</u>, 20 S.D.L. Rev. 107 (1975), and <u>Judicial Implication of Private Causes of Action; Reappraisal and Retrenchment</u>, 80 Dick. L. Rev. 167 (1976).

*William J. Ban*, partner in Barrack, Rodos & Bacine, is a graduate of Brooklyn Law School (J.D. 1982) and Lehman College of the City University of New York (A.B. 1977). Over the past twenty-five years, Mr. Ban's practice of law has focused on antitrust, securities and consumer class action litigation on behalf of plaintiffs. Mr. Ban is the attorney at the firm principally responsible for the prosecution of *In re OSB Antitrust Litigation*, Master File No. 06-cv-826-PD before the Honorable Paul S. Diamond in the Eastern District of Pennsylvania.

*Chad A. Carder* is a 1999 honors graduate of The Ohio State University (B.A. Political Science) and a 2002 graduate of the College of William and Mary, Marshall-Wythe School of Law, where he was awarded a Graduate Research Fellowship and served as a Justice on the William and Mary Moot Court Board. Before joining the firm's Philadelphia office, Mr. Carder served as the law clerk to the Honorable Michael J. Hogan of the New Jersey Superior Court.

Since joining Barrack, Rodos & Bacine, Mr. Carder has litigated major antitrust class actions across the country, including *In re Publication Paper Antitrust Litigation*, *In re OSB Antitrust Litigation* and *In re Pressure Sensitive Labelstock Antitrust Litigation*. Mr. Carder's complex civil litigation practice also includes the litigation of several securities class actions, shareholder derivative actions in various state and federal courts, including those arising out of instances of improper stock option backdating, and policyholder actions against insurance companies.

*Jeffrey B. Gittleman*, a partner in Barrack, Rodos & Bacine joined the firm in 1998. Jeff is an honors graduate of Tulane University (B.A. 1993) and Temple University School of Law (J.D. 1996). Mr. Gittleman has also been recognized by *Philadelphia Magazine* and *Pennsylvania Super Lawyers* as a Pennsylvania Rising Star in 2006 and 2007.

Mr. Gittleman has extensive experience litigating major antitrust class actions throughout the country, and has secured multi-million dollar recoveries against the manufacturers or producers of carbon fiber, automotive refinishing paint, graphite electrodes, flat glass, sodium gluconate, sorbates, polypropylene and nylon carpet, and metal building insulation. Mr. Gittleman is currently serving on the Executive Committee in *In re Publication Paper Antitrust Litigation*.

In May 2004, Mr. Gittleman served as the lead trial attorney in *Meikrantz v. Janney Montgomery Scott, et al.*, where he obtained a substantial award for his shareholder clients. He was also part of the team that represented Iridian Technologies, Inc. and its common shareholder-elected directors in the 2003 trial of *Equity Asset Investment Trust, Inc. v. John Daugman, et al.*

*Lisa M. Lamb* graduated, *summa cum laude*, from Villanova University School of Law in 2003, where she was a member of the Order of the Coif and an associate editor of the *Villanova Law Review*. She received her B.A. in psychology, with honors, from Princeton University in 2000.

5

Ms. Lamb is currently litigating a number of antitrust class actions, including *In re Air Cargo Shipping Services Antitrust Litigation*, 06-MDL-1775 (E.D.N.Y.), *Universal Delaware v. Ceridian Corp.*, 07-1078-JKG (E.D. Pa.) and *In re Plastics Additives Antitrust Litigation*, 05-MD-1684 (E.D. Pa.). Ms. Lamb was a member of the highly successful trial team in *In re WorldCom, Inc. Securities Litigation* — a prosecution that yielded a record-breaking recovery of more than $6.13 billion for defrauded investors. Ms. Lamb is admitted to practice in Pennsylvania and before the U.S. District Court for the Eastern District of Pennsylvania.

**Mark R. Rosen**, partner in Barrack, Rodos & Bacine, is an honors graduate of the University of Pennsylvania (A.B. *summa cum laude* with distinction in political science 1976), where he was elected to Phi Beta Kappa, and the Harvard Law School (J.D. *cum laude* 1979). Mr. Rosen, who served as a law clerk to Judge Stanley S. Brotman, of the United States District Court for the District of New Jersey, has handled many trials and appeals as an experienced civil litigator representing plaintiffs and defendants in federal and state courts in, *inter alia*, antitrust, constitutional, securities, environmental, consumer and other class action litigation.

Mr. Rosen has been successfully litigating antitrust class actions for many years including, *inter alia*, *In re Automotive Refinishing Paint Antitrust Litigation*, before the Honorable R. Barclay Surrick in the Eastern District of Pennsylvania, *In re Publication Paper Antitrust Litigation*, before the Honorable Stefan R. Underhill in the District of Connecticut, and *In re Aspartame Antitrust Litigation*, Master Docket No. 06-1732-LDD, before the Honorable Legrome D. Davis in the Eastern District of Pennsylvania.

*          *          *

In *In re Automotive Refinishing Paint Antitrust Litigation*, 2:10-md-01426-RBS (E.D. Pa.), Barrack, Rodos & Bacine, co-lead counsel for a Class of direct purchasers of automotive refinishing paint, achieved settlements with five defendants in excess of $100 million. After reaching a settlement with the last two defendants

remaining in the litigation, this Court stated, *"I want to commend counsel on both sides of this litigation. I think that the representation on both sides of this litigation is as good as I've ever seen in my entire professional career. Counsel worked together in this case. They frankly made the job of this Court very easy and I commend all of you for what you've done in this litigation."*

In *In re Apollo Group Inc. Securities Litigation*, Master File No. CV-04-2147 PHX-JAT (District of Arizona), Barrack, Rodos & Bacine was lead counsel for the class that secured a jury verdict for the full amount per share requested, which in the aggregate could exceed $200 million, the largest securities litigation jury verdict since passage of the PSLRA. Judge Teilborg commented that trial counsel *"brought to this courtroom just extraordinary talent and preparation.... The technical preparation, the preparation for your examination and cross-examination of witnesses has been evident in every single instance. The preparation for evidentiary objections and responses to those objections have been thorough and foresighted. The arguments that have been made in every instance have been well-prepared and well-presented throughout the case. *** Likewise, for the professionalism and the civility that you -- and the integrity that you have all demonstrated and exuded throughout the handling of this case, it has just, I think, been very, very refreshing and rewarding to see that. *** [W]hat I have seen has just been truly exemplary."*

In *In re WorldCom, Inc. Securities Litigation*, No. 02 Civ. 3288 (DLC), Barrack, Rodos & Bacine was co-lead counsel for the Class and achieved settlements in excess of $6.13 billion. After a partial settlement with one group of defendants for in excess of $2.56 billion, the Court stated that *"the settlement amount ... is so large that it is of historic proportions."* The Court found that *"Lead Counsel has performed its work at every juncture with integrity and competence. It has worked as hard as a litigation of this importance demands, which for some of the attorneys, including the senior attorneys from Lead Counsel on whose shoulders the principal responsibility for this litigation rests, has meant an onerous work schedule for over two years."* The

Court further found that *"the quality of the representation given by Lead Counsel is unsurpassed in this Court's experience with plaintiffs' counsel in securities litigation. Lead Counsel has been energetic and creative.... It has behaved professionally and has taken care not to burden the Court or other parties with needless disputes.... The submissions of Lead Counsel to the Court have been written with care and have repeatedly been of great assistance."* The Court also found that *"In sum, the quality of representation that Lead Counsel has provided to the class has been superb"*. In approving the final settlements totaling $3.5 billion, in an opinion and order dated September 20, 2005, the Court stated *"The impressive extent and superior quality of Lead Counsel's efforts as of May 2004 were described in detail in the Opinion approving the Citigroup Settlement. ... At the conclusion of this litigation, more than ever, it remains true that 'the quality of representation that Lead Counsel has provided to the class has been superb.' ... At trial against Andersen, the quality of Lead Counsel's representation remained first-rate. .. The size of the recovery achieved for the class – which has been praised even by several objectors – could not have been achieved without the unwavering commitment of Lead Counsel to this litigation."*

The Court also found that *"Despite the existence of these risks, Lead Counsel obtained remarkable settlements for the Class while facing formidable opposing counsel from some of the best defense firms in the country;"* and *"If the Lead Plaintiff had been represented by less tenacious and competent counsel, it is by no means clear that it would have achieved the success it did here on behalf of the Class." "It is only the size of the Citigroup and Underwriters' Settlements that make this recovery so historic, and it is likely that less able plaintiffs' counsel would have achieved far less."*

In *In re Cendant Corporation Litigation*, No. 98-CV-1664 (WHW) (D.N.J. December 7, 1999), Barrack, Rodos & Bacine was co-lead counsel for the Class and achieved settlements with defendants in excess of **$3.18 billion**, more than three times larger than the next highest recovery ever achieved in a securities law class action suit by that time. The *Cendant* settlement included what was, at the time, the largest amount

by far ever paid in a securities class action by an issuing company (which, nearly ten years later, remains the second largest ever paid) and what was, and remains, the largest amount ever paid in a securities class action by an auditor. The *Cendant* settlement further included extensive corporate governance reforms, and a contingency recovery of one-half the net recovery that Cendant and certain of its affiliated individuals may recover in on-going proceedings against CUC's former auditor. The *Cendant* Court stated that *"we have all been favored with counsel of the highest competence and integrity and fortunately savvy in the ways of the law and the market."* The Court found that the *"standing, experience and expertise of counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposed counsel were and are high in this action."* The Court further found that the result of lead counsel's efforts were *"excellent settlements of uncommon amount engineered by highly skilled counsel with reasonable cost to the class."*

# EXHIBIT I

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE MUNICIPAL DERIVATIVES ANTITRUST LITIGATION | : <br> : <br> : MDL No. 1950 <br> : |
| THIS DOCUMENT RELATES TO: | : <br> : Master Docket <br> : No. 08 Civ. 2516(VM)(JCF) |
| ALL ACTIONS | : <br> : |

### DECLARATION OF LAURENCE S. BERMAN ON
### BEHALF OF LEVIN, FISHBEIN, SEDRAN & BERMAN

I, Laurence S. Berman, Esquire, pursuant to 28 U.S. C. § 1746, declare under penalty of perjury that the foregoing is true and correct:

1.    I am a partner in the law firm of Levin, Fishbein, Sedran & Berman, co-counsel for Plaintiff Fairfax County, Virginia in this multi-district litigation.

2.    My law firm specializes in complex litigation, including federal multi-district litigation, and the attorneys in my firm have extensive experience in national class actions that present cutting edge issues in both substantive and procedural areas. My firm has had this area of specialization since its inception in 1980 and has been appointed a lead class counsel in numerous cases over its 28 year existence.

3.    In this case, my firm was requested to be co-counsel on behalf of Plaintiff Fairfax County, Virginia by that entity and the law firm of Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("Cohen Milstein") because of our vast experience in litigating complex class action cases. Some of the antitrust cases that our firm has litigated include: *In re Air Cargo Shipping*

1

*Antitrust Litigation*, MDL 1775 (E.D. N.Y.); *In re Bulk [Extruded] Graphite Products Antitrust Litigation*, Master File No. 02-CV-06030 (WHW)(D. N.J.); *In re Graphite Electrodes Antitrust Litigation*, MDL 1244 (E.D. Pa.). In addition, our firm is presently lead, liaison and co-class counsel in *In re Diet Drugs Products Liability Litigation*, MDL 1203 (E.D.Pa.) and in *In re Orthopedic Bone Screws Product Liability Litigation*, MDL 1014 (E.D. Pa.). We have litigated other complex cases where we received judicial appointments to be a member of committees representing the plaintiffs, such as the Steering and Executive Committees of *In re Vioxx Products Liability Litigation*, MDL 1657 (E.D. La.) and the *In re Rezulin Products Liability Litigation* MDL 1348 (S.D. N.Y.).

4.      Accordingly, my firm is eminently qualified to be an interim lead counsel or member of the executive committee for this litigation. However, early on in this litigation, in light of the extensive work performed by Cohen Milstein and its other co-counsel representing Fairfax County, Virginia, in particular, Boies, Schiller & Flexner LLP ("Boies Schiller") and the work that the law firm of Sussman Godfrey L.L.P. ("Susman Godfrey") had undertaken to represent the class and its clients, our law firm made a determination that it would not seek to be a lead counsel in this case. Instead, it is our belief that the interests of the class would be best served if the Court were to appoint as Interim Co-Lead Counsel for the proposed class the three law firms of Cohen Milstein, Boies Schiller and Susman Godfrey and we therefore support the Motion for Appointment of Interim Leadership Structure filed jointly by those three law firms.

5.      My firm also supports the request that upon the appointment of Cohen Milstein, Boies Schiller and Susman Godfrey as Interim Co-Lead Counsel, that those law firms also be empowered to appoint an Interim Executive Committee to assist them.

2

6.     While our law firm does not seek to be one of the co-lead counsel for this case, we nevertheless wish to have a significant role in the litigation and to bring to it our vast experience in complex litigation matters.  The law firms who we support being appointed as Interim Co-Lead Counsel have assured us that our participation in the litigation is welcomed and sought along with the participation of various other law firms who represent putative class members in the case who might also have sought to be appointed one of the co-lead counsel.  With the large number of defendants in this case, we have been assured that our law firm will be afforded a fair opportunity to perform meaningful work in this case.

7.     Under these circumstances, our firm believes that in the best interests of the putative class that a united front of plaintiffs' counsel exist with whom the Court can interface and with whom the defendants' counsel can litigate.

8.     We therefore believe the Court should seriously consider the proposal made by Cohen Milstein, Boies Schiller and Susman Godfrey that those law firms be appointed Interim Co-Lead Counsel and be authorized to appoint an Interim Executive Committee to assist them. We believe that if other counsel were appointed to be Interim Co-Lead Counsel the case would suffer because of their lack of knowledge and information about the cause of action and facts that these three firms have demonstrated to possess.  In order to avoid disruption and confusion among plaintiffs and their counsel, and inconsistent litigation positions that may be harmful to

the interests of the putative class, we support the Motion filed by Cohen Milstein, Boies Schiller and Susman Godfrey.

Executed this _16th_ day of July, 2008.

By: _____

Laurence S. Berman, Esquire

4

# EXHIBIT J



1   SOLOMON B. CERA (State Bar. No. 99467)
2   JOSEPH M. BARTON (State Bar. No. 188441)
    C. ANDREW DIRKSEN (State Bar No. 197378
3   PAMELA A. MARKERT (State Bar No. 203780)
    GOLD BENNETT CERA & SIDENER LLP
4   595 Market Street, Suite 2300
    San Francisco, California 94105-2835
5   Telephone: (415) 777-2230
    Facsimile: (415) 777-5189
6   E-mail: scera@gbcslaw.com
    E-mail: cdirksen@gbcslaw.com
7   E-mail: jbarton@gbcslaw.com
    E-mail: pmarkert@gbcslaw.com
8
9
    Attorneys for Plaintiff
10  Central Bucks School District

11
                    UNITED STATES DISTRICT COURT
12                  SOUTHERN DISTRICT OF NEW YORK

13

14  IN RE MUNICIPAL DERIVATIVES            MDL No. 1950
    ANTITRUST LITIGATION
15                                         Master Docket No. 08-02516 (VM) (JCF)

16                                         **DECLARATION OF SOLOMON B. CERA
                                           ON BEHALF OF GOLD BENNETT CERA
17  THIS DOCUMENT RELATES TO:              & SIDENER LLP**

18      ALL ACTIONS
19

20

21

22

23

24

25

26

27

28

DECL. OF SOLOMON B. CERA - Master Docket No. 08-02516 (VM)
#119630

1    I, Solomon B. Cera declare:

2    1.    I am a partner at the law firm of Gold Bennett Cera & Sidener LLP and am

3    counsel for plaintiff Central Bucks School District ("Central Bucks") in this multi-district

4    litigation.

5    2.    My law firm has represented plaintiffs for over forty years in complex business,

6    antitrust and trade regulation cases, among others. The attorneys in my firm have extensive

7    experience in nationwide class action cases. My firm has worked successfully with Cohen

8    Milstein Hausfeld & Toll PLLC ("Cohen Milstein") on numerous matters, representing direct

9    purchasers in many complex antitrust class actions. These actions and the results achieved

10   include the following eight (8) actions, in which both firms served (or continue to serve) as co-

11   lead counsel:

12   •   *In re Rubber Chemicals Antitrust Litigation*, MDL No. 1648 (N.D. Cal.) ($320
13       million);

14   •   *In re EPDM Antitrust Litigation*, MDL No. 1542 (D. Conn.) ($81 million)
         (partial);

15   •   *In re CR Antitrust Litigation*, MDL No. 1642 (D. Conn.) ($62 million);

16   •   *In re Organic Peroxides Antitrust Litigation* (D.D.C.) ($37 million);

17   •   *In re NBR Antitrust Litigation* ($35 million) (W.D. Pa.) ($35 million);

18   •   *In re Plastics Additives Antitrust Litigation*, MDL No. 1684 (E.D. Pa.) ($30.4
19       million) (partial);

20   •   *In re Polyester Staple Antitrust Litigation*, MDL No. 1516 (W.D.N.C.) ($30.5
         million) (partial); and,

21   •   *In re MCAA Antitrust Litigation* (D.D.C.) ($15.6 million).

22   3.    The leadership and work of Gold Bennett Cera & Sidener LLP and Cohen

23   Milstein was recently applauded by District Judge Jenkins in *In re Rubber Chemicals Antitrust*

24   *Litigation.* That class action case arose from an international price-fixing scheme involving

25   rubber chemicals used to treat and cure finished rubber products, such as tires. The class action

26   resulted in a recovery of nearly $320 million. In his Order certifying a class in that case, Judge

27

28   Jenkins observed the following:

---

In the instant lawsuit, it is undisputed that the counsel selected by the named plaintiffs – Gold Bennett and Cohen Milstein – have extensive experience and expertise in antitrust and other class actions, as well as other complex litigation, and have successfully prosecuted such cases in courts across the country. Gold Bennett and Cohen Milstein, Co-Chairs of the Plaintiffs' Executive Committee, have worked together to identify, investigate, and prosecute the claims alleged here. They have reviewed documents produced in discovery, worked with economists to analyze impact and damage methodologies, analyzed comprehensive transactional data, briefed legal issues, and engaged in negotiations with opposing counsel. Gold Bennett and Cohen Milstein have also devoted considerable attorney resources to this case and have associated with other counsel, experienced in class actions, who have assisted in the matter as members of the Plaintiffs' Executive Committee. There is every indication that Gold Bennett and Cohen Milstein are well equipped to fairly and adequately represent the interests of the Class.

*See In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 355 (N.D. Cal. 2006).

4.    In light of the foregoing, my firm is well qualified to be an interim lead counsel or member of the executive committee in this case.

5.    My firm became aware of potential bid-rigging in the market for municipal derivatives in the summer of 2007. At that time, we began an intensive investigation of the underlying facts, which included an exhaustive analysis of all publicly available sources of information. Thereafter, we became aware of additional facts learned by Cohen Milstein from its own investigation, including with regard to defendant Bank of America, which confirmed that the filing of litigation was appropriate.

6.    On June 4, 2008, my firm, on behalf of Central Bucks, filed two actions in the United States District Court for the District of Columbia (Nos. 08-955 and 08-956) that are related to the actions that have been consolidated for coordinated pretrial proceedings before this Court. It is anticipated that these two actions will be transferred to this Court shortly, in light of the June 16, 2008 Transfer Order issued by the United States Judicial Panel on Multi-District Litigation that transferred to this Court three similar actions (specifically, the two *Fairfax County* actions and the *Hinds County* action).

7.    My firm supports the request that Cohen Milstein and the firms it is working with, Boies Schiller and Susman Godfrey, be appointed as Interim Co-Lead Counsel, and that those law firms be permitted to appoint an Interim Executive Committee to assist them.

1    8.    While my firm has foregone seeking a lead counsel position in this case, it has

2  been assured that it will have a significant role in the litigation and be able to bring to it our

3  expertise in complex litigation matters.  We have been assured that it is the intent of proposed

4  Interim Co-Lead Counsel that my firm will have a substantial role in the prosecution of this case.

5    I declare under penalty of perjury under the laws of the United States that the foregoing is

6  true and correct.  Executed this 17th day of July, 2008 in San Francisco, California.

7

8    _____

9    Solomon B. Cera

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT K

Transpacific 3-28-08.txt

1

1 Pages 1 - 17

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4              BEFORE THE HONORABLE CHARLES R. BREYER

5

6 IN RE TRANSPACIFIC PASSENGER AIR     ) No. C 07-5634 CRB
  TRANSPORTATION ANTITRUST LITIGATION )
7 _____) MDL No. 1913
                                        San Francisco, California
8                                       March 28, 2008

9                    TRANSCRIPT OF PROCEEDINGS

10 APPEARANCES:

11 For Plaintiffs:        COTCHETT, PITRE & MCCARTHY
                          840 Malcolm Road, Suite 200
12                        Burlingame, California  94010
                   BY:    JOSEPH W. COTCHETT, ESQUIRE
13                        STUART GROSS, ESQUIRE
                          NEIL SWARTZBERG, ESQUIRE
14
   For Plaintiff          COHEN, MILSTEIN, HAUSFELD & TOLL, LLP
15 Diller:                One Embarcadero Center, Suite 2440
                          San Francisco, California  94111
16                 BY:    MICHAEL D. HAUSFELD, ESQUIRE
                          MICHAEL P. LEHMANN, ESQUIRE
17
   For Plaintiff          PEARSON SIMON SOTER WARSHAW PENNY, LLP
18 Ajaye:                 44 Montgomery Street, Suite 1200
                          San Francisco, California  94104
19                 BY:    BRUCE SIMON, ESQUIRE

20

21 (Appearances continued on next page)

22 Reported By:    Katherine A. Powell, CSR #5812, RPR, CRR
                   Official Reporter - U.S. District Court
23

24

25
                                                            2

1 APPEARANCES (CONTINUED):

2 For Plaintiff           MILBERG, LLP
  Turner:                 300 South Grand Avenue, Suite 3900
3                         Los Angeles, California  90071
                   BY:    JEFF WESTERMAN, ESQUIRE
4
  For Plaintiff           GIRARD GIBBS, LLP
                              Page 1

```
                              Transpacific 3-28-08.txt
 5 Mark Foy:                  601 California Street, Suite 1400
                              San Francisco, California 94108
 6                      BY:   AARON M. SHEANIN, ESQUIRE
                              ELIZABETH C. PRITZKER, ESQUIRE
 7
   For Plaintiff             MURRAY & HOWARD LLP
 8 Maloof:                   436 14th Street, Suite 1413
                             Oakland, California  94612
 9                      BY:  DEREK G. HOWARD, ESQUIRE
                             SCOTT J. YUNDT, ESQUIRE
10
   For Plaintiffs            STEYER, LOWENTHAL, BOODROOKAS & WALKER
11 Diller and Nguyen:        One California Street, Third Floor
                             San Francisco, California  94111
12                      BY:  ALLAN STEYER, ESQUIRE

13 For Plaintiffs:           KABATECK BROWN KELLNER LLP
                             644 South Figueroa Street
14                           Los Angeles, California  90017
                        BY:  RICHARD L. KELLNER, ESQUIRE
15
   For Plaintiff Moy:        GROSS & BELSKY LLP
16                           180 Montgomery Street, Suite 2200
                             San Francisco, CA 94104
17                      BY:  TERRY GROSS, ESQUIRE

18 For Plaintiffs            KAPLAN, FOX & KILSHEIMER
   Hut and Gaffigan:         350 Sansome Street
19                           San Francisco, California  94104
                        BY:  LAURENCE D. KING, ESQUIRE
20
   For Plaintiffs:           ZELLE, HOFMANN, VOELBEL, MASON & GETTE
21                           44 Montgomery Street, Suite 3400
                             San Francisco, California  94104
22                      BY:  FRANCIS O. SCARPULLA, ESQUIRE

23

24          (Appearances continued on next page)

25
□                                                            3


 1 APPEARANCES (CONTINUED):

 2 For Plaintiffs            O'DONNELL AND ASSOCIATES, P.C.
   Murphy and Ko:           550 South Hope Street, Suite 1000
 3                          Los Angeles, California  90071
                        BY:  ROBERT M. BRAVA PARTAIN, ESQUIRE
 4
   For Plaintiffs:          SAVERI & SAVERI, INC.
 5                          111 Pine Street, Suite 1700
                            San Francisco, California  94111
 6                      BY:  GUIDO SAVERI, ESQUIRE
                            CADIO ZIRPOLI, ESQUIRE
 7
   For Defendant            HOLME, ROBERTS & OWEN, LLP
 8 All Nippon Airways:      560 Mission Street, 25th Floor
                            San Francisco, California  94105-2994
 9                      BY:  JESSE W. MARKHAM, JR., ESQUIRE

10 For Defendant            CONDON & FORSYTH LLP
                              Page 2
```

Transpacific 3-28-08.txt

|    | Air New Zealand: | 1901 Avenue of the Stars, Suite 850 |
|----|------------------|--------------------------------------|
| 11 |                  | Los Angeles, California  90067 |
| 12 | BY: | SCOTT D. CUNNINGHAM, ESQUIRE |
| 13 | For Defendant Japan Airlines: | STEPTOE & JOHNSON, LLP<br>1330 Connecticut Avenue, N.W.<br>Washington, D.C.  20036-1795 |
| 14 | BY: | WILLIAM KARAS, ESQUIRE |
| 15<br>16 | For Defendant Malaysia Airlines: | MCBREEN & SENIOR<br>2029 Century Park East, Third Floor<br>Los Angeles, California  90067 |
|    | BY: | BENJAMIN D. WESTON, ESQUIRE |
| 17<br>18 | For Defendant Quantas Airways: | HANSON BRIDGETT LLP<br>425 Market Street, 26th Floor<br>San Francisco, California  94105 |
| 19 | BY: | CHRISTOPHER SANCHEZ, ESQUIRE |

20

21

22

23

24

25

⬚                                                                     4

1                    P R O C E E D I N G S

2 MARCH 28, 2008                         10:08 A.M.

3

4            THE CLERK:  Calling MDL 1913, Civil 07-5634,

5 Transpacific Passenger Air Transportation Antitrust Litigation.

6            Counsel, please step forward and state your

7 appearance.

8            MR. COTCHETT:  Joseph Cotchett, Cotchett, Pitre &

9 McCarthy, for one of the movants.

10           THE COURT:  Right.

11           MR. HAUSFELD:  Good morning, Your Honor.

12           Michael Hausfeld for plaintiff Diller.

13           THE COURT:  Okay.

14           MR. SIMON:  Good morning, Your Honor.

15           Bruce Simon on behalf of plaintiff Ajaye.

```
                        Transpacific 3-28-08.txt
16        MR. WESTERMAN:  Good morning, Your Honor.

17        Jeff Westerman of Milberg for plaintiff Turner.

18        MR. SHEANIN:  Good morning, Your Honor.

19        Aaron Sheanin from Girard Gibbs on behalf of

20 plaintiff Mark Foy.

21        MR. HOWARD:  Good morning, Your Honor.

22        Derek Howard, Murray & Howard, for plaintiff Maloof.

23        MR. STEYER:  Good morning, Your Honor.

24        Allan Steyer on behalf of plaintiffs Rachel Diller

25 and Trong Nguyen.                                        5
⬚

1         THE COURT:  Okay.

2         MR. KELLNER:  Good morning, Your Honor.

3         Richard Kellner, Kabateck, Brown, Kellner, on behalf

4 of various plaintiffs.

5         MS. PRITZKER:  Good morning, Your Honor.

6         Elizabeth Pritzker, Girard Gibbs, on behalf of a

7 plaintiff Mark Foy.

8         MR. CUNINGHAM:  Good morning, Your Honor.

9         Scott Cunningham of Condon & Forsyth in Los Angeles,

10 on behalf of defendant Air New Zealand.

11        MR. SCARPULLA:  Good morning, Your Honor.

12        Frances Scarpulla on behalf of the plaintiffs.

13        MR. KING:  Good morning, Your Honor.

14        Laurence King on behalf of plaintiffs Hut and

15 Gaffigan.

16        MR. PARTAIN:  Good morning, Your Honor.

17        Robert Partain on behalf of plaintiffs David Murphy

18 and David Ko.

19        MR. SAVERI:  Good morning, Your Honor.

20        Guido Saveri on behalf of various plaintiffs.

21        MR. ZIRPOLI:  Good morning, Your Honor.
                                Page 4
```

Transpacific 3-28-08.txt

22          Cadio Zirpoli on behalf of plaintiff Schelly.

23          Good morning, Your Honor.

24          MR. KARAS:  William Karas on behalf of Japan

25 Airlines.  Steptoe & Johnson.                                    6

1           MR. GROSS:  Good morning, Your Honor.

2           Terry Gross on behalf of plaintiff Moy.

3           MR. WESTON:  Good morning, Your Honor.

4           Ben Weston, McBreen & Senior, on behalf of Malaysia

5 Airlines.

6           MR. SANCHEZ:  Good morning, Your Honor.

7           Christopher Sanchez on behalf of defendant Quantas

8 Airways.

9           MR. MARKHAM:  Good morning, Your Honor.

10          Jesse Markham on behalf of Nippon Airways.

11          THE COURT:  Good morning.

12          So we have here this morning two competing requests

13 for appointment of what we call interim counsel.

14          Has the class been certified?  I don't know.

15          MR. COTCHETT:  Interim counsel.

16          MR. HAUSFELD:  Interim counsel.

17          THE COURT:  Interim counsel, right.

18          Mr. Cotchett, I understand that you're not going to

19 be -- I'm not going to have the pleasure of your company again.

20          MR. COTCHETT:  Yes, you are.

21          THE COURT:  I am?

22          MR. COTCHETT:  I have worked that out, Your Honor.

23          THE COURT:  Great.

24          MR. COTCHETT:  I got the message loud and clear.

25          THE COURT:  Well, I didn't want to deny myself.  As   7

Page 5

Transpacific 3-28-08.txt

1 Judge Walker says, you know, when you can get a certain quality
2 of lawyer in front of you to hear the case, you should never
3 grant summary judgment.  I think he meant that facetiously.
4 But I'm delighted.
5         Actually, Mr. Cotchett, I understood that you did
6 have a conflict, and I was simply going to say, I'm sorry, I'm
7 going to miss your services, because you have perfectly capable
8 standby counsel.  Who is very good, by the way.  But,
9 obviously, that's something you have to work out.
10        Well, that's on another matter.  This matter, there
11 are two competing applications.  And I understand that one of
12 the applicants takes the position that this is like a ship; you
13 need a single captain.  But, by the way, like any ship, you
14 need a good crew.  And that the various law firms and so forth
15 would be included in the steering committee.  And that's
16 essentially Cotchett, Pitre and McCarthy's position.
17        With Mr. Hausfeld, he takes the position, I think,
18 that it ought to be co-lead counsel; that this case is not
19 dissimilar enough from the case that was previously resolved or
20 almost resolved, the one that we called first, actually; that
21 the law firms work very well together; and that, certainly, he
22 brings to the table a degree of expertise and familiarity with
23 it, and certain other, quote, assets that would be of great
24 benefit to the class; and that he's willing to work with
25 Mr. Cotchett and his firm.

                                                          8

1        So that's what the Court has to decide.  And I guess
2 I would say -- I mean, I have the papers in front of me.  Does
3 anybody want to add anything to it?  I've looked at the papers.
4 I've looked at the supporting papers.
5        I don't think the defendants have anything to say
6 about it.  At least I generally don't listen to them.  And if

Transpacific 3-28-08.txt

7 anybody wants to add anything, this is a time to do it.

8          Mr. Cotchett.

9          MR. COTCHETT:  Thank you, very much.  I'll be very

10 brief.

11          First, let me make it absolutely clear for the record

12 I have nothing but the highest regard for the Cohen Milstein

13 firm, especially Mr. Hausfeld and his associates.  So that

14 we're absolutely clear, we would welcome working with him.

15          We think this is a little unique though.  Unlike the

16 case you just had before you, the International Air Passenger,

17 this involves many, many moving parts.

18          In my experience -- and I think Mr. Hausfeld will

19 verify this when he speaks -- in a case of this nature you need

20 one person or one firm that is going to call the various

21 different movements of the moving parts.  Again, I would hope

22 that Mr. Hausfeld's firm would be, if the Court so chooses to

23 elect a captain or pick a captain, would be part of that team.

24          As Your Honor knows, the previous case entailed no

25 depositions and a lot of hard work, but it entailed one route,

□                                                                    9

1 so to speak, back and forth between the East Coast and

2 Heathrow.

3          Unlike this case, it involves many routes all over

4 the Pacific.  It involves various different airlines.  We have

5 been in contact with all of the -- most of the defendants so

6 far.  We have put in place a placeholder complaint, as you

7 know.  You signed an order for us, allowing us to work through

8 the State Department and the Hague.

9          So we have gone down the road.  We know the positions

10 of the defendants.  We know as to certain defendants it is

11 going to be a battle royal.  We know the time and efforts it's

Page 7

Transpacific 3-28-08.txt

12 going to take and the coordination it's going to take.  Simply

13 put, we feel one firm should coordinate all of these efforts.

14         Having been in a number of these cases, I've been

15 co-counsel, I've been in a case where we've been had four

16 co-leads.  To be brutally candid with you, I don't think it

17 works out as well as having one captain, that is to say, one

18 person directing the coordination.

19         I won't belabor it because it's all in the papers.

20 Whatever choice you make I know is going to be representative

21 of that great seal up there, and what justice flows from this

22 extraordinary courtroom.

23         THE COURT:  You ought to tell that to the Ninth

24 Circuit.

25         Do you want to be heard?

0                                                              10

1         MR. HAUSFELD:  Good morning, Your Honor.  Michael

2 Hausfeld for the plaintiff Diller.

3         There is an adage that many times two heads are

4 better than one.  What I don't seem to understand and I haven't

5 heard explained, as Your Honor kind of started this morning, is

6 a good reason why a case that is more complicated and more

7 complex needs less heads than one that was less complex.

8         There are a series of these litigations, not just

9 involving the air routes between the United States and the

10 United Kingdom, but air carriage with regard to air cargo that

11 involved over two dozen defendants.  And there, there wasn't a

12 single head appointed but, rather, a co-leadership that could

13 address all of the moving parts most sensibly.

14         THE COURT:  If you were appointed sole counsel, is it

15 your view that you could handle this?

16         MR. HAUSFELD:  Yes.  But I would, given, I guess, my

17 history, prefer working along with someone of stature that

Page 8

Transpacific 3-28-08.txt

18 would assist as an equal.

19        THE COURT:  Okay.  Mr. Cotchett, think about this
20 carefully.  If I take your logic, if I accept it, and then I
21 decide to appoint Mr. Hausfeld, is that an appropriate result?

22        MR. COTCHETT:  Yes.

23        THE COURT:  Okay.  Well, I have given it thought.
24 And I think I would say two things.  Number one, I'm going to
25 appoint co-counsel.

                                                              11

1        It's my view that Mr. Hausfeld has the better of the
2 two arguments.  However, I do think that I want to acknowledge
3 the fact that you did take a principal position.  And I was
4 going to call your bluff, but I understand what you're saying.
5 I do think, though, that two heads are better than one.  This
6 is a more complicated case than the other.  I accept that.

7        I think that you have worked, from what I see -- I'm
8 not there, but from what I've seen you've worked very well in
9 the past.  And, actually, you were quite generous in your
10 comments the last time we met, about the role that Mr. Hausfeld
11 played in this.  Of course, that was all over off the record.
12 I don't think I had a court reporter there.

13        MR. COTCHETT:  I hope it was on the record because
14 that's exactly how I felt.

15        THE COURT:  No, I appreciate that.  I mean, the fact
16 of the matter is, this is a serious case, as all counsel have
17 recognized.  I think it can benefit, the class can benefit from
18 two individuals working on it.

19        And so while the logic of your position may have been
20 that I should -- that the mistake I would make in appointing
21 Mr. Hausfeld would be more than balanced by the fact that it
22 would be a single captain of the ship, I appreciate that.  But

                                Page 9

Transpacific 3-28-08.txt

23 on the other hand, I actually think that both firms can share

24 this work.

25          I've been very impressed with the work that's been
                                                                    12
0

1 done.  I've seen a small bit of it.  So my guess is that a lot

2 was done in connection with the resolution of that case that

3 perhaps given whatever the scenarios out there are ought to be

4 at least considered in following resolution.  I appreciate the

5 fact that it may very well -- we may very well end up here in a

6 trial, and I'm available for that.

7          As you know, I'll be here and, apparently, you will

8 as well, in May, for the Celebrex-Bextra case.  And sometimes

9 those cases have to go to trial for a variety of reasons.

10 Nevertheless, I do think that it makes sense to explore

11 settlement and settlement opportunities at an early stage in

12 the proceedings.

13          And so I'm glad we have all these defense lawyers

14 here.  I can simply tell them that my view is that it's never

15 an admission of weakness to sit down early in the case and see

16 whether or not it can be resolved.  That's entirely up to the

17 parties, but there's nothing wrong to explore those

18 possibilities perhaps through a mediator.  I'll leave that up

19 to you.

20          So I will issue an order today appointing the two

21 firms as co-interim lead counsel.

22          MR. HAUSFELD:  Thank you, Your Honor.

23          MR. COTCHETT:  Thank you very much, Your Honor.

24          THE COURT:  Is there anything else I have to do?

25 Hearing from the defense.
                                                                    13
0

1          MR. MARKHAM:  Your Honor, not on that issue.  My name

2 is Jessie Markham.  I represent All Nippon Airways.

                         Page 10

Transpacific 3-28-08.txt

3          Your Honor, I wonder if there would be an opportune

4 moment to handle just a minor housekeeping matter.

5          THE COURT:  Sure.

6          MR. MARKHAM:  Okay.  We have in the Northern District

7 a number of cases that have been filed that are essentially

8 identical to those that have been transferred here but

9 apparently without the benefit of notices of related cases.

10 And so those cases the calendars are moving along.  I believe

11 Judge Chesney has a case management conference coming up, and

12 we're prepared to file something with her to get that case sent

13 here.

14          THE COURT:  Well, did you file a notice of related

15 case?

16          MR. MARKHAM:  We haven't been served.

17          THE COURT:  I see.

18          MR. MARKHAM:  In addition, there are cases that were

19 filed in Los Angeles at or --

20          THE COURT:  Are you aware of those cases?

21          MR. MARKHAM:  Oh, sure.

22          THE COURT:  Well, then why don't you just simply

23 publish, but send -- I mean, you can send a notice of related

24 case.  I mean, or somebody should.  I don't want to -- let's

25 see.  You haven't been served.  I guess your concern is if you

⌂                                                              14

1 appear in the action --

2          MR. MARKHAM:  It may be something that lead counsel

3 can attend to.

4          THE COURT:  Well, what do you think about that,

5 Mr. Cotchett?  They may not know of all those cases; is that

6 right?  Is it brought by members of the plaintiffs' lawyers

7 here or some other lawyer out there who brought the action?

Page 11

Transpacific_3-28-08.txt

8        MR. COTCHETT:  I don't quite follow.

9        THE COURT:  Apparently, some other actions have been

10 filed.

11        MR. COTCHETT:  Yes.

12        THE COURT:  And no notice of related action has been

13 filed in connection.  When I get a notice of related case, I

14 think I would sign it.

15        MR. COTCHETT:  It's my understanding that all are

16 coming here.  I've had phone calls from people.  Some people

17 are unfamiliar with how to file the notice of related case.

18        They are all coming here.  I don't think it will be a

19 problem.

20        MR. MARKHAM:  Okay.  And related to that, Your Honor,

21 are cases that were filed in the Central District, that may not

22 have been captured in the JPML transfer order.

23        THE COURT:  Well, then that's something to address.

24 However, that's something you have to address with the MDL

25 panel.

                                                        15

1        MR. MARKHAM:  Okay.  And then, finally, I wonder if

2 we --

3        THE COURT:  And, by the way, a telephone call to

4 Robert Cane at the MDL office usually takes care of that.

5 Robert Palm.  Pardon me.

6        MR. MARKHAM:  Right.

7        I wonder if we could inquire as to the plaintiffs'

8 intention as to a consolidated amended complaint.  Because the

9 schedule that we set really ought to be built around that so

10 that we can anticipate when we should be responding to what

11 would be at least initially the controlling document.

12        THE COURT:  Okay.

13        MR. COTCHETT:  The answer is, we will be filing a

Page 12

Transpacific 3-28-08.txt

14 consolidated amended complaint.  Right, Mr. Hausfeld?

15          MR. HAUSFELD:  Yes.

16          MR. COTCHETT:  And, accordingly, we will sit with

17 counsel to work out a schedule to come back to you with.  We

18 were going to ask you for a CMC date this morning, but it's too

19 early.  We have all these Hague Convention problems.

20          As to the issues of what's coming here, I will hand

21 counsel -- I'm sure you've seen this -- the transfer order.

22 And the way I read it, everything comes to Your Honor.

23          MR. MARKHAM:  Thank you, Your Honor.

24          THE COURT:  Okay.  So do we have the mechanics down?

25 You'll certainly give Mr. Cotchett or Mr. Hausfeld a call and

☐                                                              16

1 they'll arrange it.

2          I just wanted everything to move on a single track.

3          MR. COTCHETT:  Absolutely.

4          MR. MARKHAM:  Exactly.

5          THE COURT:  Thank you very much.

6          (Counsel thank the Court.)

7          (At 10:26 a.m. the proceedings were adjourned.)

8                          -   -   -   -

9

10

11

12

13

14

15

16

17

18

Page 13

Transpacific 3-28-08.txt

19

20

21

22

23

24

25
☐                                                                        17

1

2                    CERTIFICATE OF REPORTER

3         I, KATHERINE A. POWELL, Official Reporter for the

4   United States Court, Northern District of California, hereby

5   certify that the foregoing proceedings in C 07-5634 CRB, MDL

6   1793, In re Transpacific Passenger Air Transportation Antitrust

7   Litigation were reported by me, a certified shorthand reporter,

8   and were thereafter transcribed under my direction into

9   typewriting; that the foregoing is a full, complete and true

10  record of said proceedings as bound by me at the time of

11  filing.

12        The validity of the reporter's certification of said

13  transcript may be void upon disassembly and/or removal

14  from the court file.

15

16        _____

17        Katherine A. Powell, CSR 5812, RPR, CRR

18                  Tuesday, April 8, 2008

19

20

21

22

23

24

Page 14

Transpacific 3-28-08.txt

25

# EXHIBIT L

# KING & SPALDING

King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006-4706
www.kslaw.com

Kevin R. Sullivan
(202) 626-2624

July 9, 2008

**VIA HAND DELIVERY**

The Honorable Victor Marrero
United States District Court Judge
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Suite 660
New York, New York 10007

> Re:   Hinds County, Mississippi v. Wachovia Bank N.A., et al.
> S.D.N.Y. Case No. 08-2516 (VM)

Dear Judge Marrero:

We represent defendant Bank of America, N.A. ("Bank of America") in the above-referenced consolidated action. We write in connection with the July 2, 2008 motion of plaintiff Haywood County, Tennessee for the appointment of Pomerantz Haudek Block Grossman & Gross LLP as interim lead counsel in this matter.

While Bank of America is not taking and will not take any position on how the plaintiffs' leadership should be organized, Haywood County's filing regarding the appointment of interim lead counsel was surprising for several reasons:

*First*, it was filed even before the parties were able to agree upon and submit a joint status letter on July 3, 2008 pursuant to Your Honor's Individual Practices. Bank of America is not aware of any discussion that Haywood County would be filing such a motion when it did even though the joint status letter had been the subject of extensive negotiations among the parties.

*Second*, the status letter (that again was the product of negotiations among numerous counsel, including counsel for Haywood County) reflects only that before the parties appear for the July 11, 2008 Case Management Conference, plaintiffs' counsel "expect to submit . . . an agreed-upon proposal for a leadership structure pursuant to

Honorable Victor Marrero
July 9, 2008
Page 2

Federal Rule of Civil Procedure 23(g) or a briefing schedule." The letter makes no mention of Haywood County's intention to file such a motion.

*Third*, at the time that counsel for Haywood County filed its motion, at least three separate actions remained to be transferred to this Court for consolidation: *City of Oakland, California v. AIG Financial Products Corp., et al.*, N.D. Cal. 08-2116; *Central Bucks School Dist. v. Bank of America, N.A.*, D.D.C. 08-955; and *Central Bucks School Dist. v. Wachovia Bank N.A.*, D.D.C. 08-956. These actions are all subject to a June 25, 2008 Conditional Transfer Order by the United States Judicial Panel on Multidistrict Litigation. Further in this regard, in the last two days alone, Bank of America has learned of at least three more actions filed or about to be filed in connection with the municipal derivatives industry—two in the Southern District of New York by the City of Baltimore and a third in the Northern District of California by Alameda County, California.

*Fourth*, in support of its motion Haywood County offers that the "actions . . . by some of the plaintiffs' counsel," in particular, at least as named by Haywood County, Cohen, Milstein, Hausfeld & Toll, P.L.L.C.; Boies Schiller & Flexner LLP; and Susman & Godfrey LLP, are somehow improper or raise "justifiable suspicions" regarding unidentified counsel's "motivations" in connection with early settlement negotiations with Bank of America, and perhaps others. In light of the importance of the apparent position taken by Haywood County, Bank of America respectfully reserves the right to brief this issue more fully. In the event, however, that Haywood County's filing is to become an issue to be addressed at the July 11 conference, Bank of America submits that any assertion that the cooperation to date is somehow inappropriate or "suspicious" runs directly contrary not only to the obligations required by the United States Department of Justice of conditional applicants under the Department's Corporate Leniency Policy (*see* http://www.usdoj.gov/atr/public/guidelines/0091.pdf) and the cooperation contemplated in Section 213(b) of the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA"), but also to Bank of America's approach to resolving this matter. Early resolution of complex litigation, particularly of the type involved in this multi-district litigation, is an appropriate and even desired effort to conserve judicial resources. It also meets with Bank of America's commitment to appropriate restitution. While there is no settlement and no assurance that a settlement agreement can be reached, the efforts are nonetheless proper. Haywood County is currently not in a position to comment on the motives of any party to those negotiations, and as such, should not be permitted to use those efforts as a part of a ploy to seek a preferred position in this litigation.

We thank the Court in advance for its attention to this matter.

Respectfully submitted,

Kevin R. Sullivan

cc:    counsel of record (via e-mail)

# EXHIBIT M

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MUNICIPAL DERIVATIVES ANTITRUST LITIGATION | MDL No. 1950 |
| | Master Docket No. 08-02516 (VM) (JCF) |
| THIS DOCUMENT RELATES TO: | **[PROPOSED] ORDER REGARDING APPOINTMENT OF INTERIM CLASS COUNSEL** |
| ALL ACTIONS | |

Pursuant to Federal Rule of Civil Procedure 23(g)(3), the Court hereby designates Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("Cohen Milstein"), Boies, Schiller & Flexner LLP ("Boies Schiller") and Susman Godfrey, LLP ("Susman") as co-lead interim class counsel for the proposed class.

The Court finds that designation of Cohen Milstein, Boies Schiller, and Susman as co-lead interim class counsel is in the best interests of the proposed class because they:

(1)  have the overwhelming support of plaintiffs and firms filing cases in this action;

(2)  have conducted significant independent investigations into the potential claims in this action;

(3)  have extensive relevant experience in complex antitrust litigation and knowledge of the law applicable to this action; and

(4)  are willing to commit the resources necessary to representing the class.

389891.1 1

## II.    Duties of Interim Class Counsel

Lead interim class counsel, working together in a coordinated fashion, shall be responsible for the overall conduct of the litigation on behalf of the plaintiffs, including the following:

a.    Supervise all pretrial, trial, and post-trial proceedings on behalf of plaintiffs;

b.    Sign any pleadings, motions, briefs, discovery requests or objections, subpoenas, or notices on behalf of plaintiffs;

c.    Determine and present in motions, briefs, oral argument, or such other fashion as may be appropriate, the position of all of the plaintiffs as to all matters arising during pretrial and trial proceedings;

d.    Designate attorneys to act as spokespersons at pretrial conferences and meetings with defendants;

e.    Negotiate and enter stipulations with defense counsel with respect to all matters in this litigation, including discovery and settlement matters;

f.    Conduct or coordinate discovery on behalf of plaintiffs, including the preparation of interrogatories, requests for production of documents, requests for admissions, and the examination of witnesses in depositions;

g.    Coordinate the activities of plaintiffs' counsel and implement procedures to ensure that schedules are met and unnecessary expenditures of time and funds are avoided;

h.    Collect time and expense reports from plaintiffs' counsel on a periodic basis;

i.      Employ and consult with experts;

j.      Convene meetings of plaintiffs' counsel;

k.      Delegate tasks to counsel for plaintiffs and otherwise coordinate the work of all plaintiffs' counsel, and perform such other duties as the lead interim class counsel deem necessary;

l.      Allocate fees, if any are awarded by the Court;

m.     Ensure that all plaintiffs' counsel are kept informed of the progress of this litigation as necessary; and

n.      Appoint firms, if deemed necessary or advisable by interim lead counsel, to serve on an Executive Committee of counsel, under the direction of interim class counsel, to assist interim class counsel in the fulfillment of the aforementioned responsibilities.

It is **SO ORDERED**:

Dated: _____, 2008

_____
Victor Marrero
United States District Judge

389891.1 1

# EXHIBIT N

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: CHOCOLATE | : | MDL DOCKET NO. 1935 |
| CONFECTIONARY ANTITRUST | : | (Civil Action No. 1:08-MDL-1935) |
| LITIGATION | : | |
| ———————————— | : | |
| | : | (Judge Conner) |
| THIS DOCUMENT APPLIES TO: | : | |
| | : | |
| ALL CASES | : | |

## MEMORANDUM OF LAW IN SUPPORT OF MAJORITY PLAINTIFFS' MOTION TO CONSOLIDATE ACTIONS AND FOR APPOINTMENT OF INTERIM DIRECT PURCHASER CLASS CO-LEAD AND LIAISON AND LOCAL COUNSEL

1348811.1

## **TABLE OF CONTENTS**

I.    PROCEDURAL BACKGROUND.................................. 5

II.   ARGUMENT......................................................6

    A.    Consolidation Will Promote Efficiency and
        Judicial Economy............................................... 6

    B.    Appointment of Interim Co-Lead Class Counsel
        Will Promote Efficiency.......................................8

        1.    Proposed Interim Direct Purchaser
                Co-Lead Counsel Have Already Taken
                Steps to Advance the Litigation on
                Behalf of the Proposed Class................... 9

        2.    Proposed Interim Lead Counsel
                Represent a Clear Majority of Direct
                Purchaser Class Plaintiffs' Counsel........... 12

        3.    Proposed Interim Direct Purchaser
                Co-Lead and Liaison Counsel Have
                The Experience, Knowledge, Resources
                And Other Qualifications Necessary
                to Serve as Co-Lead Counsel for the
                Proposed Class................................... 14

III.  CONCLUSION.......................................................23

## TABLE OF AUTHORITIES

### Cases

*Coleman v. General Motors Acceptance Corp.*, 220 F.R.D. 64 (M.D. Tenn. 2004) ...................... 8

*Dittimus-Bey v. Taylor*, 244 F.R.D. 284 (D.N.J. 2007) ................................................. 14

*Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137, 142 (N.D. Cal. 2004) ..................................... 20

*In re Intel Corp. Microprocessor Antitrust Litig.*, MDL No. 05-1717, Slip. Op.
(D. Del. April 18, 2006) ................................................................................ 12

*In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996) ...................... 14

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2008 WL 1883447, *2 (D.D.C. April 28, 2008) ................................................................................................... 13

*In re Sunbeam Sec. Litig.*, 1998 WL 1990884 (S.D. Fla. Dec. 4, 1998) ........................................ 7

*In re TMI Litig.*, 193 F.3d 613 (3rd Cir. 1999) ......................................................... 7

*United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966) ................................................ 6

### Rules

Federal Rule of Civil Procedure 42(a) .......................................................... 1, 6, 7

Federal Rule of Civil Procedure 23(g) .......................................................... 1, 8, 9

### Statutes

Sherman Act, 15 U.S.C. § 1 ..................................................................... 1, 6, 25

### Other Authorities

*Federal Practice & Procedure* § 2384 (2d ed. 1995) ................................................. 7

*Manual for Complex Litigation* (4th ed. 2004) ......................................... 7, 9, 11, 12, 24

*Third Circuit Task Force Report: Selection of Class Counsel*, 208 F.R.D. 340 (2002) ............... 12

1348811.1

## MEMORANDUM OF LAW IN SUPPORT OF MAJORITY PLAINTIFFS' MOTION TO CONSOLIDATE ACTIONS AND FOR APPOINTMENT OF INTERIM DIRECT PURCHASER CLASS CO-LEAD AND LIAISON AND LOCAL COUNSEL

On behalf of the majority of direct purchaser class plaintiffs, the undersigned counsel collectively move this Court pursuant to Rules 23(g)(3) and 42(a) of the Federal Rules of Civil Procedure and Case Management Order No. 4, for: (a) the consolidation of the related direct purchaser class actions alleging price-fixing of chocolate under the Sherman Act, 15 U.S.C. §1, that were filed in this Court or have been and/or will be docketed in this Court after being sent from their transferor jurisdictions pursuant to the Transfer Order issued by the United States Judicial Panel on Multidistrict Litigation ("MDL Panel") on April 7, 2008 (the "Transfer Order") (*see In re Chocolate Antitrust Litigation*, MDL Docket No. 1935 (J.P.M.L.), and (b) for appointment of Labaton Sucharow LLP ("Labaton Sucharow"); Preti, Flaherty, Beliveau & Pachios, LLP ("Preti Flaherty"); Cohen, Milstein, Hausfeld & Toll, PLLC ("Cohen Milstein"); and Kirby McInerney LLP ("Kirby McInerney") as Interim Co-Lead Counsel for the Proposed Class of direct purchasers ("Proposed Interim Co-Lead Counsel" or "Proposed Leadership Group"), and Obermayer, Rebmann, Maxwell & Hippel, LLP ("Obermayer

1325009.8

Rebmann") as Interim Liaison and Local Counsel.[1] The proposed structure would ensure that this antitrust action against several large, well-financed corporate Defendants will be directed by able, well-capitalized, and experienced counsel with the demonstrated capacity to efficiently organize, prosecute, and finance large-scale, complex litigation such as this multi-district proceeding.

All of the direct purchasers class plaintiffs share similar interests in prosecuting this case. At a meeting on April 14, 2008, to which all counsel representing direct purchaser class plaintiffs were invited, the undersigned counsel reached an agreement to support the Proposed Interim Co-Lead Counsel. Thereafter, the Proposed Leadership Group further endeavored to create consensus

---

[1] This majority represents class action plaintiffs in at least 50 of the 66 cases filed. The Plaintiffs represented by undersigned counsel are Jonathan Benjamin, Card & Party Mart II Ltd., CNS Confectionery Products LLC, Glenn Coffey t/d/b/a/ Candy Man, Comwest Industries Inc., D Controls Inc., Seth E. Ellis, P.A., International Wholesale, Inc., Marc and Jill Lavin, Eric Lense, Mandel Tobacco Co., Inc., Akisa Matsuda, NMJ Consultant Group, Inc., Original Fowler's Chocolate Co., Inc., Robert Philipson, Royal Enterprises Foundation, Stephen Snow, United Customs Distribution, United Wholesale, Valos House of Candy, VME Distributors, Inc., Weaver Nut Company, Webb's Candies, Inc., Winn Corporation, and Katherine Woodman. In addition, the leadership structure proposed in this Motion is supported by the following plaintiffs and their respective counsel: STLE Corporation; Diane Chiger; Dacia Lower, Carmen Pellitteri, Daphne Matalene, Daniel Klein, Thomas Rode, Adrianne Shienvold, Julia Isenhower, Autry Greer & Sons, Inc., Tanya O. Butts, T. Levy Associates trading as Beautyland, and Ellen Widom; Molly Wagman; Marcy Linder; Edward S. Hesano; Dean Solomon; Ben Lee Distributors, Inc.; Canteen Vending Company; Isabelle Dikland; Candy Jar, Inc; Pitco Foods; Long Leaf Vending Inc.; Cindy Elan-Mangano; Food Lion, Hannaford Bros. Co., Kash N' Karry Food Stores, Inc.; Karin Jacobs, Stephanos

2

among all direct purchaser class plaintiffs for the private ordering of leadership in

this action. To this end, they approached counsel then supported by the remaining

direct purchaser class plaintiffs on several occasions in order to discuss alternative

leadership structures. The Proposed Leadership Group suggested several

compromises that would have included a lead position for one of the firms

supported by some of the remaining minority of direct purchaser class plaintiffs

and their counsel as well as prominent organizational roles for other firms. Such

proposals were rejected summarily.

At the initial case management conference held with all counsel on May 29,

2008, this Court urged plaintiffs' counsel to reach an agreement as to a leadership

structure in the case and to "be creative" in that endeavor. Towards that end, and

in the spirit of cooperation and moving the litigation forward, the Proposed

Leadership Group again approached counsel supported by the remaining minority

number of direct purchaser plaintiffs with one final proposal. That proposal was

also summarily rejected.

Thus, in the interest of cooperation and inclusion, Proposed Interim Co-Lead

Counsel have reached out to those firms who have refused to accept the leadership

proposed by 75% of the Plaintiffs in the direct purchaser class actions. Despite

such efforts to accommodate these few attorneys by proposing lead or other

---

Sgouros, and Weis Markets, Inc.. A list of plaintiffs either making and/or

3

responsible positions within the leadership structure of these cases, the Proposed Leadership Group's efforts to develop complete consensus have been rejected outright or ignored, thus necessitating the submission of the leadership question to the Court for resolution or further direction.

Having failed to reach agreement, Labaton Sucharow, Preti Flaherty, Cohen Milstein, and Kirby McInerney now respectfully move for consolidation of the direct purchaser plaintiffs and for appointment as Interim Co-Lead Counsel for the direct purchaser class actions.

As Interim Co-Lead Counsel for the direct purchaser class actions, the Proposed Leadership Group would have the following responsibilities: (a) to brief and argue motions and file opposing briefs in proceedings initiated by other parties; (b) to initiate and conduct discovery proceedings; (c) to act as spokesperson at pretrial conferences; (d) to negotiate with defense counsel with respect to settlement and other matters; (e) to call meetings of plaintiffs' counsel when appropriate; (f) to make all work assignments to plaintiffs' counsel to facilitate the orderly and efficient prosecution of this litigation and to avoid duplicative or unproductive effort; (g) to conduct trial and post-trial proceedings; (h) to consult with and employ experts; (i) to coordinate the filing of any joint fee petition by plaintiffs' counsel; (j) to perform such other duties and undertake such

_____

supporting this Motion and their counsel is attached as Exhibit A hereto.

4

other responsibilities as they deem necessary or desirable; and (k) to coordinate and communicate with defendants' counsel with respect to the above matters.

Proposed Interim Liaison and Local Counsel, Obermayer Rebmann would be responsible for receiving and, as appropriate, distributing to Proposed Interim Co-Lead Counsel orders from the Court and documents from counsel for the indirect purchasers, individual plaintiffs, and defendants, and otherwise facilitating and expediting communications among Proposed Interim Co-Lead Counsel, the other parties, and the Court.

## I.    PROCEDURAL BACKGROUND

In its Transfer Order, the MDL Panel ordered that 20 chocolate direct purchaser antitrust class actions be transferred to this Court for coordinated or consolidated pretrial proceedings. The 20 actions listed in Schedule A of the Transfer Order, together with approximately 57 tag-along actions and other related cases that have been or may subsequently be filed, are referred to herein as the "Class Actions." Since the date of the Transfer Order, certain actions have been docketed in this Court after having been sent here from their transferor jurisdictions. To date, the Court has issued several Case Management Orders and the initial case management conference was held on May 29, 2008.

1325009.8

## II.    ARGUMENT

Each of the Class Actions asserts that the Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1. The direct purchaser Plaintiffs seek damages and injunctive relief on behalf of themselves and a proposed Plaintiff Class. In the interest of judicial economy, these related actions should be consolidated for coordinated proceedings before this Court, and Labaton Sucharow, Preti Flaherty, Cohen Milstein, and Kirby McInerney should be appointed Interim Co-Lead Counsel for the proposed direct purchaser class in these consolidated proceedings, and Obermayer Rebmann designated Interim Liaison Counsel. This Motion is supported by an overwhelming majority[2] of Plaintiffs in this MDL litigation, including six of the seven direct purchaser class actions originally filed in the Middle District of Pennsylvania.

### A.    Consolidation Will Promote Efficiency and Judicial Economy

Federal Rule of Civil Procedure 42(a) provides that [I]f actions before the court involve a common question of law or fact, the court may: "(1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed R. Civ. P. 42(a). Consolidation of related actions is favored. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 724 & n.10 (1966) ("Under the Rules, the impulse

6

is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged."); *In re Sunbeam Sec. Litig.,* 1998 WL 1990884 at *2 (S.D. Fla. Dec. 4, 1998) (stating that "[c]onsolidation of related complex action . . . is commonplace and an effective use of judicial resources."); *see also Manual for Complex Litigation* § 10.123, 13-14 (4th ed. 2004) ("*Manual*").

Consolidation under Rule 42(a) is appropriate where, as here, the defendants are essentially the same.  9 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2384 (2d ed. 1995) ("Actions involving the same parties are apt candidates for consolidation.").

Consolidation and coordination of the Class Actions for all purposes is also appropriate because the factual questions and legal issues presented by these actions — the existence and effect of a price-fixing conspiracy on the sale of chocolate products — are the same.  *See In re TMI Litig.*, 193 F.3d 613, 724 (3rd Cir. 1999) ("The purpose of consolidation is to streamline and economize pretrial proceedings so as to avoid duplication of effort, and to prevent conflicting outcomes in cases involving similar legal and factual issues.").  Furthermore, because all the direct purchaser class cases are related complex class actions that have been transferred to this court by the MDL Panel for pretrial proceedings,

---

[2] Indeed, lawyers representing Plaintiffs in 75% [50 of 67] of these direct purchaser

7

judicial economy is well-served by consolidating and coordinating them into a single, unified proceeding that avoids the inefficiencies and confusion attending the parallel administration of multiple identical cases. *See id.* This process will be further facilitated by the early appointment of Interim Co-Lead Counsel.

**B.    Appointment of Interim Co-Lead Class Counsel Will Promote Efficiency**

"[T]he primary responsibility of class counsel, resulting from appointment as such, is to represent the best interests of the class." *Coleman v. General Motors Acceptance Corp.*, 220 F.R.D. 64, 100 (M.D. Tenn. 2004). The Federal Rules of Civil Procedure recognize the importance of an early appointment of counsel to act on behalf of a putative class. Rule 23(g)(3) expressly grants the court the power to appoint interim co-lead counsel before determining whether to certify the action as a class action.

Rule 23(g)(3) sets out those factors that must be considered in connection with the appointment of class counsel. In appointing class counsel, the court must consider:

- the work counsel has done in identifying or investigating potential claims in the action,

- counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action,

- counsel's knowledge of the applicable law, and

---

Class Actions support the structure proposed herein.

- the resources counsel will commit to representing the class .
. .

F.R.Civ.P. 23(g)(1)(A).  These factors support the appointment of the Proposed

Leadership Group as Interim Co-Lead Counsel for the proposed class.

> **1.      Proposed Interim Direct Purchaser Co-Lead Counsel Have
> Already Taken Steps to Advance the Litigation on Behalf of
> the Proposed Class**

The Proposed Leadership Group has coordinated the efforts of numerous

cooperating Plaintiffs' counsel in this litigation to get this litigation up and

running.  The firms have conducted a factual investigation of the alleged price-

fixing conspiracy, including the acquisition of evidentiary materials filed by the

Canadian Competition Bureau relating to its investigation of chocolate price-fixing

by many of the same Defendants named in the Class Actions, and of relevant

information from a potential witness in this case.  Proposed Interim Direct

Purchaser Co-Lead Counsel have engaged a former FBI Special Agent investigator

and have retained economic consultants who have been working in this matter.

The Proposed Leadership Group has agreed among themselves to coordinate tasks

and share the costs expected to be incurred in prosecuting this litigation.  To this

end, the firms have set up a litigation fund to cover such costs.  "In some cases the

attorneys coordinate their activities without the court's assistance, and such efforts

should be encouraged." *Manual* § 10.22.

1325009.8

Proposed Interim Direct Purchaser Co-Lead Counsel have also undertaken international service of process under the Hague Convention on non-U.S. Defendants and domestic service of process on Defendants in the United States. The interests of the Proposed Class have been well served by the prompt efforts of Proposed Interim Direct Purchaser Co-Lead Counsel to bring all Defendants before this Court. Preti Flaherty was the first to request that the MDL Panel transfer these related cases to this Court for pre-trial proceedings, and presented the argument on behalf of direct purchasers who filed in this District before the Judicial Panel on Multidistrict Litigation. Proposed Interim Direct Purchaser Co-Lead Counsel also initiated efforts to coordinate the direct purchaser litigation with the indirect purchaser and individual plaintiffs litigations pending in this District, in the interest of judicial economy and streamlining the litigation.

Further, Proposed Interim Direct Purchaser Co-Lead Counsel initiated the preparation of a Proposed Joint Case Management Plan and Agenda for submission to the Court by Plaintiffs and Defendants in accordance with Case Management Order No. 3. In this regard, the Proposed Leadership Group coordinated this effort both with counsel for Defendants, counsel for the Indirect Purchaser Class Plaintiffs, and counsel for the individual plaintiffs in order to narrow as much as possible the different approaches in the case management plans proposed by all parties and to ensure that all parties have had an opportunity to contribute to these

10

submissions. These efforts have enabled the parties to establish lines of communication that will promote the resolution of future disputes and other issues without the intervention of the Court.

Similarly, Proposed Interim Direct Purchaser Co-Lead Counsel initiated the preparation of the Pre-Conference brief which was submitted by all Plaintiffs in accordance with Case Management Order No. 3. Thus, the Proposed Leadership Group has already developed close working relationships with counsel for the indirect purchaser class plaintiffs and the individual plaintiffs. These relationships will prove important in the future as counsel for all Plaintiffs work to coordinate matters such as discovery.

Finally, Proposed Interim Co-Lead Counsel have collaborated to reach agreement on an organizational structure that will maximize the resources available to support the direct purchaser Plaintiffs and the Proposed Class in this litigation. "In deciding on appointment [of counsel], courts in class actions have traditionally exercised case-by-case discretion, often relying on competing counsel to work out an arrangement, also known as private ordering." *Third Circuit Task Force Report: Selection of Class Counsel*, 208 F.R.D. 340, 356 (2002); *see also Manual* § 21.271, 21.272.

1325009.8

### 2.    Proposed Interim Lead Counsel Represent a Clear Majority of Direct Purchaser Class Plaintiffs' Counsel

In selecting lead counsel, courts commonly give weight to plaintiffs' counsel's approach of self-selection. *See, e.g., In re Intel Corp. Microprocessor Antitrust Litig.*, MDL No. 05-1717, Slip Op. (D. Del. April 18, 2006) ("The most common approach to the selection of class counsel is private ordering, in which plaintiffs' counsel agree on which of them should serve as class counsel.") (citation omitted); *Manual*, § 21.272 (2004) ("By far the most common [method for selecting among competing applicants] is the so-called 'private ordering' approach: The lawyers agree who should be lead class counsel and the court approves the selection after a review to ensure that the counsel selected is adequate to represent the class interests."). This is particularly important in the instant case where the Proposed Leadership Group is supported by an overwhelming majority of the direct purchaser class plaintiffs and their counsel and can thus ensure that they vigorously represent the interests of all such plaintiffs. The appointment of other interim direct purchaser class lead counsel may jeopardize this private ordering and undermine the undersigned firms' cooperative efforts which have already been undertaken to collectively represent their clients' interests.

Here, the proposed leadership structure was formed by consensus following a meeting of counsel representing plaintiffs in over 50 direct purchaser class cases on April 14, 2008. Firms supporting this application include many of the nation's

12

1325009.8

other leading antitrust class action counsel. In an effort to build consensus, these firms have decided to support the proposed appointment of the Proposed Leadership Group rather than seek their own appointment as interim class counsel, although many supporting firms have themselves served in leadership positions in major antitrust litigation. The collective judgment of these counsel is entitled to serious consideration, and their decision to support the Proposed Leadership Group is a reflection of their considered judgment that the interests of the litigation and the class would best be served by doing so. In contrast, appointing as lead counsel a firm or firms that are supported by only a small minority of plaintiffs and their counsel would discourage the very efforts to compromise and build consensus that are central to private ordering. If such firms—who rejected repeated efforts to develop a fair and inclusive leadership structure supported by *all* plaintiffs—are appointed as interim counsel here, the Court will be, in effect, rewarding them for their recalcitrance. Such a result would unfairly penalize the many fine firms that supported the majority plaintiffs proposed structure, and would diminish the incentive for counsel in future cases to cooperate in the development of leadership structures.

Accordingly, the Court should give cognizance to this consensus. *See, e.g., In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2008 WL 1883447, *2 (D.D.C. April 28, 2008) (establishing leadership structure supported by majority of

1325009.8

plaintiffs while rejecting argument that court should only defer to private ordering when there is complete unanimity among counsel).  In sum, Proposed Interim Co-Lead Class Counsel have joined together in the interests of the direct purchaser Plaintiffs and the Proposed Class to promote the efficient and expeditious prosecution of this complex antitrust litigation.

>    3.    **Proposed Interim Direct Purchaser Co-Lead and Liaison Counsel Have the Experience, Knowledge, Resources and Other Qualifications Necessary to Serve as Co-Lead Counsel for the Proposed Class**

As courts evaluating Rule 23's adequacy of representation requirement at class certification have repeatedly held, a class is fairly and adequately represented where counsel are qualified, experienced, and generally able to conduct the litigation on its behalf.  *See Dittimus-Bey v. Taylor*, 244 F.R.D. 284 (D.N.J. 2007).  Where proposed class counsel "include some of the most experienced lawyers in the United States in the prosecution of antitrust . . . class actions" and demonstrate that they are "ready, willing and able to devote the resources necessary to litigate this case vigorously," the adequacy requirement is met.  *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 515 (S.D.N.Y. 1996).

As set forth in the firm resumes attached hereto as Exhibits B, C, D, E and F, Proposed Interim Direct Purchaser Co-Lead Class Counsel are among the most experienced attorneys in the country in the prosecution of complex antitrust class actions.  They have repeatedly served as lead counsel in such cases and would be

14

able to draw upon their experience and resources to effectively represent Plaintiffs
and the Proposed Class in this litigation. These firms have worked together in
other complex cases and have demonstrated their ability to work cooperatively
with each other and with Plaintiffs' counsel. Moreover, they have associated
themselves with Walter Cohen, Esq. of Obermayer Rebmann, a highly respected
Harrisburg attorney to act as liaison and local counsel for the direct purchaser class
action plaintiffs.

*Labaton Sucharow*, which represents the Plaintiffs who filed the first
chocolate direct purchaser antitrust class action complaint in the United States, is a
leading antitrust class action firm with an established track record in the
prosecution of complex antitrust class actions. The firm is comprised of over 60
attorneys, including some of the most experienced attorneys in the country, and it
has repeatedly served as lead counsel in major antitrust cases. *See* Labaton Firm
Resume (attached hereto as Exhibit B). Labaton Sucharow's Antitrust Practice
Group has vigorously litigated and settled numerous class actions. *See, e.g., In re
Natural Gas Commodity Litig.*, C.A. No. 1:03-cv-06186 (VM) (S.D.N.Y.)
(Labaton Sucharow as Co-Lead Counsel obtained a total of $101 million in
settlements in 2007 on behalf of a class of NYMEX natural gas futures traders
injured by defendant energy companies' alleged manipulation of published price
indices, the second-largest class action commodities manipulation recovery on

1325009.8

record); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002),

*aff'd*, 391 F.3d 516 (3d Cir. 2004) ($44.5 million settlement); *In re Stock Exchange

Options Trading Antitrust Litig.*, 99 CIV. 0962, MDL No. 1283, Master Docket

No. M-21-79 (RCC) (S.D.N.Y.) ($47 million); *In re Lorazepam & Clorazepate

Antitrust Litig.*, 2003 U.S. Dist. LEXIS 12344 (D.D.C. June 16, 2003)($135.4

million settlement); *In re Buspirone Antitrust Litig.*, MDL No. 1412

(S.D.N.Y.)($90 million settlement); and  *In re Air Cargo Services Antitrust

Ligitation*, MDL No. 1775 (E.D.N.Y.) ($85 partial million settlement preliminarily

approved).

In addition, Labaton Sucharow recently was selected by *The National Law

Journal* for the second year in a row as one of the country's leading plaintiffs'

class action firms.  *See* Exhibit F attached hereto.  It has been recognized for the

quality of its legal work on many occasions, including by Judge Koeltl in *In Re

Buspirone Antitrust Litigation*:  "Let me say that the lawyers in this case have done

a stupendous job.  They really have."  MDL No. 1413; C.A. No. 1:01-md-01413

(JGK) (S.D.N.Y.) (approving $90 million settlement with Bristol-Myers Squibb).

Bernard Persky is the head of the Labaton Sucharow's Antitrust Practice

Group and will be leading the Labaton team working on this litigation.  For over

39 years his practice has involved complex business litigation and class actions,

primarily antitrust, trade regulation, securities fraud and civil RICO.  Among his

16

peers, he is recognized as a leading antitrust litigator. He has played a key role in

major antitrust class actions that have resulted in monetary recoveries to class

members, including consumers and businesses, of well over $1 billion.

In *County of Suffolk v. Long Island Lighting Company*, a case in which Mr.

Persky was Co-Lead Trial Counsel, the Second Circuit, in upholding a $400

million class settlement, quoted the trial judge, Honorable Jack B. Weinstein, as

stating "counsel [has] done a superb job [and] tried this case as well as I have ever

seen any case tried." Mr. Persky is a member of the Advisory Board of the

American Antitrust Institute and the Executive Committee of the Antitrust Section

of the New York State Bar Association.

Hollis L. Salzman is a partner in Labaton's Antitrust Practice Group and will

be actively involved in this litigation. She represents businesses and consumers in

prosecuting major antitrust class actions pending throughout the United States.

She is Co-Lead Counsel in: *In re Abbott Labs Norvir Antitrust Litigation* which is

set for trial in August 2008, *In re Air Cargo Shipping Services Antitrust Litigation*

and *In re Marine Hoses Antitrust Litigation*. Ms. Salzman is also a Co-Chair of the

New York State Bar Association, Commercial & Federal Litigation Section —

Antitrust Committee.

*Preti Flaherty* – which represents one consumer direct purchaser and three

commercial plaintiffs, filed the first chocolate direct purchaser class action

17

complaint in this District, filed the first motion for coordinated or consolidated

proceedings with the MDL Panel, and successfully argued for the transfer of this

multidistrict litigation to this District – has been similarly recognized as a leading

firm in the prosecution of antitrust class actions. *See* Preti Firm Resume (attached

hereto as Exhibit C). It is an 85-lawyer, full service commercial law firm with

offices throughout New England and has represented plaintiffs and defendants,

including many Fortune 500 corporations, in class actions and other complex

litigation. Courts have appointed Preti Flaherty Co-Lead counsel in several recent

cases: *In re Marine Hose Antitrust Litigation*, MDL Docket No. 1888 (S.D. Fla.);

*In re Foundry Resins Antitrust Litigation,* MDL Docket No. 1638 (S.D. Ohio); *In

re ACR Copper Tubing Litigation,* Case No. 06-cv-2207 (W.D. Tenn.); and *Blind

Builders USA Inc.* v. *Royal Window Coverings (USA) L.P.* (*"Window Coverings

Antitrust Litigation"*), Case No. 07-1387 (E.D. Pa.). Preti Flaherty was also

appointed Liaison Counsel in *In re Compact Disc Minimum Advertised Price

Antitrust Litigation,* MDL No. 1361 (D. Maine). Gregory Hansel of the firm is

Board Certified in Antitrust and Trade Regulation Law by the Florida Bar Board of

Legal Specialization and Education. Preti Flaherty was recognized for its work by

The Honorable Paul S. Diamond, U.S. District Judge, who wrote: "Plaintiffs'

Counsel [including Co-Lead Counsel Preti Flaherty] showed consummate skill and

efficiency in prosecuting this case – the settlement . . . they obtained illustrates

18

their ability." *Window Coverings Antitrust Litigation*, Order, November 29, 2007.

In the Middle District of Pennsylvania, Preti Flaherty won the affirmance of a $40

million arbitration award in an international securities arbitration. *Baker v.

Kingspan Holdings U.S., Inc.*, Case No. 1:03-CV-1968 (M.D. Pa. 2004).

*Cohen Milstein* is a highly respected leader of the plaintiffs' antitrust bar.

*See* Cohen Milstein Firm Resume (attached hereto as Exhibit D). The firm has a

unique knowledge of antitrust class actions and unparalleled experience in

prosecuting such cases. With over 78 attorneys in four domestic offices and one

international office, Cohen Milstein is one of the largest firms in the nation

dedicated primarily to the prosecution of class actions. Moreover, Cohen Milstein

has one of the largest plaintiffs' antitrust class action practices in the bar with

approximately 35 attorneys dedicated to the practice. This size allows Cohen

Milstein to avail itself of resources and expertise not available to smaller firms.[3]

Reflecting its status as a leader of the plaintiffs' bar, Cohen Milstein is involved in

class actions that are "historic in nature"[4] and spearheads innovations in the field.

Cohen Milstein attorneys bring to their practice experiences rare in the plaintiffs'

bar, including clerkships on the Supreme Court and leading Circuit and District

---

[3] For example, Cohen Milstein attorneys are widely regarded as having expertise in cutting-edge issues relating to electronic discovery.

19

Courts. Among other benefits, such experiences are one reason why Cohen

Milstein attorneys are regarded for prosecuting cases in a manner reflecting the

highest standards of professional decorum and civility.

The Cohen Milstein team working on this litigation is headed by Michael

Hausfeld, one of the most respected members of the plaintiffs' bar. Mr. Hausfeld's

career has included some of the largest and most successful class actions in the

fields of antitrust, human rights, and discrimination law. Mr. Hausfeld has a long

record of success in the antitrust field, on behalf of both individuals and classes, in

cases involving monopolization, tie-ins, exclusive dealings and price fixing. He is

or has been co-lead counsel in antitrust cases against manufacturers of genetically

engineered foods, managed healthcare companies, bulk vitamin manufacturers,

technology companies and international industrial cartels. He is actively involved

in ongoing investigations into antitrust cases abroad, and was the only private

lawyer permitted to attend and represent the interests of consumers worldwide in

the 2003 closed hearings by the EU Commission in the Microsoft case.

Chief Judge Edward Korman (E.D.N.Y) has noted that Mr. Hausfeld is one

of the "leading class action lawyers in the United States." He has been profiled in,

and recognized by, many articles and surveys. Recently, a *Forbes* magazine article

---

[4] *Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137, 142 (N.D. Cal. 2004)
(discussing certification of class covering 1.5 million women in sex discrimination
case).

reported on Mr. Hausfeld's work to establish an international alliance for the protection of consumers and investors worldwide. *The Wall Street Journal* profiled him and his practice, and he has been recognized by *The National Law Journal* as one of the "Top 100 Influential Lawyers in America." He has been described by a leading civil rights columnists as an "extremely penetrating lawyer", and by a colleague (in a *Washington Post* article) as a lawyer who "has a very inventive mind when it comes to litigation. He thinks of things most lawyers don't because they have originality pounded out of them in law school." *The New York Times* referred to Mr. Hausfeld as one of the nation's "most prominent antitrust lawyers," and *Washingtonian Magazine* has listed Mr. Hausfeld in several surveys as one of Washington's 75 best lawyers, saying he is "a Washington lawyer determined to change the world – and succeeding."

Robert G. Eisler is a Cohen Milstein partner who will be actively involved in the case on a day-to-day basis. First admitted to practice in Pennsylvania in 1989, Mr. Eisler has extensive experience in complex litigation at the trial and appellate levels, particularly in the prosecution of antitrust class actions. He has served as lead or co-lead counsel in numerous cases in the state and federal courts.

*Kirby McInerney* has represented clients in a wide variety of antitrust matters at the trial and appellate level in state and federal courts throughout the country. *See* Kirby McInerney Firm Biography (attached hereto as Exhibit E).

21

Kirby McInerney also has more than 50 years of litigation and trial experience, prosecuted numerous complex antitrust, securities and consumer fraud class action cases, and has been involved in a leadership capacity in numerous complex class action cases that will serve the proposed class well in this litigation.

Relevant examples of the firm's antitrust experience include the following: *In re Reformulated Gasoline (RFG) Antitrust & Patent Litigation*, MDL Case No. 05-cv-1671 (CAS)(C.D. Cal.) (pending); *Coordination Proceeding Special Title (Rule 1550(b)) Intel x86 Microprocessors Cases*, No. 1-05-cv-045077 (Cal. Super. Ct. Santa Clara Co. 2005) (pending); *Gordon v. Microsoft*, Case No. 00-5994 (Minn. Dist. Ct., Henn. Co. 2004) (co-lead counsel, $175 million settlement of antitrust claims following trial); *In re Florida Microsoft Antitrust Litigation*, Case No. 99-27340 CA 11 (Fla. Cir. Ct. 11th Cir., Miami/Dade Co. 2003) (co-lead counsel, $205 million settlement); *Cox v. Microsoft*, Case No. 105193/00 (N.Y. Sup. Ct., N.Y. Co. 2000) (co-lead counsel, $350 million settlement); Sherwood v. Microsoft, 99C-3562 (Cir. Ct. Davidson Co., Tenn.),  ($64 million settlement); Gordon v. Microsoft, 00c-297 (Cir. Ct. Boone Co., W. Va.)($21 million settlement); *In re Visa Check/MasterMoney Antitrust Litigation*, Case No. 96-cv-5238 (E.D.N.Y. 2003) (significant discovery and trial preparation role, $3 billion settlement.); *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456: *The City of New York, et. al. v. Abbott Laboratories, et al.*, Case

22

No. 01-12257-PBS (D. Mass) (lead counsel for over 50 New York counties including New York City, pending).

Finally, Proposed Interim Liaison and Local Counsel, Obermayer Rebmann, is a firm well-known in Harrisburg and experienced in complex litigation. The resumes of the firm and of Walter W. Cohen and Kevin Kehner are attached hereto as Exhibit F. As suggested by the *Manual*, liaison counsel has responsibility for the maintenance and distribution of the up-to-date service list and the distribution to all plaintiffs' counsel of Court Orders, pleadings, and other documents. *See Manual*, § 10.221 at 24. This firm's major case experience demonstrates that it will perform all necessary liaison and local counsel duties competently and efficiently as it has already done with the filing of documents on behalf of the Plaintiffs and a current Service List in response to the Court's Case Management Orders.

As they have in the past, Interim Co-Lead Counsel and Liaison and Local Counsel will ensure the vigorous, fair and efficient prosecution of this litigation.

## IV.    CONCLUSION

For the reasons set forth herein the majority of Plaintiffs respectfully move for the consolidation of the related direct purchaser class actions alleging chocolate price-fixing and antitrust claims under the Sherman Act, 15 U.S.C. §1, that were filed in this Court or have been and/or will be docketed in this Court pursuant to

23

the Transfer Order, and for the appointment of Labaton Sucharow, Preti Flaherty,

Cohen Milstein, and Kirby McInerney  as Interim Co-Lead Counsel and

Obermayer Rebmann as Interim Liaison and Local Counsel for the class of direct

purchasers.


Dated: June 10, 2008                    Respectfully submitted,

                                        /s/ Walter W. Cohen

                                        **Walter W. Cohen** (PA 12097)
                                        Obermayer, Rebmann, Maxwell & Hippel LLP
                                        Suite 400
                                        200 Locust Street
                                        Harrisburg, PA 17101
                                        Telephone: (717) 234-9730
                                        Fax: (717) 234-9734
                                        Walter.cohen@obermayer.com

                                        **Counsel for:** Robert Philipson

                                        *Proposed Interim Liaison Counsel*

                                        **Gregory P. Hansel**
                                        **Randall B. Weill**
                                        PRETI, FLAHERTY, BELIVEAU &
                                        PACHIOS, LLP
                                        One City Center
                                        P.O. Box 9546
                                        Portland ME 04112-9546
                                        Telephone: (207) 791-3000

                                        **Counsel for**: Katherine Woodman, Glenn
                                        Coffey, t/d/b/a Candy Man, Valos House of
                                        Candy, and Original Fowler's Chocolate
                                        Co., Inc.
                                        24

1325009.8

**Bernard Persky**
**Hollis L. Salzman**
**Gregory Asciolla**
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700

**Counsel for**: CNS Confectionery Products, LLC and WINN Corporation, Julia Isenhower, Thomas Rode, Stephen Snow and Comwest Industries Inc.

**Michael D. Hausfeld**
**Christopher J. Cormier**
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC, 20005
Telephone: (202) 408-4600
Email: mhausfeld@cmht.com, ccormier@cmht.com

**Robert Gerard Eisler** (PA 56698)
**Seth Rich Gassman**
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
150 East 52nd Street
New York, NY 10022
Telephone: (212) 838-7797
Email: reisler@cmht.com, sgassman@cmht.com

**Counsel for:** Webb's Candies, Inc., Candy Jar, Inc., VME Distributors, Inc.

25

**Peter S. Linden**
**Daniel Hume**
**David Kovel**
KIRBY McINERNEY LLP
830 Third Avenue
New York, NY 10022
Telephone: 212-371-6600

**Counsel for:** International Wholesale, Inc.,
United Wholesale, United Customs
Distribution, Weaver Nut Company and
Royal Enterprises Corporation

*Proposed Interim Co-Lead Counsel*

**Richard L. Wyatt, Jr.**
AKIN, GUMP, STRAUSS, HAUER &
FELD, LLP (DC)
Robert S. Strauss Bldg,
1333 New Hampshire Ave. NW
Washington, DC 20036
Telephone: (202) 887-4000 x4252

**Counsel for:** Food Lion, LLC, Hannaford
Bros. Co., Kash N' Karry Food Stores, Inc.

**William A. Isaacson**
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W., Suite 570
Washington, DC 20015
Telephone: (202) 237-2727

**Counsel for:** Canteen Vending Company

**Bryan Clobes**
CAFFERTY FAUCHER LLP
1717 Arch Street, Suite 3610

26

Philadelphia, PA 19103
Telephone: (215) 864-2800

**Counsel for:** Akisa Matsuda, Marc Lavin
and Jill Lavin, Seth E. Ellis, P.A., D
Controls, Inc., Ellen Widom, Adrianne
Shienvold

**Richard M. Volin**
FINKELSTEIN THOMPSON LLP
The Duvall Foundry
1050 30th Street, N.W.
Washington, DC 20007
Telephone: (202) 337-8000

**Counsel for:** Isabelle Dikland

**Steven A. Kanner**
Freed Kanner London & Millen LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Fax: (224) 632-4521

**Gary B. Friedman**
FRIEDMAN LAW GROUP LLP
270 Lafayette Street, 14th Floor
New York, NY 10012
Telephone: (212) 680-5150

**Counsel for:** Dacia Lower

**Robert J Gralewski, Jr.**
GERGOSIAN & GRALEWSKI LLP
655 West Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 237-9500

**Counsel for:** Karin Jacobs

27

**Elizabeth C. Pritzker**
GIRARD GIBBS LLP
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800

**Counsel for:** Diane Chiger

**Michael M. Goldberg**
GLANCY BINKOW and GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: (310) 201-9150

**Counsel for:** Molly Wagman

**Mark Goldman**
GOLDMAN SCARLATO & KARON, P.C.
101 West Elm Street, Suite 360
Conshohocken, PA 19428
Telephone: (484) 342-0700

**Counsel for**: Eric Lense

**M. Stephen Dampier**
LAW OFFICE OF M. STEPHEN
DAMPIER, P.C.
13 S. Section Street
P.O. Box 161Fairhope, AL 36533
Telephone: (251) 928-9160

**Counsel for:** Autry Greer & Sons, Inc.,
Tanya O. Butts

**David S. Stellings**
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY 10017

28

Telephone: (212) 355-9500

**Counsel for:** Ben Lee Distributors, Inc.

**Geoffrey M. Horn**
LOWEY DANNENBERG COHEN PC
1 North Broadway Suite 509
White Plains, NY 10601-2301
Telephone: (914) 997-0500

**Counsel for:** Pitco Foods

**Jayne Arnold Goldstein**
MAGER & GOLDSTEIN, LLP (PA)
1818 Market Street, Suite 3710
Philadelphia, PA 19103
Telephone: (215) 640-3280

**Counsel for:** NMJ Consultant Group, Inc.

**Craig Briskin**
MEHRI & SKALET, PLLC
1250 Connecticut Avenue, N.W. Suite 300
Washington, DC 20036
Telephone: (202) 822-5100

**Counsel for:** Jonathan Benjamin

**Peter Safirstein**
MILBERG LLP
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
Telephone: (212) 594-5300

**Counsel for:** Edward S. Hessano, Dean
Solomon

**J. Douglas Richards**
POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP

29

100 Park Avenue, 26th Floor
New York, NY 10017
Telephone: (212) 661-1100

**Counsel for:** STLE Corporation

**Michael Hamilton**
PROVOST UMPHREY LAW FIRM LLP
One Burton Hills Blvd., Suite 380
Nashville, TN 37215
Telephone: (615) 242-0199

**Counsel for:** Daphne Matalene

**Garret D. Blanchfield, Jr.**
REINHARDT WENDORF &
BALNCHFIELDE
1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Telephone: (651) 287-2100

**Counsel for:** Carmen Pellitteri

**Camilo Kossy Salas, III**
SALAS LC 650 Poydras St.,  Suite 1650
New Orleans, LA 70130
Telephone: (504) 799-3080

**Counsel for:** Long Leaf Vending Inc.

**Timothy Battin**
STRAUS & BOIES, LLP
4041 University Drive, 5th Floor
Fairfax, VA 22030
Telephone: (703) 764-8700

**Counsel for:** Stephanos Sgouros

**Adam S. Levy**

30

THE HAVILAND LAW FIRM LLC
740 S. 3rd Street, 3rd Floor
Philadelphia, PA, 19147
Telephone: (215) 609-4661

**Counsel for:** T. Levy Associates trading as
Beautyland

**Donna F. Solen**
THE MASON LAW FIRM, P.C.
1225 19th Street NW, Suite 500
Washington, DS 20036
Telephone: (202) 429-2290

**Counsel for:** Daniel Klein

**Mark J. Tamblyn**
WEXLER TORISEVA WALLACE LLP
1610 Arden Way, Suite 290
Sacramento, California 95815
Telephone: (916) 568-1100

**Counsel for:** March Linder

**Mark R. Cuker**
WILLIAMS CUKER BEREZOFSKY
1617 J.F.K. Blvd.
Suite 800
Philiadelphia, PA 19103
Telephone: (215) 557-0099

**Counsel for:** Weis Markets, Inc.

**Mary Jane Fait**
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600

31

1325009.8

**Counsel for:** Mandel Tobacco Company, Inc.

**Richard M. Hagstrom**
ZELLE, HOFMANN, VOELBEL, MASON & GETTE LLP
500 Washington Avenue South, Suite 4000
Minneapolis, Minnesota 55415
Telephone: (612) 339-2020

**Counsel for:** Cindy Elan-Mangano

32

1325009.8

## CERTIFICATE OF COMPLIANCE

I, Walter W. Cohen, certify that the foregoing Memorandum of Law in Support of Majority Plaintiffs' Motion to Consolidate Actions and For Appointment of Interim Direct Purchaser Class Co-Lead and Liaison and Local Counsel complies with the word-count limit set forth in Local Rule 7.8(b)(2). The foregoing brief contains 4,980 words.

/s/ Walter W. Cohen
Walter W. Cohen, Esq.
PA12097

33

## CERTIFICATE OF SERVICE

I, Walter W. Cohen, certify that the foregoing Memorandum of Law in Support of Majority Plaintiffs' Motion to Consolidate Actions and For Appointment of Interim Direct Purchaser Class Co-Lead and Liaison and Local Counsel was served upon counsel of record via ECF on this 10th day of June, 2008.


/s/ Walter W. Cohen
Walter W. Cohen, Esq.
PA12097

34

# EXHIBIT O

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE INTEL CORPORATION | ) | |
| MICROPROCESSOR ANTITRUST | ) | MDL Docket No. 05-MD-1717-JJF |
| LITIGATION | ) | Civil Action No. 1:05-CV-00485-JJF |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CONSOLIDATION AND FOR APPOINTMENT OF CO-LEAD COUNSEL AND LIAISON COUNSEL

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Allyson B. Baker
COHEN, MILSTEIN, HAUSFELD &
TOLL, P.L.L.C.
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC 20005
*Proposed Co-Lead Counsel*

Michael P. Lehmann
Thomas P. Dove
Alex C. Turan
THE FURTH FIRM, LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
*Proposed Co-Lead Counsel*

Steven W. Berman
Anthony Shapiro
HAGENS BERMAN SOBOL SHAPIRO,
LLP
1301 Fifth Avenue
Suite 2900
Seattle, WA 98101
*Proposed Co-Lead Counsel*

James L. Holzman (DE Bar # 663)
David W. Gregory (DE Bar #4408)
Eric M. Andersen (DE Bar #4376)
Prickett, Jones & Elliott, P.A.
1310 King Street
Wilmington, DE 19801
(302) 888-6500
jlholzman@prickett.com
dwgregory@prickett.com
*Proposed Liaison Counsel*

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111
*Proposed Co-Lead Counsel*

## Table of Contents

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 2

ARGUMENT ....................................................................................................... 3

I.      FEDERAL RULE 23(G) PROVIDES FOR THE DESIGNATION OF LEAD COUNSEL WHO HAVE EXEMPLARY QUALIFICATIONS AND EXPERIENCE, AS WELL AS SUBSTANTIAL LITIGATION RESOURCES .. 3

II.     PROPOSED LEAD COUNSEL HAVE ENORMOUS EXPERIENCE LITIGATING ANTITRUST CASES AND COMPLEX CIVIL ACTIONS ......... 5

        A.      Cohen, Milstein, Hausfeld, & Toll ............................................... 5

        B.      The Furth Firm ............................................................................. 7

        C.      Hagens Berman Sobol & Shapiro ................................................ 9

        D.      Saveri & Saveri ........................................................................... 11

        E.      Prickett, Jones & Elliott (Proposed Liaison Counsel) .............................. 13

III.    ENTERING THE PROPOSED ORDER WILL BEST REPRESENT THE INTERESTS OF THE PROPOSED CLASS AND ALSO EXPEDITE THE LITIGATION ............................................................................................. 14

CONCLUSION .................................................................................................. 15

## Table of Authorities

**Cases**

*Coopersmith v. Lehman Bros., Inc.,*
  344 F. Supp. 2d 783 (D. Mass. 2004) ............................................................................ 4

*In re Auction Houses Antitrust Litig.,*
  197 F.R.D. 71 (S.D.N.Y. 2000) ................................................................................... 14

*In re Cardinal Health, Inc. ERISA Litig.,*
  225 F.R.D. 552 (S.D. Ohio 2005) .......................................................................... 3, 14

*In re Cement & Concrete Antitrust Litig.,*
  MDL No. 296, 1980 WL 1994, at *30 (D. Ariz. 1980) ................................................. 7

*In re Cree, Inc. Securities Litig.,*
  219 F.R.D. 369 (M.D.N.C. 2003) ................................................................................. 3

*In re Delphi Erisa Litig.,*
  230 F.R.D. 496  (E.D. Mich. 2005) ............................................................................. 3

*In re Joint Eastern and Southern Districts Asbestos Litig.,*
  132 F.R.D. 332 (E.D.N.Y.; S.D.N.Y., 1990) ............................................................. 14

*In re Linerboard Antitrust Litig.,*
  292 F.Supp.2d 644  (E.D. Pa. 2003) ...................................................................... 3, 14

*In re Rubber Chemicals Antitrust Litig.,*
  2005 WL 2649292 at * 8 (N.D. Cal. Oct. 6, 2005) ...................................................... 4

*Warner Communications, Inc. v. Murdock,*
  581 F.Supp. 1482 (D. Del. 1984) ................................................................................ 4

**Other Authorities**

28 U.S.C. § 1407 ................................................................................................................ 3

**Rules**

Fed. R. Civ. P. 23 ........................................................................................................ 1, 3

# INTRODUCTION

Certain Plaintiffs[1] who filed antitrust purchaser actions against Intel Corporation ("Intel") in this Court or whose cases have been transferred to this Court pursuant to JPML Transfer Order for Docket No. 1717, dated Nov. 8, 2005, Ex. A., (collectively "Centralized Actions"), respectfully request that the Court enter the attached proposed order. The proposed order would to consolidate all purchaser antitrust actions against Intel that have been filed with this court transferred to this Court for pretrial proceedings, consistent with the JPML Transfer Order. The proposed order also establishes a co-lead counsel structure for plaintiffs in the Centralized Actions. *See* Fed. R. Civ. P. 23 (g)(2)(A) ("[t]he court may designate counsel to act on behalf of the putative class before determining whether to certify the action as a class action."). Specifically, the proposed order would appoint Cohen, Milstein, Hausfeld & Toll, P.L.L.C.; The Furth Firm LLP; Hagens Berman Sobol & Shaprio LLP; and Saveri & Saveri, Inc. as co-lead plaintiffs' counsel and Prickett, Jones, & Elliott, in Wilmington, Delaware, as liaison counsel for the Centralized Actions.

The law firms proposed to serve as lead counsel and liaison counsel are well-suited to manage the litigation of the Centralized Actions. They bring exemplary qualifications, experience and resources to bear and have the support of a substantial number of firms whose clients have filed Intel class actions. The proposed lead attorneys have decades of class action and antitrust experience and have served as lead counsel in the largest recovery in U.S. litigation history and the largest antitrust recovery. Intel does not oppose this motion.

---

[1] Certain Plaintiffs who originally filed cases in this Court, as well cases in the Northern District of California, and other district courts. *See* list of certain Plaintiffs' cases attached as Exhibit B.

1

## BACKGROUND

As a result of its unlawful monopoly power, Intel has charged supra-competitive prices to computer manufacturers which then pass on the overcharges to consumers. *See* Complaint at ¶ 42, *Phil Paul v. Intel Corp.*, No. 1:05-cv-00485-JJF (D. Del. July 12, 2005). Intel maintains this pricing scheme by engaging in multi-faceted efforts designed to stymie any inroads that competitors like Advanced Micro Devices ("AMD") would otherwise make in the market for x86 microprocessors. *See* Complaint at ¶¶ 35-38, *Advanced Micro Devices, Inc. v. Intel Corp.*, No. 1:05-cv-00441-JJF (D. Del. June 27, 2005).

On June 27, 2005, AMD filed suit against Intel in this Court, where both companies have litigated many of their disputes. *See id.* Since then, more than sixty class actions have been brought in federal court by purchasers who have suffered antitrust injury as a result of Intel's anticompetitive conduct. *See* List of actions pending against Intel, Ex. C. Almost all federal purchaser plaintiffs in actions against Intel nationwide support the proposed lead counsel structure. *See* Exs. B and C. In light of these facts and the following arguments, movants respectfully ask the Court to enter the attached proposed order.

2

# ARGUMENT

**I.    FEDERAL RULE 23(G) PROVIDES FOR THE DESIGNATION OF LEAD COUNSEL WHO HAVE EXEMPLARY QUALIFICATIONS AND EXPERIENCE, AS WELL AS SUBSTANTIAL LITIGATION RESOURCES**

Courts look to the strictures of Rule 23(g) of the Federal Rules of Civil Procedure when designating lead counsel for a proposed class of plaintiffs. *See* Fed. R. Civ. P. 23(g) advisory committee notes 2003 ("Rule 23(g)(2)(A) authorizes the court to designate interim counsel to act on behalf of the putative class before the certification decision is made."). *See also In re Cardinal Health, Inc. ERISA Litig.*, 225 F.R.D. 552, 554-55 (S.D. Ohio 2005); *In re Delphi Erisa Litig.*, 230 F.R.D. 496, 498 (E.D. Mich. 2005).[2]

To this end, the Federal Rules enumerate the following factors that inform designation of lead counsel:    (i) "the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; and (iii) counsel's knowledge of the applicable law; and (vv) the resources counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(C)(i). *See also In re Cree, Inc. Securities Litig.*, 219 F.R.D. 369, 373 (M.D.N.C. 2003) (Designating a firm as lead

---

[2]Other Distrcit Courts in this Circuit have recognized that a district court has substantial discretion to appoint co-lead counsel in order to effectively manage complex, multidistrict litigation:   "'The multiplicity of suits requires that the district court be allowed to combine procedures, appoint lead counsel, recognize steering committees of lawyers, limit and manage discovery, etc. to minimize expense to all litigants and to provide judicial efficiency.'" *In re Linerboard Antitrust Litig.*, 292 F.Supp.2d 644, 653 (E.D. Pa. 2003) (quoting *In re Showa Denko K.K. L- Tryptophan Prods. Liab. Litig., 953 F.2d 162, 165 (4th Cir.1992)* (citing *Manual for Complex Litigation (Second)* §§ 33.22, 33.25 (1985) (suggesting mechanism to organize counsel and discovery in mass tort litigation)).   The district court's ultimate goal in multidistrict litigation is to '... promote the just and efficient conduct of such actions.'" 28 U.S.C. § 1407(a).

counsel after finding that the firm had "extensive experience" with the particular area of litigation, class actions and also after finding that "the firm ha[d] sufficient resources to prosecute this action in a thorough and expeditious manner."); *Coopersmith v. Lehman Bros., Inc.*, 344 F. Supp. 2d 783, 793 (D. Mass. 2004) (Designating two law firms as co-lead counsel because "[i]t is clear that these firms have extensive experience in cases such as this and are well situated to pursue this action on behalf of the class."); *In re Rubber Chemicals Antitrust Litig.*, No. C. 04-1648 MJJ, 2005 WL 2649292, at * 8 (N.D. Cal. Oct 6, 2005) (appointing Cohen Milstein as co-lead counsel because it is "undisputed that th[is] counsel . . . ha[s] extensive experience and expertise in antitrust and other class actions, as well as other complex litigation, and have successfully prosecuted such cases in courts across the country.").[3]

As discussed below in more detail, all of the proposed lead counsel have a great deal of experience with complex antitrust litigation.[4] These attorneys and law firms also have impressive qualifications, a long record of success in complex litigation, a demonstrated willingness to invest substantial resources in the prosecution of complicated cases, and a long history of working together in such endeavors. Together, these firms have a combined total of more than 130 years of experience litigating antitrust actions, as well as other complex, civil cases. *See* Biographies of Firms and Individual Attorneys, collected and attached as Exhibits D-H.

---

[3] Attached hereto as Exhibit I.
[4] These firms and their attorneys also have handled cases in this District Court, Cohen Milstein litigated *Trotter v. Perdue Farms, Inc.*, No.99-393-RRM in front of the Honorable Joseph J. Farnan, Jr., and the Furth Firm litigated *Warner Communications, Inc. v. Murdock*, 581 F.Supp. 1482 (D. Del. 1984) in front of the Honorable Caleb M. Wright.

4

## II.    PROPOSED LEAD COUNSEL HAVE ENORMOUS EXPERIENCE LITIGATING ANTITRUST CASES AND COMPLEX CIVIL ACTIONS

### A.    Cohen, Milstein, Hausfeld, & Toll

Cohen Milstein has more than thirty five years of experience litigating some of the nation's most complicated antitrust cases and recovering billions of dollars in overpayments made by its clients to monopolists, price-fixers, and other violators of the antitrust laws. *See* Cohen Milstein Biography, Ex. D.  In 2002 and 2003, the National Law Journal named Cohen Milstein one of the top 25 plaintiffs' firms in the nation.

The firm has more than 50 attorneys, with offices in Washington, D.C., New York, Philadelphia and Chicago.  A substantial portion of its practice –indeed, its largest practice group -- is devoted to antitrust class actions, many of which implicate industries that employ complicated technology such as the computer, pharmaceutical, and chemical industries.  Cohen Milstein has served as lead counsel on many important antitrust cases, including the following cases:

> *In re Vitamins Antitrust Litigation*, MDL No. 1285 (D.D.C.).
> Cohen Milstein served as co-lead counsel for two certified classes of direct purchasers.  Chief Judge Hogan approved four major settlements between certain defendants and Class Plaintiffs, including a landmark partial settlement of $1.1 billion. In a later trial before Chief Judge Hogan concerning four Class Plaintiffs' remaining unsettled claims, a federal jury in Washington unanimously found the defendants liable for participating in the conspiracy and ordered them to pay $49,539,234,which is trebled to $148,617,702 under the federal antitrust laws. The case was subsequently settled against those defendants.  The National Journal ranked this jury verdict the 12th highest for 2003.

> *Oncology & Radiation Associates, P.A. v. Bristol Myers Squibb Co., et al.*, Case No. 1:01CV02313 (D.D.C.). Cohen Milstein was lead counsel; the case settled for $65,815,000 on behalf of direct purchasers.

> *North Shore Hematology-Oncology Associates, P.C. v. Bristol-Meyers Squibb Co.*, Case No. 1:04CV00248 (D.D.C.). Cohen Milstein, which served as lead counsel, investigated and prosecuted this case, leading to a settlement of $50 million in November 2004.

5

*In re Relafen® Antitrust Litigation,* No. 01-12239-WGY (D. Mass.). Cohen Milstein served as co-lead counsel on behalf of a class of direct purchasers and obtained a $175 million settlement of this action.

*Kruman v. Christie's International plc., et al.,* Docket No. 01-7309. Cohen Milstein served as one of three leading counsel on behalf of foreign plaintiffs and obtained a $40 million settlement on their behalf. This case marked the first time that claims on behalf of foreign plaintiffs under U.S. antitrust laws have resolved in a U.S. court, a milestone in U.S. antitrust jurisprudence.

*In re Domestic Air Transportation Antitrust Litigation* (N.D. Ga.) As co-lead counsel, Cohen Milstein obtained a settlement of travel discounts and cash totaling $458 million for the class of individuals and businesses.

In addition, Michael Hausfeld is regarded as one of the country's top civil litigators. He was recently recognized as one of the "Top 100 Influential Lawyers in America," by the National Journal. *See id.* Chief Judge Edward Korman of the Eastern District of New York, has stated that Mr. Hausfeld is one of the two "leading class action lawyers in the United States." Furthermore, the New York Times has referred to Mr. Hausfeld as one of the "most prominent antitrust lawyers" in the nation. *Id.*

He has served as co-lead counsel on numerous antitrust cases involving a diversity of industries, including genetically engineered foods, managed healthcare companies, technology industries, and auto racing, and involving hosts of international industrial cartels in varied and diverse industries. In 2003, Mr. Hausfeld was the only private attorney permitted to attend the European Commission's closed hearings regarding Microsoft's conduct; while at those hearings, Mr. Hausfeld represented the interests of consumers worldwide. *See id.*

Daniel Small is co-chair of the antitrust practice group at Cohen Milstein. He has been selected as lead counsel in several cases involving varied industries. For example, he was appointed lead counsel in *Paper Systems, Inc. et al. v. Mitsubishi Corp. et al.,*

which settled for more than single damages and co-lead counsel for end-user plaintiffs in *In re Buspirone Antitrust Litigation*, a case involving claims of unlawful monopolization, which settled for $90 million. Mr. Small, as co-lead counsel tried *Nate Pease, et al. v. Jasper Wyman & Son, Inc., et al.*, Civil Action No. 00-015 (Knox County Superior Court, Me.), to a verdict in favor of a class of blueberry farmers suing processors for price fixing. Mr. Small also has briefed and argued significant appellate cases, including *Free v. Abbott Laboratories*, No. 99-391 in the United States Supreme Court.

**B.    The Furth Firm**

Since its inception in1966, the Furth Firm has represented clients in a wide variety of antitrust matters at the trial and appellate level in state and federal jurisdictions throughout the country. *See* http://www.furth.com; Furth Firm Biography, Ex. E. In 1967, shortly after its founding, the firm's name partner, Frederick P. Furth, initiated an antitrust class action against gypsum wallboard manufacturers alleging a price-fixing conspiracy. That case, which expanded to include 5,500 plaintiffs in over 140 cases, several hundred lawyers and seven defendants and resulted in $82 million in damages, established the firm's prominence in the antitrust field.

Since then, the firm, including Michael Lehmann and Thomas Dove, who are eminently qualified, have been appointed lead counsel for plaintiffs in a number of large, nationwide antitrust cases, involving various industries. The Furth Firm LLP has received commendations for its talent at litigating complex civil cases. For example, in one massive nationwide price-fixing case, Judge Carl A. Muecke remarked that "members of Mr. Furth's firm were involved in virtually every aspect of plaintiff's discovery efforts.... In all of these activities, the highest caliber of legal skill was evidenced." *In re Cement & Concrete Antitrust Litig.*, MDL No. 296, 1980 WL 1994, at *30 (D. Ariz. 1980).

7

The firm has been lead counsel or class counsel in numerous antitrust cases, including the following actions:

*In re Publication Paper Antitrust Litigation (U.S. District Court, District of Connecticut) (Judicial Panel on Multidistrict Litigation No. 1631)*

The Furth Firm LLP was appointed co-chair of the Plaintiffs' Executive Committee that runs this case.

*In re: High Pressure Laminates Antitrust Litigation (U.S. District Court, Southern District of New York) (Master File No. 00-MD-1368 CLB) (Judicial Panel on Multidistrict Litigation No. 1368)*

The Furth Firm LLP was appointed co-lead counsel for the certified class of direct purchasers; two defendants have settled for a total amount exceeding $40 million.

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation (U.S. District Court, Northern District of California, No. C 02-1486 PJH) (Judicial Panel on Multidistrict Litigation No. 1486 )*

The Furth Firm LLP was appointed to serve on the Executive Committee representing the proposed indirect purchaser class in these proceedings.

*In re Tableware Antitrust Litigation And All Related Cases (U.S. District Court, Northern District of California, No.c-04-3514 VRW)*

The Furth Firm LLP is one of the lead counsel representing the putative nationwide class.

*In re: Microcrystalline Cellulose Antitrust Litigation (U.S. District Court, Eastern District of Pennsylvania) (Master File No. 01-CV-111) (Judicial Panel on Multidistrict Litigation No. 1402)*

The Furth Firm LLP is counsel for one part of the certified class in this action; one of the two defendants settled with all plaintiffs for the sum of $25 million.

*In re: Auction Houses Antitrust Litigation (U.S. District Court, Southern District of New York) (Master File No. 00 Civ. 0648 LAK)*

The Furth Firm LLP was appointed interim co-lead counsel for the plaintiffs in this nationwide class action, which settled for $412 million in cash and an additional $100 million in auction certificates.

*In re Brand Name Prescription Drug Antitrust Litigation (U.S. District Court, Northern District of Illinois)(Judicial Panel on Multidistrict Litigation No. 997)*

The Furth Firm LLP was appointed to serve on the Plaintiffs' Steering Committee in these cases, which settled for $700 million in cash and $25 million in product

## C.    Hagens Berman Sobol & Shapiro

For more than a decade, Hagens Berman and its name partners, Steven Berman and Anthony Shapiro have served as court-appointed lead class counsel in complex federal and state actions pending throughout the country. Their efforts have resulted in total recoveries of more than $260 billion. *See* Hagens Berman Firm Biography, Ex. F. The firm also has a substantial track record in representing plaintiffs in complex civil litigation. For example, Hagens Berman successfully represented 13 states against the tobacco industry, with the end result being the largest settlement in litigation history ($206 billion).

The firm has more than 35 attorneys with offices in Boston, Chicago, Phoenix, Los Angeles, New York and Seattle. A substantial portion of its practice is devoted to antitrust actions, many of which implicate industries that employ complicated technologies such as the computer and pharmaceutical industries. The firm's expertise was recognized by Microsoft which has engaged the firm to represent it in antitrust class actions as well as other class actions. Recently, Hagens Berman served as lead counsel in the largest antitrust settlement in United States history, reaching a settlement in a case against Visa and Master Card for approximately $3 billion; the trial judge valued injunctive relief in excess of $20 billion.

Hagens Berman also has handled antitrust litigation in several important areas, including artificial shortages and price-fixing in the electricity market and price manipulation in the California gas market. Recently, it served as lead counsel in the largest antitrust settlement in United States history, reaching a settlement in a case against

Visa and MasterCard for approximately $3 billion; the trial judge valued injunctive relief in excess of $20 billion.

Mr. Berman is the firm's managing partner. He has prosecuted numerous high profile cases implicating complicated facts and technology, including the Washington Public Power Supply System, Exxon Valdez Oil Spill, Michael Milken Litigation, Enron ERISA Litigation, Tobacco Litigation, and the Visa/MasterCard Litigation, and served as special attorney general to 13 states in their tobacco cases (which also had antitrust claims). .

Mr. Berman also has received numerous commendations for his innovative approaches to litigation. In April 2000, the *National Law Journal* listed Mr. Berman as the top litigator in the state and, in June, named him as one of the 100 most powerful lawyers in the nation. In January 2001, *Seattle Magazine* featured him in an issue profiling the top lawyers in Seattle.

Mr. Shapiro has significant complex litigation experience, with a practice that concentrates on antitrust matters, environmental and general commercial disputes, and personal injury cases. In the antitrust arena, he has served as plaintiffs' counsel in the Brand Name Prescription Drug Antitrust Litigation, Carbon Dioxide Antitrust Litigation, Carpet Antitrust Litigation, Infant Formula Antitrust Litigation, Baby Food Antitrust Litigation, Scouring Pads Antitrust Litigation, Medical X-Ray Film Antitrust Litigation, High Fructose Corn Syrup Antitrust Litigation, Visa/MasterCard Antitrust Litigation, Commercial Tissue Products Antitrust Litigation, Flat Glass Antitrust Litigation, Lease Oil Antitrust Litigation, and Bromine Antitrust Litigation. In addition, Mr. Shapiro's work prosecuting plaintiffs' claims against the Alaska Pipeline Service Company

resulting from the 1989 Exxon Valdez Oil Spill ultimately resulted in a $98 million settlement for plaintiffs.

### D.    Saveri & Saveri

"For more than forty-five years the firm has specialized in complex, multi-district and class action litigation." Saveri & Saveri, Inc. Firm Biography, Ex. G. The firm was founded in 1959 by Guido Saveri. Since then, it has litigated numerous antitrust class actions and recovered many millions of dollars on behalf of its clients. Saveri & Saveri, Inc. has served as lead counsel on cases around the country in a variety of jurisdictions, and it has been involved in more than 100 antitrust cases, including the following matters:

> *Nisley v. Union Carbide and Carbon Corp.*, 300 F. 2d 561 (10th Cir. 1960), and *Continental Ore. Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690 (1962). In 1960, Mr. Saveri tried these cases, which helped give rise to Rule 23 and which continue to serve as model class action cases.
>
> *In Re Sugar Antitrust Litigation*, MDL 201, Mr. Saveri served as lead counsel in this case which settled for more than $35 million.
>
> *In Re Fine Paper Antitrust Litigation*, MDL 325, Eastern District of Pennsylvania. Mr. Saveri was a member of the Executive Committee and the trial team. The case was settled for approximately $80 million.
>
> *In Re Ocean Shipping Antitrust Litigation*, MDL 395, Southern District of New York. Mr. Saveri held a leadership position among plaintiffs' counsel; this case was the first class action settlement involving claims by foreign companies. The case was settled for approximately $79 million.
>
> *In Re Coconut Oil Antitrust Litigation*, MDL 474, Northern District of California. Mr. Saveri was co-lead counsel.
>
> *In Re Brand Name Prescription Drugs Antitrust Litigation*, MDL 997, CPK, United States District Court, Northern District of Illinois, Eastern Division. Mr. Saveri was Co-Lead Counsel on behalf of approximately 50,000 retail pharmacies nationwide alleging an illegal cartel between 17 drug manufacturers and 6 drug wholesalers in preventing discounts to retail pharmacies. The case was tried for eight weeks. The case settled for $700 million in cash and $25 million in product. Mr. Saveri was one of four lead trial lawyers.

11

*In re Citric Acid Antitrust Litigation*, MDL 1092, United States District Court, Northern District of California.    Mr. Saveri served as Co-Lead counsel representing a certified class of purchasers of citric acid throughout the United States against the citric acid manufacturers for violations of the Sherman Act for fixing the price of citric acid in the United States and around the world.    The case settled for $86 million.

*In Re Methionine Antitrust Litigation*, MDL 1311, United States District Court, Northern District of California.    A nationwide class action on behalf of direct purchasers of methionine alleging price-fixing.    Mr. Saveri served as Co-lead counsel on behalf of a certified class that settled for $107 million.

*In Re Dynamic Random Access Memory Antitrust Litigation*, MDL 1486 (Judge Hamilton) United States District Court, Northern District of California. Mr. Saveri serves as Co-Lead Counsel on behalf of direct purchasers of dynamic random access memory (DRAM) alleging a nationwide class for price-fixing.

Guido Saveri has long been one of the leaders of the plaintiffs' antitrust bar. Since 1959, he has devoted his entire practice to antitrust litigation, as well as to other corporate and complex litigation.    As described in some detail above, Mr. Saveri has actively participated in antitrust cases involving the electrical industry, the water meter industry, scrap metal industry, liquid asphalt industry, dairy products industry, typewriter industry, vanadium industry, pipe-fitting industry, grocery business, liquor industry, movie industry, animal-raising business, chemical industry, snack food industry, paper label industry, chrysanthemum industry, sugar industry, recording industry, industrial gas industry, wheelchair industry, rope industry, copper tubing industry, folding cartons industry, ocean shipping industry, pancreas gland industry, corrugated container industry, glass container industry, fine paper industry, food additives industry, prescription drugs industry, medical x-ray film industry, computer chip industry and many others.

In addition, he has testified before the Federal Judiciary Committee on antitrust matters and has lectured on antitrust matters before the Association of Trial Lawyers of

America, the Federal Practice Institute, and other lawyer associations. Mr. Saveri has also written various periodicals on antitrust topics, and he participated in drafting proposed legislation creating the Panel on Multi-District Litigation.

R. Alexander Saveri also has substantial antitrust experience. He has litigated numerous antitrust and complex civil cases, including some of the following cases on which he is serving as court appointed Co-Lead or Liaison Counsel:

> *In Re Polychloroprene Antitrust Cases*, J.C.C.P. No. 4376, Los Angeles Superior Court (antitrust class action on behalf of all California indirect purchasers of polychloroprene rubber);

> *In Re NBR Cases*, J.C.C.P. No. 4369, San Francisco Superior Court (antitrust class action on behalf of all California indirect purchasers of NBR)

> *In Re Label Stock Cases*, J.C.C.P. No. 4314, San Francisco Superior Court (antitrust class action on behalf of all California indirect purchasers of high pressure label stock)

> *Smokeless Tobacco Cases I-IV*, J.C.C.P. Nos. 4250, 4258, 4259 and 4262, San Francisco Superior Court (certified antitrust class action on behalf of California consumers of smokeless tobacco products);

> *Compact Disk Cases*, J.C.C.P. No. 4123, Los Angeles Superior Court (antitrust class action on behalf of California consumers of prerecorded compact disks);

> *In re Flat Glass Cases*, J.C.C.P. No. 4033, San Francisco Superior Court (antitrust class action on behalf of California indirect purchasers of flat glass products);

> *Vitamin Cases*, J.C.C.P. No. 4076, San Francisco Superior Court (antitrust class action on behalf of California indirect purchasers of vitamins);

**E.      Prickett, Jones & Elliott (Proposed Liaison Counsel)**

Since 1888, Pricket Jones has had a significant presence among the Delaware legal establishment. *See* Prickett, Jones & Elliott Biography, Ex.H. Its attorneys regularly appear before judges in the United States District Court for the District of Delaware, U.S. Court of Appeals for the Third Circuit, as well as all Delaware state courts including the Delaware Supreme Court.

13

James Holzman practices in all areas involving Delaware corporation law and business litigation. Mr. Holzman is listed in the Best Lawyers in America and has served as Chair of the Business and Corporate Litigation Committee of the American Bar Association Section of Business Law.

Clearly, all of these attorneys and firms have the experience to undertake this litigation, and they are willing and able to harvest the necessary resources to litigate these actions zealously and effectively.

III.   **ENTERING THE PROPOSED ORDER WILL BEST REPRESENT THE INTERESTS OF THE PROPOSED CLASS AND ALSO EXPEDITE THE LITIGATION**

In appointing lead counsel, courts additionally consider whether the proposed lead counsel will "act fairly, efficiently, and economically in the interest of all parties and parties' counsel." *In re Cardinal Health, Inc.*, 225 F.R.D. at 555. *See also In re Linerboard Antitrust Litig.*, 292 F.Supp.2d at 653-56; *In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 75 (S.D.N.Y. 2000). Indeed, "[t]he Court has power to act prior to addressing the merits of the class certification motion; it may appoint counsel to represent the proposed class. . . . Prompt designation of capable counsel *now* who are able to proceed forcefully and promptly to help protect the prospective class, with the possibility of additional counsel from the plaintiffs' bar to be appointed subsequently to serve as a committee, will *expedite* this litigation and help ensure protection of the putative class." *In re Joint Eastern and Southern Districts Asbestos Litig.*, 132 F.R.D. 332, 333-34 (E.D.N.Y.; S.D.N.Y., 1990) (emphasis added) (citations omitted).

Here, the proposed lead firms have a long history of working together in the joint prosecution of antitrust actions in a fair and efficient manner. Accordingly, these attorneys and firms enjoy overwhelming support. As indicated by the extensive list of

14

cases in Exhibits B hereto, all but a handful of plaintiffs in the Centralized Actions support this co-lead structure. Thus, because there already is substantial consensus among counsel, entering the proposed order would best reflect the interests of the plaintiffs in the Centralized Actions.

Entering the proposed order also will expedite the litigation. The proposed lead counsel structure is not only established and well organized, it is also comprised of firms that have offices on the East Coast – where this Court and many parties are located and also on the West Coast – where AMD and Intel are headquartered and many important documents and witnesses in these actions reside. The bi-coastal nature of this proposed lead counsel organization will enhance the efficiency of the litigation and also conserve resources. Moreover, these attorneys already have taken steps to coordinate the production of initial disclosures and other discovery with AMD's and Intel's attorneys. They have demonstrated their intention and ability to coordinate and expedite discovery, and thereby advance the interests of all federal purchaser plaintiffs.

## CONCLUSION

For all of the foregoing reasons, certain plaintiffs from the Centralized Actions respectfully request that the Court enter the attached proposed order seeking consolidation of all federal purchaser actions for pretrial proceedings, consistent with the JPML Order, attached as Exhibit A and further seeking appointment of the proposed co-lead counsel structure.

November 10, 2005

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Allyson B. Baker
COHEN, MILSTEIN, HAUSFELD &
TOLL, P.L.L.C.
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC 20005
*Proposed Co-Lead Counsel*

Michael P. Lehmann
Thomas P. Dove
Alex C. Turan
THE FURTH FIRM, LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
*Proposed Co-Lead Counsel*

Steven W. Berman
Anthony Shapiro
HAGENS BERMAN SOBOL SHAPIRO,
LLP
1301 Fifth Avenue
Suite 2900
Seattle, WA 98101
*Proposed Co-Lead Counsel*

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111
*Proposed Co-Lead Counsel*

PRICKETT, JONES & ELLIOTT, P.A.

_____/S/ Eric M. Andersen_____
James L. Holzman (DE Bar # 663)
David W. Gregory (DE Bar #4408)
Eric M. Andersen (DE Bar #4376)
1310 King Street
Wilmington, DE 19801
(302) 888-6500
jlholzman@prickett.com
dwgregory@prickett.com
*Proposed Liaison Counsel*

16

D. Natalie Finkelman
Bennett Shepard
Finkelman, Miller & Shah, LLC
35 East State Street
Media, PA 19603
Telephone: (610) 891-9880
*Counsel for Ludy A. Chacon*

James E. Miller
Bennett Shepard
Finkelman, Miller & Shah, LLC
65 Main Street
Chester, CT 06412-1311
Telephone: (860) 526-1100
*Counsel for Ludy A. Chacon*

Ira Neil Richards
R. Andrew Santillo
Trujillo Rodriguez & Richards, LLC
226 W. Rittenhouse Square,
The Penthouse
Philadelphia, PA 19103
Telephone: (215) 731-9004
*Counsel for Ludy A. Chacon*

Jeffrey S. Goddess
Rosenthal, Monhait, Gross & Goddess, P.A.
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
Telephone: (302) 656-4433
*Counsel for Ludy A. Chacon, Joseph Samuel Cone, Michael K. Simon*

Douglas P. Dehler
The Dehler Law Firm, S.C.
250 N. Sunnyslope Road, Suite 300
Brookfield, WI 53005
Telephone: (262) 780-7041
*Counsel for Ludy A. Chacon*

Marc A. Wites
Wites & Kapetan, P.A.
4400 North Federal Highway
Lighthouse Point, FL 33064
Telephone: (954) 570-8989
*Counsel for Ludy A. Chacon*

John R. Minnino
J. Minnino, LLC
475 White Horse Pike
Collingswood, NJ 08107-2909
Telephone:  (856) 833-0600
*Counsel for Ludy A. Chacon*

Anthony J. Bolognese
Joshua Grabar
Bolognese & Associates, LLC
One Penn Center Plaza
1617 JFK Boulevard, Suite 650
Philadelphia, PA 19103
Telephone:  (215) 814-6750
*Counsel for Phil Paul*

Douglas G. Thompson, Jr.
William P. Butterfield
Finkelstein, Thompson & Loughran
1050 30th Street, NW
Washington, DC 20007
Telephone:  (202) 337-8000
*Counsel for Plaintiffs Carol Cowan,*
*Leonard Lorenzo and Russell Dennis,*
*Damon DiMarco, Ian Walker*

Daniel Hume
David Kovel
Kirby McInerney & Squire, LLP
830 Third Avenue
New York, NY 10022
Telephone: (212) 371-6600
*Counsel for Matthew Kravitz and Raphael Allison*

Michele C. Jackson
Lieff Cabraser Heimann & Bernstein, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 9411-3399
Telephone: (415) 956-1000
*Counsel for Huston Frazier, Jeanne Cook Frazier and Brian Weiner*

Steven O. Sidener
Joseph M. Barton
Gold Bennett Cera & Sidener, LLP
595 Market Street, Suite 2300

San Francisco, CA 94106
Telephone: (415) 777-2230
*Counsel for Jerome Feitelberg*


Robert S. Kitchenoff
Steven A. Asher
Mindee Reuben
Weinstein Kitchenoff & Asher, LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Telephone: (215) 545-7200
*Joseph Samuel Cone*

Francis O. Scarpulla
Law Offices of Francis R. Scarpulla
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 788-7210
*Counsel for Michael Brauch, Andrew Meimes, Lazio Family Products*

Craig C. Corbitt
Zelle Hofmann Voelbel Mason & Gette, LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 693-0700
*Counsel for Michael Brauch, Andrew Meimes, Lazio Family Products, Law offices of Laurel Stanley*

Scott E. Chambers
Jeffrey J. Clark
Schmittinger and Rodriguez, P.A.
414 South State Street
P.O. Box 497
Dover, DE 19903
*Counsel for Lena K. Manyin;*
*Jason Craig*

Jeffrey F. Keller
Kathleen R. Scanlan
Law Offices of Jeffrey F. Keller
425 Second Street, Suite 500
San Francisco, CA 94107
Telephone: (415) 543-1305

*Counsel for Susan Baxley, David E. Lipton, Dana F. Thibedeau, Ronald Konieczka,*
*Maria I. Prohias, Steven J. Hamilton, Patricia M. Niehaus, Kevin Stoltz, Peter Jon*
*Naigow*

Mark Reinhardt
Garrett D. Blanchfield, Jr.
Reinhardt Wendorf & Blanchfield
332 Minnesota Street, Suite E-1250
St. Paul, MN 55101
Telephone: (651) 287-2100
*Counsel for Susan Baxley*

Joseph Patane
Law Office of Joseph M. Patane
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 346-0679
*Counsel for Lawrence Lang, Karol Juskiewicz*

Mario Nunzio Alioto
Trump Alioto Trump & Prescott, LLP
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 346-0679
*Counsel for Lawrence Lang, Karol Juskiewicz*

Spencer Hosie
Bruce J. Wecker
Hosie McArthur LLP
One Market Street
Spear Street Tower #2200
San Francisco, CA 94105
Telephone: (415) 247-6000
*Counsel for Dwight E. Dickerson*

Steven Greenfogel
Daniel B. Allanoff
Meredith Cohen Greenfogel & Skirnick, P.C.
22nd Floor, Architects Building
117 S. 17th Street
Philadelphia, PA 19103
Telephone: (215) 564-5182
*Counsel for Benjamin Allanoff*

Robert N. Kaplan
Richard J. Kilsheimer

Gregory K. Arenson
Kaplan, Fox & Kilsheimer LLP
805 Third Avenue, 22nd Floor
New York, NY 10022
Telephone: (212) 687-1980
*Counsel for Christian Ambruoso*

Eugene A. Spector
Jeffrey L. Kodroff
Jeffrey J. Corrigan
William G. Caldes
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
*Counsel for Lena Manyin,*
*Jason Craig, Andrew S. Cohn,*
*Maria Griffin, Paul Ramos,*
*David Arnold*

Steven A. Kanner
Douglas A. Millen
William H. London
Much Shelist Freed Denenberg Ament & Rubenstein, P.C.
191 North Wacker Drive
Suite 1800
Chicago, IL 60606
Telephone: (312) 521-2000
*Counsel for HP Consulting Services, Inc., Phillip Boeding*

Kenneth A. Wexler
Edward A. Wallace
The Wexler Firm LLP
One N. LaSalle Street, Suite 2000
Chicago, IL 60602
Telephone: (312) 346-2222
*Counsel for Peter Jon Naigow*

Allan Steyer
Steyer Lowenthal Boodrookas Alvarez & Smith, LLP
San Francisco, CA 94111
Telephone: (415) 421-3400
*Counsel for Jodi Salpeter, Jay Salpeter,*
*Cheryl Glick-Salpeter, Michael H. Roach*

James R. Malone, Jr.
Chimicles &Tikellis LLP
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: 610-642-8500
*Counsel for Elizabeth Bruderle Baran, Paul C. Czysz, Carrol Cowan, Leonard Lorenzo,*
*Russell Dennis, Angel Genese, Gideon Elliott, Nir Goldman, Damon DiMarco,*

Robert C. Shubert
Juden Justice Reed
Peter E. Borkon
Shubert & Reed LLP
San Francisco, CA 94111
Telephone:  (415) 788-4220
*Counsel for Patrick J. Hewson*

Dan E. Gustafson
Jason S. Kilene
Gustafson Gluek PLLC
725 Northstar East
608 Second Avenue S.
Minneapolis, MN 55402
Telephone: (612) 333-8844
*Counsel for Fairmont Orthopedics & Sports Medicine*

Chad C. Noland
Chad C. Noland, P.C.
109 North 4th Street
Suite 300
Bismarck, ND 58502-0640
Telephone: (701) 222-3030
*Counsel for Melinda Harr, D.D.S., P.C.*

Mark A. Griffin
Keller Rohrback L.L.P.
1201 Third Avenue
Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
*Counsel for Henry Korngay*

Samuel D. Heins
Vincent J. Esades

Troy J. Hutchinson
Heins Mills & Olson, P.L.C.
3550 I.D.S. Center
80 S. Eighth Street
Minneapolis, MN 55402
Telephone: (612) 338-4605
*Counsel for Bergenson & Associates, Inc.*

Gerald Rodos
Mark R. Rosen
Jeffrey B. Gittelman
Barrack Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
*Counsel for Michael K. Simon*

Hollis L. Salzman
Kellie Safar
Goodkind Labaton Rudoff & Sucharow LLP
100 Park Avenue
New York, NY 10017-5563
Telephone: (212) 907-0700
*Counsel for Angel Genese, Gideon Elliott, Nir Goldman*

Roberta D. Liebenberg
Donald L. Perelman
Fine Kaplan and Black, RPC
1835 Market Street, 28th Floor
Philadelphia, PA 19103
Telephone: (215) 568-6565
*Counsel for Kevin Stoltz*

Joseph W. Cotchett
Bruce L. Simon
Nancy Fineman
Kelly L. Bulawsky
Cotchett, Pitre, Simon & McCarthy
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
*Counsel for Trotter-Vogel Realty, Inc. dba Prudential California Realty*

Jeffrey S. Goldenberg

John C. Murdock
Murdock, Goldenberg Schneider & Groh, L.P.A.
700 Walnut Street, Suite 400
Cincinnati, OH 45202-2011
*Counsel for Ronald Konieczka, Patricia M. Niehaus*

Lance A. Harke
Howard M. Bushman
Harke & Clasby LLP
155 South Miami Avenue, Suite 600
Miami, FL 33130
*Counsel for Maria I. Prohias*

Randy R. Renick
Law Offices of Randy Renick
128 North Fair Oaks Avenue, Suite 204
Pasadena, CA 91103
Telephone: (626) 585-9600
*Counsel for the Harmon Press*

Gordon Ball
Ball & Scott
Bank of America Building
550 West Main Avenue, Suite 750
Knoxville, Tennessee 37902
Telephone: (865) 525-7028-

## CERTIFICATE OF SERVICE

I, Eric M. Andersen, hereby certify that on this 10th day of November, 2005, the foregoing Memorandum of Law in Support of Plaintiff's Motion for Consolidation and for Appointment of Co-Lead Plaintiff and Liaison Counsel was served on counsel for the following parties as indicated below:

### VIA ELECTRONIC FILING

Joel Freidlander
James G. McMillan, III
Bouchard, Margules & Friedlander, PA
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801

Scott E. Chambers
Jeffrey J. Clark
Schmittinger & Rodriguez, PA
414 State Street
P.O. Box 497
Dover, DE 19903

Pamela S. Tikellis
Robert J. Kriner, Jr.
A. Zachary Naylor
Robert R. Davis
Chimicles & Tikellis LLP
One Rodney Square
P.O. Box 1035
Wilmington, DE 19999

R. Bruce McNew
Taylor & McNew, LLP
3711 Kennett Pike, Suite 210
Greenville, DE 19807

Jeffrey S. Goddess
Rosenthal, Monhait, Gross & Goddess
Mellon Bank Center, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070

Robert D. Goldberg
Biggs and Battaglia
921 North Orange Street
P.O. Box 1489
Wilmington, DE 19899-1489

Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street
Wilmington, Delaware 19801

19684.1\290129v1

VIA FIRST CLASS U.S. MAIL

Francis O. Scarpulla
Law Offices of Francis O. Scarpulla
44 Montgomery Street, Suite 3400
San Francisco, CA  94104

Joseph M. Patane
Law Offices of Joseph M. Patane
2280 Union Street
San Francisco, CA 94123

Spencer Hosie
Bruce J. Wecker
Hosie McArthur LLP
One Market, Spear Street Tower, #2200
San Francisco, CA  94105

Kenneth A. Wexler
Edward A. Wallace
The Wexler Firm LLP
One LaSalle Street, Suite 2000
Chicago, IL 60602

Randy R. Renick
Law Offices of Randy R. Renick
128 North Fair Oaks Avenue, Suite 204
Pasadena, CA  91103

Howard M. Bushman
Harke & Clasby LLP
155 South Miami Avenue, Suite 600
Miami, FL  33130

Steven Greenfogel
Meredith Cohen Greenfogel &
Skirnick, P.C.
22nd Floor, Architects Building
117 S. 17th Street
Philadelphia, PA  19103

Jeffrey F. Keller
Kathleen R. Scanlan
Law Office of Jeffrey F. Keller
425 Second Street, Suite 500
San Francisco, CA  94107

Robert C. Schubert
Juden Justice Reed
Peter E. Borkon
Schubert & Reed LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA  94111

Michael L. Kirby
Post Kirby Noonan and Sweat
600 West Broadway
Suite 1100
San Diego, CA  92101-3302

Daniel J. Mogin
The Mogin Law Firm, P.C.
110 Juniper Street
San Diego, CA  92101-1502

Gordon Ball
Ball & Scott
550 W. Main Avenue, Suite 750
Knoxville, TN  37902

Daniel Karon
55 Public Square, Suite 1500
Cleveland, OH  44113

Amamgbo & Associates
1940 Embarcadero
Oakland, California 94606

Mayo & Rogers
Attn: Terence Mayo
114 Sansome Street, Suite 1310
San Francisco, CA  94104

Alexander, Hawes & Audet
152 N. Third Street, Suite 600
San Jose, CA  95112

Law Offices of Krishna B. Narine
7839 Montgomery Avenue, Third Floor
Elkins Park, Pennsylvania 19027

Isaac L. Diel
Law Office of Isaac L. Diel
135 Oak Street
Bonner Springs, KS  66012

Edward M. Gergosian
Robert J. Gralewski, Jr.
Gergosian & Gralewski LLP
550 West C Street, Suite 1600
San Diego, CA  92101

Thomas M. Ferlauto
King & Ferlauto, LLP
1880 Century Park East, Suite 820
Los Angeles, CA  90067

_____/s/ Eric M. Andersen_____
Eric M. Andersen (#4376)

# Exhibit B

## Exhibit B (60 Plaintiffs)

| Plaintiff | Court | Date | Attorneys |
|---|---|---|---|
| Kravitz, Matthew and Allison, Raphael | D. Del. | 7/8/2005 | Bouchard Margules & Friedlander; Kirby McInerney & Squire, LLP |
| Ruccolo, Michael | D. Del. | 7/8/2005 | Schmittinger and Rodriguez |
| Paul, Phil | D. Del. | 7/12/2005 | Prickett, Jones & Elliot; CMHT; Bolognese & Associates |
| Chacon, Ludy | D. Del. | 7/13/2005 | Rosenthal, Monhait, Gross & Goddess; Shepherd, Finkelman, Miller & Shah, LLC |
| Simon, Michael | D. Del. | 7/13/2005 | Rosenthal, Monhait, Gross & Goddess; Barrack Rodos & Bacine |
| Ambruoso, Christian | D. Del. | 7/20/2005 | Prickett, Jones & Elliott |
| Baran, Elizabeth Bruderle | D. Del. | 7/20/2005 | Chimicles & Tikellis |
| Czysz, Paul | D. Del. | 7/20/2005 | Chimicles & Tikellis |
| Fairmont Orthopedics & Sports Medicine | D. Del. | 7/22/2005 | Prickett, Jones & Elliott; Gustafson Gluek PLLC; |
| HP Consulting Cowan, Carrol; | D. Del. | 7/22/2005 | Prickett, Jones & Elliott; Much Shelist Freed Denenberg Chimicles & Tikellis; |
| Lorenzo, Leonard; Dennis, Russell; | D. Del. | 7/22/2005 | Finkelstein, Thompson & Loughran; Arthur J. |
| Manyin, Lena; Craig, Jason | D. Del. | 7/22/2005 | Schmittinger and Rodriguez; Spector Roseman & Kodroff |
| Feitelberg, Jerome | D. Del. | 7/25/2005 | Prickett, Jones; Gold Bennett |

| | | | |
|---|---|---|---|
| Cone, Joseph Samuel | D. Del. | 7/25/2005 | The Furth Firm Rosenthal, Monhait, Gross & Goddess; Weinstein, Kichenoff, & Asher; Hagens Berman Sobal Shapiro; Saveri & Saveri |
| Harr, Melinda | D. Del. | 7/26/2005 | Prickett, Jones; Chad C. Noland, PC |
| Cohn, Andrew S. | D. Del. | 7/26/2005 | Schmittinger & Rodriguez; Spector Roseman & Kodroff |
| Griffin, Maria | D. Del. | 7/26/2005 | Schmittinger & Rodriguez; Spector Roseman & Kodroff |
| Kornegay, Henry | D. Del. | 7/27/2005 | Prickett, Jones & Elliott; Keller Rohrback |
| Ramos, Paul | D. Del. | 7/28/2005 | Schmittinger & Rodriguez; Spector Roseman & Kodroff; |
| Bergerson & Associates | D. Del. | 7/28/2005 | Prickett, Jones & Elliott; Heins, Mills & Olson |
| Arnold, David | D. Del. | 8/1/2005 | Schmittinger & Rodriguez; Spector Roseman & Kodroff; The Law Offices of Randy M. Webber |
| Boeding, Phillip | D. Del. | 8/2/2005 | Prickett, Jones & Elliott; Much Shelist Freed Denenberg |
| Genese, Angel and Elliott, Gideon; Goldman, Nir | D. Del. | 8/2/2005 | Chemicles & Tikellis; Goodkind Labaton Rudoff |
| Salpeter, Jodi; Salpeter Jay; Glick-Salpeter, Cheryl | D. Del. | 8/8/2005 | Prickett, Jones & Elliot; Steyer Lowenthal Boodrookas Alvarez & Smith; The Furth Firm |

| | | | |
|---|---|---|---|
| Roach, Michael | D. Del. | 8/22/2005 | Prickett, Jones & Elliott; Steyer Lowenthal Boodrookas Alvarez & Smith; The Furth Firm |
| DiMarco, Damon | D. Del. | 8/25/2005 | Chimicles & Tikellis; Finkelstein, Thompson & Loughran |
| Lipton, David E. | NDCA | 6/29/2005 | Law Offices of Jeffrey F. Keller; Hagens Berman Sobol Shapiro LLP (LA and Seattle offices) |
| Konieczka, Ronald | NDCA | 6/30/2005 | Murdock Goldenberg Schneider & Groh; Law Offices of Jeffrey Keller; Hagens Berman (LA and Seattle) |
| Prohias, Maria | NDCA | 6/30/2005 | Hagens Berman (LA and Seattle); Law Offices of Jeffrey F. Keller; Harke & Clasby |
| Hamilton, Steve J. | NDCA | 7/1/2005 | LO of Jeffrey F. Keller; Hagens Berman |
| Niehaus, Patricia M. | NDCA | 7/1/2005 | LO of Jeffrey Keller; Hagens Berman; Murdock Goldenberg Schneider & Groh |
| Brauch, Michael | NDCA | 7/5/2005 | Furth Firm; Law Offices of Francis Scarpulla, Zelle Hofman Voelbel Mason & Gette |
| Baxley, Susan | NDCA | 7/6/2005 | LO of Jeffrey F. Keller; Murray Frank & Sailer; Reinhardt Wendorf & Blanchfield |
| Frazier, Huston, Frazier, Jeanne, Weiner, Brian | NDCA | 7/11/2005 | Lieff Cabraser Heimann & Bernstein, LLP |
| Dickerson, Dwight E. | NDCA | 7/11/2005 | Hosie McArthur, LLP |
| The Harman Press | NDCA | 7/11/2005 | Saveri & Saveri; Law Offices of Randy Renick |

| | | | |
|---|---|---|---|
| Allanoff, Benjamin | NDCA | 7/12/2005 | Furth Firm; Meredith Cohen Greenfogel & Skirnick |
| Major League Softball, Inc. | NDCA | 7/12/2005 | Saveri & Saveri; LO of Randy Renick; Serratore & Ames |
| Shanghai 1930 Restaurant Partners, L.P. | NDCA | 7/12/2005 | Saveri & Saveri; LO of Randy Renick |
| Lazio Family Products | NDCA | 7/13/2005 | Furth Firm; Zelle, Hofman, Voelbel, Mason & Gette; LO of Francis O. Scarpulla |
| Law Offices of Laurel Stanley | NDCA | 7/13/2005 | Zelle Hofmann Voelbel Mason & Gette |
| Walker, Ian | NDCA | 7/14/2005 | Finkelstein Thompson & Loughran |
| Stoltz, Kevin | NDCA | 7/15/2005 | Law Offices of Jeffrey F. Keller; Fine Kaplan & Black; Aoki Sakamoto Grant, LLP |
| Hewson, Patrick J. | NDCA | 7/18/2005 | Schubert & Reed |
| Naigow, Peter Jon | NDCA | 7/15/2005 | LO of Jeffrey F. Keller; The Wexler Firm |
| Lang, Lawrence | NDCA | 7/20/2005 | LO of Joseph M. Patane |
| Trotter-Vogel Realty | NDCA | 7/26/2005 | Cotchett, Pitre, Simon & McCarthy |
| Juskiewicz, Karol | NDCA | 7/29/2005 | Law Offices of Joseph M. Patane; Trump, Alioto, Trump and Prescott |
| Schwartz, Nathaniel | S.D. Fla. | 8/16/2005 | Hagens Berman; Howard Mitchell Bushman |
| Armbrister, Andrew | E.D. Tenn. | 8/19/2005 | Ball & Scott |

# EXHIBIT C
# (1 OF 3)

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

———————————————————
                                    MDL NO. 1514
IN RE:                   MASTER CIVIL NO. 03-2182 (JBS)

ELECTRICAL CARBON PRODUCTS
ANTITRUST LITIGATION
———————————————————


                         UNITED STATES COURTHOUSE
                         ONE JOHN F. GERRY PLAZA
                         CAMDEN, NEW JERSEY 08101
                         WEDNESDAY, JUNE 25, 2003


B E F O R E:        THE HONORABLE JEROME B. SIMANDLE,
                        UNITED STATES DISTRICT JUDGE



A P P E A R A N C E S:


    MELISSA H. MAXMAN, ESQUIRE
    WARREN RUBIN, ESQUIRE
    MARK R. ROSEN, ESQUIRE
    TINA MOUKOULIS, ESQUIRE
    JOSEPH R. SAVERI, ESQUIRE
    NATALIE FINKLEMAN-BENNETT, ESQUIRE
    ALLYN Z. LITE, ESQUIRE
    JASON S. HARTLEY, ESQUIRE
    ROBERT N. KAPLAN, ESQUIRE
    H. LADDIE MONTAGUE, ESQUIRE
    HOWARD J. SEDRAN, ESQUIRE
    NAT G. KIEFER, JR., ESQUIRE
    STEVEN A. ASHER, ESQUIRE
    LISA J. RODRIGUEZ, ESQUIRE
    ATTORNEYS FOR PLAINTIFFS

    LOUIS R. MOFFA, ESQUIRE
    ATTORNEY FOR DEFENDANTS


                         LISA MARCUS, C.S.R.
                         CERTIFICATE NO. 1492
                         OFFICIAL U. S. REPORTER

            United States District Court - Camden, New Jersey

```
1              DEPUTY CLERK:  All rise.

2              THE COURT:  Be seated, please.

3         Good morning, and welcome once again to the Electrical

4  Carbon Products Antitrust litigation.

5         Let me begin by saying that I feel it's an honor and a

6  privilege to preside over this case.  And I could pledge to

7  you that I'll do my best, and I'm sure I receive the same

8  pledge in return.  What I look forward to is managing the

9  class collaborative with the attorneys.  I believe it will

10 always be clear who's in charge of the case, hopefully it

11 will be clear the judge is in charge of the case, but I'm not

12 a judge who so wouldn't, or so overly structured that I'm not

13 open to good suggestions, and that's what I'm really calling

14 upon everyone to develop over the course of the litigation.

15        I have your sign-up sheets.  Let me just call through

16 the names and then I can see if I've missed anyone.  And this

17 is just in the order that you happen to sign-up.

18        Melissa Maxman, Warren Rubin.

19             MR. RUBIN:  Here, your Honor.

20             THE COURT:  Mark Rosen.

21             MR. ROSEN:  Good morning, your Honor.

22             THE COURT:  Tina Moukoulis.

23        MS. MOUKOULIS:  Here.

24             THE COURT:  Joseph Saveri and Elizabeth Cabraser.

25             MR. SAVERI:  I'm Joseph Saveri, your Honor.  Good
```

United  States  District  Court  -  Camden,  New  Jersey

3

1    morning.  Elizabeth Cabraser is my partner, she's not here

2    today.

3            THE COURT:  I misread the sign up.  I thought Ms.

4    Cabraser was once again visiting this courtroom.

5        Let's see Natalie Finkleman-Bennett.

6            MS. FINKLEMAN-BENNETT:  Here.

7            THE COURT:  Allyn Z. Lite.

8            MR. LITE:  Good morning, your Honor.

9            THE COURT:  Jason Hartley.

10           MR. HARTLEY:  Good morning, your Honor.

11           THE COURT:  Robert Kaplan.

12           MR. KAPLAN:  Good morning, your Honor.

13           THE COURT:  H. Laddie Montague.

14           MR. MONTAGUE:  Good morning, your Honor.

15           THE COURT:  Howard Sedran.

16           MR. SEDRAN:  Good morning.

17           THE COURT:  Nat Kiefer, Jr.  Okay.

18       Do you want to raise your hand again so the attorneys

19   can see?

20       Steven Asher.

21           MR. ASHER:  Good morning.

22           THE COURT:  Lisa Rodriguez.

23           MS. RODRIGUEZ:  Good morning, your Honor.

24           THE COURT:  And Louis Moffa.

25           MR. MOFFA:  Good morning, your Honor.

4

1          THE COURT:  Have I missed anybody?  Okay.

2          This morning is the return date of the motion for

3    approval of Pretrial Order Number 1, and I've certainly

4    received some interesting submissions on it.  And I would

5    like to give the movant and the opponents the opportunity to

6    flesh out their positions a little bit more.  I also have

7    some questions.  I think this is, frankly, a very important

8    hearing.

9          I considered whether any testimony would be needed.

10   I've reached a conclusion that none is.  I do have some

11   affidavits, but, more importantly, I do have officers of the

12   Court prepared to make representations to me about any of the

13   important facts of the case.

14         And so why don't we proceed.  Who will argue in favor

15   of the motion?  Ms. Rodriguez?

16         MS. RODRIGUEZ:  Your Honor, actually Mr. Sedran

17   will argue in favor of the motion.

18         THE COURT:  Okay.  Mr. Sedran, you may proceed.

19         MR. SEDRAN:  Good morning, your Honor.  Howard

20   Sedran.

21         We too are pleased that you have been assigned to MDL

22   1514, and all of us look forward to working with the Court

23   and our co-counsel in a collaborative fashion and manner so

24   that hopefully the litigation will proceed expeditiously, as

25   expeditiously as it can under the circumstances of this

United  States  District  Court  -  Camden,  New  Jersey

5

```
1    complex case.

2          I note this is MDL 1514.  In my junior years as a law

3    clerk for a federal judge, I worked on MDL 55, we're already

4    up to 1514.

5          THE COURT:  Are they growing exponentially in

6    number?

7          MR. SEDRAN:  I don't think that they are.

8          THE COURT:  No?

9          MR. SEDRAN:  Actually, in all these years that I've

10   been practicing, I'm surprised that we're only up to 1514.

11   Maybe they started over again.  But, in any event, I worked

12   on MDL 55, In Re:  Nissan Antitrust litigation a long time

13   ago.

14         I'm here on behalf of the movants who filed the papers

15   for entry of Pretrial Order Number 1, and those papers

16   propose an Executive Committee of four lawyers, myself from

17   the law firm of Levin, Fishbein, Sedran & Berman; Warren

18   Rubin from the law office of Bernard Gross; Melissa Maxman

19   from the Duane Morris firm; and Steve Asher from the Fox

20   Rothschild firm.

21         THE COURT:  What is the magic to an Executive

22   Committee of four?  Why should it be four and not, for

23   instance, one, two, or three?

24         MR. SEDRAN:  I don't think that there is any magic.

25   In our papers we cited to the Third Circuit Task Force on the
```

United States District Court - Camden, New Jersey

6

1    selection of lead counsel.  And what I drew from that report,

2    and Ms. Rodriguez served as a committee member, was that

3    private ordering is a method of selecting lead counsel as

4    long as the Court is comfortable with the firms and lawyers

5    that are selected.  The Court needs to assure itself that the

6    class is properly represented.  And that's the fundamental

7    question before the Court, I would suggest.

8          But in terms of four versus two or three, as we

9    pointed out in our papers, most, all but one of the

10   plaintiffs attended a meeting in Philadelphia to discuss how

11   the litigation should proceed.  We all recognize, the

12   plaintiffs' lawyers, that we needed some organized structure,

13   that we all could not be coming into court making our own

14   presentations, we had to narrow the field so that the Court

15   would have a group of lawyers to address, and the defense

16   counsel as well.  The collective wisdom of the lawyers that

17   met with one another was that a group of four would work

18   well.

19         So I would suggest to the Court that the starting

20   point is what was the collective will of the plaintiffs'

21   lawyers.  In many cases, but not exclusively, there are four

22   lead counsel or four members of an Executive Committee to

23   lead the litigation.  In our experience, that sort of number

24   works well.  We are able to make sure that, amongst our

25   group, that we are always well-equipped to do battle with the

United  States  District  Court  -  Camden,  New  Jersey

```
 1   defense counsel, if necessary.

 2        In this litigation, there are currently two groups of

 3   defendants with subsidiaries.  When we get to the point of

 4   filing a consolidated amended complaint, I expect that there

 5   will be an additional defendant named with subsidiaries and

 6   possibly a fourth.  So to make sure that the plaintiffs'

 7   counsel, the plaintiffs are adequately represented and can do

 8   battle with the defense counsel, we would suggest to the

 9   Court there is absolutely no reason not to allow the

10   plaintiffs' counsel to equip themselves with the group of

11   lawyers that they feel is appropriate.

12        We don't think that we're over-layering the case with

13   lawyers, and that's sometimes a concern of courts.  What we

14   propose in our Pretrial Order Number 1 is that there will be

15   contemporaneous time reports maintained and submitted to the

16   counsel for review.

17        THE COURT:  What is done typically to prevent

18   redundancy among the four attorneys?  And the proposed Order

19   says that any Order that I enter will be served on six

20   attorneys for the plaintiffs alone, two liaison attorneys

21   plus four Executive Committee attorneys.  What, as a

22   practical matter, can be done so all four attorneys, actually

23   all six, are not doing the same thing in response to orders

24   or mailing and forwarding information on or even

25   strategizing.
```

| | |
|---|---|
| 1 | MR. SEDRAN:  Well, in terms of redundancy, the |
| 2 | lawyers that we propose to serve on the committee of four |
| 3 | have actually worked together in a variety of cases over |
| 4 | time.  And in our CVs or resumes, you'll note we have very |
| 5 | deep Antitrust experience, and we're used to working together |
| 6 | and delegating assignments.  So I would represent to the |
| 7 | Court that there will not be redundancy, that we will draw |
| 8 | upon the strengths of one another to get the job done.  At |
| 9 | the end of the day, the Court will, if the case is |
| 10 | successful, be in a position to award attorney's fees and -- |
| 11 | I mean, my representation to you is, your Honor, that we are |
| 12 | not going to allow redundancy, and we'll supervise the |
| 13 | litigation to make sure it doesn't happen.  But at the end of |
| 14 | the day, you have the final say to voice your opinion as to |
| 15 | whether we made our promise to you. |
| 16 | There are just numerous cases where four co-lead |
| 17 | counsel or four Executive Committee members work.  And I |
| 18 | would suggest that there's no reason not to have that in this |
| 19 | instance.  And again, drawing back to the private ordering |
| 20 | that's reflected in the Task Force report, I think that the |
| 21 | Task Force report says that that's okay.  The Court just |
| 22 | can't rubber stamp any suggestion, but as long as the counsel |
| 23 | are experienced and the Court feels comfortable that we will |
| 24 | live up to our responsibilities to the Court, there's no |
| 25 | reason not to have four. |

9

1          THE COURT:  One of the opponents have said that

2     their client, San Francisco, will be disadvantaged unless

3     they're included.  Is San Francisco somehow differently

4     situated from those clients whose attorneys are proposed for

5     the Executive Committee?

6          MR. SEDRAN:  No, your Honor.  These are class

7     actions.  And, as a matter of fact, the City of San Francisco

8     filed its own case as a class action seeking to represent all

9     direct purchasers of this product.  And they, in their own

10    papers, said that they are able to represent all other

11    purchasers because the interests of all the class members are

12    the same.

13          We represent many transit authorities, your Honor.  In

14    addition, Mr. Asher is representing a non-transit authority.

15    I represent the New Orleans Transit Authority and their

16    private purchasing arm.  So the City of San Francisco is not

17    unique, does not stand-alone, and their interests in this

18    class action proceeding would be adequately represented by

19    the class representatives in the litigation.

20          So the short answer is I am unaware of any reason why

21    the City of San Francisco has a unique position.  And, in

22    fact, Ms. Maxman represents BART located in San Francisco, so

23    that in terms of the array of plaintiffs, we have

24    geographical diversity, we have plaintiffs from all around

25    the country representing purchasers who are located in the

United   States   District   Court   -   Camden,   New   Jersey

1  United States.  So as far as I can tell, your Honor, there's

2  no factor, no reason why the City of San Francisco stands

3  alone and needs special counsel.

4          THE COURT:  Let me return to something you said.

5          MR. SEDRAN:  Yes.

6          THE COURT:  You mentioned that the four that were

7  proposed have experience working together in other cases.

8  Could you tell me in a nutshell about some of those other

9  cases?

10          MR. SEDRAN:  Yes, your Honor.  And I may have

11  overstated it because I have not worked with Ms. Maxman

12  directly before.  I'm involved in litigation with her

13  concerning another product in the Eastern District of

14  Pennsylvania.  And Ms. Maxman's working with Mr. Montague.

15  Mr. Asher and I have most recently worked on the Graphite

16  Electrodes Antitrust litigation in the Eastern District of

17  Pennsylvania, that's pending before Judge Wiener.  Mr. Asher

18  and I are currently working on a case called Sulfuric Acid

19  Antitrust litigation, that is in its infancy.  For example,

20  Mr. Rubin and I are working in Auto Paint Antitrust

21  litigation pending in the Eastern District of Pennsylvania.

22  Ms. Rodriguez's firm and I have worked together on a variety

23  of cases.  Notably, I'm doing this from memory, your Honor,

24  the Airline Commission Antitrust litigation.  Mr. Asher and I

25  have worked together on Flat Glass Antitrust litigation.  Mr.

1   Kaplan, who is here, was co-lead counsel in that litigation.

2   Our firms have worked together on the Polypropylene Carpet

3   Antitrust litigation.  I think Ms. Rodriguez's firm was in

4   that and Mr. Rubin was involved in that.  The Commercial

5   Waste Haulers Antitrust litigation.  So that's a sampling of

6   the cases, your Honor.  And if you wanted more elaboration, I

7   would have to go through all our resumes and actually

8   pinpoint them.  But we --

9          THE COURT:  The four have never worked together as

10  a group before, is that right, as lead counsel?

11         MR. SEDRAN:  That's correct, your Honor.

12         THE COURT:  But at least two of the four have

13  worked together in different combinations in different cases

14  as lead counsel?

15         MR. SEDRAN:  Yes, three of the four.  Is that

16  right?

17         MR. RUBIN:  Yes, it is.  I just might add.

18         THE COURT:  Yes, Mr. Rubin.

19         MR. RUBIN:  Actually, I've had Ms. Maxman on the

20  other side of me in the class action.

21         THE COURT:  How did that work out?

22         MR. RUBIN:  We settled the case.

23         THE COURT:  Who got the better part of the deal.

24         MS. MAXMAN:  I did.

25         MR. SEDRAN:  Your Honor, so the collective wisdom,

```
1    whether you want to accept it or not, of the various

2    plaintiffs, except for those few objectors, was that this

3    group of four, proposed members of four would adequately

4    represent the class.  The lawyers for the various plaintiffs

5    felt comfortable in this alignment, and that's why I suggest

6    it's a group that would work.  It's within the mainstream of

7    other cases where pretrial orders have been entered where the

8    leadership is greater than one or two.  We think it would

9    work.

10               THE COURT:  Are liaison counsel needed in addition

11   to an Executive Committee?  Could those functions of liaison

12   counsel be eliminated and just have the Executive Committee?

13               MR. SEDRAN:  Well, I think we need a law firm that

14   has a dominant New Jersey practice.  So my suggestion is that

15   I think there is a need for liaison counsel, it's called for

16   in the Manual, and our feeling is that liaison counsel would

17   be appropriate.  And we'd have to make sure that, with

18   respect to the Court's concern about redundancy, that there

19   is no redundancy.  But in this situation, I think that

20   liaison counsel would be appropriate and that is our

21   proposal.  If the Court had particular concerns about any

22   role of liaison counsel, we would be willing to discuss it,

23   but I think it would be appropriate.

24               THE COURT:  See, the reason I ask that is if I

25   approve this structure, there will be six attorneys on the
```

United   States   District   Court   -   Camden,   New   Jersey

13

1  plaintiffs side of the V and some number of attorneys,

2  probably a comparable number.  And that means in order to

3  manage the case, say I have telephone conference calls, which

4  is how I like to do it on the record and save some time and

5  some travel, I'm going to have 12 people on that call plus

6  myself.  If there was no liaison counsel and there was an

7  Executive Committee of, let's say, two, it really starts to

8  streamline things.  What's lost if we were to, if I were to

9  cut it down to such a number?

10        MR. SEDRAN:  Well, in terms of conference calls,

11  it's been my experience that in terms of delegating

12  responsibilities, depending on what issue is up before your

13  Honor, that there's no need for every call for the

14  plaintiffs' group to have six members or six people on the

15  call, that we would self-elect within the course of the

16  litigation who is appropriate or who is assigned the specific

17  task.  So, for example, if we're arguing a discovery issue

18  and I've done the work on that -- and listening to your Honor

19  right now, I would suggest that we don't need everyone on the

20  line.  We don't necessarily need to have everyone on the

21  line.  If it's something of critical importance to the

22  litigation and we need the collective wisdom of all, we would

23  like to be able to exercise our discretion, but we'd also

24  listen to the Court.

25        And your Honor indicated that you would be open to

14

1   suggestions.  You're the judge, we're always open to

2   suggestions from the Court.  And if you suggested to us for

3   this motion or why don't you guys try and narrow it down,

4   then we'll listen to your Honor and we'll try to do that.

5   I'm listening to what you're saying and we will do our best

6   to not have redundancies in the litigation.  And at any time

7   just tell us, you know, I don't think this is working, maybe

8   we need to reconfigure it.

9        But again, going back to this private ordering

10  concept, that the collective view of all the lawyers was, we

11  think this will work from a practical standpoint, your Honor,

12  if the case is successful and a fee application is made, the

13  other lawyers in the case that don't serve on a committee

14  want to make sure that the lawyers on the Executive Committee

15  were not engaged in redundancies, but they feel comfortable

16  we can get the job done.  And again, that is really -- one of

17  the primary concerns is, are the lawyers that are being

18  suggested to your Honor competent, qualified counsel to get

19  the job done?  And I would suggest that that should be a

20  primary concern.  And as reflected in the resumes submitted

21  to your Honor, I would suggest that the four members of the

22  Executive Committee have stellar credentials.  I hate to say

23  it, but we might have 90 years of experience amongst

24  ourselves, so we believe we can get the job done.

25              THE COURT:  Yes, I don't think anyone has taken

1   issue with the credentials of the six attorneys whose names

2   have been put forth, the two liaison and the four Executive

3   Committee.  I think the objectors, though, also have

4   wonderful credentials, also have participated in many such

5   cases, also have achieved great results.  The Manual For

6   Complex Litigation III does counsel against the endorsement

7   of private ordering unless it's scrutinized in detail by the

8   judge.  One of the questions that's proposed for a judge to

9   ask, and I'll ask it now, is whether there are any private

10  agreements that haven't already been disclosed to the other

11  plaintiffs' counsel among the proposed members of the

12  Executive Committee about how things are to be done?  One of

13  the concerns that animates that question, of course, is that

14  someone will be shut out of the practical day-to-day

15  management of the litigation if they're not on the Executive

16  Committee.

17         So the first question is are there any such

18  agreements, and, if so, have they been disclosed?

19         MR. SEDRAN:  Your Honor, in the course of

20  discussions -- and if I could just take you to -- the answer

21  is that we have represented to the plaintiffs' group as a

22  whole that we will do our best to include all of the counsel

23  in the litigation as warranted, that we can't create

24  make-work, but if the litigation requires us to do certain

25  tasks, that we will reach out, within reason, your Honor, to

1   get those tasks done.

2       There was a lawyer representing the Cleveland Transit

3   Authority and he asked to be involved in discovery.  They had

4   stepped back, along with Mr. Heins, from their efforts to be

5   co-lead counsel.  So we did say to them, yes, of course, we

6   will try and get you involved in the case.  Mr. Saveri and I

7   had a conversation about what he might do in the litigation,

8   and I suggested to Mr. Saveri that perhaps a good way to

9   proceed, if he wanted to work in the collaborative,

10  cooperative manner with us was to work along on the task

11  concerning experts in class certification issues surrounding

12  experts.  Mr. Kaplan, who's in the courtroom, asked to be

13  involved in discovery work and wanted to, I believe, have

14  input on the assessment of damages and how that might evolve

15  into discussion on settlement.  So there have been

16  generalized discussions, your Honor.

17      Without revealing or breaching attorney/client

18  confidences, at the meeting we had at Mr. Montague's office,

19  there was a proposal to create specific work assignments, a

20  discovery committee, an expert committee, a briefing

21  committee, a class certification committee.  And the decision

22  made there was, is that we should not make those sort of

23  commitments because that sort of layering would ultimately

24  lead to the redundancies that the Court is concerned about.

25  So I believe that I fairly have expressed to the Court what

1    we've said to others in terms of enabling them to participate

2    in the litigation if the litigation warrants it.

3         Your Honor, the proposal made by the people in front

4    of you through me was the result of an open and candid

5    discussion about how the litigation should proceed.  I've

6    indicated to your Honor that I've been involved in this area

7    of law for quite a long time.  This was not a situation where

8    there were, in quotes, back room deals.  We had an open

9    discussion among counsel, an open and frank discussion, and,

10   quite frankly, I don't think that anyone knew what the result

11   of that meeting would be until the results were achieved

12   through those conversations.  This was unlike a lot of cases.

13   This really was done, in my humble opinion, the way it ought

14   to be done, professionals in a case get together and talk

15   through the issues recognizing that the Court needs a more

16   narrow group.  As reflected in our papers, all those in

17   attendance at the meeting were in agreement with the proposal

18   before the Court.

19        There have been papers filed by the objectors, and we

20   can hear from them, but it all laid out in the papers.

21        Your Honor --

22        THE COURT:  Now, if someone does agree at such a

23   meeting and they say, yes, this is the structure or, yes,

24   I'll step aside, should that work an estoppel against their

25   objecting later on?  And there's nothing in the rules that

```
 1    says, you know, these meetings should take place or there
 2    should be private agreements or that they're even favored.
 3    But, on the other hand, I think your papers have pointed out
 4    there's something less than fully seemly about someone
 5    agreeing and then when push comes to shove, there's motion
 6    practice objecting.
 7              MR. SEDRAN:  Well, as a lawyer, I like to believe
 8    an agreement is an agreement.  We can't sue for money
 9    damages, but in the context of formulating a group of
10    lawyers, I think that the Court should hold lawyers to their
11    word.  So in this context, I think that it's more than
12    estoppel, it's the word of counsel, and I think that counsel
13    should be held to his or her word.  And in the context of
14    putting together a group of lawyers to work cooperatively,
15    the group took into consideration the concerns of the lawyers
16    from San Francisco, from the Gold Bennett firm who are not
17    here today, and asked Mr. Lite if he was willing to serve
18    as -- Co-Liaison Counsel.  So this overall structure was
19    created based upon the representations of counsel,
20    accommodating all of the concerns.  So the short answer, your
21    Honor, is lawyers should be held to their word.
22              THE COURT:  On the merits, is there a reason that
23    the present structure of the Executive Committee, the
24    proposed structure is better without Gold Bennett than it
25    would be with it?  If we were to look at whether Gold
```

1   Bennett, notwithstanding Mr. Lite's, what he says is a

2   misunderstanding, were to be a candidate to be included today

3   as they are, are there reasons that this Executive Committee,

4   other than the fact of an agreement, should be kept in place?

5           MR. SEDRAN:  And are you suggesting, your Honor,

6   that there be a fifth member of the Executive Committee or a

7   replacement?

8           THE COURT:  Well, I have some qualms about four, so

9   I don't think I'm up to five yet.

10          MR. SEDRAN:  I didn't think you were.  I just

11  wanted to make sure that I understood.

12          THE COURT:  Yes, a replacement.

13          MR. SEDRAN:  The first answer, and I'll try not to

14  keep using this term, is private ordering, this was the

15  consensus of the overwhelming majority of the lawyers.  As we

16  said in our papers, your Honor, the Gold Bennett firm does

17  not have a veto right.  The Senate of the United States is

18  able to override a veto of the President.  Surely, the

19  overwhelming majority of the plaintiffs' lawyers should be

20  permitted to override the veto of a single law firm in

21  California.  Their clients -- their clients bring nothing

22  unique to the case.  The Gold Bennett firm also has a lot of

23  experience, but they bring nothing, I don't think they bring

24  anything specially to the table.

25          In addition, your Honor, and this is extremely

1    important and I almost overlooked it, in the context of the

2    meeting, there were other firms that sought to be lead

3    counsel, including Mr. Kaplan and Samuel Heins of Heins,

4    Mills and Olson.  It would be unfair to them to allow a firm

5    to leapfrog over them when that firm participated in the

6    consensual arrangement that was reached.

7        So in terms of equities, I don't think that should be

8    done.  I don't want to boast, your Honor, but the group of

9    lawyers, we have excellent credentials, and I just see no

10   reason to have any of us step down to allow Gold Bennett to

11   participate in the litigation.  I don't think that they add

12   anything.  I think we will do a better job together.

13       Are there any other questions?

14       THE COURT:  One of the concerns that I have, as a

15   judge, is the longer a case goes on, not only is more time

16   expended but also the hourly rates of the attorneys tend to

17   increase as time goes by, billing rates, in other words, seem

18   to be increased every year.  In the name of fostering economy

19   and perhaps a more prompt resolution and not dragging the

20   case on, one of my questions today is whether the Executive

21   Committee, if it's appointed and the liaison counsel, would

22   agree to freeze their hourly rates at the current rates

23   rather than stepping them up over time, subject, however, to

24   revision if there were to be good cause for doing so.  I'm

25   asking that question based on experience in a lot of complex

```
1    cases that I've had, and based also on the fact that hourly
2    rates are increased at the firm's behest and not at the
3    judge's, although ultimately the judge has to approve them.
4    And if all of a sudden someone doubled their fees, it
5    wouldn't fly.
6              MR. SEDRAN:  Just to show how we work well
7    together, while not appointed, the answer is yes, your Honor,
8    we will do that.
9              THE COURT:  All right.  Let me just add one thing
10   because if someone ever reads this record, they might think
11   this is a very cookie request that I'm making.  I'm not
12   saying there may never be a fee enhancement of the type
13   that's permitted under the attorney's fees cases for a swift
14   and excellent resolution of a case, but I'm only addressing
15   this subject of hourly rates under the lodestar and whether
16   there would be a voluntary agreement to freeze those unless
17   something unanticipated in the future.
18             MR. SEDRAN:  Everyone to my left says yes, your
19   Honor.
20             THE COURT:  Very well.
21             MR. SEDRAN:  So we would be willing to do that.  We
22   don't need to get into a detailed conversation, at the end of
23   the case, depending on the success, let me put it this way,
24   at the end of the case, assuming there's a verdict or
25   settlement, we would be applying to the Court for an award of
```

1    attorney's fees.  What we contemplate is --

2              THE COURT:  I'm not shocked by that.

3              MR. SEDRAN:  And I have a mortgage to pay, as we

4    all do, at the end of the case, your Honor, what I

5    contemplate is that we would be requesting the Court to award

6    a fee based upon a percentage of the recovery.  And again,

7    the Task Force and Third Circuit precedent supports that.  We

8    don't have to get into the nitty-gritty details of that, but

9    the lodestar amount of hourly rates may be a secondary issue.

10   But, yes, we will cap our hourly rates.

11             THE COURT:  Okay.  I have no other questions.  Is

12   there anything you need to add at this point?  You'll have a

13   chance to rejoin later.

14             MR. SEDRAN:  Let me ask my co-counsel.

15        Thank you, your Honor.

16             THE COURT:  Thank you.

17        Who wishes to argue next?  Mr. Lite?

18             MR. LITE:  Sure.  Thank you, your Honor.

19        For the record, Allyn Lite of the firm of Lite,

20   DePalma, Greenberg & Riva in Newark.

21        On behalf of what we have designated as the New Jersey

22   plaintiffs in objecting to the proposed Pretrial Order Number

23   1, your Honor, I note that my friend, Mr. Sedran, has noted

24   that no one from Gold Bennett is here today.  Just so that

25   the record is very clear, Mr. Sidener had every intention of

1    being here, to the point where he had a reservation at the

2    Gateway Hilton for last night.  He was supposed to be on a

3    plane yesterday morning.  I spoke to him yesterday afternoon,

4    he told me what time, what arrangements were made.

5              THE COURT:  What day?

6              MR. LITE:  This was Monday, your Honor.  This is

7    Wednesday.  He told me what time he was coming in Tuesday.  I

8    said, Steve, I don't recognize your voice.  He said I have a

9    bad cold.  I said, well, I'll see you.  I was supposed to

10   have dinner with him last night.  He called me at ten after

11   7:00 California time yesterday morning, he was on his way to

12   the airport, he pulled over to the side of road, he was very

13   sick.  I spoke to him later in the morning, he had gotten

14   back, he was running a high fever.  I called your Honor's

15   chambers and advised your law clerk, Claire, of Mr. Sidener's

16   circumstances, because there was an Order directing people

17   who made motions to be here today.  I was advised that your

18   Honor excused Mr. Sidener from being here today because of

19   illness.  And I just want the record to be very clear that

20   nothing untoward should be taken by the fact that Mr. Sidener

21   is not here today, other than the fact that he is, I think,

22   quite ill.

23             THE COURT:  That's correct.  I can confirm that.

24   My law clerk came to me with that request, and I said Mr.

25   Sidener could be excused on the grounds of illness.  If

# EXHIBIT C
# (2 OF 3)

1    anyone else from that firm wished to be here, they were, of

2    course, welcome to be.  And also, I think there may have been

3    another aspect to the request that I wasn't able to grant,

4    which is that Mr. Sidener participate by telephone today.

5    And the reason I denied that was in my experience, it doesn't

6    work for a whole group of attorneys to be sitting around

7    talking at a telephone, it just isn't a good dynamic.  But I

8    did, of course, invite anyone from either the California

9    office to come here or someone who's closer from that firm.

10              MR. LITE:  Your Honor, I understand that.  I

11   appreciate, on behalf of Mr. Sidener, your Honor's

12   indulgence.  I understand why he could not participate by

13   phone.  The other firm that has worked with Gold Bennett and

14   filed cases through my law firm in this litigation is the

15   Ross, Dickson & Bell firm out of San Diego.  I was not able

16   to get anyone else from Gold Bennett to, who obviously had

17   commitments yesterday and could not get here, but I was able

18   to contact Jason Hartley, who is here today, Mr. Hartley got

19   in at midnight last night from the San Diego office of Ross,

20   Dickson & Bell, and Mr. Hartley is co-counsel with Gold

21   Bennett on the Joliet complaint that has been filed in this

22   case.  And Mr. Hartley worked closely with the Gold Bennett

23   firm and with my firm in preparing the papers that went to

24   the Multi-District Panel as well, and Mr. Hartley actually

25   argued at the Multi-District Panel on behalf of the case

1   coming to New Jersey.

2        If at some point Mr. Hartley wishes to address the

3   Court, I'm hopeful that the Court will allow him to do so.

4           THE COURT:  Of course.

5           MR. LITE:  Your Honor, I think you've recognized

6   the most important thing, and that's that the entry of this

7   order is at the Court's discretion.  And that whatever

8   private ordering was reached and whatever understandings

9   there were, that there is no lead counsel in this case and

10  there is no Executive Committee in this case and there are no

11  liaison counsel in this case until your Honor enters an order

12  to that effect.

13       The Gold Bennett firm  -- before I talk about the Gold

14  Bennett firm for a moment, I want to go back to something

15  that Mr. Sedran said about working together in the private

16  ordering concept.  And one of the things that Mr. Sedran

17  mentioned was what was the collective will of all the

18  plaintiffs' counsel that attended this meeting and the result

19  being the lawyers felt comfortable with this alignment of

20  counsel.  Again, without trying to breach any confidences

21  that took place at this meeting, and, your Honor, I'm

22  cognizant of that problem, I'm concerned about that problem,

23  I don't even know if there are lawyers for the defendants in

24  this room, there are people in this room who did not attend

25  that meeting.

26

1          THE COURT:  There's at least one.  Mr. Moffa is

2    present.

3          MR. LITE:  Yes.  So I'm happy to respond to any

4    questions the Court may have.

5          But the idea about what was the collective will -- if

6    your Honor will indulge me just one second.

7          THE COURT:  Let's back up just one step.  It's been

8    said in several affidavits that the affiants believe that you

9    were there with the blessing of Gold Bennett and that when

10   the agreement emerged, that you were specifically asked

11   whether Gold Bennett would be on board.  And their

12   recollection was that Gold Bennett was covered by your

13   participation and that the agreement had its blessing.

14         Is that a fair impression for them to have gotten from

15   the way that your participation in the meeting unfolded?

16         MR. LITE:  Yes, your Honor, I think it is a fair

17   impression.  Because up until that time -- if I can go into

18   it just for a moment.

19         There was suggestions and it goes back to your Honor's

20   question about why do I need an Executive Committee of four.

21   My suggestion at the meeting was that there be two co-lead

22   counsel, and then let those co-lead counsel would assign out

23   in various areas much like, as Mr. Sedran mentioned, the

24   committee structure.  The two that I recommended were Ms.

25   Rodriguez and myself because we had filed, I think 11 or 10

United  States  District  Court  -  Camden,  New  Jersey

1    out of the 11 cases that were filed in New Jersey.  The case

2    was then transferred to New Jersey by the MDL Panel and

3    consolidated and coordinated here.

4           THE COURT:  I still don't know whether to be

5    thankful for that or not.

6           MR. LITE:  I think, your Honor, that it's a good

7    case and it's a challenging case and I think that you will

8    enjoy this case.

9           THE COURT:  I think so, too.

10          MR. LITE:  But my suggestion was that there be two,

11   and it was to avoid this kind of situation that we're having

12   here today.  Because what was most important for me and for

13   Gold Bennett and Ross Dickson, whom I represented at this

14   meeting, was that there be an ability to make sure that work

15   would be assigned equitably so that everybody could

16   participate at the level to which they had first come into

17   this case and what they had to offer to the case.

18          I made my suggestion.  That suggestion was talked

19   about, was not accepted.  And then there was discussions

20   about having four Executive Committee members.  And I've been

21   in this business a couple of years, your Honor, and an

22   Executive Committee, in my mind, and when you read the

23   manuals, is different than a lead counsel group, than lead

24   counsel.  The authority of an Executive Committee is

25   different than the authority of lead counsel if you go

United  States  District  Court  -  Camden,  New  Jersey

1    through what the manual says.  And it was decided there would

2    be an Executive Committee of four, and Ms. Rodriguez and I

3    were told that we would be the Co-Liaison Counsel.  But it

4    wasn't going to liaison counsel, your Honor, the normal sort

5    of liaison counsel of getting papers to the Court and

6    maintaining records and keeping lists but that there would be

7    a real role for the liaison counsel in this case, which I

8    interpreted, and maybe wrongly so, that I interpreted we

9    would have the ability to see to it that work was doled out

10   properly, which was my concern in the case.

11        There were discussions about how much work there would

12   be.  Mr. Sedran speaks here this morning and was candid with

13   your Honor and told your Honor very forthrightly that there

14   were discussions with the firms that had asked for lead

15   positions and then withdrew, Mr. Kaplan's firm and Mr. Heins'

16   firm, and that there were things that were offered to them,

17   if possible, if it was warranted, they would have work in the

18   case.  Mr. Karon, who was there at the meeting, was also

19   offered discovery work in the case.  I note when Mr. Saveri,

20   on behalf of the City and County of San Francisco, submitted

21   his papers, the reply to his papers contains a declaration

22   and affidavit of Mr. Sedran saying that we have contacted Mr.

23   Saveri and we have offered him substantive work in the case.

24        My understanding of this, and, your Honor, maybe I'm

25   naive, but my understanding was that the Co-Liaison Counsel

1   in this case, and I spoke with Ms. Rodriguez about this on

2   the way back to her office where I picked up a taxi, is that

3   we were going to have a real role to play in this case.  When

4   I advised Mr. Sidener about what had happened at this meeting

5   within, I think, three hours, there was an e-mail sent to Mr.

6   Asher from Mr. Sidener saying that Gold Bennett could not go

7   along with this.  So the proposed Executive Committee was on

8   clear notice within three hours, I think the e-mail says 7:01

9   P.M., it may have been four hours, that they did not agree

10  with this.  So all of the discussion in the movant's papers

11  that they relied on this, they knew right then and there that

12  Gold Bennett was not going to go along with this.

13          And the idea was --

14          THE COURT:  But what was that based on?  If at the

15  time you left the meeting you thought liaison counsel would

16  have a substantial role in channeling business, did anything

17  change over the next three hours?

18          MR. LITE:  Well, when he had the meeting afterwards

19  with just the group, the group of four and the group of two

20  in Mr. Montague's conference room, there were discussions

21  then that led me to believe that, in fact, we were not going

22  to be in a position, we being Ms. Rodriguez and I, to

23  delegate work to this group.

24          THE COURT:  I see.  So there were really two

25  meetings, a large one and then a small one.

1    MR. LITE:  There was a meeting, there was the grand

2    meeting with people there who were on many of the complaints.

3    And then afterwards, there was a meeting in the garden among

4    the group that, the group of four and the two Co-liaison,

5    proposed Co-liaison and Mr. Heins and Mr. Kaplan and Mr.

6    Karen and it was at that meeting in the garden that Mr. Heins

7    and Mr. Kaplan; Mr. Karon said they would withdraw and not

8    push to be on the Executive Committee as long as they were

9    given some assurances that they would have work in the case.

10       My concern, when I left, was that I no longer thought

11   that I was going to be able to be in a position in which I

12   was going to be able to make sure that Gold Bennett was

13   protected and that Gold Bennett got work.  If you look at Mr.

14   Kaplan's affidavit, Mr. Kaplan specifically says he spoke to

15   me and did I have Gold Bennett's proxy, something to that

16   effect.  And I said Gold Bennett is not as concerned as an

17   Executive position as long as they know they're going to have

18   work in the case.  Well, after Mr. Sidener sent his e-mail to

19   Mr. Asher, there were discussions over the next several days

20   between Mr. Sidener and Mr. Asher and between me and Mr.

21   Asher that had to do with some assurances that there was

22   going to be work.  The information that was given to me by

23   Mr. Sidener from his discussions with Mr. Asher and that he

24   gave to Mr. Hartley as well about his discussions with Mr.

25   Asher, is that he was told that Gold Bennett was not going to

1   get any work in the case.

2       I find that, in light of what has been said here this

3   morning, that if work is available, they will give it and

4   they will give it to Mr. Saveri to tell Gold Bennett who had

5   five complaints in this case, more than any other single

6   firm, and have five clients in this case that they are

7   representing that they would have nothing walking away from

8   this.  And it was on that basis, and then when I look at the

9   proposed Pretrial Order, it confirmed to me that the

10  Co-Liaison Counsel were certainly not going to be in a

11  position where we were able to delegate any work.  Hence, the

12  objection.

13      THE COURT:  Who told Gold Bennett that they

14  wouldn't receive any work?

15      MR. LITE:  It's my understanding it's Mr. Asher.

16      Your Honor, on the private ordering issue, just if you

17  will hear me for a moment on that, your Honor needs to

18  understand that at meetings like this, these organizational

19  meetings, that lawyers who file these complaints come to the

20  meetings and many times there are multiple law firms on the

21  same complaint, there are complaints that are filed that have

22  six law firms, another one has five law firms, all of these

23  people come to the meeting and they support the person whose

24  name is on that complaint.  So when you talk about private

25  ordering and this is the will of the group, the will of the

United  States  District  Court  -  Camden,  New  Jersey

1   group is somewhat skewed by that fact that there may be six

2   law firms on one complaint all voting for their one person on

3   that complaint thereby getting six votes.

4       If you look at the five complaints that the Gold

5   Bennett firm filed, all of them are Gold Bennett filing

6   through my office because they need New Jersey counsel except

7   for the Joliet Equipment case, which includes Gold Bennett,

8   the Ross Dickson firm, Mr. Hartley is here, and my firm, so

9   these are legitimate clients of this law firm or these law

10  firms and they're not weighted at the time for a vote on an

11  Executive Committee by having multiple law firms on the same

12  complaint to vote.

13      Your Honor, I want to go back to something that --

14          THE COURT:  Let's look at the interests that are

15  represented by the Gold Bennett plaintiffs.  Are those

16  interests different in some way from the interests that are

17  represented on the proposed Executive Committee, are they

18  much larger or do they bring something different to the

19  Executive Committee?

20          MR. LITE:  Let me put it this way, your Honor,

21  they're direct purchasers, but I think among them they've

22  bought hundreds of thousands of dollars of these products,

23  but they're certainly smaller than a transit authority.  They

24  are private.  They're not public.  They're not governmental.

25  They're private.

1      Out of all of the private cases that were filed, I

2    think there were 15 private cases and eight governmental

3    cases filed.  Out of the 15 private cases, Gold Bennett

4    represents five of those, and more than any other single law

5    firm they represented -- they have more cases than any other

6    single law firm.

7        And, you know, I note in the papers that were filed by

8    the moving parties, some question raised about, well, why

9    would they have to file all of those cases just to sort of

10   aggregate a position?  It's sort of an odd question

11   considering people on the proposed Executive Committee filed

12   multiple cases for multiple transit authorities when each of

13   those transit authorities, any one of them could have

14   represented the interests of all.

15       One reason that cases are filed is that the client

16   comes to you and asks you to file the case and you file the

17   case.  One of the criteria the MDL Panel looks for, your

18   Honor, when deciding where a case will go, is where are most

19   of the cases filed.  That was one of the things they looked

20   at in making the decision that the cases would come here.

21       So I guess the answer to your Honor's question do they

22   represent anyone different, Mr. Sedran and Mr. Asher each

23   state that they represent a private party, the Gold Bennett

24   firm represents five private parties.  I think that's my

25   answer to that question, your Honor.

1          THE COURT:  Okay.

2          MR. LITE:  To answer your question, your Honor,

3     that you posed to Mr. Sedran, and he queried the people, as

4     he said, on his left, no one has ever accused me of being on

5     the right, but I was sitting on the right, but certainly on

6     behalf of Gold Bennett and Ross Dickson, the answer to your

7     question about capping fees, capping hourly rates or freezing

8     hourly rates as to what they are today is certainly

9     acceptable to us.

10          Your Honor asked Mr. Sedran whether or not the people

11     on my left have ever, I don't know if they're all really on

12     my left but they're sitting on my left, had worked together

13     in the past, and he enumerated many times that they have.

14     The Gold Bennett firm, your Honor should know, has also

15     worked with these individuals and as co-lead counsel with a

16     number of them in both the Sulfuric Acid and the

17     Polystapolene (ph) Antitrust litigations.  I've worked with

18     the Gold Bennett firm in the Laminates Antitrust litigation,

19     which certainly I know Mr. Heins is involved even though he's

20     not a proposed lead today, a proposed Executive Committee

21     here today.

22          Your Honor, I think recognized when you said that Gold

23     Bennett has also done a lot of this work and quality work,

24     it's in their resume that's attached.  I think that your

25     Honor needs to exercise this Court's discretion and make a

United  States  District  Court  -  Camden,  New  Jersey

1    determination now as to what this organization is going to be

2    before the proposed Executive Committee and proposed

3    Co-Liaison Counsel act in such a way that, they can't act

4    because they haven't been appointed yet and I have some

5    concerns about that, and I think until your Honor enters an

6    Order and makes some determination as to how this is going to

7    be organized, that everybody ought to take a step back.

8            THE COURT:  Certainly it's my intention to resolve

9    this today, or else within a couple of days, because the next

10   event in the case comes up pretty quickly.

11           MR. LITE:  That's on the 24th of July.

12           THE COURT:  Right.  And before then, I'll need the

13   positions from both sides about how the case should be

14   managed in the near future.

15           MR. LITE:  Your Honor, I don't know if you have any

16   more questions for me, but if Mr. Hartley wants to add

17   anything, I don't know.

18           THE COURT:  Okay.  Mr. Hartley.

19       And thank you, Mr. Lite.

20           MR. LITE:  Thank you, your Honor.  And thank you

21   for your indulgence again about Mr. Sidener.

22           THE COURT:  You're welcome.

23           MR. HARTLEY:  Good morning, your Honor.  Jason

24   Hartley from Ross, Dixon & Bell.

25       Mr. Lite has emphasized a lot of the points that I

1    want to make sure your Honor was aware of too.

2         One that I would like to make, give a little more

3    emphasis to, is to the fact that there were five plaintiffs

4    who approached our group and asked us to represent them in

5    this litigation.  In fact, no other firm, beyond the Gold

6    Bennett firm, has more of an objective legitimate claim to be

7    lead.

8         I understand from our co-counsel, counsel on the left,

9    that Mr. Heins and Mr. Kaplan stepped back from a leadership

10   position, and they shouldn't be punished for stepping back.

11   But the fact of the matter is Mr. Heins only represented two

12   plaintiffs in the case and Mr. Kaplan only one if my

13   calculation is correct.

14        THE COURT:  Are you saying that five plaintiffs

15   approached Ross Dixon, which is your firm?

16        MR. HARTLEY:  Ross Dixon or Gold Bennett.

17        THE COURT:  Well, you're not from Gold Bennett.

18        MR. HARTLEY:  I understand.

19        THE COURT:  But you said  --

20        MR. HARTLEY:  I said our group.

21        THE COURT:  My firm, I thought?

22        MR. HARTLEY:  No, I said five plaintiffs approached

23   our group, one approached me and four approached Gold

24   Bennett, and Gold Bennett filed on behalf of all the five.

25        THE COURT:  You're right.  You said five plaintiffs

37

1    approached our group.

2          MR. HARTLEY:  And what that means is that there are

3    five plaintiffs who want to have a role in this litigation.

4    And when you come to the stages like discovery, for example,

5    these plaintiffs are going to have a substantial role and

6    there's going to be a lot of, you know, work, a lot of

7    possibly depositions, document productions from five

8    plaintiffs who won't even have any representation on the

9    Executive Committee if Gold Bennett is not given a spot.

10         THE COURT:  Do you know if any discovery from the

11    defendants will be sought on the West Coast?  If you uncloud

12    the crystal ball, and I know it's very early in the case, but

13    won't this case pretty much be centered on the East Coast in

14    terms of discovery from defendants?

15         MR. HARTLEY:  I don't know.  It's likely that there

16    would be document depositories established and then the

17    different plaintiffs would submit their documents and that

18    would be all collected in one spot.  But there's going to be

19    a certain amount of discovery taking place wherever each of

20    these named plaintiffs are located.  And then, my experience,

21    we work pretty well with defense counsel to arrange

22    depositions that are convenient for the different plaintiffs

23    and the defendants, so it's possible that some depositions

24    could take place where the plaintiffs are located and that

25    may not be the East Coast.

1          THE COURT:  Well, I would think in the ordinary

2    course you would be defending your own client if your client

3    was being deposed.

4          MR. HARTLEY:  Yes.

5          THE COURT:  I would think that under any ordering

6    that the Executive Committee were to do, if one of the five

7    plaintiffs represented by your group were being deposed or

8    discovery is being sought, then that's squarely your work.  I

9    can't think that that would be seated over to someone else to

10   defend your client or produce your client's documents.

11         MR. HARTLEY: The point I was trying to make, was

12   not that we wouldn't do that work, but that these plaintiffs

13   would want to have a role in strategizing and the direction

14   this case takes, and that's why they all approached our firms

15   and hoped that we would make that happen for them.

16         Mr. Lite suggested that -- well, told you that at the

17   meeting, he suggested a two-way co-lead.  I was on the

18   telephone call with Mr. Sidener and Mr. Lite before that

19   meeting, and Gold Bennett and my firm both agreed that that

20   would be an agreeable structure for us.  To have Ms.

21   Rodriguez and Mr. Lite as the co-leads seemed to us to be the

22   most, the most tolerable arrangement given the number of

23   different firms who had claims to some kind of leadership

24   role in this case because they represented so many different

25   groups of plaintiffs and so many different plaintiffs, named

1   plaintiffs in the case.

2           THE COURT:  Well, that would be another way of

3   structuring this, wouldn't it?

4           MR. HARTLEY:  That's something we would support and

5   the Gold Bennett firm would support as well.

6           THE COURT:  And let Mr. Lite and Ms. Rodriguez

7   propose an Executive Committee.

8           MR. HARTLEY:  I have every confidence --

9           THE COURT:  But I don't want to invent another

10  battle though.

11          MR. HARTLEY: I have every confidence that Mr. Lite

12  and Ms. Rodriguez can fairly distribute the work and appoint

13  that Executive Committee, and we would be prepared to defer

14  to their decision if that were the case.

15          I just wanted also to support Mr. Lite's assertion

16  that of what Mr. Sidener represented to me, he did represent

17  to me that, during discussions with counsel on my left here,

18  that he was told that Gold Bennett would not be getting any

19  work in the case.

20          THE COURT:  All right.

21          MR. HARTLEY:  Unless your Honor has any other

22  questions.

23          THE COURT:  I have a logistical question.  If Mr.

24  Sidener were to become a member of the Executive Committee,

25  does that work well logistically if the litigation is

1    centered here and it takes all day to go here from his

2    office?  The Executive Committee and liaison counsel have,

3    all have something in common, which is, I think, their

4    offices are all within probably 150 miles of this courthouse.

5            MR. HARTLEY:  Well, I can tell you that Mr. Sidener

6    is lead counsel and has a significant position, and I am

7    involved in many other litigations, and the vast majority of

8    them end up coming to the East Coast anyway.  It's never been

9    a problem for us to come out here and make ourselves

10   available and participate in litigation here.  I was able to

11   arrange a flight to get here at the last minute to

12   participate today.

13           There should be some deference given also to

14   plaintiffs' choice of counsel.  These five plaintiffs chose

15   to hire West Coast counsel and they shouldn't be ignored or

16   punished for that decision.

17           THE COURT:  Where are the five plaintiffs located

18   again?  Can you remind me?

19           MR. HARTLEY:  Allen, do you know?  California

20   Electric Company is in California.

21           MR. LITE:  Koffler and Shultz are also in

22   California.  I believe Hayes & Lunsford is either California

23   or North Carolina, I think.

24           MR. HARTLEY:  So there's a substantial California

25   interest in these or presence from these named plaintiffs.

1   Nevertheless, those plaintiffs supported and argued for

2   transfer to this venue and decided to file their cases in New

3   Jersey.

4          THE COURT:  Can you foresee any conflict between

5   the position of your client and the position of the Executive

6   Committee based on its present proposed structure?

7          MR. HARTLEY:  Any conflict?

8          THE COURT:  In terms of goals or your positioning

9   within the litigation or the type of harm that has befallen

10  your clients compared with their clients.

11         MR. HARTLEY:  Well, it's sort of early to tell.  We

12  mentioned in our papers there may be a difference in the

13  purchasing practices of some of the city and state transit

14  agencies as we represented private entities.  I understand

15  there are only one or two private entities reflected on the

16  current proposed structure.  And I'm not aware of what, how

17  large those companies are, what kind of deals they were able

18  to make, or whether they were able to get discounts, or

19  whether that skews the market definition or anything in this

20  case.  There's a possibility, but there's no way for me to

21  know at this early stage, your Honor.

22         THE COURT:  Does anyone present have a handle on

23  what the overall, how the individual purchases stack up of

24  one plaintiff against another or whether the transit

25  authorities are typically larger in their claimed losses than

United  States  District  Court  -  Camden,  New  Jersey

1    individual private companies or vice versa, is there any way

2    of knowing?

3              MR. RUBIN:  Your Honor, Warren Rubin, I represent

4    Amtrak, which is the national 500 pound gorilla in this

5    litigation.  We've purchased millions of dollars worth of

6    this.

7              And we're a private entity, we're not a public entity.

8    Congress has said we are a private entity.  So I think what

9    Mr. Lite has said is wrong as far as his facts are concerned,

10   his spokesman right there now.

11             In terms of purchases, I don't think it makes a hill

12   of beans of difference whether it's private or public in

13   terms of the class definition.  I think the people standing

14   at this table on the left, so to speak, can represent the

15   interests of the people in California.  I don't think it's a

16   bit of difference, it's a product that sold, and we purchased

17   it directly and that's the definition of the class.  And I

18   would respectfully suggest that there is no conflict.

19             THE COURT:  Thank you, Mr. Rubin.

20        Mr. Hartley, anything further?

21             MR. HARTLEY:  I think I've stated it all.  I don't

22   want to repeat myself.

23             THE COURT:  Thank you.  And I appreciate you flying

24   here on short notice.

25             MR. HARTLEY:  You're welcome.

United  States  District  Court  -  Camden,  New  Jersey

43

1          MR. SAVERI:  Unfortunately, good afternoon, your

2    Honor.  Hopefully, last but not least.

3          I'm Joseph Saveri from the Lieff Cabraser law firm.  I

4    don't want to belabor any of the points that have been made,

5    and I would be happy to answer any specific questions that

6    you wanted to address regarding my client and my involvement

7    in the litigation.

8          THE COURT:  Well do you agree there was notice of

9    the May 1 meeting to your firm?

10          MR. SAVERI:  I understood there was a meeting that

11    was being held.  And when I found out about it, the City and

12    County of San Francisco, is my client, I thought I should

13    participate in the meeting.  I asked that the meeting be

14    rescheduled to accommodate the fact that I was in a mediation

15    all that day, and I was essentially told, no, sorry, the

16    meetings  going to happen.  So the meeting was hardly

17    formally noticed.  Just like any other meeting that I hear

18    about in the context of my business, when it's inconvenient

19    or I have a conflict, I try to move it.  I was told sorry.

20    So I didn't participate in the meeting.

21          THE COURT:  Well, could you have sent someone else

22    to the meeting?

23          MR. SAVERI:  We do have a big office and there are

24    certainly other attorneys, I mean particularly, we have a New

25    York office and we could have sent someone down, but

United  States  District  Court  -  Camden,  New  Jersey

1   honestly, your Honor, I thought it would be appropriate

2   because it's my relationship with the client and it's the

3   case that the client came to me to file that I should have an

4   opportunity to participate in the meeting and that simply

5   didn't happen.

6           THE COURT:  If you had participated in the meeting,

7   what is unique about your client's role?  Aren't they just

8   examples of two more transit authorities publicly funded,

9   already well-represented?

10          MR. SAVERI:  Well, a couple things, your Honor.  I

11  think, first of all, we happen to be one of the larger

12  transit authorities and may, in fact, represent more

13  purchases than some of the clients whose attorneys are put up

14  to be lead counsel.  But I think --

15          THE COURT:  Well it would be hard to, hard to

16  conclude that San Francisco's transit agency, excluding BART,

17  is somehow larger than New York's MTA and Chicago's transit

18  and SEPTA in Philadelphia, which has a budget of like 500

19  million dollars a year.

20          MR. SAVERI:  It's a fair point, your Honor.  We're

21  certainly not standing here saying we are the biggest and

22  largest purchaser.

23          THE COURT:  Your papers kind of read that way, that

24  special deference should be given to San Francisco because

25  it's so huge.

45

1          MR. SAVERI:  I would say compared to many of the

2     plaintiffs, we certainly believe that.  But I also think,

3     your Honor, the more significant point is, I think, the one

4     that the hearing started out on, which is the Manual For

5     Complex Litigation recognizes that the Court should look at

6     these kinds of consensus voted on proposals with a fair

7     amount of scrutiny.

8          And the certain that, I think, underlies the MCL is

9     evidenced here where there's been a series of discussions

10    about who's going to do what work in the case, about

11    retribution for not going along with the program, a whole

12    series of discussions, which seem to me to indicate that

13    there have been certainly discussions, if not agreements or

14    agreements to agree about who will do what in this case.  And

15    particularly given the fact that I don't think we were, the

16    City and County of San Francisco was fairly accommodated in

17    those discussions, I have real concern going forward about

18    the extent to which the City and County of San Francisco can

19    and will participate in the litigation.  And that's the real

20    concern here.

21          I agree with Mr. Rubin that there aren't formal

22    conflicts that distinguish the members of the class.  This

23    class should be certified, there are common interests here.

24    But the point is the City and County of San Francisco is

25    entitled to have a voice and participate fairly in the

1　litigation.  And I -- and I have a real concern about that,

2　particularly given what I've heard today for the first time

3　as far as who said what to whom.

4　　　　THE COURT:  Well, if an Executive Committee is

5　appointed, then I would think everyone would agree that

6　committee owes duties to every plaintiff to fairly represent

7　their interests.  And if there comes a point where the

8　Executive Committee isn't doing its job, then I would have to

9　be told that and have a hearing and make changes.

10　　　　MR. SAVERI:  Well, absolutely, your Honor.  But I

11　think there's a much more effective way of dealing with the

12　potential problem by putting a process and structure in place

13　to prevent that from happening.  I think it's a lot harder

14　and a lot more difficult and a lot more unpleasant for people

15　to come back in as disaffected participants in the litigation

16　and say essentially to the Court, look, I haven't been

17　treated fairly.  It's much more effective to put a process or

18　procedure and structure in place that does as the MCL

19　recommends, permit and ensure the participation of all of the

20　constituent groups here.  And I think that the discussion

21　that we've had here indicates there's been a series of

22　discussions about who's going to do what work, who's going to

23　be denied that, and that gives me real pause.

24　　　　So there's nothing in this Order, there's nothing in

25　this Order that protects or gives me or any other entity that

1    may not go along with the program or be satisfied to come

2    back and to have that protection.  And so there's a real --

3    we have a real concern.

4         You know, the other thing, I guess, I would point out

5    is that there is nothing magic about the number of people at

6    the top of the case.  I believe that the Ford Ignition case,

7    in which my firm represented plaintiffs, had a slightly

8    different structure than what was proposed.  And I don't want

9    to speak out of school, but I think that worked fine.  And I

10   think the work of my firm in that case speaks for itself.

11   The weight of --

12             THE COURT:  I should add, since you brought it up,

13   I think Ms. Cabraser, when she appeared, gave one of the most

14   effective presentations that I heard, although in the end it

15   didn't carry the day, but about how the class could be

16   certified, how the trial could go forward in front of one

17   jury with the proper set of interrogatories and so forth, and

18   she drew from her experience from the case in Louisiana, I

19   think.

20             MR. SAVERI:  Unfortunately, I've spent some part of

21   my career coming second to Elizabeth Cabraser before courts

22   and I've heard the same sort of things.  Hopefully, I'll be

23   more successful in convincing the Court of the merits of the

24   position today.

25             THE COURT:  You proposed something that would

1    exclude a lot more plaintiffs by the rationale you're using,

2    that there be one lead counsel and one liaison counsel and

3    everyone can say, gee, we don't have really a role in

4    formulating strategy.

5           MR. SAVERI:  Well, your Honor, I think that there

6    should be, having heard this and had an opportunity to look

7    at the subsequent papers that have been filed, and I didn't

8    want to continue to burden the Court, that all the groups

9    should be represented.  I'm not -- my firm is probably the

10   biggest firm of all, with the exception of the counsel for

11   BART, we probably have the resources to do this case

12   ourselves.  We have offices all over the country.  We have

13   that ability.  But I also think that, given what I've heard

14   today, that the different groups should be represented.

15   There's a group here, Mr. Lite has stood up, and I think ably

16   advocated for the people that he represents, and there's the

17   City and County of San Francisco, there should be a way of

18   allowing all of the groups to be able to participate and not

19   to run the risk of their being excluded or punished for a

20   position that may have taken in the case.  And I think that's

21   the real solution.

22          I think, in fact, there could be a broader group which

23   would include some subset of the people that have put

24   forward, plus the addition of someone from Mr. Lite's camp

25   and someone on behalf of the City and County of San

1   Francisco.  The way to address your problem, the Court's

2   sensitivity to redundant work, are specific things in the

3   Pretrial Order that would say in advance that the Court isn't

4   going to pay for redundant work, we've had those in a number

5   of cases.

6           THE COURT:  I hope I don't get billed for any of

7   them.

8           MR. SAVERI:  Excuse me, I misspoke.

9           THE COURT:  I knew what you meant.

10          MR. SAVERI:  Or, for example, in the Microsoft case

11  we handled in front of Judge Motz in Baltimore, there's

12  essentially a rule that only two representatives from the

13  plaintiffs' side would participate in conference calls.

14  There are certainly ways of eliminating the potential for

15  piling on and doing repetitive work.  The real issue, and I

16  think --

17          THE COURT:  Sure.  And, in fact, I would call on

18  the Executive Committee itself to take the first cut at

19  making those kinds of proposals, how many should attend

20  depositions, for instance, how many should participate in

21  conferences with the Court.

22          MR. SAVERI:  I agree, your Honor.  There are

23  structural things that can be put in place.  The operation of

24  the committee and the operation of the Pretrial Order that

25  protect against the kind of evils of duplication of effort

1     and the inefficiency that that entails.  I think the issue

2     before the Court is the issue that the MCL recognizes in

3     providing guidance about looking at Pretrial Orders, which is

4     to make sure that the various constituencies have an

5     opportunity to have their voice heard in the context of the

6     organization, structure, the prosecution of the litigation.

7               THE COURT:  Well, in terms of constituencies, I

8     think we have to tease out the constituency, which is the

9     client, which is the two San Francisco authorities that you

10    represent, San Francisco plus  --

11              MR. SAVERI:  Yeah, just to be clear, the City and

12    County of San Francisco is the top and the transit authority

13    is really part of that.

14              THE COURT:  Okay.

15              MR. SAVERI:  But, your Honor, it's certainly not

16    BART.  And just so we're clear about that, BART is a wholly

17    separate entity.  There's no overlap.  I don't think the BART

18    people would say that they include the City and County of San

19    Francisco, and we certainly wouldn't say we represent BART.

20              THE COURT:  But where there are so many transit

21    authorities in the case and governmental type units, I'm

22    failing to see that the Executive Committee that's proposed

23    doesn't have the interests of every single transit authority

24    and governmental unit in mind.  I don't see the fear.  I

25    don't share the fear that your client or any other client

United  States  District  Court  -  Camden,  New  Jersey

1    that isn't physically on that committee would be left out.

2        But if we put that aside and say, well, how should

3    work be divided among law firms, especially well-experienced

4    law firms in prosecuting this sort of a case, then that's a

5    different thing.  I'm very tempted to say that I would like

6    to enable the proposed Executive Committee to confer and see

7    whether the concerns that you've addressed and that Mr. Lite

8    has addressed on behalf of Gold Bennett could somehow be

9    satisfied without necessarily changing the proposed

10   structure, but reasonably assuring that the work be divided

11   in a non-redundant and effective way.  And I don't think that

12   I should have to enlarge the Executive Committee in order to

13   assure that the clients that you've represented are

14   represented properly.

15        MR. SAVERI:  Well, we're searching for the

16   assurances.  Now, we've been told there have been no

17   agreements, there's nothing in the formal structure that

18   provides us with the assurances that we've requested.  So,

19   from my perspective, it's important that we do have the

20   assurances.  My position would be that the best way to do

21   that would be to make sure structurally that there's a seat

22   on the Executive Committee, or whatever the governing body

23   is, for want of a better word, and I agree with Mr. Lite the

24   terminology is a little bit loose here, I'm not sure these

25   are lead counsel or members of the Executive Committee, but I

1  think the surest way to do that is by inclusion in a

2  membership.  I don't know if it's broadening it.  I think

3  that is doable and probably can cause the least amount of

4  having to unwind this S.  But I guess I would also support

5  your Honor's recommendation that if there's a way to come up

6  with an alternative proposal, I'm certainly willing to listen

7  to it.  And I am here, and I didn't miss this meeting, and I

8  wanted to make sure my client's position was voiced.

9        So unless there's something more specific, a more

10  specific question or an additional question that the Court

11  would like me to address, I'm prepared to sit down.

12        THE COURT:  Okay.  Just a moment.

13        You've made the suggestion that no decision be made

14  until all the tagalong cases are here as an alternative.  Are

15  there very many tagalong cases that are still out there or is

16  this about it?

17        MR. SAVERI:  As far as I know, I don't know of any

18  other.  Maybe we were the last person, last ones to get here,

19  but other than the cases that I think were in the caption of

20  the latest Order that I received from the Court, I don't

21  believe that there are any other tagalong cases that have,

22  any tagalong cases that are coming or additional cases that

23  might be treated as tagalong cases pursuant to the Panel

24  rules.  So if your question is whether all your cases are

25  here now, I think the answer is yes.  But I don't want to

United  States  District  Court  -  Camden,  New  Jersey

53

1     vouch for the foolproofness of the system.

2            THE COURT:  Okay.  Well, one of the cases attached

3     to your brief at Exhibit 1 from the MDL Panel, wasn't this

4     case, of course, it was the Nifedipine Antitrust litigation.

5     Was there another Order entered the same day that you're

6     referring to.

7            MR. SAVERI:  I think it was entered the same day.

8            MR. SEDRAN:  It was.  They attached the wrong

9     Order, but the transfer Order was entered, it was either the

10    14th or 15th.

11           MR. SAVERI:  So it was a screw up on my part, your

12    Honor.

13           THE COURT:  Your client, Mr. Clements, filed an

14    affidavit --

15           MR. SAVERI:  Yes.

16           THE COURT:   -- and pointed out that there is

17    something unique about this City and County of San Francisco,

18    namely, that it's taken the lead in this sort of affirmative

19    litigation in a way that most municipalities don't.

20           MR. SAVERI:  Yes.

21           THE COURT:  Can you give me some more information

22    about that?

23           MR. SAVERI:  Well, the City and County of San

24    Francisco, for example, was one of the only municipal

25    organizations that filed cases against the tobacco industry.

United  States  District  Court  -  Camden,  New  Jersey

54

```
 1    The City and County of San Francisco has also filed a number
 2    of cases involving consumer type claims, title insurance
 3    abuse.  There have also been civil rights claims filed by the
 4    City and County of San Francisco.  The attorneys at the City
 5    and County of San Francisco, there's a group that's charged
 6    with doing complex litigation, and Dennis J. Herrera, the
 7    City Attorney is extremely interested and active in, and I
 8    would say among, maybe the most active of all the City
 9    Attorneys or similarly situated public officials in the
10    country, on enforcing on behalf of the City and on behalf of
11    the people of the City and County of San Francisco the laws
12    in the State of California and the laws of this country.  And
13    I think that is significant.
14                THE COURT:  Thank you very much.
15                MR. ASHER:  Your Honor --
16                MR. SEDRAN:  Hang on.
17          Your Honor --
18                THE COURT:  Mr. Sedran first, and then Mr. Asher.
19                MR. SEDRAN:   -- there's a lot of ground I would
20    like to cover, and also includes comments from Mr. Asher and
21    maybe some of the other plaintiffs' counsel.  So just give me
22    a minute, Steve, and your turn will come.
23          With respect to Mr. Lite's presentation, let me first
24    say that in response to his argument that some complaints
25    were loaded up with lawyers, whether or not a complaint had
```

United  States  District  Court  -  Camden,  New  Jersey

1    one, two, or three law firms on it or more, and I don't know

2    what the count is, is besides the point.  In our papers, we

3    pointed out to your Honor that 21 plaintiffs, I'm not

4    counting lawyers, 21 plaintiffs out of the 27 plaintiffs that

5    have filed cases support Pretrial Order Number 1 as proposed

6    by my group of lawyers.  And it's very important from our

7    perspective, your Honor, that you not be lured into the

8    temptation of looking at three groups and just splitting the

9    baby.

10          To change the configuration as proposed to you, your

11   Honor, would provide a disincentive for counsel to meet,

12   compromise, and form a consensus, and reward counsel that

13   refuse to participate in the process, that is what is being

14   suggested.  So just to reconfigure the proposed organization,

15   it would be extremely unfair to Mr. Kaplan for these firms to

16   just be able to leapfrog over him.  So I encourage your Honor

17   not to buy into that proposal, it is inequitable and sends

18   the wrong message about how professionals should try and

19   structure themselves.

20          THE COURT:  But didn't Mr. Kaplan receive, in

21   exchange for withdrawing from the competition, an

22   understanding that perhaps discovery work and input on

23   assessment of damages might come to him?  That's what you

24   said.

25          MR. SEDRAN:  That was actually not the sequence.

1   The sequence was he agreed to withdraw and then, in all

2   candor, said, you know, I would like participation in the

3   case.  So he voluntarily -- there were no promises made to

4   him to do that.

5        In the proposed Pretrial Order Number 1, your Honor,

6   on Page 10, Paragraph Sub G, there's a provision that

7   empowers the Executive Committee to make all work assignments

8   to plaintiffs' counsel to facilitate the orderly and

9   efficient prosecution of this litigation and to avoid

10  duplicative or unproductive effort.  Listening to the

11  conversation, I would suggest that perhaps we amend that

12  paragraph to read to make all work assignments to plaintiffs'

13  counsel on an equitable basis to facilitate the orderly and

14  efficient prosecution of the litigation.  I think it's

15  implicit, your Honor, but in order to maybe fine-tune the

16  point, maybe that's the solution.

17       But I want to remind you, your Honor, that the goal of

18  appointing lead counsel or an Executive Committee is to make

19  sure that the class is adequately represented.  And nothing I

20  heard today indicated to me, and hopefully your Honor, that

21  there are any unique plaintiffs to my right that would

22  require their counsel to substitute for any of us.  There is

23  adequate representation.  Mr. Lite, who I know for a number

24  of years, and I respect Allyn, talk about doling out work,

25  those were his terms, and that is an issue separate from

57

1   whether the class is to be adequately represented.  I am

2   representing to you, your Honor, that the Executive

3   Committee, if you appoint this group of four, will act in a

4   professional manner and will equitably assign work where

5   appropriate, but we just can't dole out work.

6        With respect to the Gold Bennett clients, your Honor,

7   first of all, this is a class action, it's just not practical

8   for every client in a class action proceeding as if to have

9   their own individual counsel representing them.  It just

10   happens it's a requirement that there needs to be a smaller

11   group of counsel.  Obviously, to the extent that the Gold

12   Bennett clients have to appear for depositions and produce

13   documents, their counsel will be representing them.  I'm

14   hoping that when the consolidated amended complaint is filed,

15   that we won't have 27 representative plaintiffs.  What's the

16   point of that?  I think it leads to inefficiency.  I would

17   encourage all plaintiffs' counsel to agree that we ought to

18   have a smaller group of representative plaintiffs, but that's

19   for another day.

20        I'm going to ask Mr. Asher to address your Honor

21   because my understanding is that there were no claims of

22   retribution, but I was not a party to the conversation

23   between Mr. Asher and the Gold Bennett firm.

24        THE COURT:  Okay.  Thank you.

25        I had that question too, Mr. Asher.

1          MR. ASHER:    If it please the Court, my name is

2    Steven Asher from the Fox Rothschild firm.

3          Your Honor, a lawyer who would come before this

4    distinguished Court and seek a leadership position in a major

5    class action should come before the Court with both integrity

6    and with competence.  And it would seem that the thrust of

7    the Gold Bennett argument is, the reason that we are seeking

8    a lead position is, at this point is because we were told by

9    Mr. Asher that we were not going to be getting any work in

10   this case.  And simply, as a matter of competence, if an

11   attorney were to make that argument, he would make the

12   argument the way we made our arguments.

13         We produced affidavits and declarations from people

14   with knowledge and let them put down in paper what they said

15   and what they heard.  And it would seem that if Mr. Sidener

16   were to be making that allegation in this Court, then in

17   these papers, which he's submitted, the opposition of the New

18   Jersey plaintiffs, one would have expected an affidavit or a

19   declaration where Mr. Sidener said I spoke to Mr. Asher and

20   this is what Mr. Asher said to me, he said the Gold Bennett

21   firm is not going to get any work in this case.  But he did

22   not submit such an affidavit, which bespeaks a certain

23   competence issue, but it also raises an integrity issue,

24   because that conversation did not happen.

25         I never told Mr. Sidener, I never told Mr. Lite, I

1  never told anyone from that firm or representing those

2  interests that they wouldn't get work in the firm.  And I

3  know that I didn't in the same way that if you asked someone

4  do you recall what you had for breakfast on July 15th, 2000,

5  they may not recall what they had for breakfast, but if you

6  ask someone --

7            THE COURT:  Unless they're a patent attorney.

8            MR. ASHER:  That's correct.  But did you have

9  breakfast in Tokyo on July 15th, 2000, then they can say I

10  can certainly say no because I've never been in Tokyo in my

11  life.  So I can say without a second's hesitation that I

12  never said that.  And that's the case here.

13            Your Honor, in my biography, I've had the privilege of

14  being appointed lead counsel on at least 12 major cases, and

15  I would like to think that one of the reasons is because I've

16  been able to get substantial results for the classes.  But

17  another is because the attorneys that worked with me on those

18  cases know that in terms of managing those cases, they get

19  managed in a fair and equitable way.  There are no private

20  deals.  There are no antagonisms.  All the work that is

21  distributed is distributed fairly and for the benefit of the

22  class.  And that's the way it has been done throughout my

23  career and that's the way, if the Court sees fit to appoint

24  me and the other group to leadership positions in this case,

25  it will get done.  It's the way I've always done business.

# EXHIBIT C
# (3 OF 3)

1  It's the way everyone else here on the proposed group has

2  done business.  In their long career, everyone had

3  distinguished careers in which they've got excellent results

4  for classes or for their clients.

5       I did speak to Mr. Lite, I did speak to Mr. Sidener

6  after the meeting when Mr. Sidener raised the issue, and Mr.

7  Sidener said all I want is to become another lead counsel or

8  Executive Committee member and I said we can't do that.  But

9  what I say to Mr. Sidener, and what I would say to everyone,

10 is that the distribution of work will be done in a fair and

11 equitable manner.  And certainly, there's every reason to

12 believe that the Gold Bennett firm would share in the work

13 the same way every other firm would.  And I would like to

14 think that puts that issue to rest.

15      Thank you, your Honor.

16      THE COURT:  So do you support the amendment to the

17 Order that would insert on an equitable basis for the

18 reassignment of work?

19      MR. ASHER:  Absolutely, your Honor.

20      THE COURT:  How does that get enforced?  You've

21 been lead counsel 12 times.  If someone comes to you and they

22 say I don't feel I'm being treated fairly as an attorney, how

23 do you generally deal with that?

24      MR. ASHER:  I'll tell you how it gets enforced,

25 your Honor, and I'm glad you asked that question, and that

61

1    goes to the meeting which was had in which this group was put

2    together.

3         That group, it was a large meeting of a lot of

4    attorneys, all of them collectively had hundreds of years of

5    experience in cases, and they all have long memories.  And

6    the way it gets enforced, your Honor, if there are situations

7    in which any of us in the past had shut people out of the

8    cases, had been unfair in any way with the allocation of work

9    or responsibilities or duties, someone would have stood up

10   and said I don't think that Mr. Sedran or Mr. Rubin or Ms.

11   Maxman or Mr. Asher should have a lead role in this case

12   because I remember them from the last case and they gave work

13   only to their friends and they didn't give any work to me.

14        But that didn't happen.  Everyone who was in that

15   room, representing the many parts of the Antitrust Bar, knew

16   us and knew our records.  And the principal reason why we

17   deal in a fair way, first, we have obligations to the class,

18   and we take those obligations very seriously, but also

19   because we have careers, and in our careers we want to make

20   sure that not only do we get big recoveries for the class,

21   but that among our colleagues, we're perceived as acting in a

22   fair and equitable manner.  That's the principal way it gets

23   enforced.  Certainly someone can come before your Honor and

24   say I'm not being treated fairly, no one is giving me work.

25   But it will never get to that.  Because I know in a year from

1   now, two years from now there will be another meeting like

2   that, and I would expect that if I'm put forward or one of

3   these people is put forward to be a lead counsel in a case,

4   that no one will come forward and say I don't think it should

5   be him because I've worked with him and he's not fair in

6   terms of the management of the case. And that's why

7   certainly I, and I believe all of the other people who have

8   been proposed, are scrupulously fair in the management of the

9   case and the allocation of work.

10          THE COURT: So it's the round world theory of

11   enforcement. It's a round world, you treat someone well now

12   and they won't be heard to complain in the future.

13          MR. ASHER: It sure is, your Honor. And that's why

14   the way this proposal came together is very useful and why

15   having -- and my concern is that if the opponents are sort of

16   inserted into the leadership, going forward will be much more

17   difficult to get attorneys to agree voluntarily to put

18   together a leadership group. Everyone will say I'm better

19   off sitting out the meeting and coming in from left field

20   when all is said and done coming into court and say my group

21   of people with hazel eyes or something, you know, we should

22   be represented as well. And that's what's going on here,

23   your Honor.

24          THE COURT: Do you agree that in this case, what's

25   being proposed as the Executive Committee is functionally

United States District Court - Camden, New Jersey

1  co-lead counsel?

2            MR. ASHER:  I would say yes with one exception.  If

3  we took seriously coming out of that meeting the suggestion

4  of Mr. Lite and Ms. Rodriguez that the liaison counsel be

5  actively involved in the case, and that is why whereas in

6  many other Pretrial Orders of this type it simply says that

7  the role of liaison counsel is to distribute notices and to

8  be a channel for communications with the Court, we

9  specifically inserted a provision saying that they will

10  assist the Executive Committee in the discharge of their

11  duties.  And to the extent that we have had some discussions

12  or deliberations among the group now, certainly Ms. Rodriguez

13  would say that she is actively involved and certainly Mr.

14  Lite would, if he were to, you know, agree to participate in

15  the leadership as well.

16            THE COURT:  Well, Mr. Lite's client's opposition

17  has no objection to the liaison counsel provisions, I think

18  that's said in their papers.  But Mr. Lite today has said

19  that the actual duties that are ascribed to liaison counsel

20  are not what he thought was coming his way when he came out

21  of that meeting.  But you pointed out the very first

22  sentence, it says, plaintiffs' Co-liaison Counsel shall

23  assist the members of plaintiffs' Executive Committee

24  performing their duties.

25            MR. ASHER:  That's correct.

United  States  District  Court  -  Camden,  New  Jersey

1          THE COURT:  Then it goes on to say, in addition,

2     they'll do the normal paperwork and forwarding and taking

3     over the clerical duties.

4          MR. ASHER:  Yes.

5          THE COURT:  So assisting the Executive Committee is

6     something other than merely forwarding papers and

7     communicating with the Court, it's more meaningful stuff.

8          MR. ASHER:  Yes.

9          THE COURT:  Mr. Lite, does that satisfy your

10     concern about liaison counsel?

11          MR. LITE:  Your Honor, I'm not so sure that I

12     understand what shall assist means.  I can tell you what the

13     earlier draft of this said.  The earlier draft said shall be

14     available to assist, which I said "be available to" should be

15     removed because that doesn't mean anything at all.  That

16     means if you have a telephone, you're available to assist

17     somebody.  It was changed to shall assist, but I don't know

18     what that means.  Does that mean under B (g), does that mean

19     that Co-Liaison Counsel shall assist in making work

20     assignment to plaintiffs' counsel?  I don't know that that's

21     what that means.  I don't believe that that's what that

22     means, your Honor.

23          THE COURT:  I don't know why that duty would be any

24     different from any other Executive Committee duty.  And so if

25     liaison counsel are to assist the Executive Committee in

1    their performance of assigning duties, it also means

2    assisting in performance of assigning of work on an equitable

3    basis.  In other words, liaison counsel would have an

4    opportunity to assist, to propose what ought to be done, to

5    squawk if you think it's inequitable, because, otherwise, the

6    first sentence of Capital D wouldn't mean much.

7          I mean, so much of this depends upon the good faith

8    and the trust that's reposed in the attorneys who are making

9    certain representations to the Court today.  And I really

10   don't have a reason to disregard the serious representations

11   that are being made about behaving professionally and

12   assigning work on a decent basis.  And, you know, beyond

13   that, I guess I would suggest proposing a reformulation of a

14   committee if the structure doesn't work, although none of us

15   would look forward to visiting this again.  It must be very

16   difficult for counsel, especially everyone who is seated in

17   the front of the room is so well-qualified to do these

18   duties.

19          Is there anything more specific you would have me put

20   in the Order about liaison counsel.  Or shall we give this a

21   try?

22          MR. LITE:  Your Honor, I would like to see it be

23   explicit that it would have to do, that we will assist in

24   making work assignments.

25          THE COURT:  Well, and also they would be equally

1   committed to efficient prosecution of the litigation and

2   avoid duplicative and unproductive effort.  That's Paragraph

3   (g).

4          MR. LITE:  I was referring to the full text of

5   Paragraph (g) as amended, as suggested to be amended to

6   insert the words "on an equitable basis in order to

7   facilitate."

8          THE COURT:  I'm inclined to agree that should be

9   amended in Paragraph (g).

10         MR. SEDRAN:  Your Honor --

11         THE COURT:  Yes?

12         MR. SEDRAN:  With all due respect to Mr. Lite, it's

13   clear that the provision we put in Paragraph D, the first

14   sentence contemplates assisting the Executive Committee in

15   performing all of the duties enumerated, so he just wants a

16   belt and suspenders provision.  But our reading of it, and we

17   drafted it, is that it includes all of the responsibilities.

18         THE COURT:  Maybe I could just insert the word all,

19   all their duties.  I don't want to single out assignment of

20   work because that should be what drives my decision in

21   choosing liaison counsel and lead counsel.  But I think if

22   the first sentence of Capital D is amended to read,

23   Plaintiffs' Co-liaison Counsel shall assist the members of

24   the Executive Committee in performing all their duties, that

25   that adjusts that in a suitable way.

```
 1              MR. SAVERI:  Your Honor?

 2              THE COURT:  Yes.

 3              MR. SAVERI:  Excuse me.  As I'm reading through the

 4   Order, if I could just make two suggestions, it may help

 5   satisfy the concerns I voiced today.

 6              THE COURT:  Yes.

 7              MR. SAVERI:  The first is there is a provision we

 8   have traditionally included in an Order of this type, and I

 9   would suggest should be used and can be adopted from the

10   Manual which says that counsel for plaintiffs who disagree

11   with lead counsel, that's the way this Order is structured,

12   or those acting on behalf of lead counsel or who have

13   individual or divergent positions, may present written and

14   oral arguments, conduct examinations of deponents, and

15   otherwise accept lead on behalf of their clients as proposed,

16   provided that in doing so, they do not repeat arguments or

17   actions of lead counsel.  I think that would go a long way,

18   at least it makes it explicit in the context of this Order

19   that there is a safety valve.

20              MR. SEDRAN:  Excuse me, Joe, what page are you

21   reading from?

22              MR. SAVERI:  I'm looking at -- my volume is the

23   Manual For Complex Litigation Third, it's at Page 445 of my

24   volume.  It's 41.31 in the proposed Order section, which is

25   at the back, Responsibilities of Designated Counsel.
```

1          THE COURT:  I see it at the bottom of the page.

2    Take a minute to look at it.

3          MR. SEDRAN:  We're okay with that, your Honor.

4          THE COURT:  Has that been done in other cases?

5          MR. ASHER:  Your Honor, I've never seen that.  And

6    my only concern is that it would weaken the plaintiffs

7    vis-a-vis defendants.  When we leave here today, the

8    principal focus is going to be on having a strong plaintiffs'

9    leadership to do battle against Sullivan & Cromwell and all

10   the major firms that the defendants are going to be throwing

11   at us, and to have other people at depositions asking

12   different questions or putting in different briefs.  Frankly,

13   the cases I've been involved with, whether as the lead or not

14   the lead, I've never seen that provision, certainly not in

15   any Antitrust case, it may have been in other cases.  I've

16   never seen it any Antitrust action.

17         MR. SAVERI:  Your Honor, all I'll say is I have no

18   particular interest in filing duplicative or redundant papers

19   or needlessly piling onto certain tasks.  But I think if I

20   did, it would be a waste of my time.  If I understand the

21   other provision of the Order, I wouldn't get paid for it.  I

22   think it's important to have this kind of procedural safety

23   valve explicitly in the Order.  I don't think there's

24   anything unusual about it.  Indeed, it's in the informed book

25   that the Manual For Complex Litigation has prepared.

United  States  District  Court  -  Camden,  New  Jersey

1          THE COURT:  I'm reluctant.  I haven't used it in

2    other cases.  But if we inserted a phrase with prior leave of

3    Court may present written arguments and so on, maybe that

4    would help.

5          MR. SAVERI:  Absolutely, your Honor.  And I

6    wouldn't presume and show up and try to steal or to come out

7    front without leave of the Court in making sure that it was

8    something that the Judge found appropriate in the context.

9          THE COURT:  So, for instance, if a deposition is

10   being taken and the steering committee is on top of the

11   situation and they ask the question but somebody thinks they

12   ought to have taken a different tack, I don't think at that

13   point individual, counsel can stand up because there hasn't

14   been prior leave of Court.  Otherwise, no one would know

15   who's really in charge of the litigation when you show up to

16   take a deposition or show up for argument.

17         MR. SAVERI:  And I would say, in the context of

18   depositions, I don't perceive this being a real problem.

19   I've done a lot of cases with these gentlemen and it's not

20   been an issue.  I'm more concerned there is an explicit

21   opportunity if something goes array and there is a real need

22   to bring something before the Court to address some of the

23   concerns, that we have the opportunity to do that.  I don't

24   see anything wrong with that and it's certainly not something

25   that's going to be abused.

1          THE COURT:  The proponents have agreed to it.

2      Do you also agree with my suggestion that the words

3  with prior leave of Court be inserted?

4          MR. SEDRAN:  Your Honor, having the opportunity

5  just to reflect upon it a little bit, your suggestion is an

6  excellent one.  But I would propose that we do not include

7  the language conduct examination of deponents.

8          MR. SAVERI:  That's absolutely fine, your Honor.  I

9  don't have any problem with that.

10          MR. MOFFA:  Your Honor, I have to because I am one

11  of the defendants' representatives, in all fairness, none of

12  the defendants have had an opportunity to review this

13  proposed language.  It does impact upon case management as

14  opposed to plaintiffs' management of their own workload.  In

15  a sense that if we're going to have a case management

16  conference where these issues are probably going to be

17  discussed at length as to who is going to get what

18  questioning done and who is responsible for submitting

19  discovery and things of that nature, I would just request

20  that if your Honor enters an Order that says any plaintiffs'

21  counsel can ask questions at depositions, that that's not

22  what was proposed.  And defense counsel has not seen that

23  proposed Pretrial Order Number 1, at least in the confines of

24  case management as opposed to plaintiffs' counsel management.

25          THE COURT:  It's really governance how to handle a

United  States  District  Court  -  Camden,  New  Jersey

1  situation if plaintiff doesn't agree with the tack taken by

2  other plaintiffs' lead counsel, that there be prior leave of

3  Court, gives everybody notice, including the defendants, that

4  there's going to be a second plaintiff involved besides lead

5  plaintiff on a particular issue or particular deposition.

6          MR. MOFFA:  All I'm suggesting, your Honor, is that

7  hasn't been circulated and hasn't been commented upon.  It

8  probably will be commented upon in connection with case

9  management and actual procedures taken in discovery.

10         THE COURT:  It's not the defendants who are being

11  asked to set up the liaison counsel structure.  It's my

12  understanding it's only going to be a handful of defendants

13  that are going to be involved.

14         MR. MOFFA:  That's right.

15         THE COURT:  They can be free to propose any

16  structure that they would like, I would welcome that.  But I

17  don't anticipate that that's going to happen.

18         MR. MOFFA:  Structure is not the issue.  Hearings

19  and depositions, and things of that nature, who is going to

20  get the right to speak and how many people are going to ask

21  the questions.

22         THE COURT:  But if there's one lead counsel for

23  plaintiffs at a deposition and five different attorneys for

24  defendants at a deposition, I would think, just as a matter

25  of fairness, the defendants would have a tough time objecting

1    to a second person from plaintiffs' side asking a question

2    because you're going to have five opportunities on the

3    defense side.

4              MR. MOFFA:  You may be right.  I'm saying that's

5    not been circulated.

6              THE COURT:  I am going to include it in the Order.

7    It can be revisited at the next conference or any future

8    conference.  I've expressed my reluctance.  I think if we

9    take out conduct examinations of deponents, which has been

10   suggested --

11             MR. SAVERI:  Your Honor, I have one --

12             THE COURT:    -- and insert with prior leave of

13   Court, that I'll include the last paragraph on 445.

14        Mr. Saveri.

15             MR. SAVERI:  I just have one more point.  There's a

16   provision in the Pretrial Order about the collection

17   and of time and expenses.  I think given the concerns that

18   have been raised, and I think the affirmations that have been

19   made, that it would be useful if those time reports were

20   circulated among the plaintiffs' counsel so we're apprised of

21   how things are going.

22             MR. SEDRAN:  Your Honor, I don't think that is

23   necessary at this time.  This is a standard procedure.  At

24   most, some courts request the record to be filed under seal

25   with the Court.  We would suggest that Mr. Saveri ought to

United   States   District   Court   -   Camden,   New   Jersey

1    stop.  We've given him many accommodations and that what

2    we've proposed is pretty standard, your Honor.  And we're

3    obligated to maintain open channels of communication with

4    everybody.  We've gotten our representations to the Court how

5    we intend to deal with everybody.  And I would suggest that

6    circulating time records among all the plaintiffs' counsel

7    actually will lead to redundance in the case because you're

8    going to have all the plaintiffs' counsel then reviewing the

9    time records.

10            MR. SAVERI:  Excuse me, let me just be clear.  I

11    would just like to know on some kind of regular basis what

12    the lodestar is.  I think it's a fair point.

13            MS. RODRIGUEZ:  Your Honor, we've undertaken to

14    collect the time and expenses in this case, and they're

15    certainly not under seal, they will be available to

16    plaintiffs' counsel if they have any questions.  But I agree

17    to circulate them on any regular basis is redundant and make

18    work, if you would.  But we will be collecting information,

19    we will make sure time is reported on a periodic basis,

20    whatever is determined to be appropriate, and that

21    information will be available to the extent anybody wants it.

22            MR. SAVERI:  With that, that's perfectly fine, your

23    Honor.

24            THE COURT:  All right.  So with that understanding,

25    there doesn't have to be any change in Paragraph Capital E on

United  States  District  Court  -  Camden,  New  Jersey

```
1    Page 11.
2              MR. SEDRAN:  Your Honor, with the changes that have
3    been ordered by the Court, we can make those changes in the
4    proposed Order and resubmit an Order to your Honor.
5              THE COURT:  That won't be necessary.  I can scan
6    this Order and get it entered.
7              MR. SEDRAN:  I might be able to assist you, though.
8    Our proposed Order did not have the right Master Docket
9    Number.
10             THE COURT:  That's right.
11             MR. SEDRAN:  So I took the liberty of redrafting
12   the Order, everything remains the same except the Master
13   Docket Number.  And the only thing is we may have added one
14   of Ms. Maxman's filings that I'm not sure whether it was on
15   the first Pretrial Order proposed that we submitted to you.
16   So I can hand this up to you and you would have a better form
17   to work from if you would like that.
18             THE COURT:  You know what, if you have that and if
19   you're able then to make the other corrections, then I'll ask
20   you to do so and to submit the corrected Order over to me,
21   that way we won't have to bother at this end.  But I would
22   like to get it entered as quickly as possible.
23             MR. SEDRAN:  Yes, it would be our pleasure to do
24   that.
25             THE COURT:  Thanks.  And then do you need me to go
```

United  States  District  Court  -  Camden,  New  Jersey

75

1    over these changes again?  Should I do so for the record?

2       MR. SEDRAN:  I think I have them.  In Paragraph G

3    on Page 10 we are going to insert, after plaintiffs' counsel,

4    on an equitable basis.  On Page 10, Paragraph D, second line,

5    it will now read in performing all their duties.  We have to

6    decide where we're going to add the language from Page 445.

7    We could put it right after Subparagraph K.

8       MR. SAVERI:  I agree that's where it goes.

9       THE COURT:  That's where it goes.

10      MR. SEDRAN:  And we'll delete conduct examinations

11   of proponents from that paragraph.  And we'll add with prior

12   leave of Court, and I think that language should go just

13   before may submit written and oral argument.

14      THE COURT:  That's right.

15      MR. SEDRAN:  We will be happy to do that.

16      THE COURT:  Okay.  And change the caption so it

17   reflects the short caption.

18      MR. SEDRAN:  Yes, your Honor.

19      THE COURT:  Wait.  Maybe we can't do that.  No,

20   keep the caption as it is because this is the Order that

21   consolidates.  And then the captions from now on will be as

22   reflected in Paragraph Roman Numeral II.

23      MR. SEDRAN:  I agree with that, your Honor, because

24   it does consolidate all the specifics cases.

25      THE COURT:  Okay.  Let me make certain findings

1    then, because there is a motion before me.  And the oral

2    argument has been excellent.  And I'd rather not belabor the

3    matter by composing and filing a written Opinion, but you're

4    certainly entitled to my thoughts.  And I'll reserve the

5    right to amplify upon this reasoning in the event that a

6    transcript is ordered.  And I'll keep this brief because I

7    understand I'm the only person standing between you and a

8    late lunch.

9         The matter is before the Court upon the motion of

10   certain plaintiffs for the approval of Pretrial Order Number

11   1.

12        The proposed Pretrial Order Number 1 is

13   self-explanatory.  The provisions that we focused on this

14   morning, and which are disputed by two objectors, namely, the

15   New Jersey plaintiffs and the County and City of San

16   Francisco, have to do with the appointment of Co-Liaison

17   Counsel and the appointment of a plaintiffs' Executive

18   Committee.

19        The proposed Order provides for an Executive Committee

20   consisting of Steven A. Asher of the firm of Fox Rothschild;

21   Melissa H. Maxman of the firm of Duane Morris; Warren Rubin

22   of the firm of Bernard M. Gross; and Howard J. Sedran of the

23   law firm of Levin, Fishbein, Sedran & Berman.  It also

24   proposes the appointment of liaison counsel, namely, Allyn Z.

25   Lite of the firm of Lite, DePalma, Greenberg & Rivas; and

1    Lisa J. Rodriguez of the law firm of Trujillo, Rodriguez &

2    Richards.  Those moving plaintiffs represent a total of 21

3    out of the 27 plaintiffs in this case, and they include

4    PATCO, SEPTA, Metro-North Commuter Railroad Company, The Long

5    Island Railroad Company, The New York City Transit Authority,

6    The San Francisco Bay Area Rapid Transit System, Chicago

7    Transit Authority, Niagra Frontier Transportation Authority,

8    New Orleans Transit Authority, Greater Cleveland Region

9    Transit Authority, National Railroad Passenger Corporation,

10   otherwise known as Amtrak, and others.

11        The New Jersey plaintiffs which oppose the present

12   Executive Committee include five plaintiffs represented by

13   Mr. Lite's firm and also by the firm of Gold, Bennett, Cera &

14   Sidener, namely, Koffler Electric Mechanical Apparatus

15   Repair, Shultz Electrical Company, Joliet Equipment

16   Corporation, Hayes & Lunsford Electrical Motor Repair, and

17   California Electric Company.

18        The objectors propose a four-member Executive

19   Committee consisting of Steven Sidener of the Gold Bennett,

20   Steven Asher of Fox Rothschild, and then a choice of two of

21   the other three proposed members between Ms. Maxman, Mr.

22   Rubin, and Mr. Sedran.

23        The San Francisco plaintiffs oppose the Executive

24   Committee structure and the liaison structure, and they

25   proposed that only one lead counsel be appointed, namely, the

78

1   firm of Lieff, Cabraser, Heimann & Berstein, and that liaison

2   counsel be appointed, namely, the firm of Shepherd,

3   Finkelman, Miller & Shah, and, finally, that there be no

4   Executive Committee.

5       I won't repeat all of the arguments and

6   counter-arguments that have been made here today.  My role

7   with regard to the appointment of counsel is to assure that

8   the plaintiffs' organization is effective, fair, and adequate

9   to represent the interest of all plaintiffs in this case.

10   And certainly the Manual For Complex Litigation speaks to the

11   Court's responsibilities in Section 20.224.

12       I've been presented with a proposal that has the wide

13   majority support within this case of the present plaintiffs.

14   There was a meeting, the details of the meeting were spelled

15   out.  I find that there was due notice to all potential

16   participants, including Lieff Cabraser and Gold Bennett.  It

17   appears that Gold Bennett was represented by Mr. Lite at that

18   meeting, and it also appears that Lieff Cabraser did not

19   participate in the meeting due to a conflict in schedule of

20   Mr. Saveri, nor did that firm send a substitute to the

21   meeting nor did it choose to participate by telephone.

22       The structure that's proposed appears to be faithful

23   to the agreement that was reached at that meeting.  It's

24   important to note that several otherwise competent,

25   experienced qualified firms withdrew from the quest for the

1    leadership structure or agreed not to oppose the membership

2    consensus, for the sake of achieving a consensual approach.

3    But it's also fair to note that there are, appear to be

4    understandings that work will be equitably shared among

5    attorneys if this Executive Committee is appointed.

6         Now, the Manual For Complex Litigation appropriately

7    warns judges against rubber stamping attorney decisions on

8    lead and liaison counsel.  And it's recognized a bargaining

9    among the attorneys may not result in the best choice for the

10   parties or for the Court.  And so I have evaluated the

11   resumes and the prior experience in the field, and I've

12   certainly given weight to the choices that have been made

13   among the plaintiffs themselves.

14        I find that the attorneys who are proposed for the

15   liaison counsel roles and Executive Committee roles are

16   highly qualified to fulfill these functions.  I also find,

17   for that matter, that the objectors come from firms that have

18   been found to be highly qualified in plenty of other similar

19   cases.  And, indeed, people who haven't objected but who

20   withdrew also come from firms that are well-known in this

21   field.  The fact is with 27 plaintiffs, and perhaps more to

22   come, not everybody can have a seat on the Executive

23   Committee without making the Executive Committee a

24   meaningless group.  I believe that today's argument has given

25   the Court a much better understanding of the dynamics that

1    led to the formation of this proposal, and also that certain

2    modifications that have been agreed to here make this a fair

3    proposal and make this the structure that the Court is going

4    to adopt.  Among those changes are the explicit understanding

5    that work assignments will be made by the Executive Committee

6    on an equitable basis, that Co-Liaison Counsel shall assist

7    the members of the Executive Committee in performing all of

8    their duties, and that there are already discussions about

9    how the work can most equitably be shared, avoid redundancy,

10   yet recognize that by the spreading of work, to include the

11   objectors, that it recognizes the roles of their respective

12   clients across the spectrum of plaintiffs.

13        I've considered the objections carefully.  It does not

14   appear to me that anyone, and certainly not Mr. Asher, has

15   foreclosed the Gold Bennett from receiving work.  I do accept

16   Mr. Asher's representations to that effect today.

17        It also appears to me that there's nothing unique

18   about the San Francisco City and County that would cause me

19   to consider either adding their attorney to the Executive

20   Committee or scrapping the Executive Committee structure to

21   permit Leiff Cabraser to be the lead firm.  Leiff Cabraser

22   obviously is well-recognized and would be, I'm confident,

23   able to do that work in this case in any capacity that would

24   be assigned to them.  But they represent one client

25   essentially.  Its lead counsel, Mr. Saveri, would be at quite

81

a distance from the Court geographically, and I don't see
that Leiff Cabraser would bring to the Executive Committee a
level of expertise that it otherwise lacks or an insight into
the particular case that somehow is not already found on the
Executive Committee.  Indeed, transportation authorities
larger than San Francisco's are already among the plaintiffs
whose counsel are on the proposed Executive Committee.

Although the proponents and objectors have not
supplied the Court with specific factual information about
the size of claims asserted by the 27 individual plaintiffs,
it would appear that the proposed Executive Committee is
drawn from the larger plaintiffs in these cases.  The size of
the stakes represented by lead counsel is a factor tending to
assure zealous representation.  I have considered enlarging
the Executive Committee to include five or six, and I'm not
going to do so.  I think that the clients of the objectors
can be well-served by the modifications that have been made.

Mr. Lite certainly, along with Ms. Rodriguez, will
play a prominent role as Co-Liaison Counsel.  There also is a
safety hatch inserted so that if it turns out that any
plaintiff believes that their position is not being
well-served by the appointed Executive Committee, that they
could, with prior leave of Court, have leave to voice their
own positions, all as set forth in the amendment to Pretrial
Order No. 1 discussed today.

United States District Court - Camden, New Jersey

82

1    I also want to make clear that I have looked at this
2    de novo.  I share the Manual For Complex Litigation's
3    cautionary note that where there is an agreement that's
4    presented, that it not be given undue prominence, that the
5    Court look behind it, that the Court examine who are these
6    attorneys, what interest do they represent, what track record
7    do they have, who has been excluded, and why they've been
8    excluded.  And I would not foreclose and have not foreclosed
9    the raising of an objection today even if someone was a
10   participant in the meeting.  Therefore, I've looked at the
11   objections that Mr. Lite has brought forward and considered
12   those concerns seriously.  I just don't find that they're of
13   sufficient weight that the structure would be improved by my
14   changing it from what's been proposed.  I also do not find
15   that the majority has treated the Gold Bennett firm unfairly.
16        And so for all of these reasons, and without
17   disparaging for a moment the concerns that have been raised,
18   but rather noting, I believe, that each of those concerns
19   have been accommodated in a suitable way, I'll approve the
20   proposed structure as soon as the revised Pretrial Order
21   Number 1 comes to me.  I'll sign it.  I'll send it to our new
22   Co-Liaison Counsel so you can perform your first official
23   duties of distributing it.
24        Are there any questions about these findings?
25        All right.  Is there anything else that's needs to be

United States District Court - Camden, New Jersey

83

1    done today?

2           MR. SEDRAN:  No, your Honor.  I expect to get the

3    revised Order to you in today.

4           THE COURT:  That would be great.

5        All right.  If there's no other business, then let's

6    adjourn.  I look forward to seeing everybody in about four

7    weeks' time.

8           (Proceedings Concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

84

1

2

3

4

5

6

7                         C E R T I F I C A T E

8

9

10

11          I, LISA MARCUS, Official Court Reporter for the
United States District Court for the District of New Jersey,
12  Certified Shorthand Reporter and Notary Public of the State
of New Jersey, do hereby certify that the foregoing is a true
13  and accurate transcription of my original stenographic notes
to the best of my ability of the matter hereinbefore set
14  forth.

15

16                         _____
                                LISA MARCUS
17                         Official U. S. Reporter
                         N. J. Certificate No. XIO1492

18

DATE: July 21, 2003
19

20

21

22

23

24

25

          United  States  District  Court  -  Camden,  New  Jersey

## **CERTIFICATE OF SERVICE**

I hereby certify that the Plaintiffs' Consolidated Opposition to Motions Of 1) City of Oakland, Count of Alameda, California for Appointment of Lieff Cabraser as Interim Lead or Co Lead Counsel and 2) Haywood County, Tennessee for Appointment of Pomerantz Haudek as Interim Lead Counsel and the accompanying Declaration of Megan E. Jones was served July 18, 2008 by the court's electronic case filing system.

Katrina H. Barbour

## AMENDED CERTIFICATE OF SERVICE

I hereby certify that Exhibit E of the Plaintiffs' Consolidated Opposition to Motions Of 1) City of Oakland, Count of Alameda, California for Appointment of Lieff Cabraser as Interim Lead or Co Lead Counsel and 2) Haywood County, Tennessee for Appointment of Pomerantz Haudek as Interim Lead Counsel and the accompanying Declaration of Megan E. Jones was served July 21, 2008 by the court's electronic case filing system.

Katrina H. Barbour